No. 22-50834

# United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

*v.*

JOSE GOMEZ QUIROZ,

*Defendant–Appellee.*

Appeal from the United States District Court
for the Western District of Texas
No. 4:22-CR-104-DC

## APPELLANT'S BRIEF FOR THE UNITED STATES

JAIME ESPARZA
United States Attorney

CHARLES E. FOWLER, JR.
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
Phone: (512) 370-1265
Fax: (512) 916-5854

## RECOMMENDATION ON ORAL ARGUMENT

The government requests oral argument. This case calls on the Court to apply the Second Amendment framework set out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* addressed a total ban on carrying handguns in public, subject only to a discretionary licensing regime requiring the applicant to show a special need for protection. The district court ruled that *Bruen* facially invalidates 18 U.S.C. § 922(n), a narrow, status-based provision preventing indicted defendants from amassing guns while subject to a felony prosecution. That judicial invalidation of a law passed by Congress and signed by the President constitutes a decision of great importance, and oral argument would significantly aid the decisional process. *See* Fed. R. App. P. 34(a).

# TABLE OF CONTENTS

RECOMMENDATION ON ORAL ARGUMENT ............................. i

TABLE OF CONTENTS ....................................................... ii

TABLE OF AUTHORITIES ................................................ iv

JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ............................................. 1

STATEMENT OF THE CASE ............................................... 1

    I.   To promote public safety, § 922(n) bars receiving a gun while under felony indictment. ...............................................1

    II.  Quiroz bought a handgun while under two felony indictments ...........................................................................3

    III. A jury convicted Quiroz of making a false statement and receiving a gun while under felony indictment. ......................4

    IV. Quiroz challenged § 922(n) under *Bruen*'s Second Amendment framework. ........................................................5

    V.  The district court ruled that § 922(n) facially violates the Second Amendment and dismissed the indictment. ...............7

SUMMARY OF THE ARGUMENT ........................................... 9

STANDARD OF REVIEW .................................................... 12

ARGUMENT ................................................................... 13

    I.   Governments can subject indicted defendants to many liberty restrictions—including gun restrictions—that would otherwise violate their constitutional rights. ..............13

II.    The Second Amendment's plain text does not cover
       receiving guns while under felony indictment. .......................16

       A.    The party challenging a gun regulation has the
             burden of showing that the Second Amendment's
             text covers him. ............................................................17

       B.    Indicted defendants are not law-abiding, responsible
             citizens whom the Second Amendment covers. .............18

III.   Section 922(n) squares with the nation's historical
       tradition of gun regulation. ...................................................27

       A.    Section 922(n) is analogous to historical laws
             allowing pretrial detention of indicted defendants. ........29

       B.    Section 922(n) is analogous to historical laws
             disarming dangerous or untrustworthy people. ..............35

       C.    Section 922(n) is analogous to historical surety laws. .....42

IV.    At a minimum, § 922(n) is constitutional as applied to
       Quiroz, a question the district court did not reach.................47

V.     Even if § 922(n) violates the Second Amendment, the
       district court erroneously dismissed the false-statement
       charge.....................................................................................50

CONCLUSION ............................................................... 53

CERTIFICATE OF SERVICE ............................................... 54

CERTIFICATE OF COMPLIANCE ......................................... 54

## TABLE OF AUTHORITIES

**Cases**

*Barrett v. United States,*
  423 U.S. 212 (1976) ............................................................. 3

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ...........................................................15

*Bryson v. United States,*
  396 U.S. 64 (1969) ....................................................... 51, 52

*Buchanan v. Alexander,*
  919 F.3d 847 (5th Cir. 2019) ...........................................47

*Carlson v. Landon,*
  342 U.S. 524 (1952) ...........................................................30

*Cases v. United States,*
  131 F.2d 916 (1st Cir. 1942) ....................................... 2, 45

*Church of Am. Knights of the Ku Klux Klan v. Kerik,*
  356 F.3d 197 (2d Cir. 2004)...............................................18

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ...........................................................18

*Dennis v. United States,*
  384 U.S. 855 (1966) ............................................... 50, 51, 52

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...................................................passim

*Estelle v. Williams,*
  425 U.S. 501 (1976) ...........................................................15

*Furman v. Georgia,*
  408 U.S. 238 (1972) ...........................................................31

*Gerstein v. Pugh,*
  420 U.S. 103 (1975) .................................................... 13, 14

*Harmon v. City of Norman, Oklahoma,*
  981 F.3d 1141 (10th Cir. 2020)..........................................18

*Kaley v. United States,*
  571 U.S. 320 (2014) ............................................... 13, 16, 32

*Kay v. United States*,
  303 U.S. 1 (1938)................................................................51

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................... 19, 23

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ............................. 24, 31, 38

*Nat'l Rifle Ass'n of Am., Inc. v. ATF*,
  700 F.3d 185 (5th Cir. 2012) ......................................passim

*New York State Rifle & aPistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...............................................passim

*Range v. Att'y Gen.*,
  53 F.4th 262 (3d Cir. 2022) .......................................passim

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) .........................................................19

*Sir John Knight's Case*,
  87 Eng. Rep. 75 (K.B. 1686) ...........................................35

*Taylor v. Kentucky*,
  436 U.S. 478 (1978) .........................................................15

*United States v. Bena*,
  664 F.3d 1180 (8th Cir. 2011)................................. 24, 25, 40

*United States v. Bledsoe*,
  334 F. App'x 711 (5th Cir. 2009)................................. 51, 52

*United States v. Carpio-Leon*,
  701 F.3d 974 (4th Cir. 2012) ..................................... 25, 39

*United States v. Edwards*,
  430 A.2d 1321 (D.C. 1981) .............................................30

*United States v. Fencl*,
  No. 21-CR-3101 JLS,
  2022 WL 17486363, (S.D. Cal. Dec. 7, 2022) ...........passim

*United States v. Grant*,
  No. CR 3:22-161-MGL-1,
  2022 WL 16541138 (D.S.C. Oct. 28, 2022) .......................23

*United States v. Grinage,*
  No. SA-21-CR-00399-JKP,
  2022 WL 17420390 (W.D. Tex. Dec. 5, 2022) ............................ 23, 36

*United States v. Howard,*
  766 F.3d 414 (5th Cir. 2014) ............................................................12

*United States v. Kapp,*
  302 U.S. 214 (1937) ................................................................... 51, 52

*United States v. Kays,*
  No. CR-22-40-D,
  2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) .......................... 29, 45

*United States v. Kelly,*
  No. 3:22-CR-00037,
  2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) .......................passim

*United States v. Kennedy,*
  327 F. App'x 706 (9th Cir. 2009) .....................................................34

*United States v. Knox,*
  396 U.S. 77 (1969) ..................................................................... 50, 51

*United States v. Laurent,*
  861 F. Supp. 2d 71 (E.D.N.Y. 2011) ..............................................2, 41

*United States v. Mandujano,*
  425 U.S. 564 (1976) ........................................................................51

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) ...........................................................47

*United States v. Peeples,*
  630 F.3d 1136 (9th Cir. 2010)..........................................................34

*United States v. Perez-Garcia,*
  No. 22-CR-1581-GPC,
  2022 WL 17477918 (S.D. Cal. Dec. 6, 2022) ........................ 29, 45, 46

*United States v. Perry,*
  788 F.2d 100 (3d Cir. 1986).............................................................30

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009)................................................................40

*United States v. Salerno,*
  481 U.S. 739 (1987). .................................................................passim

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ........................................................2, 38

*United States v. Slye,*
  No. 1:22-MJ-144,
  2022 WL 9728732 (W.D. Penn. Oct. 6, 2022)...................29, 30, 32, 34

*United States v. Stephens,*
  594 F.3d 1033 (8th Cir. 2010)..........................................14, 30, 32, 33

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010)....................................................24, 39

*United States v. Yancey,*
  621 F.3d 681 (7th Cir. 2010) ............................................................39

*United States v. Young,*
  No. CR 22-054, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022) ............23

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442 (2008) ....................................................................47, 48

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ..........................................................43

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021) ............................................................43

