# No. 22-50834

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOSE GOMEZ QUIROZ,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Texas

———————

**Brief of Defendant-Appellee**

———————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

TIMOTHY M. SHEPHERD
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

## Certificate of Interested Persons

### UNITED STATES v. JOSE GOMEZ QUIROZ, No. 22-50834

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Jose Gomez Quiroz,** Defendant-Appellee;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley C. Hoff,** former U.S. Attorney;

4. **Fidel Esparza, III, Matthew Ellis,** and **Scott Van Greenbaum,** Assistant U.S. Attorneys, who represented Plaintiff-Appellant in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Jack Meredith** and **Christopher J. Carlin,** Assistant Federal Public Defenders, who represented Defendant-Appellee in the district court; and

7. **Timothy M. Shepherd,** Assistant Federal Public Defender, who represents Defendant-Appellee in this Court.

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
*Attorney for Defendant-Appellee*

## Statement Regarding Oral Argument

Oral argument is currently scheduled for February 8, 2023.

# Table of Contents

Certificate of Interested Persons............................................ i

Statement Regarding Oral Argument............................................iii

Table of Authorities.......................................................... vi

Issues Presented for Review........................................... 1

Statement of the Case...................................................... 2

Summary of the Arguments ............................................. 6

Arguments and Authorities ........................................... 10

I.  Section 922(n) violates the Second Amendment, and the
    district court's dismissal should be affirmed........................... 10

    A. *Bruen* established a new analytical framework for
       analyzing Second Amendment challenges..........................11

    B. The Second Amendment's plain text covers the conduct
       prohibited by § 922(n)......................................... 13

       1. Firearm *receipt* is covered by the Second
          Amendment's plain text. ................................. 13

       2. Those under indictment are included in "the people"
          protected by the Second Amendment. .......................... 14

    C. The Government has not shown that § 922(n) is
       "consistent with the Nation's historical tradition of
       firearm regulation." ........................................... 25

       1. *Bruen* established an exacting framework for
          demonstrating a historical tradition. ........................... 25

       2. The Government misunderstands the *Bruen*
          framework....................................................... 29

3. The Government fails to point to sufficiently similar laws that prove a tradition of categorically disarming those under indictment. ............................... 31

D. The district court correctly held that § 922(n) is facially unconstitutional. .................................................................. 51

E. The district court did not plainly err by analyzing § 922(n) facially. .................................................................. 55

1. Standard of review ....................................................... 55

2. The Government cannot show plain error..................... 56

II. The district court did not plainly err in dismissing Quiroz's § 922(a)(6) charge, because § 922(n)'s unconstitutionality rendered any false statement immaterial................................ 58

A. Standard of review. ............................................................ 58

B. The Government has not shown that dismissal of the § 922(a)(6) charge was plain error....................................... 59

1. The district court did not err in dismissing the § 922(a)(6) charge because § 922(n)'s unconstitutionality rendered any false statement immaterial. ................................................................... 60

2. The Government cannot satisfy any of the other requirements to reverse for plain error. ........................ 65

Conclusion .................................................................................... 67

Certificate of Service.................................................................... 68

Certificate of Compliance with Type-Volume Limit ...................... 69

Addendum

# Table of Authorities

## Cases

*Abramski v. United States,*
  573 U.S. 169 (2014) ............................................................. 61, 64

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ............................................................. 22, 23

*Bryson v. United States,*
  396 U.S. 64 (1969) ..................................................................... 63

*Buchanan v. Alexander,*
  919 F.3d 847 (5th Cir. 2019) ..................................................... 56

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019) ............................................................... 57

*Coffin v. United States,*
  156 U.S. 432 (1895) ............................................................. 20, 21

*Dennis v. United States,*
  384 U.S. 855 (1966) ................................................................... 63

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................*passim*

*Gerstein v. Pugh,*
  420 U.S. 103 (1975) ................................................................... 23

*Green v. U.S. Dep't of Just.,*
  54 F.4th 738 (D.C. Cir. 2022)..................................................... 57

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ..................................................... 11

*In re White-Robinson,*
  777 F.3d 792 (5th Cir. 2015) ..................................................... 19

*Johnson v. United States*,
   576 U.S. 591 (2015) ................................................. 52

*Kaley v. United States*,
   571 U.S. 320 (2014) ................................................. 23

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) .................................*passim*

*Kay v. United States*,
   303 U.S. 1 (1938) .................................................... 63

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ....................................... 11, 12, 14

*N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) .........................................*passim*

*Puckett v. United States*,
   556 U.S. 129 (2009) ................................................. 60

*Range v. Att'y Gen. United States*,
   __ F.4th __, 53 F.4th 262 (3d Cir. 2022),
   *reh'g en banc granted, opinion vacated,*
   __ F.4th __, No. 21-2835, 2023 WL 118469
   (3d Cir. Jan. 6, 2023) ...................................... 19, 22, 39

*Sir John Knight's Case*,
   87 Eng. Rep. 75 (K.B. 1686) ..................................... 37

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) ..................................... 18

*United States v. Avants*,
   278 F.3d 510 (5th Cir. 2002) ..................................... 57

*United States v. Avila*,
   No. 22-50088, 2022 WL 17832287
   (5th Cir. Dec. 21, 2022) ....................................... 65, 66

*United States v. Bena*,
   664 F.3d 1180 (8th Cir. 2011) ................................... 22

*United States v. Bledsoe,*
  334 F. App'x 711 (5th Cir. 2009) ........................................... 63, 65

*United States v. Castillo,*
  386 F.3d 632 (5th Cir. 2004) ................................................. 57, 59

*United States v. Coombes,*
  __ F. Supp. 3d __, No. 22-cr-189-GKF,
  2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) ......................... 19

*United States v. Emerson,*
  270 F.3d 203 (5th Cir. 2001) ................................................. 56, 57

*United States v. Evans,*
  587 F.3d 667 (5th Cir. 2009) ....................................................... 65

*United States v. Faulkner,*
  488 F.2d 328 (5th Cir. 1974) ....................................................... 21

*United States v. Fencl,*
  No. 21-cr-3101-JLS, 2022 WL 17486363
  (S.D. Cal. Dec. 7, 2022) ................................................ 24, 34, 45

*United States v. Francis,*
  183 F.3d 450 (5th Cir. 1999) ....................................................... 60

*United States v. Graves,*
  5 F.3d 1546 (5th Cir. 1993) ....................................................... 60

*United States v. Hicks,*
  __ F. Supp. 3d __, No. 6:21-cr-0060-ADA,
  2023 WL 164170 (W.D. Tex. Jan. 9, 2023) ......................... *passim*

*United States v. Hill,*
  35 F.4th 366 (5th Cir. 2022) ....................................................... 56

*United States v. Holden,*
  __ F. Supp.3d __, No. 3:22-cr-30-RLM-MGG,
  2022 WL 17103509 (N.D. Ind. Oct. 31, 2022) ..................... *passim*

*United States v. Jimenez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ................................................... 17

*United States v. Kapp,*
  302 U.S. 214 (1937) ............................................................... 63, 64

*United States v. Kays,*
  __ F. Supp.3d __, No. 22-cr-40-TDD,
  2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) ......... 10, 14, 24, 45

*United States v. Kelly,*
  No. 3:22-cr-0037, 2022 WL 17336578
  (M.D. Tenn. Nov. 16, 2022) ....................................... 10, 24, 30, 31

*United States v. Knox,*
  396 U.S. 77 (1969) ...................................................................... 63

*United States v. Love,*
  No. 20-cr-20327, 2021 WL 5758940
  (E.D. Mich. Dec. 3, 2021) ............................................................ 24

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) ................................................. 11, 12

*United States v. Olano,*
  507 U.S. 725 (2009) ................................................. 55, 57, 59, 66

*United States v. Ortiz-Loya,*
  777 F.2d 973 (5th Cir. 1985) ....................................................... 61

*United States v. Perez-Gallan,*
  __ F. Supp. 3d __, 4:22-cr-427-DC,
  2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ...................... 48, 50

*United States v. Perez-Garcia,*
  __ F. Supp. 3d __, No. 3:22-cr-1581-GPC,
  2022 WL 17477918 (S.D. Cal. Dec. 6, 2022) .............................. 45

*United States v. Ramirez,*
  37 F.4th 233 (5th Cir. 2022) ....................................................... 65

*United States v. Reaves,*
  No. 4:22-cr-224-HEA-JMB
  (E.D. Mo. Jan. 9, 2023), ECF No. 55.................................... 10, 24

*United States v. Salerno,*
  481 U.S. 739 (1987) .............................................................*passim*

*United States v. Slye,*
  No. 1:22-mj-144, 2022 WL 9728732
  (W.D. Penn. Oct. 6, 2022) ........................................................ 34

*United States v. Stambaugh,*
  __ F. Supp. 3d __, No. 22-cr-00218-PRW-2,
  2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)..................*passim*

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010)...................................................... 20

## Constitutional Provisions

U.S. Const. amend. I .................................................... 16, 18, 22, 63

U.S. Const. amend. II .............................................................*passim*

U.S. Const. amend. IV .............................................................*passim*

U.S. Const. amend. IX .................................................................. 16

U.S. Const. amend. XIV.......................................................... 26, 46

## Statutes

18 U.S.C. § 922(a)(6) .............................................................*passim*

18 U.S.C. § 922(b)(1) .................................................................. 63

18 U.S.C. § 922(g)(8) .................................................................. 48

18 U.S.C. § 922(n) ..................................................................*passim*

18 U.S.C. § 3142....................................................................*passim*

1 Acts and Resolves, Public and Private, of the Prince of the
  Massachusetts Bay (1869) .......................................................... 48

