No. 22-50834

# United States Court of Appeals
## *for the*
# Fifth Circuit

United States of America,

*Plaintiff-Appellant*,

*v.*

Jose Gomez Quiroz,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
NO. 4:22-CR-10-DC
(HONORABLE WALTER DAVID COUNTS, III, JUDGE)

**BRIEF OF *AMICUS CURIAE* NATIONAL AFRICAN AMERICAN GUN
ASSOCIATION, INC IN SUPPORT OF DEFENDANT-APPELLEE**

STEPHEN P. HALBROOK
3925 Chain Bridge Road, Ste. 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

NEZIDA S. DAVIS
DAVIS BAKARI LAW LLC
2915 Pleasant Ridge Dr.
Decatur, GA 30034
(404) 771-1832
nsdavis@davisbakarilaw.com

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for the Amicus Curiae*
*National African American Gun Association, Inc, Inc.*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel for *amicus* certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Jose Gomez Quiroz, Defendant-Appellee ;

2. Jaime Esparza, U.S. Attorney;

3. Ashley C. Hoff, former U.S. Attorney;

4. Fidel Esparza, III, Matthew Ellis, and Scott Van Greenbaum, Assistant U.S. Attorneys, who represented Plaintiff-Appellant in the district court;

5. Charles E. Fowler, Jr., Assistant United States Attorneys, who represent Plaintiff-Appellant in this court;

6. Maureen Scott Franco, Federal Public Defender;

7. Jack Meredith and Christopher J. Carlin, Assistant Federal Public Defenders, who represented Defendant-Appellee in the district court;

8. Timothy M. Shepherd, Assistant Federal Public Defender, who represents Defendant-Appellee in this Court;

9. National African American Gun Association, Inc., *amicus curiae* on behalf of Defendant-Appellee in this Court; and

10.David H. Thompson, Peter A. Patterson, William V. Bergstrom, Stephen P. Halbrook, and Nezida S. Davis, attorneys, who represent *amicus* NAAGA in this Court.

*/s/ David H. Thompson*

David H. Thompson

*Attorney for Amicus Curiae National African American Gun Association, Inc.*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................iv

INTEREST OF AMICUS CURIAE..........................................................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT .........................................................................................3

I.     The *Bruen* Framework. ..............................................................3

       A.     "The Second Amendment's Plain Text.".............................4

       B.     "The Nation's Historical Tradition of Firearm Regulation." .............14

CONCLUSION .....................................................................................24

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                      <u>**Page**</u>

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871).......................................................6, 7

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ............................8

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........................................................................8

*Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336 (3d Cir. 2016)..........................12

*Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................16

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989)..............................................................................................18

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008)....................................... 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 16, 20

*Dred Scott v. Sandford*, 19 How. 393 (1857) ........................................................19

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021)......................................6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)..........................................6

*Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897 (3d Cir. 2020)......................22, 23

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ...........................................15, 16

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp.2d 928 (N.D. Ill. 2014)......................................................................6

*Jackson v. City and Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014)..................................................................................6

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).................................................21, 22

*Luis v. United States*, 578 U.S. 5 (2016) ..............................................................7

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) .....................................21

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019).......................................13, 14

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
    700 F.3d 185 (5th Cir. 2012)...............................................................................3, 4

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022).......................... 2, 4, 7, 10, 11, 13, 14, 15, 16, 19, 22, 23

*Nunn v. State*, 1 Ga. 243 (1846) ............................................................................7

*Range v. Att'y Gen. U.S.*, 53 F.4th 262 (3d Cir. 2022) ...................................13, 19

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ...............................5, 6

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) ...........................................14

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) ........................................8, 18

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .....................................8

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) .........................................22

## Constitutions, Statutes, and Rules

U.S. Const. amend. II .................................................................................3

18 U.S.C. § 922(n) ...............................................................................2, 5

## Other Authorities

3 Joseph Story, Commentaries on the Constitution of the United States
§ 1890 (1833) ....................................................................................7

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous and Unusual Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020)......20

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam,
Fall 2022, available at bit.ly/3FKF9us ...........................................................15

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the National African American Gun Association, Inc. (NAAGA) is a nonprofit association headquartered in Griffin, Georgia, with tax exempt status under Internal Revenue Code § 501(c)(4). NAAGA exists to defend the Second Amendment rights of members of the African American community. NAAGA has over 130 chapters in 38 states, and over 50,000 members living in every state of the United States and the District of Columbia.