## Federal Statutes

18 U.S.C. § 922 .......................................................................passim

18 U.S.C. § 3142 .........................................................................13, 33

18 U.S.C. § 3231 ................................................................................ 1

18 U.S.C. § 3731 ................................................................................ 1

## State Statutes & Legislative Materials

1 Acts and Resolves, Public and Private, of the Province of the
  Massachusetts Bay (1869) ..........................................................36, 44

1 Laws of the State of Delaware from the Fourteenth Day of October,
  One Thousand Seven Hundred, to the Eighteenth Day of August,
  One Thousand Seven Hundred and Ninety-Seven (1797) ..................44

1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State (1821) ................................................................36

2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) ........44

A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time (1836) ...................................................................37

Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789)...........................31

Acts and Laws of His Majesties Colony of Connecticut in New England (1901) ....................................................................44

Acts and Laws of His Majesty's Province of New Hampshire in New England (1759). ...................................................................43

Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament (1771) .......................36, 44

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) ..........37

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ...........................35

S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937) ...................................... 2

Tenn. Code § 39-17-1351....................................................................22

Tex. Penal Code § 30.02 ...................................................................... 3

Ariz. Rev. Stat. § 13-3112 ...................................................................22

Ky. Rev. Stat. § 237.110......................................................................22

La. Stat. § 40:1379.3 ..........................................................................22

Mass. Rev. Stat. ch. 134, § 16 (1836)...................................................44

## Books & Articles

2 Bernard Schwarz, The Bill of Rights: A Documentary History (1971) ...............................................................................39

Clara Kalhous, *et al.*, *Bail Pending Trial, Changing Interpretations of the Bail Reform Act & the Importance of Bail from Defense Attorneys' Perspective*, 32 Pace L. Rev. 800 (2012)................................................30

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986) ..............................................................40

George Webb, The Office and Authority of a Justice of Peace (1736)...36

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020)........................................................................................35

Joyce Lee Malcolm, To Keep and Bear Arms (1994)............................38

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ......................................38

Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490 (2018).......30

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ........38

Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002)...............40

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1st ed. 1868)...........................................................39

4 William Blackstone, Commentaries on the Laws of England (1769) ..................................................... 43, 45, 46

William Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977) .........................................................................................30

William Rawle, A View of the Constitution of the United States of America (2d ed. 1829).....................................................................43

**Federal Rules**

Fed. R. App. P. 4...................................................................................... 1

Fed. R. App. P. 32.................................................................................54

Fed. R. App. P. 34.................................................................................. i

## Jurisdiction

The government appeals a final order dismissing the indictment in a criminal case. (ROA.309.) The district court had jurisdiction under 18 U.S.C. § 3231. The government timely noticed this appeal. (ROA.310–11.) *See* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## Statement of the Issues

Quiroz was charged with buying a gun while under felony indictment, *see* 18 U.S.C. § 922(n), and lying about his status as an indicted defendant in connection with the purchase, *see id.* § 922(a)(6). The district court ruled that § 922(n) violates the Second Amendment. It also ruled that because Quiroz could not be constitutionally prohibited from buying a gun based on his indictments, he could not be prosecuted for lying about them. The court thus dismissed both charges.

I.    Does § 922(n) violate the Second Amendment?

II.   Can Quiroz defend against a charge of lying about meeting the statutory qualifications to buy a gun by collaterally challenging the constitutional validity of those qualifications?

## Statement of the Case

### I.   To promote public safety, § 922(n) bars receiving a gun while under felony indictment.

Section 922(n) states: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term

exceeding one year to … receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

The federal prohibition in § 922(n) has existed in some form since 1938. That year, Congress passed the Federal Firearms Act, limiting gun access by people under indictment as well as convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938" (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251)). The Federal Firearms Act restricted those under indictment for or convicted of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82. It sought to protect the public by "eliminat[ing] the guns from the crooks' hands, while interfering as little as possible with the law-abiding citizen." S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937). Congress believed that the restricted classes of people had, "by their past conduct, … demonstrated their unfitness to be entrusted with such dangerous instrumentalities" as guns and ammunition. *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).

In 1961, Congress expanded the prohibitions to include all crimes. *Id.* at 83. And in 1968, Congress passed the Gun Control Act, which updated the restrictions on gun access by people under indictment and by convicted felons. *Id.* Among other things, the Gun Control Act "clarified the definition of 'indictment' to include an information or indictment in *any court*—state or federal—if the court had power to prosecute any crime punishable

by more than one year in prison." *Id.* (emphasis original). Like the Federal Firearms Act, the Gun Control Act "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons." *Id.* (cleaned up) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)). "In 1986, Congress again revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id.* at 84. The statutory text has not substantively changed since then.

## II.   Quiroz bought a handgun while under two felony indictments

Quiroz was indicted in Texas state court for burglary of a habitation, a second-degree felony. (ROA.55, 105.) *See* Tex. Penal Code § 30.02(c)(2). He pled not guilty and was released on bond. (ROA.106.) After he failed to appear for a hearing in his burglary case, he was also indicted for bail jumping, a third-degree felony. (ROA.57, 106.) *See* Tex. Penal Code § 38.10(f).

While under those felony indictments—and still at large—Quiroz bought a handgun from a hardware store. (ROA.106.) He filled out an ATF form on which he denied that he was under indictment. (ROA.61, 106.) The National Instant Criminal Background Check System (NICS) returned a delayed response, meaning that the store could not give Quiroz the gun until he cleared the check or seven days passed. (ROA.106.) Seven days passed without a response, and so Quiroz retrieved the gun.

(ROA.106.) Soon after, NICS denied the purchase and informed ATF that Quiroz had illegally received the gun. (ROA.106.)

### III.  A jury convicted Quiroz of making a false statement and receiving a gun while under felony indictment.

Quiroz was charged with (1) making a false statement while buying a gun, *see* 18 U.S.C. § 922(a)(6); and (2) receiving a gun while under felony indictment, *see id*. § 922(n). (ROA.13–14.)

Before trial, Quiroz moved to dismiss the indictment, claiming that § 922(n) violates the Second Amendment. (ROA.38–48.) He also claimed that because Congress could not constitutionally prohibit those under indictment from receiving guns, he could not be convicted under § 922(a)(6) of falsely denying that he was under indictment. (ROA.51.)

The district court denied Quiroz's motion. (ROA.105–16.) To start, the court agreed with the government that the § 922(a)(6) charge survived regardless of § 922(n)'s constitutionality. (ROA.108–09; *see* ROA.74–76.) It observed that the charge was "directed at [Quiroz's] false statements; it is not a charge to enforce the statute claimed to be unconstitutional." (ROA.108–09.) Quiroz could not defeat "a prosecution directed at [his] fraud [] based on the argument that § 922(n) is unconstitutional." (ROA.109.)

Turning to Quiroz's Second Amendment challenge to § 922(n), the court applied this Court's pre-*Bruen* test, which asked, first, whether the challenged law burdens conduct within the Second Amendment's scope

and, if so, whether the law survives means-end scrutiny. (ROA.110–11 (citing *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185, 194 (5th Cir. 2012)).) At the first step, the court concluded that because Quiroz was presumed innocent of the state charges until proven guilty, he "remain[ed] a law-abiding citizen" who enjoyed Second Amendment rights while under indictment. (ROA.112.) At the second step, however, the court concluded that § 922(n) survives intermediate scrutiny because it substantially and directly relates to an important public-safety interest. (ROA.113–14.)

A jury convicted Quiroz of both counts in the federal indictment. (ROA.192.)

## IV. Quiroz challenged § 922(n) under *Bruen*'s Second Amendment framework.

On the same day as the verdict in this case, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Court struck down New York's "may-issue" licensing law, which allowed the executive to issue a license for public carry only on a showing of "proper cause." *Id.* at 2123. The Court clarified that means-end scrutiny is inconsistent with its Second Amendment precedents. *Id.* at 2127–29. It said: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

5

Based on *Bruen*, Quiroz moved for judgment of acquittal or reconsideration of his motion to dismiss. (ROA.210–24.) He observed that *Bruen* displaced this Court's two-step test for assessing Second Amendment claims. (ROA.213–14.) And he challenged § 922(n) under *Bruen*'s framework, both facially and as applied to him. (ROA.223, 253, 254–56.) He argued that his conduct was covered at *Bruen*'s first, textual inquiry because his "status as an individual under indictment is not relevant to whether the Second Amendment protects the conduct." (ROA.217.) And he argued, at *Bruen*'s second inquiry, that § 922(n) is inconsistent with the nation's historical tradition of gun regulation. (ROA.219–24.)