1 Laws of the State of Delaware from the Fourteenth Day
of October, One Thousand Seven Hundred, to the
Eighteenth Day of August, One Thousand Seven
Hundred and Ninety-Seven (1797) ....................................... 48, 49

2 Statutes at Large of Pennsylvania from
1682 to 1801 (1896) .............................................................. 48, 49

Act of Oct. 3, 1961, Pub. L. No. 87–342,
75 Stat. 757 (repealed) ............................................................... 32

Acts and Laws of His Majesties Colony of
Connecticut in New England (1901).................................... 48, 49

Acts and Laws of His Majesty's Province of
New-Hampshire in New England (1759) ...................... 47, 48, 50

Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e),
52 Stat. 1250 (repealed) ............................................................. 32

Gun Control Act of 1968, Pub. L. 90–618,
82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928) ...................... 32

Judiciary Act of 1789, 1 Stat. 73 ............................................... 34, 35

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (Eng.)................. 37, 38

**Rules**

Fed. R. App. P. 32(a)(5) ................................................................... 69

Fed. R. App. P. 32(a)(6) ................................................................... 69

Fed. R. App. P. 32(a)(7)(B) ............................................................. 69

Fed. R. App. P. 32(f)........................................................................ 69

Fed. R. Crim. P. 51(b)................................................................ 58, 59

Fed. R. Crim. P. 52(a)....................................................................... 57

Fed. R. Crim. P. 52(b)................................................................ 57, 58

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ......................................... 45

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) ......................... 38

Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 Wm. & Mary Bill Rts. J. 1037 (2009) ............. 38

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ............................................. 40, 41, 42

Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994) ........................................ 38

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) ...................................... 39, 41, 43

## Issues Presented for Review

1.    Whether the district court correctly held that 18 U.S.C. § 922(n)  violates the Second Amendment under *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

2.    Whether the district court correctly held, under plain-error review, that 18 U.S.C. § 922(n)'s unconstitutionality renders a related false statement immaterial for the purposes of an 18 U.S.C. § 922(a)(6) charge.

## Statement of the Case

The district court dismissed Jose Gomez Quiroz's charges under 18 U.S.C. § 922(n), for receipt of a firearm while under indictment, and 18 U.S.C. § 922(a)(6), for making a false statement in connection with the acquisition of a firearm. The court held that § 922(n) violates the Second Amendment under the framework announced in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Government appeals the district court's ruling. ROA.310. This Court should affirm.

In December 2021, Quiroz ordered a semi-automatic pistol and had it shipped to a hardware store in Alpine, Texas. ROA.59. Two weeks later, Quiroz completed the relevant paperwork, including an ATF Form 4473, when he picked up the firearm at the hardware store. ROA.39, 61–66. On the Form 4473, he checked a box indicating he was not under indictment for a felony or other crime for which he could be imprisoned for more than a year. ROA.61. But Quiroz was under indictment at the time. He had been indicted in Texas state court for a June 2020 burglary of a habitation and for failure to appear at a court hearing in June 2021. ROA.55, 57.

In March 2022, Quiroz was indicted for making a false statement in connection with the acquisition of a firearm, in violation of

§ 922(a)(6), and for receiving a firearm while under indictment, in violation of § 922(n). ROA.13–15.

Quiroz moved to dismiss the indictment. ROA.38–52. He argued that § 922(n) violated the Second Amendment and his due process rights, both facially and as applied, and that any false statement about his indictment status was, therefore, immaterial for the purposes of his § 922(a)(6) charge. ROA.38–52. The Government opposed the motion, arguing primarily that Quiroz lacked standing to challenge either statute because he was accused of making a false statement. ROA.71–81. After additional briefing, the district court found that Quiroz had standing to challenge § 922(n) but denied the motion. ROA.105–16. The court did not address the as-applied challenge, finding it inadequately briefed. ROA.109. On the facial challenge, the court applied the Fifth Circuit's then-existing two-part framework, using means-end scrutiny. ROA.110–14. The court's order was issued June 9, 2022. ROA.116.

On June 23, 2022, the Supreme Court announced its decision in *Bruen*. The decision repudiated the use of means-end scrutiny in Second Amendment challenges. *Bruen*, 142 S. Ct. at 2127–30. Under the *Bruen* framework, if the Second Amendment's plain text co-

vers an individual's conduct, the conduct is presumptively protected. *Id.* at 2129–30. The government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. On the same day that the Court announced *Bruen*, a jury convicted Quiroz on both counts of the indictment. ROA.192.

In light of *Bruen*, Quiroz moved for reconsideration of the denial of his motion to dismiss, or, in the alternative, for judgment of acquittal. ROA.193–207.

The Government opposed Quiroz's motion. ROA.231–49. It argued that the district court should only consider Quiroz's facial challenge, not his as-applied challenge. ROA.238–39. The Government did not address Quiroz's request to dismiss his § 922(a)(6) charge. ROA.238–39.

The district court granted Quiroz's motion to reconsider and dismissed the indictment. ROA.285–309. It explained, at *Bruen* step one, that the plain text "without a doubt" covers the conduct in question. ROA.289–91. It reasoned that, at step one, it needed only consider the conduct—firearm receipt—not Quiroz's status as an indictee. ROA.289–91. And the court explained that receipt was protected conduct, as a prerequisite to firearm possession.

ROA.289–91. At step two, it rejected the Government's attempted analogies to statutes like § 922(g)(1) and 19th century surety statutes. ROA.293–97. After an extensive historical discussion and analysis of other constitutional rights, the district court concluded that § 922(n) was not consistent with the Nation's historical traditions of firearms regulation. ROA.293–309. The court reasoned that because § 922(n) is unconstitutional, the § 922(a)(6) charge must also be dismissed because Quiroz's "false statement during the purchase of the firearm is immaterial." ROA.286. Thus, the court dismissed both counts of the indictment. ROA.309.

## Summary of the Arguments

**I. Section 922(n) violates the Second Amendment, and the district court's dismissal should be affirmed.**

Under the new analytical framework established in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the district court correctly held that 18 U.S.C. § 922(n) violates the Second Amendment. The plain text of the Second Amendment protects receipt of a firearm, and the Government cannot show that § 922(n) is consistent with the Nation's historical tradition of firearm regulation. This Court should affirm the district court's dismissal of the § 922(n) charge.

On *Bruen*'s first step, § 922(n) conduct is protected by the plain text of the Second Amendment. Receipt of a firearm impacts the core right to bear arms. And step one considers only conduct, not a person's status. The Second Amendment extends to "the people" without limitation. It does not exclude those under indictment. The Government's arguments to the contrary are unavailing. Even if the Government could insert a "law-abiding" requirement not found in the text of the Second Amendment, indictees are necessarily "law-abiding" because they are innocent until proven guilty.

On step two, there is no historical tradition from the founding of disarming those under indictment. Under *Bruen*'s straightforward approach, the Government must show a broad historical tradition of firearms restrictions that are "distinctly similar" to § 922(n). The absence of such laws demonstrates that § 922(n) is not consistent with the Nation's historical tradition of firearm regulation. The Government argues that *Bruen* does not require following the straightforward approach. Instead, it incorrectly applies the "nuanced approach" reserved for cases "implicating unprecedented societal or dramatic technological change" that would have been "unimaginable at the founding." *See Bruen*, 142 S. Ct. at 2132. The Government misapplies *Bruen*. It also relies on three general types of historical restrictions to support § 922(n)'s constitutionality: (1) laws permitting pretrial detention, (2) laws disarming "dangerous or untrustworthy" people, and (3) surety laws. None satisfy the *Bruen* standard under either approach.

The Government's alternative arguments also fail. The Government argues that the district court failed to apply the appropriate standard for a facial challenge, which requires showing that § 922(n) is unconstitutional in all its applications. The Government misunderstands the facial standard by considering circumstances

7

that would render § 922(n) irrelevant, rather than actual applications of the statute. Its characterization of the burden in a facial challenge would prohibit facial challenges to any statute under any Constitutional provision, including the very challenge brought in *Bruen*. The Government also claims that the district court erred by finding § 922(n) facially unconstitutional instead of first considering it as applied. The Government failed to raise this argument below and cannot show that any purported error was plain.

This Court should affirm.

## II. The district court did not plainly err in dismissing Quiroz's § 922(a)(6) charge, because § 922(n)'s unconstitutionality rendered any false statement immaterial.

The district court also correctly dismissed Quiroz's 18 U.S.C. § 922(a)(6) charge, which charged him with falsely stating that he was not under indictment when purchasing a firearm. The court correctly concluded that if § 922(n) is unconstitutional, then any false statement about his indictment status is not "material" under the plain language of § 922(a)(6). This Court should affirm the district court's dismissal.

The Government argues for the first time on appeal that the district court erred because a defendant charged with false statements

is not permitted to challenge the validity of the requirement itself. It is wrong. The Government's cases address direct constitutional challenges to fraud statutes and do not foreclose Quiroz challenging the materiality element of § 922(a)(6). Moreover, the Government fails to show that any error is "clear and obvious," affected the Government's substantial rights, or affected the integrity of the judicial proceedings.

This Court should affirm.

## Arguments and Authorities

### I. Section 922(n) violates the Second Amendment, and the district court's dismissal should be affirmed.

18 U.S.C. § 922(n) criminalizes firearm receipt by any person under indictment for a crime punishable by more than a year. Under the new framework announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the district court correctly held that § 922(n) violates the Second Amendment. ROA.285–309. A growing majority of courts have similarly found § 922(n) unconstitutional.[1] This Court should affirm the district court's order dismissing the indictment.