NAAGA's mission is to establish a fellowship by educating on the rich legacy of gun ownership by African Americans, offering training that supports safe gun use for self-defense and sportsmanship, and advocating for the inalienable right to self-defense for African Americans. Its goal is to have every African American introduced to firearm use for home protection, competitive shooting, and outdoor recreational activities. NAAGA welcomes people of all religious, social, and racial perspectives, including African American members of law enforcement and active/retired military.

This case is a constitutional challenge to a federal statute that strips indicted persons of their Second Amendment rights on the basis of their indictment. *Amicus*

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. Undersigned counsel for *amicus curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* and their counsel have contributed money for this brief.

is well suited to opine on the constitutionality of this statute and has a strong interest in ensuring that this Court's decision—as one of the first circuit cases calling for application of the Supreme Court's newly elaborated framework for resolving Second Amendment challenges—accurately applies governing caselaw.

## SUMMARY OF ARGUMENT

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that almost every circuit had misinterpreted its decision in *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), and that, when analyzing Second Amendment challenges, the only appropriate standard is one rooted in the text of the Amendment and our nation's history of firearm regulation. This case presents an early opportunity to apply *Bruen*'s standard to a challenged regulation—18 U.S.C. § 922(n), which prohibits the receipt of firearms by individuals who have been indicted for crimes punishable by more than one year in prison—and for this Court to set a precedent that takes seriously the methodology that the Supreme Court has said must be followed in Second Amendment cases.

Following that methodology, Section 922(n) is unconstitutional. Under the plain text of the Amendment, the statute restricts the right of "the people," an expansive phrase comprising all Americans, to "keep" (and therefore acquire) firearms. As a result, Section 922(n) is presumptively unconstitutional and can only be saved if the Government can show that there is a history of "distinctly similar"

2

firearm regulations that have been accepted as constitutional. The Government cannot bear that burden and points only to disanalogous statutes and inapposite theories about virtue which do not support a sweeping ban on firearm acquisition by indicted persons without regard to specific evidence of dangerousness. As a result, the challenged statute is unconstitutional, and the district court's decision must be affirmed.

## ARGUMENT

### I.    The *Bruen* Framework.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Heller*, the Supreme Court concluded that the Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. Following *Heller*, many circuit courts, including this one, adopted a two-part framework for resolving challenges to laws implicating this right. Under that test, "the first inquiry [was] whether the conduct at issue falls within the scope of the Second Amendment right," a determination that required the Court to assess "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185, 194 (5th Cir. 2012). If the law was found to have

"burden[ed] conduct that falls within the Second Amendment's scope, [this Court] then proceed[ed] to apply the appropriate level of means-end scrutiny." *Id.* at 195.

In *Bruen*, the Supreme Court held that "[d]espite the popularity of this two-step approach, it is one step too many," and while "[s]tep one of the predominant framework is broadly consistent with *Heller* . . . *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. Rather, following *Bruen*, once a regulation is found to implicate the plain text of the Second Amendment, whether that regulation is constitutional is determined by a single step rooted in an analysis of this Nation's historical practices:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2126 (quotation marks omitted). *Amicus* submits this brief to assist the Court in applying *Bruen*'s clarification of the proper framework for analysis in Second Amendment cases.

### A. "The Second Amendment's Plain Text."

The textual inquiry under *Bruen* will frequently be straightforward because the Supreme Court in *Heller*, *McDonald*, and *Bruen*, has already extensively and

bindingly interpreted the text of the Second Amendment. For instance, in this case, 18 U.S.C. § 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate commerce." The activity described—receiving any firearm or ammunition—is protected by the plain text of the Amendment which, although it does not mention "receiving," does mention "keeping." Looking to Founding era dictionaries, the Court in *Heller* noted definitions of "keep" including: "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession." 554 U.S. at 582 (citations omitted). In light of these definitions, *Heller* concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.' " *Id.* And the right to "have weapons" *must* include a right to "receive weapons." As the district court correctly noted, "receive" means "to take into . . . one's *possession*," Mem. Op. at 7, *U.S.A. v. Quiroz*, No. 22-CR-00104-DC (W.D. Tex. Sept. 19, 2022) (emphasis in original) (quoting Oxford English Dictionary (3d ed. 2015)), and it would be impossible to "possess" a firearm without a means to take it into possession.