The government opposed dismissal. (ROA.231–49.) First, the government argued that the Second Amendment's plain text does not cover receiving a gun while under felony indictment. (ROA.240–41.) Second, the government argued that § 922(n) squares with the nation's historical tradition of gun regulation, pointing to historical laws disarming potentially dangerous or "unvirtuous" citizens. (ROA.242–45.) The government also pointed to historical restrictions on the liberties of those accused (but not convicted) of wrongdoing, including pretrial detention and release conditions (ROA.247), as well as "surety" laws requiring those accused of posing a threat to post a bond before carrying a gun (ROA.248–49).

6

## V.   The district court ruled that § 922(n) facially violates the Second Amendment and dismissed the indictment.

The district court granted reconsideration and dismissed the indict-ment, ruling that § 922(n) facially violates the Second Amendment. (ROA.285–309.) First, the court held that the Second Amendment's plain text covered Quiroz. According to the court, the "conduct" burdened by § 922(n) is not "buying a gun *while under felony indictment*" but rather "'re-ceipt' of a firearm—nothing more." (ROA.289–90 (quotation marks omit-ted).) Whether the government can restrict receipt "for a specific group of people," the court said, "would fall under *Bruen*'s second step: the histori-cal justification for that regulation." (ROA.290.)

Second, the court concluded that § 922(n) is inconsistent with histor-ical tradition. To start, the court dismissed an analogy to restrictions on convicted felons as insufficiently rooted in history. (ROA.293–95.) Alt-hough the Supreme Court had endorsed felon-in-possession laws in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that endorsement "was in dicta." (ROA.294.) The court then summarized historical gun laws dating to the colonial period and concluded that it was "unclear" and "unproven" whether there exists "a historical justification for disarming those indicted, but not yet convicted, of any crime." (ROA.295–97.) The court also re-jected the government's analogy to surety laws as regulating guns "through materially different means." (ROA.298–99.)[1]

---

[1] The court *sua sponte* raised and rejected other possible analogies to cir-cumstances in which legislatures restrict rights that the Constitution re-serves to "the people." It cited the Article II right to choose members of

Last, the court expressed "other reasons" it thought "§ 922(n) evokes constitutional scrutiny." (ROA.304.) First, the court opined that "the nature of grand jury proceedings … casts a shadow of constitutional doubt on § 922(n)." (ROA.304.) It observed that grand-jury proceedings are not adversarial and that defendants sometimes lack the right to a grand jury in state court. (ROA.304–05.) Second, the court compared § 922(n) to historical laws used as pretexts to "disarm disfavored groups." (ROA.306–07.) Third, the court observed that some pre-*Heller* precedents upholding § 922(n) rested on the view that the Second Amendment establishes a "collective" rather than individual right. (ROA.307–08.) *See Heller*, 554 U.S. 570 (rejecting the collective-right view and holding that the Second Amendment protects an individual right to bear arms).

The court declared that because it was holding § 922(n) facially unconstitutional, it "need[ed] not answer whether § 922(n) is unconstitutional as applied to" Quiroz. (ROA.309 n.119.) In addition—although the parties had provided no further briefing or argument on the issue—the court reversed its earlier ruling on the § 922(a)(6) charge, holding that, if § 922(n) is unconstitutional, "then [Quiroz's] false statement during the purchase of the firearm is immaterial." (ROA.286.) The court gave no explanation for the reversal.

---

the House and the First Amendment right to assemble but concluded that in neither circumstance did historical restrictions apply to those under indictment. (ROA.301–04.)

## SUMMARY OF THE ARGUMENT

Congress passed § 922(n)'s narrow prohibition of receiving guns while under felony indictment decades ago, and it had never been held unconstitutional until the decision below. A jury convicted Quiroz of violating that prohibition. *Bruen* does defeat his conviction. Rather, *Bruen* addressed a sweeping public-carry ban, subject only to case-by-case executive discretion. Although the Court clarified the analytical framework applicable to Second Amendment claims, it did not upset the applecart of federal gun regulation that has persisted for decades. Nor did the Court retract its past assurances that the Constitution permits a range of narrow, status-based gun restrictions. Indeed, the Court insisted that its holding did not put legislatures in a "regulatory straightjacket." This Court should reverse the district court's ruling that § 922(n) violates the Second Amendment.

**I.** A felony indictment allows a range of liberty restrictions that would otherwise violate the indicted defendant's constitutional rights. An indictment reflects a grand jury's probable-cause finding that the defendant committed a serious crime. That finding is enough to temporarily allow substantial restrictions on many constitutional rights to promote the administration of justice—the government can seize an indicted defendant's assets or even detain him pending trial. The "presumption of innocence" does not preserve freedom before trial but merely allocates the burden of proof *at trial*, prohibiting criminal punishment before the

government proves the defendant's guilt beyond a reasonable doubt. There is no reason to treat Second Amendment rights any differently.

**II.** Quiroz cannot show that the Second Amendment's plain text covered his conduct, an issue on which he has the burden. The Second Amendment's text codified a preexisting right that belongs only to law-abiding, responsible citizens. A person's status as non-law-abiding, therefore, counts at *Bruen*'s first, textual step. Many courts—both before and after *Bruen*—have recognized that the Second Amendment does not prohibit legislatures from restricting the gun rights of people whose status or actions show that they will unlikely obey the law.

A person's status as an indicted felony defendant puts him outside the law-abiding citizens whom the Second Amendment presumptively protects. As set forth above, probable cause that a person committed a serious crime is sufficient to trigger a range of liberty restrictions, including pretrial detention. And the power to detain an indicted defendant necessarily encompasses the power to impose some lesser liberty restrictions. Thus, a felony indictment is sufficient evidence that a person is non-law-abiding to temporarily suspend his Second Amendment rights.

**III.** Even if the Second Amendment's text does not exclude indicted defendants, the nation's historical tradition supports restricting their gun rights. *Bruen*'s historical inquiry requires only a relevantly similar historical analogue, not a historical twin. And because the Second Amendment tolerates any law the founding generation would have believed

10

permissible—not just laws that happened to exist—a court must consider whether a modern law squares with the broader attitudes that the historical record demonstrates.

Three types of laws each establish a historical tradition consistent with § 922(n). First, American jurisdictions have always detained some indicted defendants pending trial, thus temporarily stripping them of all gun rights and many other constitutional liberties. Those broad restrictions support § 922(n)'s far lesser restriction on an indicted defendant's gun rights. Second, § 922(n) squares with the tradition of categorically disarming specific groups deemed dangerous or untrustworthy. Third, § 922(n) squares with historical surety laws requiring those accused of posing a threat to post a bond before carrying guns.

**IV.** At a minimum, the district court erred in holding § 922(n) facially unconstitutional without determining whether it could constitutionally be applied to Quiroz. It could.

Facial challenges are disfavored and should be granted only as a last resort. A facial challenge requires the challenger to show that no circumstances exist under which the law would be valid—that it is unconstitutional in all its applications. When a party challenges a law both facially and as applied, a court should first consider the narrower as-applied challenge.

The district court defied these principles. The court skipped Quiroz's as-applied challenge and considered only his broader facial challenge. It

then held § 922(n) facially unconstitutional without determining that it lacks any constitutional application. That is wrong: no reading of the Second Amendment would cover every circumstance under which an indicted defendant might obtain a gun. Section 922(n) is constitutional as applied to Quiroz, whose conduct portrayed a danger and flight risk that would have allowed him to be constitutionally detained pending trial and subjected to other historical liberty restrictions.