---

[1] *See United States v. Hicks*, __ F. Supp. 3d __, No. 6:21-cr-0060-ADA, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023); *United States v. Stambaugh*, __ F. Supp. 3d __, 22-cr-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022); *United States v. Holden*, __ F. Supp.3d __, No. 3:22-cr-30-RLM-MGG, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022); *see also United States v. Reaves*, No. 4:22-cr-224-HEA-JMB (E.D. Mo. Jan. 9, 2023), ECF No. 55. Conversely, counsel is aware of only two district courts that have upheld § 922(n) since *Bruen*. *See United States v. Kelly*, No. 3:22-cr-0037-AAT, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022); *United States v. Kays*, __ F. Supp.3d __, No. 22-cr-40-TDD, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022). No circuit court has yet addressed this issue.

**A.** *Bruen* **established a new analytical framework for analyzing Second Amendment challenges.**

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified an individual right to possess and carry weapons, the core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right").

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (cleaned up). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law

was constitutional. *Id*. Otherwise, courts proceeded to the second step to determine whether to apply strict or intermediate scrutiny. *Id*. That framework has now been abrogated by the Supreme Court. *See Bruen*, 142 S. Ct. at 2127.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims. The Court rejected the second step of the two-step inquiry adopted by this Court and others because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. The Supreme Court reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

The Supreme Court elaborated that, under the new framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the Government cannot make that showing, then the regulation is unconstitutional. *Id*.

The *Bruen* framework applies to Quiroz's challenge to § 922(n).[2]
*See, e.g., United States v. Hicks*, __ F. Supp. 3d __, No. 6:21-cr-0060-ADA, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023).

## B. The Second Amendment's plain text covers the conduct prohibited by § 922(n).

Section 922(n) prevents those under indictment from receiving firearms, a necessary precursor to the fundamental right to possess firearms for self-defense. Under the plain text of the Second Amendment, it is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129–30.

### 1. Firearm *receipt* is covered by the Second Amendment's plain text.

The sole question at this first stage of the *Bruen* analysis is whether the relevant "conduct" is covered by the plain text of the Second Amendment. *Id.* at 2126. The conduct prohibited by § 922(n)—receipt of a firearm—is clearly covered by "the right of

---

[2] The Government appears to argue that caselaw upholding the power to detain or impose other restraints on indictees should extend directly to § 922(n), without applying *Bruen*. Gov't Br. 13–16. The *Bruen* framework plainly applies to all Second Amendment challenges and the Government's arguments are better addressed in the context of the plain text of the Amendment and the historical traditions of firearm regulation. *See infra* Sections I.B.2.b and I.C.3.a.

the people to keep and bear arms[.]" U.S. Const. amend. II. Receipt itself, and as a necessary precursor to possession, impacts the core Second Amendment right to possess a firearm for self-defense.[3] *See McDonald*, 561 U.S. at 767; *see also generally Bruen*, 142 S. Ct. 2111.

2. <u>Those under indictment are included in "the people" protected by the Second Amendment.</u>

The question of a person's status, as an indictee or otherwise, is irrelevant to this stage of the *Bruen* framework. The district court held the same. ROA.289–91; *see also United States v. Kays*, ___ F. Supp. 3d ___, No. 22-cr-40-TDD, 2022 WL 3718519, at *2 (W.D. Okla. Aug. 29, 2022). The Government, however, argues the plain text of the Second Amendment does not apply to § 922(n) conduct, because those under indictment are not "law-abiding." Gov't Br. 18–27. It is wrong.

---

[3] *See United States v. Laurent*, 861 F. Supp. 2d 71, 85 (E.D.N.Y. 2011) ("Unless the defendant already possesses a firearm prior to his indictment, § 922(n) does deny him the ability to keep and bear arms for the purpose of self-defense in his home.").

14

a. *"The people" protected by the Second Amendment is not limited to "law-abiding" citizens.*

The Second Amendment covers all citizens by conferring the right "to keep and bear arms" on "the people." U.S. Const. amend. II. The plain text does not limit who is included in "the people." *Id.* The text simply says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has confirmed that "the people" includes "all Americans." *See Heller*, 554 U.S. at 581. So whether a category of person can be disarmed is a question of historical tradition—and falls under the second *Bruen* step, not the Second Amendment's plain text.

*Heller* rejected the Government's theory here that "the people" protected by the Second Amendment is limited to a subset. 554 U.S. at 579–81, 592–600. The Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

15

*Heller* explained that, like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right, as opposed to "collective" actions like voting. *Id.* at 579–80. Individual rights extend to "the people," or a "'class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community.'" *Id.* at 580. Categorically excluding indictees from the plain text of the Second Amendment would, therefore, endanger their basic protections under the First and Fourth Amendment, or else run afoul of *Bruen*'s directive that the Second Amendment is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (cleaned up).

One sitting Justice—who joined the majority in *Bruen*—has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the existence of the right. In *Kanter v. Barr*, then-Judge Barrett reasoned that, under *Heller*, the word "people" refers to "all Americans"—that even those who can be lawfully restricted are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by*

*Bruen*, 142 S. Ct. 2111. The "question is whether the government has the power to *disable* the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* (emphasis added); *cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (interpreting *Heller* to say that felons and others who could be disarmed are still part of "the people" protected by the Constitution). Thus, a person's status is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Kanter*, 919 F.3d at 451–52).

The Government rejects this plain application of *Heller* and the plain text of the Second Amendment. It argues that step one requires consideration of status, because the Second Amendment applies only to law-abiding, responsible citizens, a category it claims excludes those under indictment. Gov't Br. 18–27. According to the Government, the *Bruen* "Court explicitly, repeatedly described the right as belonging only to law-abiding citizens." Gov't Br. 19.

But the Second Amendment says nothing about "law-abiding" citizens. And *Bruen* never said the right belongs *only* to law-abiding citizens. Rather, the Court noted that it was undisputed that the petitioners, who were "two ordinary, law-abiding, adult citizens—

are part of 'the people.'" 142 S. Ct. at 2134. The Court did not hold that being law-abiding was a *prerequisite* to the basic protections of the Second Amendment. Such a reading would conflict with *Bruen*'s language that the "Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156.

Nor did *Heller* hold that "the people" is limited to "law-abiding" citizens. Rather, *Heller* explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of heart and home." 554 U.S. at 635; *see also Stimmel v. Sessions*, 879 F.3d 198, 204–05 (6th Cir. 2018) (finding *Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens *at the very least*") (emphasis added). The Government's reading conflicts with *Heller*'s plain directive that the Second Amendment, like the First and Fourth Amendments, applies to "all Americans." 554 U.S. at 579–81.

The Government also argues that some courts before and since *Bruen* instruct that the Second Amendment only applies to "law-

abiding" citizens.[4] Gov't Br. 19, 22–25. The primary case it cites to has since been vacated. *See Range v. Att'y Gen. United States*, __ F.4th __, 53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, __ F.4th __, No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023). A vacated opinion, of course, "is not good law." *In re White-Robinson*, 777 F.3d 792, 797 n.3 (5th Cir. 2015). *Range* did not analyze the plain text of the Second Amendment, and its reasoning improperly conflated the two steps of *Bruen* to determine that felons were excluded from the Second Amendment. *See, e.g.*, 53 F.4th at 269 (stating *Bruen* directed courts to consider the Second Amendment's text and the Nation's historical traditions "in a single step"). The pre-*Bruen* cases cited by the Government suffer the same flaw because, before *Bruen*, the textual and historical analyses were part of the same step. *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 158–

---

[4] While courts are split on whether *felons* are categorically excluded from the Second Amendment on this reasoning, *see, e.g., United States v. Coombes*, __ F. Supp. 3d __, No. 22-cr-189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022), in § 922(n) challenges they uniformly hold that *indictees* are not. *See infra* Section I.B.2.b.

60 (D.C. Cir. 2019); *United States v. Vongxay*, 594 F.3d 1111, 1116–18 (9th Cir. 2010).[5]

The district court correctly found that a person's status should not be considered at step one of *Bruen*.

### b. Those under indictment cannot be categorically excluded from "law-abiding citizens."

Even if—contrary to its plain text and precedent—the Second Amendment was read to apply only to "law-abiding" citizens, that definition does not categorically exclude indictees.

Indictees are, by definition, "law-abiding." *United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011); *cf. Coffin v. United*

---

[5] The Government's remaining arguments that indictees are not included in "the people" are likewise unavailing and frequently misstate or conflate the two *Bruen* steps. For example, *Bruen*'s failure to find "shall-issue" licensing regimes unconstitutional is not an endorsement of each component of those laws and in no way suggests that only "law-abiding" people are protected by the Second Amendment. *See* Gov't Br. 21–22. *Bruen* declined to "rule out constitutional challenges to shall-issue regimes[.]" *Id.* at 2138 n.9. And it made this point in a single footnote in the *second* step of *Bruen*, so it does not suggest that the "law-abiding" question must be addressed at step one. Nor does *Bruen*'s use of the word "presumptively" in step one, and *Heller*'s use of "presumptively lawful" to describe longstanding prohibitions on felons, imply that the "law-abiding" question must be considered at step one of *Bruen*. Gov't Br. 20–21.