Even before *Bruen*, courts consistently concluded that the Second Amendment protects activity necessary for the exercise of the right to have and carry firearms, including specifically the right to acquire firearms. *See Teixeira v. Cnty. of*

*Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quotation marks omitted); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp.2d 928, 930 (N.D. Ill. 2014) ("[T]he right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to *acquire* a firearm . . . .") (emphasis in original); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (The Second Amendment right to keep and bear "arms in common use" "implies a corresponding right to acquire and maintain proficiency with common weapons.") (quotation marks omitted); *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (quotation marks omitted); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use.").

In reaching these conclusions, these courts were acting on deeply rooted constitutional reasoning. Shortly after the Civil War, the Tennessee Supreme Court, in a decision cited approvingly by both *Heller* and *Bruen*, engaged in precisely the same type of reasoning: "The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v.*

*State*, 50 Tenn. 165, 178 (Tenn. 1871). And the principle that constitutional rights protect activities necessary to their exercise is one of general application, not limited to the Second Amendment. Constitutional rights generally "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). So, the mere fact that "receipt" is not specifically mentioned in the Constitution does not diminish the point that receipt of firearms and ammunition *must* be covered by the Amendment's text.

Similarly, the Supreme Court has already defined to whom the right applies. The Amendment says it is a right of "the people." The "normal and ordinary meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *accord* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833) ("The right of the *citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. State*, 1 Ga. 243, 250 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147) (all emphases in original).

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). "[I]n all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

> "[T]he people" seems to have been a term of art employed in select parts of the Constitution . . . suggest[ing] that "the people" protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community.

*Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)) (first brackets in *Heller*). An individual who is under indictment is nevertheless part of "the people" with First and Fourth Amendment rights, even if those rights may be in some ways curtailed. *See, e.g.*, *United States v. Scott*, 450 F.3d 863, 875 (9th Cir. 2006) (search without probable cause violated Fourth Amendment rights of individual on pre-trial release). For instance, though the Government cites *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) for the proposition that pretrial detainees' First Amendment rights may be restrained, *see* Appellant's Br. for the U.S. at 15 ("Gov't Br."), it was implicit in that case that even pretrial detainees—much less those under indictment but not detained—*had* First Amendment rights, *see Wolfish*, 441 U.S. at 552 (noting that it was "balance[ing] First Amendment rights against legitimate governmental interests" (cleaned up)). And it cannot be the case that the Government

8

could bar individuals released into the community under indictment from putting money in an offering plate at church or purchasing a newspaper. But that is the necessary implication of the Government's argument if those under indictment are not members of "the people" for purposes of the Second Amendment and "the people" is to be interpreted consistently across the Bill of Rights. Thus, contrary to its assurance that it merely means to treat Second Amendment rights the same as other constitutional liberties, *see* Gov't Br. 16, in arguing that Quiroz's conduct in this case does not fall within the plain text of the Second Amendment at all, the Government is necessarily arguing that it applies differently than the First and Fourth Amendments. If Quiroz falls outside the text of the Amendment, then he has *no* Second Amendment rights at all and there is no question that any restriction on his ability to keep or use a firearm is constitutional. The Second Amendment simply is not implicated.

The Government's alternative reading of the Amendment is not convincing. First, the Government asserts that the Second Amendment applies only to "law-abiding, responsible citizens." Gov't Br. 19 (quoting *Heller*, 554 U.S. at 635). But this is directly contrary to *Heller* which, when construing the text of the Amendment, gave it much wider scope as described. And while *Bruen* did repeatedly use the phrase "law-abiding citizens" in various contexts, the text of the Amendment does not. Nothing in *Bruen*'s repeated use of that phrase—in a case that did not present

the issue of the rights of individuals who have been charged with not being law-abiding citizens—can be read to reject *Heller*'s definitive reading of the text.

Indeed, the best reading of *Bruen* is that the case *reiterated Heller*'s conclusion that the Second Amendment, like the First and the Fourth, as a textual matter extends to all Americans. In its discussion of the Second Amendment's text, *Bruen* stated that "[i]t is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. And immediately after this statement, the Court cited "*Heller*, 554 U.S. at 580"—the page of the *Heller* decision in which the Court explained that the term "the people" in the Bill of Rights "refers to all members of the political community, not an unspecified subset."