**V.** No matter how this Court decides § 922(n)'s constitutionality, it should reinstate his conviction on count one, charging that Quiroz made a false statement in violation of § 922(a)(6). The Supreme Court has repeatedly recognized that a person cannot defend against a charge that he lied about complying with a statutory requirement by claiming that the requirement is unconstitutional. The Court has applied this rule even to crimes like § 922(a)(6) requiring a *material* false statement. The district court correctly applied this rule in its order denying Quiroz's original motion to dismiss. It erred by inexplicably reversing course in its final order.

## STANDARD OF REVIEW

This Court "review[s] preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

**ARGUMENT**

I. **Governments can subject indicted defendants to many liberty restrictions—including gun restrictions—that would otherwise violate their constitutional rights.**

The Supreme Court has recognized that an indictment "eliminates" some constitutional liberties. *Kaley v. United States*, 571 U.S. 320, 329 (2014). The "inviolable grand jury finding … may do more than commence a criminal proceeding (with all the economic, reputational, and personal harms that entails); the determination may also serve the purpose of immediately depriving the accused of her freedom." *Id.* An indictment triggers an arrest warrant without further inquiry into the case's strength or, if the person is already arrested, "eliminates her Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention." *Id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 114, 117 n.19 (1975)). For federal crimes, the indictment "may play a significant role in" the detention decision itself since the Bail Reform Act creates a presumption of detention "if 'there is probable cause to believe' [the defendant] committed certain serious crimes." *Id.* at 329 n.6 (citing 18 U.S.C. § 3142(e)(2)–(3), (f)). *Kaley* held that the government can also freeze an indicted defendant's forfeitable assets—even if the defendant needs them to pay a lawyer—without violating the Fifth Amendment due-process right or Sixth Amendment right to counsel. *Id.* at 327–28. If the grand jury's probable-cause finding is "reliable enough, protective enough" to "restrain *persons*," then it must be sufficient to restrain property. *Id.*

13

Similarly, the Supreme Court has held that pretrial detention based on future dangerousness under the Bail Reform Act violates neither the Fifth Amendment due process right nor the Eighth Amendment prohibition of excessive bail. *United States v. Salerno*, 481 U.S. 739, 754–55 (1987). The Court collected circumstances under which an individual's Fifth Amendment liberties yield to "the government's regulatory interest in community safety," explaining that "[e]ven competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system." *Id.* at 748–49 (citing *Gerstein*, 420 U.S. 103). The Court concluded that detaining defendants based on dangerousness was a valid exercise of "the well-established authority of the government, in special circumstances, to restrain individuals' liberty prior to or even without a criminal trial and conviction." *Id.* at 749. While the Court noted that the Bail Reform Act authorizes detention only after an adversarial proceeding at which the government must show that the defendant poses a threat, *see id.* at 750–51, it did not suggest that the Constitution bars Congress from categorically restricting some defendants' liberties. Indeed, as set forth in more detail below, nothing in the Constitution bars Congress from mandating detention "in entire classes of cases." *See United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) (relying on that principle to uphold the Adam Walsh Act's mandatory pretrial release conditions categorically restricting some defendants' liberties).

14

The Court has also upheld restraints on pretrial detainees' First Amendment liberties. *See Bell v. Wolfish*, 441 U.S. 520, 550 (1979). After rejecting Fourth and Fifth Amendment challenges by pretrial detainees to their conditions of confinement, *see id.* at 541, 544, the Court considered whether the First Amendment allowed prison officials to prohibit them from receiving books and magazines other than from the publisher or a book club, *see id.* at 549–51. The Court held that the prohibition did not violate the First Amendment but was a rational response to security concerns. *Id.* at 550. The Court cited, among other factors supporting its holding, the prohibition's temporary impact on detainees. *Id.* at 552.

Given the indictment's historical role, the "presumption of innocence" is no impediment to denying indicted defendants these constitutional liberties. (*See* ROA.112, 214–15, 262.) Rather, that "presumption" is a *trial* right—"an inaccurate, shorthand description" of the government's burden to prove guilt beyond a reasonable doubt. *Bell*, 441 U.S. at 533 (quoting *Taylor v. Kentucky*, 436 U.S. 478, 484 n.12 (1978)); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (explaining that the presumption protects "the fairness of the fact-finding process" and "guard[s] against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt"). The presumption "has no application" to determining an indicted defendant's liberties "before his trial has even begun." *Bell*, 441 U.S. at 533.

15

There is no reason to treat Second Amendment rights differently from these other constitutional liberties. *Bruen* announced that its "Second Amendment standard accords with how [the Court] protect[s] other constitutional rights." 142 S. Ct. at 2130 (comparing the Second Amendment to the First and Fourth Amendments); *see also id.* at 2137, 2157 (comparing the Second Amendment to the First and Sixth Amendments). *Heller* too "repeatedly compared the right to keep and bear arms" to the First Amendment, *id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635), as well as the Fourth Amendment, *see Heller*, 554 U.S. at 579, 582, 592. Thus, if an indictment is constitutionally sufficient to trigger (sometimes presumptive) detention and the seizure of the indicted defendant's assets, *see Kaley*, 571 U.S. 327–28, and to restrict his First Amendment rights, *see Bell*, 441 U.S. at 550, then it must be sufficient to temporarily restrict his right to bear arms too.

## II.   The Second Amendment's plain text does not cover receiving guns while under felony indictment.

This Court need not decide whether § 922(n) squares with the nation's historical tradition of gun regulation because it burdens no conduct covered by the Second Amendment's text. Quiroz has the burden at this step to show that the Second Amendment applies. He cannot carry his burden because the Second Amendment right extends only to law-abiding citizens, a community that excludes indicted defendants.

16

**A.  The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers him.**

In *Bruen*, the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively protects"—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a gun regulation has that initial burden.

To repeat, *Bruen* proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g.*, *id.* at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not need to say which party has the burden at step one since the parties did not dispute that the respondents were law-abiding adults whom the Second Amendment covered and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's First Amendment analogy, the party challenging a gun regulation has the burden at step one. Although the government has the burden of justifying a restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment applies in the first place. *See, e.g.*, *Harmon v. City of Norman,*

17

*Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Here too, Quiroz has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct.

### B. Indicted defendants are not law-abiding, responsible citizens whom the Second Amendment covers.

The Second Amendment codified a preexisting understanding of the right to bear arms as covering only law-abiding, responsible citizens. A felony indictment rests on probable cause that the defendant committed a serious crime and thus excludes the indicted defendant from the law-abiding citizens entitled to bear arms. The district court thus erred in holding that Quiroz's status as an indicted defendant is irrelevant to *Bruen*'s first, textual inquiry. (ROA.289–90.)

**1.** The Second Amendment does not cover all citizens. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English

ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). So the right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634–35.

"The founders understood that not everyone possessed Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 271 (3d Cir. 2022) (brackets omitted). And while *Heller* did not exhaustively analyze "the full scope of the Second Amendment," it explained that the Second Amendment is "not unlimited" and noted some limits that have always been understood to bound the right. 554 U.S. at 626. The Court identified a nonexhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626–27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" about restrictions on felons and the mentally ill). The Second Amendment's scope excludes those people because it codified a "right of law-abiding, responsible citizens." *See Heller*, 554 U.S. at 635.

*Bruen* confirmed that a person's status as non-law-abiding counts at its first, textual step. Echoing *Heller*, the Court explicitly, repeatedly described the right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of

law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also Range*, 53 F.4th at 271 (noting that "the [*Bruen*] majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). None of those references suggest that the Second Amendment curbs laws restricting the gun rights of non-law-abiding citizens.

Three more aspects of the *Bruen* opinion further confirm that a person's status as non-law-abiding counts at its first, textual step:

First, the *Bruen* opinion itself addressed whether the petitioners were law-abiding citizens in the section (III.A) addressing the Second Amendment's textual scope, not the section (III.B) addressing historical tradition. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id*. (citing *Heller*, 554 U.S. at 580). The Court thus implied that the Second Amendment covered them *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* (along with *Heller*) set contrary presumptions depending on whether a law prevents law-abiding citizens from bearing arms. As

noted, *Heller* established that laws disarming "felons and the mentally ill"—and some other gun regulations—are "presumptively lawful." 554 U.S. at 626 & n.26. In contrast, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," so that laws prohibiting the conduct are presumptively *unlawful*. 142 S. Ct. at 2126. *Bruen*'s presumptive protection could be "[i]n keeping with" *Heller*'s presumption of lawfulness, *see id.*, only if *Heller*'s "presumptively lawful" regulations burden no conduct covered by the amendment's text. In other words, at least some status-based restrictions of people considered non-law-abiding or irresponsible—"felons and the mentally ill"—are "presumptively lawful" *because* the Second Amendment's text excludes them.