*States*, 156 U.S. 432, 453 (1895) (explaining that defendant's "innocence is established until sufficient evidence is introduced to overcome the proof which the law has created"). The "indictment itself is not any evidence whatever of guilt," but "merely a means of method of getting a case into court and of informing the defendant of the nature of the charge against him." *United States v. Faulkner*, 488 F.2d 328, 331 (5th Cir. 1974). "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin*, 156 U.S. at 453. A declaration that a person under indictment is not "law-abiding" necessarily presumes his or her guilt rather than innocence.[6]

The Government disregards the presumption of innocence and suggests indictees are categorically not "law-abiding" because other courts have held that felons or other categories of people are not

---

[6] The Government misunderstands the import of the presumption of innocence on this question. The Government notes that the presumption of innocence allocates the burden of proof in criminal trials but does not confer additional rights. Gov't Br. 15. But the question is whether indictees are "law-abiding" and the Government's assertion that those under indictment are presumptively not "law-abiding"—guilty of a crime—subverts the trial burden itself.

"law-abiding." *See* Gov't Br. 25–26 (citing *Range*, 53 F.4th at 280–81; *United States v. Bena*, 664 F.3d 1180, 1184–85 (8th Cir. 2011)). But indictees are plainly distinguishable from felons because they have not been convicted. Nor were they subject to an adversarial hearing at which they were found to pose a specific threat, such as in *Bena.* 664 F.3d at 1185.

The Government otherwise argues that indictees are excluded from the Second Amendment because they can have other liberties restricted. Gov't Br. 26; *see also* Gov't Br. 13–16. The Government misunderstands *Bruen* and the difference between the existence of a right (step one) and the power to restrict that right (step two).

The cases cited by the Government do not say that indictees or pretrial detainees lack constitutional rights; they specifically hold that the groups retain constitutional rights, which can nevertheless be restricted in certain circumstances. *See United States v. Salerno*, 481 U.S. 739, 748–51 (1987) (holding the "individual's strong interest in liberty" was outweighed by the regulatory interest in community safety); *Bell v. Wolfish*, 441 U.S. 520, 545, 550–51, 558–60 (1979) (explaining that detainees and prisoners retain First and Fourth Amendment rights, which can be restricted for security con-

cerns). The Government also erroneously asserts that *Kaley* recognized that an "indictment 'eliminates' some constitutional liberties." Gov't Br. 13 (citing *Kaley v. United States*, 571 U.S. 320, 327–29 (2014)). In fact, *Kaley* makes clear that by "eliminate," the Court did not mean extinguishes, but rather that an indictment otherwise *satisfies* a person's "Fourth Amendment right to a prompt judicial assessment of probable cause[.]" *Kaley*, 571 U.S. at 320–21; *see also Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). Like *Salerno* and *Bell*, *Kaley* does not say that those under indictment are *excluded* from the protections of the Constitution.

Assuredly, those under indictment can have some rights impaired, particularly after an additional hearing or finding, but that does not mean that they are no longer protected by the Constitution or, specifically, the Second Amendment. As explained in *Bell*: "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." 441 U.S. at 545. Similarly, indictees continue to be protected by the Constitution, even if those protections may be subject to restrictions.

Every district court to consider § 922(n) has found either that indictees are "law-abiding" or that the issue should not be addressed at step one of *Bruen*. *See, e.g.*, *Hicks*, 2023 WL 164170, at *2–3; *United States v. Kelly*, No. 3:22-cr-0037, 2022 WL 17336578, at *2–3 (M.D. Tenn. Nov. 16, 2022); *United States v. Stambaugh*, __ F. Supp. 3d __, No. 22-cr-00218, 2022 WL 16936043, at *2–3 (W.D. Okla. Nov. 14, 2022); *United States v. Holden*, __ F. Supp. 3d __, No. 3:22-cr-30-RLM-MGG, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022); *Kays*, 2022 WL 3718519, at *2; *United States v. Love*, No. 20-cr-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021); *Laurent*, 861 F. Supp. 2d at 101–02; *see also Reaves*, No. 4:22-cr-224, ECF No. 55 at 15–16.[7] No circuit court has addressed the question post-*Bruen*.

The district court correctly found that Quiroz's conduct was protected by the Second Amendment's plain text.

---

[7] The Government relies on an outlier case addressing another statute to argue those under indictment are not "people" protected by the Constitution. *See* Gov't Br. 26–27 (citing *United States v. Fencl*, No. 21-cr-3101-JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (addressing 18 U.S.C. § 3142(c)(1)(B)(viii))).

**C. The Government has not shown that § 922(n) is "consistent with the Nation's historical tradition of firearm regulation."**

Because the plain text of the Second Amendment covers § 922(n), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As the district court correctly held, the Government has not met that burden. ROA.309.

### 1. *Bruen* established an exacting framework for demonstrating a historical tradition.

The *Bruen* framework requires the Government to establish that the challenged law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. *Bruen* set out some metrics by which the sufficiency of the historical precedent should be analyzed: (1) the historical regulations' temporal proximity to the founding era, (2) the breadth of historical regulations, and (3) the similarity of the historical regulation to the challenged restriction. *Bruen*, 142 S. Ct. at 2130–34, 2136, 2138.

For temporal proximity, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the*

*people adopted them.*'" *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id.*[8] Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the particular Constitutional Amendment and explained that, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

Regarding breadth, the Government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Id.* at 2138. In other words, the founding-era historical

---

[8] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not suggest—for a challenge to a *federal* statute—that regulations from around the passage of the Fourteenth Amendment, or 1868, would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, 142 S. Ct. at 2137–38; *see also id.* at 2163 (Barrett, J., concurring).

evidence must show a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic." *Id*. at 2137 (cleaned up). The Government cannot "simply posit that the regulation promotes an important interest." *Id*. at 2126. Nor can it rely on "outlier" historical restrictions. *Id*. at 2133, 2156. Indeed, the *Bruen* Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id*. at 2142 (emphasis in original). Moreover, it is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id*. at 2130 n.6, 2150.

Lastly, the Government must present founding-era historical examples comparable to the challenged regulation. *Bruen* established two different approaches for how similar those historical examples must be. Which approach applies depends on whether the challenged restriction seeks to address an unprecedented or persistent societal problem. For a regulation that "addresses a general societal problem that has persisted since the 18th century," a "straightforward historical inquiry" applies. *Id*. at 2131. For that straightforward inquiry, the "lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged

regulation is inconsistent with the Second Amendment." *Id*. A distinctly similar regulation, as illustrated by *Bruen*'s historical analysis, means that the historical regulation must be meaningfully the same.[9] *Id*. at 2153. "Likewise, if earlier generations addressed the societal problem … through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*. at 2131. The total handgun ban in *Heller* and the public-carry restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id*.

In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id*. Whether a historical regulation is a proper analogue for a uniquely modern regulation turns

---

[9] The Court found only one statute sufficiently analogous to the New York public-carry restriction to be "distinctly similar"—a Texas statute effectively identical to the New York restriction. *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). The Texas statute forbade carrying a pistol unless the person had reasonable grounds to fear an attack, and the New York regulation required the person to show a special need for defense before issuing a public-carry license.

on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id*. at 2132–33. But this "nuanced approach" only applies to "modern regulations that were unimaginable at the founding." *Id*. at 2132.

As in *Bruen*, § 922(n) addresses a "general societal problem" that existed during the founding era—indictees receiving firearms. Thus, the straightforward inquiry applies. If historical regulations did not address this problem in a distinctly similar way—blanketly criminalizing an indictee's receipt of a firearm—then that is relevant evidence that § 922(n) is unconstitutional.

   2. The Government misunderstands the *Bruen* framework.

The Government disagrees with this application of *Bruen* in two ways.

First, it argues that *Bruen*'s historical inquiry does not "split neatly into" a straightforward approach and a nuanced approach. Gov't Br. 28–29. The Government then applies the nuanced approach without asserting that § 922(n) addresses an "unprecedented societal concern or dramatic technological change." *Bruen*, 142 S. Ct. at 2133; *see* Gov't Br. 27–29. But *Bruen* plainly established two approaches. Indeed, the Court applied the "straightforward" approach, as it had in *Heller*, because both cases addressed

general and persistent societal problems. 142 S. Ct. at 2131–32.[10] It then explained that other types of restrictions addressing "unprecedented societal concerns" could "require a more nuanced approach." *Id.* at 2132.[11]

Second, the Government argues that historical analysis considers not just the laws that existed during relevant time periods, but "what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." Gov't Br. 28 (citing *Kelly*, 2022 WL 17336578). *Kelly* cites no authority for this proposition, and it is contrary to *Bruen*. *Kelly* ignored key portions of *Bruen*'s originalist underpinnings, and

---

[10] Both approaches require extensive consideration of history. But contrary to the Government's argument, *Bruen* did not review history for "relevantly similar analogues." Gov't Br. 28. Rather, under the "straightforward" approach, it noted in each historical period the absence of laws restricting public carry only to those who demonstrated special need. *Bruen*, 142 S. Ct. at 2142, 2145, 2150, 2155–56. The only historical example it found sufficiently "similar" was effectively identical to the challenged New York law. *See supra* n.12.

[11] It was only in the context of this "nuanced approach," that the *Bruen* Court explained that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*," and that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." 142 S. Ct. at 2133.

the court even expressed a lack of confidence in its own ruling. *Id.* at \*4–6. *Bruen* directs parties to compare challenged firearms laws to actual historical regulations, not merely the Founders' views, hypothetical or otherwise. 142 S. Ct. at 2131–35. *Bruen* established a concrete burden for the Government: to show consistency with the "historical tradition of *firearm regulation*." *Id.* at 2130 (emphasis added); *see, e.g.*, *id.* at 2142 ("[T]here is little evidence of an early American practice of regulating public carry by the general public.").