From *Heller* and *Bruen*, then, it is clear that as a matter of plain text the Second Amendment extends to all Americans. To be sure, there are actions those Americans can take that can cause them to be "disqualified from the exercise of Second Amendment rights," *Heller*, 554 U.S. at 635, but the nature of those actions must be gleaned from history, not the Second Amendment's plain text. Indeed, *Heller* makes clear that "permissible" "exceptions" to the Second Amendment's textual protection flow from "historical justifications," not plain text. *Id*. In this way, the Second Amendment is like the First, where the Government, when regulating "speech"—*i.e.*, activity covered by the plain text of the First Amendment—has "the burden . . .

10

to show that [the regulated speech] belongs to a historic and traditional category of constitutionally unprotected speech." *Bruen*, 142 S. Ct. at 2130 (quotation marks and internal brackets omitted).

The Government further misreads *Heller* and *Bruen* when it suggests that, because *Heller* described certain regulations as "presumptively lawful," including "longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 626–27 & n.26, they must fall outside of the Second Amendment's plain text because the *Bruen* test makes regulations on activities within the plain text presumptively unlawful. The Government suggests that the only way to reconcile these statements is to interpret *Bruen*'s list of "presumptively lawful" regulations as being presumptively lawful "*because* the Second Amendment's text excludes them." Gov't Br. at 21 (emphasis in original). But this does not make sense. If the Second Amendment's text does not cover conduct affected by a regulation, under *Bruen* the regulation is not *presumptively* lawful—it is lawful, full stop. If conduct falls outside the Second Amendment's plain text, no historical tradition can change that. "[T]o the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137. Furthermore, the Government's theory misreads *Heller*, which specifically noted its "presumptively lawful" regulatory measures were part of its interpretation of *historical* restrictions on the right: "Although we do not undertake an exhaustive *historical analysis* today of the full scope of the Second Amendment,

11

nothing in our opinion should be taken to cast doubt on *longstanding* prohibitions . . . ." 554 U.S. at 626 (emphasis added). Following *Bruen*, which clarified that text and history must be analyzed separately, under different burdens, this presumption must be understood merely as the Supreme Court's indication that it believed, after the text and history of the Amendment was analyzed in a case appropriately raising the issue, that such laws would turn out to be grounded in an accurate understanding of the Amendment. As Judge Hardiman explained in an opinion predating *Bruen*, the Supreme Court "declined to expound upon the historical justifications for the list of presumptively lawful firearm exclusions in *Heller*—leaving that task to us." *Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). This Court would be abdicating the responsibility of analyzing a question neither *Heller* nor *Bruen* reached if it accepted the Government's contention that dicta in *Heller* about "longstanding" prohibitions somehow removed this case from the textual scope of the Amendment.

Next, the Government overreads *Bruen*'s statement that, in overturning New York's "may-issue" regime, it was not "suggest[ing] the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," as endorsing every aspect of those regimes, including the background checks that, in some cases, bar indicted persons from acquiring firearms. Gov't Br. at 21–23. The Supreme Court never said every aspect of those 43 licensing regimes—which differ among themselves widely—was

12

necessarily constitutional and to the extent the Court *did* assume that background checks were *one* aspect of them that was constitutional, it did not distinguish between background checks targeted at people with convictions versus those that identify even those who have been charged but not yet convicted. *See Bruen* 142 S. Ct. at 2138 n.9. And in any event, the Court's assumption that such regimes are constitutional must be read as an extension of *Heller*'s presumption that certain longstanding restrictions are constitutional, meaning that it is a question to be resolved at the *historical* inquiry and one that may well be resolved differently than the Supreme Court presumed.

Finally, the Government cites cases from both before and after *Bruen* that, it says, performed "textual analyses" that removed individuals convicted of a crime from the scope of the Second Amendment right, Gov't Br. 23–24, but the cases it cites for that proposition do not root their conclusions about the scope of the Amendment in its text, but rather in its history. *See Range v. Att'y Gen. U.S.*, 53 F.4th 262, 273 (3d Cir. 2022) ("Our Court's own *review of the historical record* supports the Supreme Court's understanding: Those whose criminal records evince disrespect of the law are outside the community of law-abiding citizens entitled to keep and bear arms."), *reh'g en banc granted, op. vacated*, 56 F.4th 992 (3d Cir. 2023); *Medina v. Whitaker*, 913 F.3d 152, 157–58 (D.C. Cir. 2019) ("Medina . . . asserts that evidence of past 'disregard for the law' is insufficient to disarm him. . . .