Third, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many states' standards disqualify indicted

defendants or anyone prohibited by federal law from having a gun.[2] By indicating that those regimes remain broadly constitutional (unless abused, as when "lengthy wait times … or exorbitant fees deny ordinary citizens their right to public carry"), the Court implied that the Second Amendment's text excludes people (like indicted defendants) considered non-law-abiding. Otherwise, the 43 states' many objective criteria disqualifying applicants for licenses—and thus preventing them from bearing arms—could survive only through case-by-case, historical inquiries. The Court suggested no such thing.[3]

In *Bruen*'s wake, several courts have interpreted the Second Amendment as covering only law-abiding citizens. In rejecting a challenge to § 922(g)(1)'s prohibition of gun possession by convicted felons, the Third Circuit explained that "[t]hose whose criminal records evince disrespect

---

[2] *See, e.g.*, Ariz. Rev. Stat. § 13-3112(E)(3) (requiring that the applicant "[i]s not under indictment for and has not been convicted in any jurisdiction of a felony … and [that] the applicant is currently not a prohibited possessor under state or federal law"); Ky. Rev. Stat. § 237.110(4)(a) (requiring that the applicant "[i]s not prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law"); La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Tenn. Code § 39-17-1351(c)(7) (requiring that "the applicant is not currently under indictment or information for any criminal offense that is designated as a felony, or that is [a] disqualifying misdemeanor[]").

[3] The breadth and variability of objective criteria applied by the 43 shall-issue states was not lost on the Court, which collected citations to all the licensing regimes and described how some work. *See Bruen*, 142 S. Ct. at 2123 n.1.

for the law are outside the community of law-abiding citizens entitled to keep and bear arms." *Range*, 53 F.4th at 273. The court "[i]nterpret[ed] the text of the Second Amendment in light of the right's 'historical background,'" *id.* at 282 (quoting *Bruen*, 142 S. Ct. at 2127), surveying historical status-based gun laws from 1600s England through the amendment's ratification, *see id.* at 274–81. It held that the Second Amendment's scope "properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 266.[4]

Some courts held the same before *Bruen* in textual analyses that *Bruen* deemed "broadly consistent" with Supreme Court precedent. *See* 142 S. Ct. 2127. Like *Range*, *Medina v. Whitaker* rejected a challenge to § 922(g)(1)

---

[4] Many district courts have likewise rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens whom the Second Amendment covers. *See, e.g.*, *United States v. Fencl*, No. 21-CR-3101 JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (holding that an indicted defendant on pretrial release fell "outside the scope of [the Second Amendment's] protections as he has been charged with unlawful possession of firearms based on a finding of probable cause"); *United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *5 (W.D. Tex. Dec. 5, 2022) (explaining that *Heller* and *Bruen* "lead[] the Court to conclude convicted felons like Grinage are not included in 'the people' protected by the Second Amendment"); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *7 (W.D. Pa. Nov. 7, 2022) ("*Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug convictions."); *United States v. Grant*, No. CR 3:22-161-MGL-1, 2022 WL 16541138, at *3 (D.S.C. Oct. 28, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment.").

as applied to a nonviolent felon. 913 F.3d 152, 157–58 (D.C. Cir. 2019).
To determine "the public understanding of the right" when the Second
Amendment was ratified, the Court considered the severe punishments
felons then faced, as well as evidence that the founders understood the
right to exclude "those who were not (or could not be) virtuous members
of the community." *Id.* at 158–59. The court held that felons—violent or
not—"are not among the law-abiding, responsible citizens entitled to the
protections of the Second Amendment." *Id.* at 154; *accord United States v.
Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are cat-
egorically different from the individuals who have a fundamental right to
bear arms").

Courts have reasoned similarly for other groups considered irrespon-
sible or non-law-abiding. For instance, the Eighth Circuit rejected a chal-
lenge to § 922(g)(8), which prohibits gun possession by people subject to
domestic-violence restraining orders. *United States v. Bena*, 664 F.3d 1180,
1184 (8th Cir. 2011). The court relied on *Heller*'s description of the right
to bear arms as protecting law-abiding citizens. *Id.* And it observed that
the Supreme Court most likely "viewed the regulatory measures it
listed"—like restrictions on felons and the mentally ill—"as presumptively
lawful because they do not infringe the Second Amendment right." *Id.* at
1183. The court thus held that § 922(g)(8) "is consistent with a common-
law tradition that the right to bear arms is limited to peaceable or virtuous
citizens." *Id.* at 1184; *see also United States v. Carpio-Leon*, 701 F.3d 974, 975

24

(4th Cir. 2012) (holding "that the scope of the Second Amendment does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community").

**2.** Quiroz's pending felony indictments excluded him from the law-abiding citizens whom the Second Amendment covers. The Supreme Court has not precisely defined the community of law-abiding, responsible citizens who enjoy the right to bear arms. It has given no indication, however, that only a felony *conviction* establishes that a person is non-law-abiding. To the contrary, it has explained that laws disarming "felons and the mentally ill" were part of a *non*-exhaustive list of "presumptively lawful" restrictions. *Heller*, 554 U.S. at 626–27 & n.26 (emphasis added). Had the Court meant to require a criminal conviction to negate a citizen's status as law-abiding, it could easily have said so.

Thus, applying *Heller* and *Bruen*, courts have defined the excluded people more broadly. According to the Third Circuit, the Second Amendment excludes those "whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms," leaving legislatures "discretion to determine when individuals' status or conduct evinced such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 280–81; *see also Bena*, 664 F.3d at 1184 (holding that the Second Amendment excludes those who pose a threat of domestic violence "[a]lthough persons restricted by § 922(g)(8) need not be convicted of an offense involving domestic violence").

25

Precedents construing other constitutional rights confirm that indicted felony defendants are insufficiently law-abiding to enjoy Second Amendment rights. As set forth above, probable cause that a person committed a crime—and especially indictment by a grand jury for a serious crime—allows many liberty restrictions that would otherwise violate the Constitution. *See supra*, Part I. By the same token, a felony indictment sufficiently establishes the indicted defendant's status as non-law-abiding that the Second Amendment does not "presumptively protect[]" his right to bear arms. *See Bruen*, 142 S. Ct. at 2126. The right to bear arms—like the other rights to which the Supreme Court has compared it—yields to the government's regulatory interest in promoting "community safety" and "preventing crime by arrestees." *See Salerno*, 481 U.S. at 748–49.

One court applying *Bruen* to an indicted defendant reached exactly that conclusion. *See United States v. Fencl*, No. 21-CR-3101 JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022). *Fencl* held that a pretrial release condition barring gun possession, *see* 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment. *Id.* The court reasoned that the defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause." *Id.* It rejected the defendant's appeal to the presumption of innocence, explaining that it "does not deprive the Government of the ability to place significant, but temporary, restrictions on an accused's

constitutional rights in order to further its interest in community safety."
*Id.* (citing *Salerno*, 481 U.S. at 748). This Court should hold the same.