3. <u>The Government fails to point to sufficiently similar laws that prove a tradition of categorically disarming those under indictment.</u>

The Government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming those under indictment.

"Indictment has historically had a limited effect on an individual's constitutional rights." *Laurent*, 861 F. Supp. 2d at 91. The impact has generally been limited to detention or certain pre-trial conditions only after a judicial determination that such conditions are necessary. *Id.* at 90–93 (citing *Salerno*, 481 U.S at 764 (1987); 18 U.S.C. § 3142). Indeed, the history of barring indicted individuals

from receiving firearms is limited and relatively recent. The colonial governments did not disarm indictees, and federal and state governments did not do so until 1938.[12]

The Government does not identify any laws "distinctly similar" to § 922(n)—laws specifically prohibiting indictees from obtaining firearms. As such, the Government fails to show a historical tradition supporting the constitutionality of § 922(n) under *Bruen*'s straightforward approach, and this Court should affirm. *Cf. Bruen*, 142 S. Ct. at 2131.

Instead, the Government identifies three sets of historical examples that it argues are sufficiently analogous: (1) laws allowing pretrial detention as a general matter, (2) a vague collection of laws disarming so-called "dangerous or untrustworthy" people, and (3)

---

[12] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not until 1961 that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968 to include indictments in state and federal court, but only those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

surety laws.  Gov't Br. 29–47. Each example fails under either approach from *Bruen*.

> ### a. *Historical laws allowing pretrial detention of indicted defendants.*

Pretrial detention is not "distinctly similar" to § 922(n), and the Government does not argue it is. *See* Gov't Br. 29–34. That should end this Court's analysis.

Nor is pretrial detention even "relevantly similar" under the nuanced approach. The Government reasons that if indictees can be *detained*, then they can be disarmed. Gov't Br. 34. But *Bruen* requires the Government to show § 922(n) is "consistent with the Nation's historical tradition of *firearm regulation*." 142 S. Ct. at 2130 (emphasis added). It does not permit reasoning by analogy to other types of restrictions. When the *Bruen* Court explained the "relevantly similar" standard, it asked "whether modern and historical regulations impose a comparable burden on *the right of armed self-defense*[.]" *Id*. at 2133 (emphasis added). Every historical law considered in *Bruen* was a firearm or weapons restriction. *Id*. at 2138–56.

Even if pretrial detention was a "firearm regulation," for *Bruen* purposes, it is not "relevantly similar" to § 922(n) based on "why"

and "how" it burdens Second Amendment rights. *See Id.* at 2132–33. Pretrial detention has historically been limited to certain offenses or required a hearing or some specific showing of dangerousness or flight risk. *See* Judiciary Act of 1789, 1 Stat. 73, Sec. 33 (requiring that bail be admitted except in capital cases); *see also* 18 U.S.C. § 3142 (requiring a detention hearing at which the government bears the burden to show dangerousness or flight risk). This procedural protection fundamentally alters "how" the law impacts a person's rights, and the inquiry into dangerousness addresses "why." The cases cited by the Government on this point do not involve § 922(n), but challenges to the Bail Reform Act firearm restrictions, so the defendant had the same protections. *See* Gov't Br. 32–33 (citing *United States v. Slye*, No. 1:22-mj-144, 2022 WL 9728732 (W.D. Penn. Oct. 6, 2022); *Fencl*, 2022 WL 17486363)). Furthermore, any restrictions on firearm possession due to pretrial detention shows that earlier generations addressed the societal problem "through materially different means"—evidence that § 922(n) is unconstitutional. *See Bruen*, 142 S. Ct. at 2131.

Pretrial detention is also not routinely granted in every felony case, but § 922(n) applies to anybody indicted for a felony. The Judiciary Act of 1789 only permitted detention without bail for capital

offenses. 1 Stat. 73, Sec. 33. While the death penalty could be applied in more cases in 1789, it did not apply to all offenses that would subject somebody to § 922(n)'s prohibitions today—any offense punishable by more than a year in prison. *See* 18 U.S.C. § 922(n); *see also Kanter*, 919 F.2d at 458–61 (Barrett, J., dissenting) (explaining that capital punishment was used sparingly in the American colonies and did not apply to property crimes). The modern Bail Reform Act, similarly, differentiates between offenses, with some warranting a rebuttable presumption of dangerousness. *See* 18 U.S.C. § 3142(e). There is no such delineation between types of felonies in § 922(n), except that the offense must be punishable by more than a year. Indeed, even misdemeanor offenses in some states could subject one to § 922(n)'s prohibition.

The Government argues that § 922(n) imposes a far lesser burden on an indicted defendant than detention. Gov't Br. 34. But *Bruen* does not ask about burdens on liberty generally, it asks about burdens on the right to bear arms. 142 S. Ct. at 2133. Although pretrial detention necessarily indirectly burdens the right to bear arms, the impact is arguably lower because the need for armed self-defense is presumably less while detained. And those detained pretrial have been determined more likely to have committed a serious

crime than those released pretrial and thus impacted by § 922(n). Indeed, § 922(n) only meaningfully applies to indictees who have been released pre-trial, the exact inverse population of those indictees detained pretrial, to whom the Government compares them.

Pretrial detention is not a firearm restriction under *Bruen* and, otherwise, does not provide a historical basis for disarming those under indictment.

### b. *Historical laws disarming dangerous or untrustworthy people.*

The Government also argues that an ill-defined history of disarming "dangerous or untrustworthy" people supports § 922(n)'s constitutionality. Gov't Br. 35–42. The Government does not argue that this history includes "distinctly similar" restrictions to § 922(n). Rather, it argues that different historical categorical restrictions against groups bearing no relation to indictees support a finding that *any* "dangerous or untrustworthy" person can be disarmed. The Government includes as support: (1) 17th century English laws disarming political opponents or prohibiting armed misconduct; (2) laws disarming those who refused to swear allegiance; (3) rejected proposals during ratification debates to limit the Second

Amendment; (4) laws disarming minorities; and (5) a general principle of disarming "unvirtuous citizens." Gov't Br. 35–42. The Government improperly groups these disparate restrictions together to suggest a robust tradition of similar firearm regulation. Its arguments are unavailing.

*17th century English laws*

The Government identifies a tradition in England of disarming those judged dangerous to the peace or "going armed to terrify the King's subjects." Gov't Br. 35 (citing Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (Eng.); *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). It reasons that this tradition was adopted by the colonies, several of which codified laws prohibiting going armed offensively. Gov't Br. 35–37.

The English laws are of little historical significance under *Bruen*. The Court cautioned against placing undue emphasis on English laws, particularly laws that long pre-date this Nation's founding. *See Bruen*, 142 S. Ct. at 2138–39. And many laws from the Restoration Era (1660–85) are recognized as incompatible with the right ultimately codified in the Second Amendment. *See Hicks*, 2023 WL 164170, at *5; *see also Heller*, 554 U.S. at 606–08. Laws like the Militia Act of 1662 were generally understood as pretextual

statutes used to disarm Protestants and political opponents. *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 401–02 (2019). The Declaration of Rights codified after the Glorious Revolution in 1688—a precursor to the Second Amendment—explicitly rejected abuses like the Militia Act and ensured that Protestants would not be disarmed. *See Heller*, 554 U.S. at 593; Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 Wm. & Mary Bill Rts. J. 1037, 1058 (2009); Joyce Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 114–18 (1994).

Moreover, English laws and similar laws passed by some of the colonies criminalizing "going armed to terrify" people, Gov't Br. 36, are not comparable to § 922(n). They criminalize specific conduct not at issue here. *See Bruen*, 142 S. Ct. at 2144–45 (rejecting comparison to these laws). Section 922(n) does not criminalize "going armed to terrify" people; it criminalizes receipt of a firearm for any purpose by a person under indictment.

*Laws disarming those who refused to swear allegiance*

The Government next relies on Revolution-era laws confiscating weapons from those who refused to swear an oath of allegiance. Gov't Br. 37–38. The Government reasons that this type of disarmament, as well as the disarming of religious minorities like Catholics, demonstrates that even non-violent individuals could be disarmed if they showed disrespect for the rule of law. *Id.* (citing *Range*, 53 F.4th at 279). But, again, the Government does not explain, except at the highest levels of abstraction, how those under indictment are similar to political or religious dissidents.

The Second Amendment was a repudiation of disarming political opponents. *See Hicks*, 2023 WL 164170, at *5; *see also Heller*, 554 U.S. at 592–95, 598. In fact, "disarmament of the politically disloyal is the very tyranny the Second Amendment sought to deter." *Hicks*, 2023 WL 164170, at *5. The laws cited by the Government were not first adopted during the American Revolution but had previously been imposed on the colonies against those who refused to swear allegiance to the English crown. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157–61 (2007)

(Churchill). The colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (Greenlee). But the period immediately around the founding was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. *Id.* at 268–70. Even "'traitors' unwilling to swear allegiance to the Crown retained their weapons in colonial America." *Hicks*, 2023 WL 164107, at *5.