To resolve this question, *we must look to tradition and history*.") (emphasis added); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("Scholarship suggests *historical support for a common-law tradition* that permits restrictions directed at citizens who are not law-abiding and responsible.") (all emphases added). To the extent those cases matter here, it is not at the textual analysis.

*Heller* has already dispositively interpreted the text of the Second Amendment in a way that includes individuals like Quiroz. To the extent Section 922(n) is found constitutional, it must be because the Government succeeds in carrying its burden at the historical analysis.

### B. "The Nation's Historical Tradition of Firearm Regulation."

In analyzing the evidence of historical restrictions presented by the Government, *Bruen* sets guidelines for this Court to follow. For a historical analogue to support the constitutionality of a modern law, courts must first consider whether the problem addressed by the challenged law is one that "has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. In such a case, historical analogies should be "relatively simple to draw" and "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131–32. In other cases, "implicating unprecedented societal concerns or dramatic technological changes," *Bruen* calls for "a more nuanced approach." *Id.* at 2132. Even so, there is no blank

check for legislatures in such circumstances, and in any case, courts must reason by analogy to determine whether the modern regulation is "relevantly similar" to historical regulations—meaning the modern regulation is similar to historical regulations in both the way it burdens the Second Amendment right and the reasons for which it burdens the Second Amendment right. *Id.* at 2132–33.

*Bruen* provides one other important cautionary point for this Court to keep in mind: "[W]hen it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (quotations omitted) (emphasis in original). The most relevant period for determining the scope of the Second Amendment is therefore the time immediately surrounding its ratification in 1791. Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, Fall 2022, at 1, available at bit.ly/3FKF9us; *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019). Although *Bruen* "acknowledge[d] that there is an ongoing scholarly debate" over whether the meaning of the Amendment should be pegged to the public understanding of 1791 (when the Second Amendment was ratified) or in 1868 (when the Fourteenth Amendment was ratified), the Supreme Court did not disturb its precedent in which it had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right

15

when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137–38. If anything, the use of "assumed" here is too tepid. The Court has repeatedly—including in *Heller*—looked to the Founding era as the critical time period when interpreting the Bill of Rights. *See, e.g.*, *Gamble*, 139 S. Ct. at 1976 (treating as dispositive "the understanding in 1791 of the double jeopardy right"); *Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ."); *Crawford v. Washington*, 541 U.S. 36, 54 (2004) ("[T]he common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."). This Court must follow those cases, particularly here in a case concerning the direct application of the Second Amendment to the Federal Government, such that there is no complication provided by incorporation of the right against the States through the Fourteenth Amendment.

Finally, this Court must properly gauge which parts—if any—of its pre-*Bruen* Second Amendment caselaw remain good law after *Bruen*. The Government asserts that "[n]othing in *Bruen* abrogates this Court's or other courts' textual or historical analyses at 'step one' of their pre-*Bruen* frameworks," because *Bruen* referred to such analyses as "broadly consistent with *Heller*." Gov't Br. 36 n.6 (quoting *Bruen*, 142 S. Ct. at 2127). This overstates things. In fact, as just discussed, *Bruen* did more

than just emphasize the importance of the text and history to understanding the Second Amendment—it prescribed a method for their analysis. While pre-*Bruen* step one caselaw may be broadly consistent with *Bruen* in its aims, it frequently took a more relaxed approach in its method. Where pre-*Bruen* caselaw fails to specifically analyze the existence of "relevantly similar" analogical precedents for a challenged regulation, and to place the burden squarely on the Government, there is a limit to how much that caselaw can inform a post-*Bruen* court.