### III. Section 922(n) squares with the nation's historical tradition of gun regulation.

Even if the Second Amendment covers indicted defendants, § 922(n) is consistent with the right to bear arms because it squares with historical tradition. When comparing modern and historical gun laws, courts must often "reason[] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotation marks omitted). *Bruen* gave no "exhaustive survey of the features that render regulations relevantly similar" but noted "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. In other words, the central inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

"[A]nalogical reasoning," the Court continued, is not "a regulatory straightjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day

regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (upholding § 922(n)). That is "because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* A court conducting *Bruen*'s historical inquiry must not only "consider what earlier legislatures did, but imagine what they could have imagined." *Id.*

Finally, *Bruen*'s history inquiry does not split neatly into (1) a "straightforward" approach for laws "address[ing] a general societal problem that has persisted since the 18th century," which always requires a "distinctly similar" historical regulation; and (2) "a more nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning. (*See* ROA.259–64, 266–67, 279–80.) *Bruen* itself considered a law addressing a persistent problem, *id.* at 2131–32, but still scoured centuries of English and American history for relevantly similar analogues, *see id.* at 2135–56. The Court did not say that "the lack of a distinctly similar historical regulation" is dispositive for laws addressing

28

a persistent problem—only that it "is relevant evidence." 142 S. Ct. at 2131. Otherwise, some restrictions that the founders would have "*believed to be permissible*" would fail just because they "*happened [not] to exist* in the founding era." *See Kelly*, 2022 WL 17336578, at *2.

Three distinct historical threads sustain § 922(n)'s restriction on indicted felony defendants: (1) historical liberty restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law; and (3) historical surety laws restricting the gun rights of people accused of posing a threat. Each of these three has been held sufficient in *Bruen*'s wake to establish a tradition supporting modern gun restrictions on indicted defendants. *See Fencl*, 2022 WL 17486363, at *3; *United States v. Perez-Garcia*, No. 22-CR-1581-GPC, 2022 WL 17477918, at *4–5 (S.D. Cal. Dec. 6, 2022); *Kelly*, 2022 WL 17336578, at *5; *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2–3 (W.D. Penn. Oct. 6, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519, at *4–5 (W.D. Okla. Aug. 29, 2022). This Court should hold the same.

### A. Section 922(n) is analogous to historical laws allowing pretrial detention of indicted defendants.

Because legislatures can constitutionally deprive indicted defendants of their liberty, they necessarily can impose the lesser restriction of temporarily prohibiting receipt of firearms. Indicted defendants lack an absolute right to freedom pending trial. "There is no constitutional right to

bail." Clara Kalhous, *et al.*, *Bail Pending Trial, Changing Interpretations of the Bail Reform Act & the Importance of Bail from Defense Attorneys' Perspective*, 32 Pace L. Rev. 800, 800 (2012) (citing William Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 34 (1977)); *see also United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (observing that most "federal courts that have addressed the issue have held that there is no absolute right to bail"); *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981) (observing that "a fundamental right to bail was not universal among the colonies or among the early states" and explaining that historical bail rights were statutory, not constitutional). While the Eight Amendment forbids *excessive* bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Id.*; *see also Stephens*, 594 F.3d at 1039 (8th Cir. 2010) (observing that "Congress may ban bail in entire classes of cases").

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"—and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those

accused of crimes dates to the early days of the Republic—indeed to English common law."). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, moreover, detention in capital cases swept broadly because many serious crimes were punishable by death. Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *see also Range*, 53 F.4th at 280 ("Historically, several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate."); *Furman v. Georgia*, 408 U.S. 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes." *Medina*, 913 F.3d at 158 (cleaned up).

The historical tradition of detaining defendants charged with serious crimes supports restricting their right to receive guns while under indictment. The power to detain necessarily encompasses the power to impose some lesser liberty restrictions. *Cf. Kaley*, 571 U.S. at 330 (reasoning that "it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when "that showing is often sufficient to restrain *persons*" (cleaned up)); *Stephens*, 594 F.3d at 1039 (reasoning that Congress's power to ban bail in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring). Indeed, the founding generation may have foregone gun (and other liberty) restrictions specifically targeting those charged with serious crimes as unnecessary because they were often detained.

Thus, applying *Bruen*, some district courts have upheld gun restrictions on indicted defendants based on the nation's history of pretrial detention. In *Slye*, the court rejected a Second Amendment challenge to § 3142(c)(1)(B)(viii), authorizing the pretrial release condition prohibiting gun possession, and the district's "standard condition" implementing it. *See* 2022 WL 9728732, at *2–3. The court explained that "[i]t would be illogical to conclude" that a court has the authority to detain an indicted defendant, thus denying him many constitutional rights, "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* at *2. "Given the long-standing

32

precedent for denial of pretrial release and its attendant right to possess firearms," the court ruled that § 3142(c)(1)(B)(viii) squares with historical tradition. *Id.* at *3; *see also Fencl*, 2022 WL 17486363, at *3 (upholding § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

This Court should similarly hold that § 922(n) is analogous to historical laws allowing pretrial detention. The main difference is that legislatures have often given courts discretion whether to detain indicted defendants, whereas § 922(n) categorically restricts their right to receive guns. But legislatures' historical power to define bailable crimes, and thus to "ban bail in entire classes of cases," shows that the Constitution tolerates at least some categorical restrictions. *See Stephens*, 594 F.3d at 1039. *Stephens* cited that historical power as supporting another type of categorical restriction on indicted defendants: the Walsh Act's mandatory pretrial release

conditions for some sex offenses. *See id.* (rejecting a facial challenge to the Walsh Act's curfew and electronic-monitoring conditions).[5]

At the same time, § 922(n) imposes a far lesser burden on an indicted defendant than does pretrial detention. *See Bruen*, 142 S. Ct. at 2133 (explaining that a central consideration in analogical reasoning is whether the historical restriction comparably burdens the right to armed self-defense). Pretrial detention strips a defendant of all Second Amendment rights and severely restricts many other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, § 922(n) imposes "a much narrower prohibition on obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution." *Kelly*, 2022 WL 17336578, at *6. That narrow prohibition squares with the historical tradition of severely restricting indicted defendants' liberties.

---

[5] *See also United States v. Peeples*, 630 F.3d 1136, 1138–39 (9th Cir. 2010) (rejecting facial and as-applied challenges to the curfew and electronic-monitoring conditions); *United States v. Kennedy*, 327 F. App'x 706, 707 (9th Cir. 2009) (vacating the district court's ruling that the Walsh Act's mandatory conditions were unconstitutional as applied to the defendant, ordering the district court to impose those conditions on remand, and noting that two "are absolute by their own terms—defendant shall have no contact with the alleged victim and potential witnesses and shall refrain from possessing a firearm, destructive device, or other dangerous weapon"). Although some district courts have questioned the constitutionality of the Walsh Act's mandatory conditions, the government has found no appellate precedent holding them unconstitutional since Congress imposed them in 2006.

**B.** **Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people.**

Section 922(n) is also analogous to laws disarming dangerous or untrustworthy people. English and American governments have long restricted some people's gun rights to promote public safety. In 1662, for example, England empowered officers to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662); *see Bruen*, 142 S. Ct. at 2140 (calling "particularly instructive" the period of English history "between the Stuart Restoration in 1660 and the Glorious Revolution in 1688" (cleaned up)). At the same time, "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law'" if committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and italics omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

The American colonies inherited that tradition. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations

were on the books." *Nat'l Rifle*, 700 F.3d at 200.[6] The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. Those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786

---

[6] *Bruen* abrogated *National Rifle*'s application of means-end scrutiny to the Second Amendment. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of [its pre-*Bruen*] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on text and history and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' textual or historical analyses at "step one" of their pre-*Bruen* frameworks. *See United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *2 (W.D. Tex. Dec. 5, 2022) ("[T]o the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.").

statute). Three of those statutes (all but North Carolina) required forfeiture of the offender's weapons. Other states soon followed. *See, e.g.*, A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) (1801 statute).

Also "noteworthy" among "revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons." *Nat'l Rifle*, 700 F.3d at 200. "The earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms." *Range*, 53 F.4th at 276.[7] And, as the English Parliament had done after the Glorious Revolution, some colonies passed laws disarming Catholics who refused "to take oaths recognizing the legal authority of the Crown, rather than the Pope, over matters of religion." *Id.* at 277. Protestant majorities in those colonies disarmed Catholics because they "viewed Catholics as defying sovereign authority and communal values." *Id.*

During the revolutionary war, "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Nat'l Rifle*, 700 F.3d at 200. In

---

[7] As *Range* observed, these laws are repugnant and would be unconstitutional today; yet they show that "legislatures had the power and discretion to use status as a basis for disarmament, and … that status-based bans did not historically distinguish between violent and non-violent members of disarmed groups." 53 F.4th at 276 n.18.