### *Proposals from ratification debates*

The Government next argues that disarming select groups is consistent with proposals raised during ratification debates to limit the right to peaceable citizens. Gov't Br. 38–39. But these proposals are not "firearms regulations," and *Heller* warned that it was "dubious" to rely on such history to interpret the Second Amendment. 554 U.S. at 603. Moreover, these proposals were not accepted as part of the Second Amendment, which is evidence that the Founders rejected them. *See Kanter*, 919 F.3d at 454–56 (Barrett, J., dissenting) (describing rejected proposals from the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions, which

could have limited those covered by the Second Amendment); *see also Hicks*, 2023 WL 164107, at \*5 (rejecting this argument in § 922(n) case). That the Founders may have identified and considered the possibility of disarming so-called "dangerous" people, but ultimately did not do so, itself illustrates that § 922(n) is unconstitutional. *See Bruen*, 142 S. Ct. at 2131 (holding that generations addressing a problem "through materially different means," or rejecting efforts to put forth analogous regulations, is evidence of a challenged statute's unconstitutionality.).

*Laws disarming minorities*

The Government next cites favorably to the Revolution and founding-era disarming of "Native Americans, Black people, [ ] indentured servants," and religious minorities, as evidence of a historical tradition of disarming "dangerous and untrustworthy" people. Gov't Br. 37. Indeed, the disarmament of oppressed communities is the most consistent species of categorial firearm regulation from the colonial era to the 19th century. *See* Greenlee at 269–70; Churchill at 156–58; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

But the Government's reliance on these laws is misplaced. The Government does not explain how disarming minorities is similar

to disarming indictees. And the fact that disarming minorities is so plainly unconstitutional defeats its argument. *See Bruen*, 142 S. Ct. at 2131 (explaining that analogous regulations found to be unconstitutional is probative evidence of unconstitutionality), 2149 (rejecting reliance on surety laws enforced only pretextually against black Americans), 2150–51 (describing efforts to disarm freed slaves as violating their right to keep and bear arms). One district court recently characterized similar arguments as citing to "historical travesties to support taking someone's Second Amendment rights today." *See Hicks*, 2023 WL 164170, at *6. The court explained the dangers inherent in permitting the Government to define certain disfavored communities as "dangerous" or "unvirtuous" to justify restricting their constitutional rights, particularly given the abhorrent historical abuses of that reasoning. *Id.*

### *Disarmament of "unvirtuous citizens"*

Finally, the Government argues that scholars have identified that the right to bear arms has historically been tied to the concept of "virtuous citizenry," which it reasons excludes those under indictment. Gov't Br. 39–40. This "virtuous citizen" theory lacks historical support. *See* Greenlee, at 275–83. The earliest articles promoting

the theory fail to cite to any historical evidence. *See id*. Rather, historical categorical disarmament was generally limited to disempowered minority communities—like slaves and Native Americans—and those who evidenced disloyalty to the government. *See id*. at 261–65; Churchill at 156–61. One court has already explained the historical abuses and obvious dangers in relying on this virtuous citizen theory. *See Hicks*, 2023 WL 164170, at *6 (explaining how the theory has been used to disarm minorities and could similarly be abused today). Those restrictions are not only troubling, they also provide no remote analogue to indictees.

* * *

The historical examples offered by the Government are dissimilar to § 922(n) and largely inconsistent with the Second Amendment. They are also largely dissimilar to one another, despite the Government's attempt to link them based on a shared generalized purpose. Historical evidence of disarming slaves, Native Americans, and political opponents cannot be generalized to encompass all "dangerous," "untrustworthy," or "unvirtuous" people—terms that mischaracterize those historical categories and which would include considerably more categories than indictees. The terms lack any limiting principles and are defined far too broadly. *Cf. Medina*,

913 F.3d at 159–60 (rejecting the "dangerousness standard" as too "amorphous … to delineate the scope of the Second Amendment").

*Bruen* warned against defining a category "far too broadly" for Second Amendment purposes. *See* 142 S. Ct. at 2134, 2150, 2156. *Bruen*'s requirement to show that "a governmental practice has been open, widespread and unchallenged since the early days of the Republic" cannot be satisfied by simply grouping together dissimilar laws. *Id*. at 2137 (cleaned up).

The Government fails to show that any of the restrictions on what it deems "dangerous or untrustworthy" people supports a finding that § 922(n) is consistent with the Nation's historical tradition of firearm regulation.

### c. Historical surety laws.

The Government also argues that historical surety statutes are analogues for § 922(n). Gov't Br. 42–47. As most courts have explained, the Government is wrong. None of these laws are sufficiently similar to § 922(n), and there is little evidence that these laws were ever enforced. Moreover, none of the cited laws are from the founding era, which limits their weight.

A "surety of the peace" is a security, like a bond or a guarantor, provided to ensure a person will not commit a future offense. *See*

44

Surety, Black's Law Dictionary (11th ed. 2019). Not all surety laws involved firearms, but certain laws permitted detaining or disarming individuals until such a surety was made.

The Government identifies three general species of "surety laws": (1) a tradition in England of "surety of the peace" for those "reasonably accused of posing a threat"; (2) colonial surety laws, primarily from 1692-1702; and (3) 19th century American surety laws, specifically in Massachusetts, requiring certain accused individuals and those likely to breach the peace to post a bond before publicly carrying a firearm. Gov't Br. 43–44.

But such statutes are not sufficient historical evidence to prove the constitutionality of § 922(n). This Court should first reject these surety statutes as evidence of a historical tradition for the same reasons stated in *Bruen*. 142 S. Ct. at 2148–49; *see also Hicks*, 2023 WL 164170, at *7; *Holden*, 2022 WL 17103509, at *4; *Stambaugh*, 2022 WL 16936043, at *3–6.[13] The *Bruen* Court explained that such

---

[13] Only one district court has found these statutes provided historical support for § 922(n). *See Kays*, 2022 WL 3718519, at *4. The other cases cited by the Government analogize surety laws to the Bail Reform Act, not § 922(n), and are inapposite. Gov't Br. 45 (citing *Fencl*, 2022 WL 17486363; *United States v. Perez-Garcia*, __ F. Supp. 3d __, No. 3:22-cr-1581-GPC, 2022 WL 17477918 (S.D. Cal. Dec. 6, 2022)).

statutes were of limited historical value because of a dearth of evidence that authorities ever enforced them, except pretextually against black defendants. 142 S. Ct. at 2149. The Court further noted that it is the Government's burden to show otherwise, and so it considered "the barren record of enforcement to be simply one additional reason to discount their relevance." *Id.* at 2149 n.25. The district court, like most others, rejected this evidence for the same reasons. ROA.297–99.

The time-period in which many of these surety statutes arose also weighs against relying on them under *Bruen*. Statutes that arose in the mid-19th century have less significance for establishing historical tradition than laws passed around the founding. *See Bruen*, 142 S. Ct. at 2136–37. In challenges to state restrictions, like in *Bruen*, 19th century historical evidence is arguably entitled to some weight because the passage of the Fourteenth Amendment in 1868 made the Second Amendment applicable to the states. *See Bruen*, 142 S. Ct. at 2135–38. Section 922(n), however, is a federal statute and the Second Amendment was directly applicable against the federal government upon its adoption in 1791. *See id.* at 2163 (Barrett, J., concurring) ("Today's decision should not be understood to endorse a freewheeling reliance on historical practice from the

mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"). The history of the 19th century surety statutes is "too far removed from 1791 such that 'they do not provide as much insight into the Second Amendment's original meaning as earlier sources.'" *Stambaugh*, 2022 WL 16936043, at *4 (quoting *Bruen*, 142 S. Ct. at 2137) (cleaned up). Likewise, vaguely referenced common law traditions in England merit limited weight because they "long predate" the founding. *See Bruen*, 142 S. Ct. at 2136.

Surety laws from the 18th century are arguably of more consequence, though the Government's examples are not from the founding-era, but the colonial period. *See* Gov't Br. 43 (offering that the traditional English "surety practice was adopted in the American colonies"). Its examples include a 1759 New Hampshire statute, which permitted imprisonment and disarmament with a surety provision, upon "confession of the offender, or legal proof" that the offender had gone "armed offensively, or put his Majesty's subjects in fear, by menaces or threatning speeches[.]" Acts and Laws of His Majesty's Province of New-Hampshire in New England, 1–2 (1759).

At least one court has rejected reliance on this law because disarmament was only permitted upon confession or a finding of guilt through a constitutional process. *See United States v. Perez-Gallan*, __ F. Supp. 3d __, 4:22-cr-427-DC, 2022 WL 16858516, at *10 (W.D. Tex. Nov. 10, 2022) (finding § 922(g)(8) violates the Second Amendment).

The Government also cites to what it describes as similar laws in Massachusetts, Pennsylvania, Delaware, New Hampshire, and Connecticut from 1692 to 1702. Gov't Br. 44; *see also* Addendum (collecting those statutes).[14] Those laws are even further removed from the founding. And while the Government argues the prior colonial laws contain "similar provisions" to the 1759 New Hampshire law, only one mentions seizing arms or weapons, and even then only upon "confession" or "legal conviction" for certain offenses. *See* 1 Acts and Resolves, Public and Private, of the Prince of the Massachusetts Bay, 52–53 (1869) (1692 statute). The other statutes do not

---

[14] After a diligent search, counsel was unable to locate the 1701 New Hampshire law cited by the Government. *See* Gov't Br. 43.

mention arms at all and only contemplate surety to resolve detention.[15] Two colonial laws involving firearms restrictions, between 1692 and 1759, is not sufficiently widespread under the *Bruen* standard. *See Bruen*, 142 S. Ct. at 2142 (expressing doubt that even three colonial regulations could suffice to show a tradition). Many of the laws also reference the protection of "His Majesty's subjects." The terminology calls into question whether the Second Amendment endorsed such laws, or in fact repudiated them, considering the Amendment was a plain rejection of the tyranny of English rule.