The Government offers three historical justifications for Section 922(n), none of which survive scrutiny under this framework. *First*, the Government claims that historical laws dating to the Founding permitted (or in capital cases, required) indicted individuals to be jailed while they awaited trial. *See* Gov't Br. at 29–34. The Government claims that "the main difference" between these laws and Section 922(n) is that Section 922(n) applies categorically to defendants indicted for sufficiently serious crimes while "legislatures have often given courts discretion whether to detain indicted defendants." Gov't Br. 33. But that is not the main difference. The relevant distinction between laws regulating the bail process and Section 922(n) is that the two do not burden the right to bear arms in the same way; the "how" is different. The Government asserts that the difference is immaterial, asserting that the greater power—to jail—must include the lesser power—to disarm. Gov't Br. 34. But this is fundamentally flawed. It does not follow that even if the

17

government could jail an individual pending trial, it could deprive him of his constitutional rights in exchange for its forbearance. "The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions. . . Once a state decides to release a criminal defendant pending trial, the state may impose only such conditions as are constitutional." *Scott*, 450 F.3d at 866 n.5. One of the purposes for which the Second Amendment was included in the Bill of Rights was to protect "the inherent right of self-defense." *Heller*, 554 U.S. at 628. If an individual is incarcerated, the Government is responsible for his safety, but if the Government has released him pending trial, he has the same need for self-defense as anyone else. Thus, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). But that is the exception to the normal rule: outside of custody and other limited, exceptional circumstances, the Government's "failure to protect an individual against private violence simply does not" violate the constitution. *Id*. at 197. Therefore, a person's Second Amendment right is infringed by being released and disarmed pending trial in a way that it is not if he is imprisoned until he is tried.

*Second*, the Government points to laws it characterizes as "disarming dangerous or untrustworthy people." Gov't Br. 35. But most of the cited laws are

not relevant to the present case. For instance, the Government cites several versions of the Statute of Northampton, *see* Gov't Br. at 35–36, but that law prohibited carrying firearms in a way that was intended to terrorize the people; it said nothing about *who* could own or carry firearms, *see Bruen*, 142 S. Ct. at 2145. Several other laws cited by the Government *were* targeted at disarming certain groups of people—"Native Americans, Black people, [] indentured servants," and Catholics, Gov't Br. at 37 (quoting *Range*, 53 F.4th at 276)—and the Government says the reason for these restrictions was concern for public safety. Though the Government relies on these statutes, it notes that they are "repugnant" and would be "unconstitutional" today. This Court should *not* rely on repugnant laws which are, in any event, not relevant to this case. The reason such laws were permissible at earlier points in our history—to the extent the cited laws even come from the period after the enactment of the Second Amendment—is that the groups targeted were not considered to be part of "the people" and so could be restricted in ways that other groups could not. *See Bruen*, 142 S. Ct. at 2150–51 (discussing *Dred Scott v. Sandford*, 19 How. 393 (1857) in which "Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States" including that they would have Second Amendment rights). *Bruen* accordingly *did not* rely on such laws as precedent for New York's restrictive carry regime, which certainly was less restrictive than laws addressed to Native Americans

19

and Black people at the Founding. These laws should be treated for what they were: examples from our past when we failed to live up to our founding ideals by construing "the people" too narrowly, not as valid precursors to be built upon by modern-day lawmakers.

The only laws the Government cites that are possibly analogous to Section 922(g) are those restrictions pertaining to individuals in actual or feared rebellion and who were identified as dangerous. *See* Gov't Br. 38. But even then, the laws the Government cites permitted individuals to avoid disarmament by swearing loyalty to the United States, and they applied only because the disarmed individuals were viewed as "dangerous." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous and Unusual Persons from Possessing Firearms*, 20 WYO. L. REV. 249 (2020). Section 922(n) is not similarly restricted. In support of its broader ban, the Government cites a "massively popular," *Heller*, 554 U.S. at 616, treatise by Thomas M. Cooley, which it says "explained that some groups were 'almost universally excluded' from exercising certain civic rights like gun rights, including 'the idiot, the lunatic, and the felon, on obvious grounds." Gov't Br. 39 (quoting Thomas M. Cooley, A Treatise Upon the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868). But Cooley was not talking about the Second Amendment, or even gun rights more generally, in the quoted passage. Instead, he was speaking *only* about who may

20

be entrusted with "the elective franchise." Cooley, *supra*, at 29. When Cooley did discuss the right to bear arms much later in his treatise, far from suggesting that certain widespread exclusions existed, he noted instead that "there has been very little occasion" to discuss "how far it is in the power of legislature[s] to regulate that right," seemingly because such exclusions *did not exist*. *Id.* at 350.