*Range*, the Third Circuit described several such laws, including a 1774 Connecticut law and 1777 laws passed by Pennsylvania and Virginia. 53 F.4th at 278–79; *see also Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994). Like laws disarming Catholics, these oaths laws disarmed not just violent individuals but also those who demonstrated "disrespect for the rule of law and the norms of the civic community." *Range*, 53 F.4th at 279 (citing Churchill, *Gun Regulation*, 25 Law & Hist. Rev. at 158).

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *Nat'l Rifle*, 700 F.3d at 200. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604); *see also Range*, 53 F.4th at 280. That report

recognized that the government could disarm potentially dangerous or untrustworthy people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *Vongxay*, 594 F.3d at 1118 (collecting scholarly sources)); *Carpio-Leon*, 701 F.3d at 979–80 (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who

are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *Bena*, 664 F.3d at 1183–84 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

The tradition of disarming dangerous or untrustworthy people supports § 922(n)'s restriction on indicted defendants. It gives legislatures "both authority and broad discretion to determine when individuals' status or conduct evince[s] such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 282. It therefore supports gun restrictions on not just convicted felons or violent people, but also others deemed untrustworthy to obey the law. *See id.* Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment rights. *See* 142 S. Ct. at 2132–33. As to "how" § 922(n) operates, like these precursors, it uses an objective criterion to categorically restrict a specific group's gun rights. As to "why," § 922(n) seeks "to combat violence and promote public safety" by "keeping firearms out of the hands of categories of potentially

irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82 (ellipses omitted). Section 922(n) thus represents a permissible legislative judgment that a person's status as an indicted felony defendant warrants disarmament.

One court deciding a post-*Bruen* challenge to § 922(n) has agreed. That court held that § 922(n) squares with "the common law tradition of gun regulation permit[ing] the disarming of certain classes of individuals based on questions regarding whether those individuals had been peaceable and/or law-abiding." *Kelly*, 2022 WL 17336578, at *5 (quotation marks omitted). "Because 18 U.S.C. § 922(n) is of a piece with the type of laws that were treated as consistent with the historical right to bear arms," it does not violate the Second Amendment even though it "diverges from those laws in some specifics." *Id.* at *5 n.7. The court cited three other factors supporting its holding. First, § 922(n) "relies on an objective criterion rather than government discretion (other than the discretion to indict the person in the first place)." *Id.* at *5. Second, § 922(n)'s restriction is temporary, "last[ing] only from indictment to conviction or acquittal." *Id.* And third, § 922(n) is "tied to the administration of justice, an area in which individuals 'may face substantial liberty restrictions,' at least for limited periods of time, in the name of maintaining the integrity and functioning of the relevant proceedings." *Id.* at *6 (quoting *Salerno*, 481 U.S. at 749).

*Kelly* exposed the flaw in the district court's analogical reasoning here. The court here incorrectly demanded "a minutely precise analogy to

historical prohibitions." *Kelly*, 2022 WL 17336578, at *5 n.7. Indeed, the court here understood *Bruen* as requiring the government to "prove a historical tradition for every regulation restricting *a specific subgroup*," which it acknowledged "creates an almost insurmountable hurdle" and an "uphill battle." (ROA.300 (emphasis added).) But that understanding defies *Bruen*'s commands that analogical reasoning is not "a regulatory straightjacket" and that courts need not demand a "dead ringer" or "historical twin." *See* 142 S. Ct. at 2133; *see also Heller*, 554 U.S. at 636 (explaining that the Second Amendment leaves legislatures with "a variety of tools" for combating gun violence). *Kelly* corrected the district court's error here by evaluating § 922(n) "in light of the broader attitudes and assumptions demonstrated by" historical restrictions on dangerous or untrustworthy people. *See* 2022 WL 17336578, at *5 n.7. Because *Kelly* properly modeled *Bruen*'s historical inquiry, this Court should adopt its reasoning.

###  C.   Section 922(n) is analogous to historical surety laws.

Finally, English and American surety laws establish a historical tradition supporting § 922(n). In general, surely laws "required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148. Surety laws burdened people's right to bear arms "only if another could make out a specific showing of reasonable cause to an injury or breach of the peace." *Id.* (cleaned up). They are relevantly similar to § 922(n) because, like § 922(n), they promote public safety by temporarily restricting the gun rights of people believed to pose a threat.

In England, a "surety of the peace followed an accusation by some-one that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895 (2022); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017) (explaining that English surety laws required a person "reasonably accused of posing a threat" "to post a bond to be used to cover any damage he might do" by carrying a gun). According to Blackstone, "wherever any private man ha[d] just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; … he [could] demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769). And if the accused did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." *Id.* The surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a proba-ble suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249.

Like other English traditions, the surety practice was adopted in the American colonies. *See* William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829). Under a 1759 New Hamp-shire law, for instance, authorities could arrest a person who went armed in a threatening manner. Acts and Laws of His Majesty's Province of New Hampshire in New England 1 (1759). On "confession" or "legal proof"

of the offense, authorities could "commit the offender to prison, until he or she f[ound] such sureties for the peace and good behaviour, as [was] required," and could "cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." *Id.* at 1–2. Even earlier colonial laws contained similar provisions. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statue); 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute).

In 1836, Massachusetts passed the state surety law discussed in *Bruen*. 142 S. Ct. at 2148 (citing Mass. Rev. Stat. ch. 134, § 16 (1836)); *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" (italics omitted)). That law "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.* "Between 1838 and 1871, nine other jurisdictions

adopted variants of the Massachusetts law." *Id.* at 2148 & n.23 (collecting citations).

Surety laws establish a historical tradition sufficient to support modern gun restrictions on indicted defendants. *See Fencl*, 2022 WL 17486363, at *3; *Perez-Garcia*, 2022 WL 17477918, at *4–5; *Kays*, 2022 WL 3718519, at *4–5. *Kays* ruled "that the surety laws discussed in *Bruen* are proper historical analogues for § 922(n)." *Id.* at *5. Like surety laws, § 922(n) presumes that people have a right to bear arms and burdens that right only on a showing that someone poses a threat. *Id.* at *4. Even then, like surety laws, § 922(n) restricts the accused's gun rights only temporarily, while the indictment is pending. *Id.*; *see* 4 Blackstone 249–50 (explaining that surety laws' restrictions applied only for a specified time). And while surety laws generally required an individualized showing that the restricted person was threatening or dangerous, *see Bruen*, 142 S. Ct. at 2148, a felony indictment serves an analogous function. That is, Congress permissibly determined that people whom a grand jury credibly accuses of having committed a felony are categorically likely to abuse guns. *See Cases*, 131 F.2d at 921 (explaining that § 922(n)'s predecessor applied to those whose conduct "demonstrated their unfitness to be entrusted with such dangerous instrumentalities" as guns). So they are categorically threatening enough to warrant temporary gun restrictions.

Like laws disarming dangerous or untrustworthy people, moreover, surety laws are "relevantly similar" to § 922(n) under the "why" and

"how" metrics that *Bruen* offered. *See* 142 S. Ct. at 2132–33. Addressing the federal pretrial release condition prohibiting gun possession by an indicted defendant, § 3142(c)(1)(B)(viii), one court explained that the release condition and surety laws "serve the same purpose: public safety." *Fencl*, 2022 WL 17486363, at *3. "Neither prohibition is meant as a form of punishment." *Id.* They also both "further this purpose in the same manner: temporarily burdening the Second Amendment rights of individuals reasonably likely to breach the peace." *Id.*; *see also Perez-Garcia*, 2022 WL 17477918, at *5 (concluding that the surety practice "clearly resembles" the release condition). Because § 922(n) similarly promotes public safety by temporarily restricting indicted defendants' gun rights, the same reasoning applies here.