Moreover, such statutes are not "distinctly," or even "relevantly," similar to § 922(n). The Government suggests that § 922(n) is similar to surety laws because they both temporarily impair the right to bear arms based on an individualized finding that the defendant is dangerous. Gov't Br. 45–46. It is wrong. Surety statutes generally only limited public carry, allowed the carrier to post bond, and applied to individuals who posed a specific threat. *See Bruen*, 142 S.

---

[15] *See, e.g.*, 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute).

Ct. at 2148–50. Indeed, the cited 1759 New Hampshire law only applied upon "confession of the offender, or legal proof" of specific misconduct. Acts and Laws of His Majesty's Province of New-Hampshire in New England, 1–2 (1759). And most "sureties, in their most potent form, were only a 'possible disarmament' if the person violated the surety." *Perez-Gallan*, 2022 WL 16858516, at *10. In contrast, § 922(n) makes it a crime for any indicted person to receive a firearm without any "specific showing of reasonable cause to fear an injury, or breach of the peace," *see Bruen*, 142 S. Ct. at 2148, or other process.

Section 922(n) imposes a greater burden on individuals than the cited surety statutes with fewer procedural protections. *See Stambaugh*, 2022 WL 16936043, at *5 (finding that "§ 922(n) is more restrictive than surety statutes with respect to 'the *central component* of the Second Amendment right': individual self-defense" and is more burdensome because of the lack of an individualized finding of dangerousness). And the district court correctly found that the fact that the "earlier generations addressed" this issue, "through materially different means" is evidence that § 922(n) is unconstitutional. ROA.299.

50

Surety laws do not establish a historical tradition of disarming those under indictment like § 922(n).

* * *

Because the Government failed to identify any "distinctly similar" laws from the founding that demonstrate a broad tradition of firearms restrictions like § 922(n), it has failed to meet its burden. The Court should affirm.

### D. The district court correctly held that § 922(n) is facially unconstitutional.

The district court held that § 922(n) is unconstitutional on its face. ROA. 25 n.119. The Government argues that the district court erred in finding § 922(n) *facially* unconstitutional. Gov't Br. 47–48. It reasons the court improperly applied the facial standard because "[a]t least some applications of § 922(n) surely violate no Second Amendment rights." Gov't Br. 48. It argues that "no reading of the Second Amendment would cover every circumstance under which an indicted defendant might obtain a gun." Gov't Br. 12. The Government misunderstands the standard for facial challenges.

A facial challenge requires showing "that the law is unconstitutional in all of its applications." *Salerno*, 481 U.S. at 745.[16] The key word is "applications." Courts only consider "applications of the [challenged] statute in which it actually authorizes or prohibits conduct," not circumstances for which the statute is irrelevant. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415–19 (2015).

The Government's argument does not raise actual "applications" of § 922(n). Rather, it argues that various scenarios that could occur in conjunction with a § 922(n) violation would not be protected by the Second Amendment. Its examples include an indictee trying to obtain a "dangerous or unusual weapon" or using a weapon to escape a jail. Gov't Br. 48–49. The scenarios described are not applications of § 922(n) but descriptions of other crimes.

The Supreme Court rejected a similar argument in *Patel*. *Patel* involved a facial Fourth Amendment challenge to a municipal code

---

[16] Courts have not strictly adhered to the *Salerno* standard. For example, in the unconstitutional vagueness context, the Supreme Court has recognized that a statute need not be vague in every application to be facially struck down. *See Johnson v. United States*, 576 U.S. 591, 602 (2015).

provision that authorized warrantless searches of certain motel records. 576 U.S. at 412–13. The city responded that a facial challenge "must fail because such searches will never be unconstitutional in all applications." *Id*. at 417. It argued that searches covered by the statute would be constitutional in certain circumstances, such as emergency situations, where consent was given, or where the police had a warrant. *Id*. at 417–18.

The Supreme Court explained that the city misunderstood "how courts analyze facial challenges." *Id*. at 418. The purportedly constitutional applications the city identified were "irrelevant to [the Court's] analysis because they do not involve actual applications of the statute." *Id*. at 419. For those examples, the searches could occur *without* the challenged statute. *Id*. "Statutes authorizing warrantless searches … do no work where the subject of a search has consented." *Id*.

The Supreme Court explained that "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id*. at 418 (cleaned up). The city's characterization of the facial standard "would preclude facial relief in every

Fourth Amendment challenge to a statute authorizing warrantless searches." *Id*.

Here, the Government argues that circumstances beyond "applications" of the statute would be constitutional, and thus bar a facial challenge. If a person under indictment obtained a "dangerous or unusual weapon" or tried to escape from jail, that conduct could be charged under other statutes. *See, e.g.*, 18 U.S.C. § 752. In those situations, § 922(n) does "no work" to prohibit the conduct, so they are not applications § 922(n). *See Patel*, 576 U.S. at 419. As in *Patel*, these circumstances would not *permit* prosecution under § 922(n), they would render it *irrelevant*. *See id.* at 418.

Indeed, *Bruen* itself could not have been decided as it was under the Government's facial standard. There too, a litigant could have argued that the New York licensing regime would not have violated the Second Amendment if the applicant wanted the license to obtain a "dangerous or unusual weapon" or wanted a firearm to help somebody escape from prison. But these are not applications of the New York statute, so they were not relevant to the facial challenge. The Court found the statute facially unconstitutional. *See generally Bruen*, 142 S. Ct. 2111. The Government argues that it was error for the district court not to recite the *Salerno* standard, but the

standard is not cited in *Bruen*, either. Gov't Br. 48. *Bruen* in fact drew no distinction between a facial or as-applied standard.

The district court correctly found that § 922(n) facially violates the Second Amendment. This Court should affirm.

**E. The district court did not plainly err by analyzing § 922(n) facially.**

The Government next argues that the district court erred by striking § 922(n) down facially rather than first determining it was unconstitutional as applied to Quiroz. Gov't Br. 47–49. The Government's argument, raised for the first time on appeal, is incorrect.

1. Standard of review

Because the Government did not raise this issue to the district court, it is subject to plain-error review. For this Court to reverse, the Government must show (1) an error, (2) that is plain—"clear and obvious"—and (3) affects the appellant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732–34 (2009). If the first three prongs are satisfied, then this Court may remedy the error if it seriously affects the fairness, integrity, and public reputation of the judicial proceedings. *Id.* at 736.

2. <u>The Government cannot show plain error.</u>

Any error by the district court was not "plain." *Bruen* drew no distinction between facial and as-applied Second Amendment challenges. 142 S. Ct. 2111. It found the New York law facially unconstitutional without first considering it as applied to the challengers. *Id.* And the Government's cited cases say only that courts "generally decide" as-applied challenges first, but do not require it. Gov't Br. 47 (citing *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019)); *cf. United States v. Emerson*, 270 F.3d 203, 265 n.66 (5th Cir. 2001) (holding it was required to consider Second Amendment challenge both facially and as applied). The Government has not cited any cases that found reversible error where the district court struck down a statute facially rather than as applied. *See United States v. Hill*, 35 F.4th 366, 396 (5th Cir. 2022) (holding the "lack of binding authority is often dispositive in the plain-error context").

Even if the district court obviously erred, the error did not affect the Government's substantial rights, because § 922(n) is unconstitutional as applied to Quiroz.[17] *See United States v. Avants*, 278

---

[17] Similarly, any preserved error would be harmless. *See* Fed. R. Crim. P. 52(a).

F.3d 510, 521–22 (5th Cir. 2002) (substantial rights are only affected if the error affected the outcome of the district court proceedings). First, because the district court found § 922(n) unconstitutional on its face, the statute is necessarily unconstitutional as applied to Quiroz as well. *See Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (explaining that facial unconstitutionality resolves as-applied claims); *cf. Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (holding that a facially invalid law is unconstitutional in all its applications). Second, § 922(n) is unconstitutional as applied to Quiroz. Other than for being under felony indictment, Quiroz was not federally prohibited from receiving the firearm. *Cf. United States v. Emerson*, 270 F.3d 203, 260–64 (5th Cir. 2001) (conducting Second Amendment as-applied analysis).

Because any error was harmless, the Government cannot show it affected its substantial rights as required under plain error. *See* Fed. R. Crim. P. 52(a), (b). Nor can it show that any such error seriously affected the fairness, integrity, and public reputation of the judicial proceedings. *Olano*, 507 U.S. at 736; *see also United States v. Castillo*, 386 F.3d 632, 637–38 (5th Cir. 2004). The district court did not plainly err by addressing the facial challenge without first addressing the as-applied challenge.

## II. The district court did not plainly err in dismissing Quiroz's § 922(a)(6) charge, because § 922(n)'s unconstitutionality rendered any false statement immaterial.

The district court correctly dismissed Quiroz's 18 U.S.C. § 922(a)(6) charge, which charged him with falsely stating that he was not under indictment when purchasing a firearm. The court concluded that because § 922(n) is unconstitutional, any "false statement during the purchase of his firearm is immaterial" under the language of § 922(a)(6). ROA.286.

The Government argues that a false statement offense cannot be challenged based on what it deems a collateral challenge to the constitutional validity of the underlying requirement itself. Gov't Br. 1, 50–52. The Government failed to contemporaneously raise this argument below and has not shown that the district court plainly erred. This Court should affirm the district court's dismissal.