The government's reliance on Cooley's discussion of civic rights betrays a fundamental misunderstanding of the Second Amendment right that has persisted in some quarters despite its utter irreconcilability with *Heller*, *McDonald*, and now *Bruen*. There are certain civic rights that arise only in the context of participation in a Republican form of government—the right to vote is one example. Such civic rights may be subject to regulation on different principles than fundamental, individual rights such as the right to self-defense. *Heller* emphatically rejected the notion that the Second Amendment is a mere civic right; it has deeper roots. As *McDonald v. City of Chicago, Ill.* explained, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller* we held that individual self-defense is the *central component* of the Second Amendment right." 561 U.S. 742, 767 (2010) (emphasis in original) (quotation marks and footnote omitted). Thus, *"Heller* . . . expressly rejects the argument that the Second Amendment protects a purely civic right. It squarely holds that 'the Second Amendment confers *an individual right* to keep and bear arms.' " *Kanter v.*

*Barr*, 919 F.3d 437, 463 (7th Cir. 2019) (Barrett, J., dissenting) (emphasis in original) (citations and internal brackets omitted). For these reasons, Cooley's discussion of the right to vote is relevant only to highlight the *contrast* between civic rights like the right to vote (which felons lost at the Founding) and basic rights like the right to armed self-defense (which they did not).

The Government's claim that the right to bear arms is "tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens,' " Gov't Br. 39 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)), should be rejected for the same reasons, *see Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting) ("The problem with this argument is that virtue exclusions are associated with civic rights—individual rights that require citizens to act in a collective manner for distinctly public purposes.") (internal brackets omitted). And this argument can also be rejected for failing to meet *Bruen*'s exacting standards for evidence of historical practice. The only support the Government offers for its "virtuous citizen" theory is a series of law review articles and pre-*Bruen* caselaw, but *Bruen* requires the Government to come forward with actual historical regulations in support of its laws. *See Bruen*, 142 S. ct. at 2132–33. The Government cites *no* such regulation supporting its "virtuous citizen" theory of the Second Amendment. What is more, as Judge Bibas has demonstrated, the academic sources allegedly supporting this theory "are like the layers of a matryoshka doll, each nested

layer successively larger with little at the core. Once we take them apart, none proves that felons' lack of virtue excludes them from the Second Amendment." *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 915–16 (3d Cir. 2020) (Bibas, J., dissenting).

*Third*, the Government cites surety laws to support Section 922(n). Gov't Br. 42. These laws, which were discussed at length in *Bruen*, "required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148. But a bond was only required if someone first "could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.' " *Id.* (quoting MASS. REV. STAT., ch. 134, § 16 (1836)). Such a law is unlike Section 922(n) for several reasons. Unlike a surety proceeding, Section 922(n) takes away the firearm rights of an individual automatically upon indictment, with no necessary showing of "reasonable cause to fear an injury, or breach of the peace." And also unlike a surety proceeding, once Section 922(n) applies, an individual in need of a firearm has no way to remove the disability (unless and until he is cleared of the charges). A bond, by comparison, provides a much less significant impediment to the exercise of Second Amendment rights. To use the same terminology as the *Bruen* Court, the "hows" of the two regulations are different and so the analogy fails.

In analyzing historical firearm regulations, *Bruen* demonstrated a granular, specific analysis of laws that were purported analogues for New York's "may-issue" carry licensing regime. *See, e.g.*, 142 S. Ct. at 2154–2156. The historical evidence

provided by the Government in this case cannot stand up to similar scrutiny and so it must be rejected.

## CONCLUSION

For the reasons set forth above, the Court should affirm the judgment.

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

Stephen P. Halbrook
3925 Chain Bridge Road, Ste. 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

Nezida S. Davis
DAVIS BAKARI LAW LLC
2915 Pleasant Ridge Dr.
Decatur, GA 30034
(404) 771-1832
nsdavis@davisbakarilaw.com

*Attorney for Amicus Curiae National*
*African American Gun Association, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 27, 2023, I filed this brief through this Court's electronic case-filing system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David H. Thompson*
David H. Thompson
*Attorney for Amicus Curiae National*
*African American Gun Association, Inc.*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,893 words, excluding the parts exempted by Fed. R. App. P. 32(f)

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) *because* this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Times New Roman font.

I certify that the text of the electronic brief and the hard copies of the brief are identical.

I certify that I am admitted to practice in the Fifth Circuit Court of Appeals, and that I am a member in good standing.

Dated this 27th day of January, 2023.

_/s/ David H. Thompson_
David H. Thompson
*Attorney for Amicus Curiae National*
*African American Gun Association, Inc.*