For those reasons, the district court was wrong that surety laws employ "materially different means" than § 922(n). (ROA.299.) In distinguishing surety laws from § 922(n), the court also noted that § 922(n) requires no "adversarial proceeding." (ROA.299.) But many surety laws similarly required no level of proof and applied to anyone "reasonably accused." *See Bruen*, 142 S. Ct. at 2148–49; 4 Blackstone 249. Finally, the district court observed that, unlike § 922(n), surety laws did not completely ban public carry but allowed it if the accused proved a special need or posted a bond. (ROA.299.) Neither does § 922(n) ban public carry; it prohibits only *receipt* of new guns while under indictment, while allowing the indicted defendant to possess and carry any guns he already had.

Regardless, as with the government's other historical analogies, the district court's reasoning incorrectly demanded "minute[] precis[ion]," *see Kelly*, 2022 WL 17336578, at *5 n.7, while ignoring that surety laws address the same basic problem as § 922(n) in an analogous way.

## IV. At a minimum, § 922(n) is constitutional as applied to Quiroz, a question the district court did not reach.

While Parts I though III, *supra*, establish that § 922(n) is constitutional in all its applications, at a minimum, the district court erred in holding § 922(n) facially unconstitutional without determining whether it could constitutionally be applied to Quiroz. It could.

Facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752–53 (5th Cir. 2020). A party bringing a facial challenge can succeed only "by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Salerno*, 481 U.S. at 745) (brackets omitted). "When a litigant brings both as-applied and facial challenges, [the Court] generally decide[s] the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The district court defied these principles. For one thing, the court skipped Quiroz's as-applied challenge and ruled on his broader facial challenge first. (ROA.309 & n.119.) Beyond that, the court purported to hold

that § 922(n) is facially unconstitutional without determining "that no set of circumstances exists under which [it] would be valid." *Washington State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745). The court neither recited nor applied *Salerno*'s standard. Instead of asking whether § 922(n) has *any* valid application, the court offered hypothetical scenarios that, in its view, might raise constitutional concerns. The court attacked § 922(n) because it might restrict the gun rights of someone indicted based on grand jury testimony that violated the Fourth of Fifth Amendments, or in state-court proceedings that afforded no grand-jury right. (ROA.304–05.) The court also implied that the government might use § 922(n) "to pretextually and unlawfully disarm disfavored groups." (ROA.306.) But the record contains no whiff of these things. The court thus inverted the proper inquiry, ruling based in part on "speculat[ion] about hypothetical or imaginary cases." *See Washington State Grange*, 552 U.S. at 450 (quotation marks omitted).

No proper application of *Salerno*'s standard could sustain the district court's ruling that § 922(n) is facially unconstitutional. At least some applications of § 922(n) surely violate no Second Amendment rights. For instance, given *Heller*'s statement (repeated in *Bruen*) that the Second Amendment affords no right to carry "dangerous and unusual weapons," 554 U.S. at 627, the amendment would not bar prosecuting someone who obtained such a weapon while under indictment. Nor would the amendment bar prosecuting an indicted defendant who obtained a gun to

facilitate his escape since *Heller* "described the right protected by the Second Amendment as 'bearing arms for a *lawful* purpose.'" *Id.* at 620 (emphasis added).

Section 922(n) is constitutional as applied to Quiroz. Had Quiroz been arrested and brought before a court at the moment when he bought the gun, the Constitution would have allowed him to be detained based on the obvious danger and flight risk he posed. He not only had been indicted for home burglary but also had breached the state court's trust by jumping bail. (ROA.55, 105–06.) He was indicted for that too. (ROA.57, 106.) He then lied to the federal government about his indictments so that he could buy the gun. (ROA.61, 106.) And if the government could have detained Quiroz—necessarily stripping him of all gun rights—then surely it could impose § 922(n)'s lesser restriction without violating the Second Amendment. *See supra*, Parts I, II.B, III.A. By the same token, the other historical traditions described above support, at a minimum, prohibiting someone with Quiroz's specific characteristics from obtaining a gun while his indictments were pending. He could be disarmed consistently with the common law tradition of disarming dangerous or untrustworthy people. *See supra*, Part III.B. And his actions demonstrated a sufficient threat that he could be prohibited from receiving guns consistently with the surety tradition. *See supra*, Part III.C.

## V.   Even if § 922(n) violates the Second Amendment, the district court erroneously dismissed the false-statement charge.

No matter how this Court decides § 922(n)'s constitutionality, it should reverse the dismissal of count one, charging that Quiroz violated § 922(a)(6).   (ROA.13–14.)   Section 922(a)(6) prohibits knowingly "mak[ing] any false or fictitious oral or written statement" in connection with buying a gun "with respect to any fact material to the lawfulness of the sale." The district court erred in holding—contrary to its initial decision—that Quiroz could not be prosecuted for lying about his indictments if he could not be constitutionally prohibited from buying a gun on that basis.

The proper mechanism for challenging an allegedly unconstitutional statutory requirement is to sue, not to lie about having complied with it. Thus, "one who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." *United States v. Knox*, 396 U.S. 77, 79 (1969). The Supreme Court demonstrated this rule's application in *Dennis v. United States*, 384 U.S. 855 (1966). Congress barred Communists from holding office in labor unions. *Id.* at 857–58. The Court held that defendants who had lied about being Communists could not justify the lies on the ground that the statutory prohibition violated the First Amendment. *Id.* at 864–66. It explained:

> It is no defense to a charge … that the statutory scheme sought to be evaded is somehow defective. Ample opportunities exist in this country to seek judicial protection. There

> is no reason for this Court to consider the constitutionality
> of a statute at the behest of petitioners who have been in-
> dicted for conspiracy by means of falsehood and deceit to
> circumvent the law which they now seek to challenge.

*Id.* at 866.

The Supreme Court has therefore "consistently—indeed, without exception—allowed sanctions for false statements" even when the government allegedly exceeded its constitutional powers in making the inquiry that elicited the false statement. *United States v. Mandujano*, 425 U.S. 564, 577 (1976) (plurality op.) (collecting cases); *see, e.g.*, *Dennis*, 384 U.S. at 867; *Knox*, 396 U.S. at 79; *Bryson v. United States*, 396 U.S. 64, 72 (1969) (explaining that "it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked"); *Kay v. United States*, 303 U.S. 1, 6 (1938) ("When one undertakes to cheat the Government or to mislead its officers … by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction."); *United States v. Kapp*, 302 U.S. 214, 217–18 (1937) (rejecting the argument that a false statement "ceased to be material because of the unconstitutionality of the provisions of the Agricultural Adjustment Act").

This Court applied this principle to § 922(a)(6) in an unpublished opinion. *See United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009). Bledsoe claimed that he could not be prosecuted for lying about his age

while buying a handgun because § 922(b)(1), barring handgun sales to people under 21, violated his Second Amendment rights. *Id.* at 711. But this Court held that "even assuming the Government could not constitutionally prohibit Bledsoe from purchasing a firearm, 'it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked.'" *Id.* (quoting *Bryson*, 396 U.S. at 72).

The district court correctly applied this principle in its order denying Quiroz's original motion to dismiss. (ROA.108–09 (citing *Dennis*, 384 U.S. at 867; *Kay*, 303 U.S. 1; *Kapp*, 302 U.S. 214; *Bledsoe*, 334 F. App'x at 711)). It erred in reversing course without supporting analysis or authority, and without further input from the parties. (ROA.286.) The court said that if § 922(n) were unconstitutional, then Quiroz's false statement would be "immaterial." (ROA.286.) But at least two of the cases discussed above involved similar materiality elements. *See Bryson*, 396 U.S. at 65 n.1; *Kapp*, 302 U.S. at 216. Those cases confirm that, even if a statute requires a *material* falsehood, a person cannot defend against a charge of lying about compliance with a statutory requirement by claiming that the requirement is unconstitutional.

## CONCLUSION

This Court should reverse the district court's order dismissing Quiroz's indictment.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on December 30, 2022, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

/s/ Charles E. Fowler, Jr.
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I certify that

1. this brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,879 words, excluding the parts exempted by Rule 32(f); and

2. this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated: December 30, 2022

/s/ Charles E. Fowler, Jr.
CHARLES E. FOWLER, JR.
Assistant United States Attorney