### A. Standard of review.

Because the Government did not contemporaneously raise this argument in the district court, its challenge is reviewed for plain error. *See* Fed. R. Crim. P. 51(b), 52(b). Under this standard, there must be (1) an error, (2) that is plain—"clear and obvious"—and (3)

affects the appellant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732–34 (2009); *see also United States v. Castillo*, 386 F.3d 632, 635–37 (5th Cir. 2004) (applying *Olano* standard in appeal by government). If the first three prongs are satisfied, then this Court may remedy the error if the error seriously affects the fairness, integrity, and public reputation of the judicial proceedings. *Olano*, 507 U.S. at 736.

### B. The Government has not shown that dismissal of the § 922(a)(6) charge was plain error.

The Government failed to contemporaneously raise the argument it raises now in the district court. *See* Fed. R. Crim. P. 51(b). It included no argument as to the § 922(a)(6) charge in its response to Quiroz's motion to reconsider or its subsequent briefing. ROA.231–49, 273–75, 314–29.[18] To preserve an issue for appeal, the Government was required to raise it contemporaneously with the district court's ruling on the motion to reconsider, not just for the initial motion to dismiss. *See* Fed. R. Crim. P. 51(b); *Puckett v.*

---

[18] In response to the initial motion to dismiss, the Government raised a different argument from the one it raises now. *See* ROA.74–76 (arguing that Quiroz lacked standing to bring any constitutional challenge to any statute, including § 922(n), because he was accused of lying).

*United States*, 556 U.S. 129, 135 (2009) ("Failure to abide by this contemporaneous-objection rule ordinarily precludes the raising on appeal of the unpreserved claim of trial error."). It did not do so. *See United States v. Graves*, 5 F.3d 1546, 1552 (5th Cir. 1993) (holding that defendant's failure to renew a previously raised objection meant he did not satisfy the contemporaneous requirement, and plain error applied); *cf. United States v. Francis*, 183 F.3d 450, 452 (5th Cir. 1999) (finding government waived suppression issue by not appealing magistrate's decision to the district court).

The Government has not shown that the district court plainly erred.

1. <u>The district court did not err in dismissing the § 922(a)(6) charge because § 922(n)'s unconstitutionality rendered any false statement immaterial.</u>

The Government cannot show that the district court erred in dismissing the § 922(a)(6) charge. The court held that, because § 922(n) is unconstitutional, a false statement about indictment status is not a fact material to the lawfulness of the sale of that firearm. ROA.285–309. The Government now argues that the court erred because Quiroz was not permitted to challenge § 922(a)(6)

based on the constitutional validity of the form's question about his indictment status. ROA.50–52. There is no error.

Section 922(a)(6) forbids making a false statement in connection with the acquisition of a firearm that is "intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale[.]" Materiality in this context relates to whether a truthful response would have meant the sale could not have proceeded under the law. *Abramski v. United States*, 573 U.S. 169, 189 (2014). Whether a statement is material is a question of law for the court. *United States v. Ortiz-Loya*, 777 F.2d 973, 982 (5th Cir. 1985).

One other district court has addressed this question since *Bruen*, and it agreed that if § 922(n) is unconstitutional, then a false statement about one's indictment status is not material for the purposes of a § 922(a)(6) charge. *See United States v. Holden*, __ F. Supp. 3d __, No. 3:22-cr-30-RLM-MGG, 2022 WL 17103509, at *5–7 (N.D. Ind. Oct. 31, 2022). In *Holden*, the government similarly argued that even if § 922(n) is unconstitutional, it does not impact a § 922(a)(6) charge, which criminalizes lying, not the underlying firearm conduct. *See United States v. Holden*, No. 3:22-cr-30-RLM-MGG (N.D. Ind. Oct. 10, 2022), ECF No. 27. The court rejected the

argument, explaining that § 922(a)(6) does not merely punish lying, but lying to deceive a firearm dealer "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm." *Holden*, 2022 WL 17103509, at *5 (quoting 18 U.S.C. § 922(a)(6)). The court agreed with the defendant that his situation was distinguishable from cases cited by the Government because a false statement about one's indictment status simply could not be material if § 922(n) is unconstitutional. *Id.* at *5–7.

The Government raises a similar argument to the one rejected in *Holden*. It offers that the "proper mechanism for challenging an allegedly unconstitutional statutory requirement is to sue, not to lie about having complied with it." Gov't Br. 50. It cites to several cases for the proposition that one cannot defend against a charge of lying to the government by arguing that the prohibition is unconstitutional. *Id.* But the Government misunderstands the issue. Quiroz did not challenge § 922(a)(6)'s constitutionality. He argued, and the district court agreed, that a false statement about his indictment status was not material as required under § 922(a)(6).

Most of the cases cited by the Government do not address materiality, but rather constitutional challenges to statutes other than

§ 922(a)(6) based on the purported validity of the underlying requirement for truthfulness. *See, e.g.*, *United States v. Knox*, 396 U.S. 77 (1969) (rejecting Fifth Amendment challenge to 18 U.S.C. § 1001 as applied to lies about wagering activities); *Bryson v. United States*, 396 U.S. 64 (1969) (rejecting First Amendment challenge to 18 U.S.C. § 1001 as applied to non-Communist affidavit); *Dennis v. United States*, 384 U.S. 855 (1966) (rejecting challenge to 18 U.S.C. § 371 conviction, based on argument that § 9(h) of Taft-Hartley Act is unconstitutional); *Kay v. United States*, 303 U.S. 1 (1938) (rejecting constitutional challenge to Home Owner's Loan Corporation). The sole cited case addressing § 922(a)(6) similarly addresses a constitutional challenge to the statute, rather than a claim of immateriality. *See United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) (unpublished) (holding that defendant could not challenge § 922(a)(6) under the Second Amendment and due process based on the purported unconstitutionality of § 922(b)(1)'s prohibition on the sale of firearms to those under 21).

The Government cites one case addressing a question of materiality, but it is inapposite. *See United States v. Kapp*, 302 U.S. 214 (1937). *Kapp* reasoned that lying to obtain a pecuniary benefit from the government was always material, as a "cheat" or "swindle,"

even if the underlying statute related to the fraud was unconstitutional. *Id*. at 217–18. But a false statement about indictment status is not designed to defraud the government of money; its only materiality relates to § 922(n)'s prohibition on firearms receipt for those under indictment.

Quiroz did not argue that § 922(a)(6) is unconstitutional. He did not use § 922(a)(6) to challenge the validity of the firearm receipt form. Rather, he argued an element of the charge, materiality, could not be met. The application form's question about indictment status is only material if those under indictment are forbidden from having firearms. *See* 18 U.S.C. § 922(n). If indictees are allowed to have firearms, as the district court held in this case, the false statement was immaterial. *See Abramski*, 573 U.S. at 189 (explaining materiality depends on whether a truthful response would have foreclosed the sale).

The Government cannot show that the district court erred in dismissing the § 922(a)(6) charge.

2. <u>The Government cannot satisfy any of the other require-ments to reverse for plain error.</u>

Even if the district court erred, the error was not plain. An error is only "plain" if it is "clear or obvious, rather than subject to reasonable dispute." *United States v. Ramirez*, 37 F.4th 233, 235 (5th Cir. 2022). "Even where the argument requires only extending authoritative precedent, the failure of the district court to do so cannot be plain error." *United States v. Evans*, 587 F.3d 667, 671 (5th Cir. 2009). Indeed, this Court recently explained in an unpublished opinion that the plain error standard requires binding precedent in favor of the appellant's specific argument. *See United States v. Avila*, No. 22-50088, 2022 WL 17832287, at *1–2 (5th Cir. Dec. 21, 2022) (finding plain error not shown for challenge to § 922(n) because of absence of "binding precedent holding § 922(n) unconstitutional").

The Government cites largely to inapposite Supreme Court cases addressing improper constitutional challenges to different statutes. *See supra* at 65–67. It cites one case on § 922(a)(6), an unpublished Fifth Circuit opinion that addressed a fundamentally different question. *See Bledsoe*, 334 F. App'x 711. None of the cited cases address whether a false statement about one's indictment sta-

tus is immaterial under § 922(a)(6) if § 922(n) is found unconstitutional. None are binding precedent for the Government's proposition. The fact that the only other district court to address the precise question agreed with the district court in this case, *see Holden*, 2022 WL 17103509, at *5–7, alone precludes a finding of plain error. *See Avila*, 2022 WL 17832287, at *2 (noting that striking down § 922(n) would require disagreeing with "several other federal courts," which is "not consonant with a finding of plain error.").

Because no binding precedent holds that § 922(a)(6) cannot be challenged based on the immateriality of questions relating to indictment status, any error was not clear.

Although the Government did not contemporaneously object in the district court, it does not address the plain error factors in its brief. *See Olano*, 507 U.S. at 732–36. It does not explain how the decision was "clear or obvious" error, nor does it argue that its substantial rights were affected or how failure to correct the error will affect the integrity of judicial proceedings. *See id*. Because the district court did not plainly err, this Court should affirm.

## Conclusion

For these reasons, this Court should affirm the district court's dismissal of the indictment.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*

## Certificate of Service

I hereby certify that on the 23rd day of January, 2023, I electronically filed the Brief of Defendant-Appellee with the Clerk of Court using the CM/ECF system which will send notification of this filing to Jaime Esparza, U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorneys Joseph H. Gay, Jr., and Charles E. Fowler, Jr.), by electronic mail.


<u>s/ Timothy M. Shepherd</u>
TIMOTHY M. SHEPHERD
*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,972 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
*Attorney for Defendant-Appellant*

Dated:  January 23, 2023