

**United States Department of Justice**

United States Attorney
Western District of Texas

903 San Jacinto Ave., Suite 334     (512) 370-1265
Austin, Texas 78701                     fax (512) 916-5854

January 31, 2023

## APPELLEE'S 28(j) LETTER

Mr. Lyle W. Cayce, Clerk of Court
United States Court of Appeals for the Fifth Circuit
600 South Maestri Place
New Orleans, Louisiana 70130-3408

      Re:    *United States v. Quiroz*, No. 22-50834

Dear Mr. Cayce:

This letter cites a new case rejecting a facial challenge to § 922(n) under the framework set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

In *United States v. Rowson*, the court held that § 922(n) squares with historical tradition and therefore does not violate the Second Amendment. 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023). The court found "two lines of historical regulation of firearms to supply analogues sufficiently apposite to sustain § 922(n)." *Id.* at *21. First, the court observed that § 922(n) "imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness," and so is consistent with historical laws "disarm[ing] persons deemed inherently dangerous." *Id.* at *21–22. Second, the court held that founding-era surety laws are "fair analogues to § 922(n)." *Id.* at *24. The court's reasoning supports the government's arguments based on those same historical traditions. (Gov't Br. 35–47; Gov't Reply 17–19.)

*Rowson* also cited historical sources showing that many crimes now considered felonies were capital crimes in the founding era—and that pretrial detention for them was common. 2023 WL 431037, at *24. "[T]he relative scarcity of non-detained felony indictees," the court reasoned, "likely explain[s] the absence of a colonial-era statute like § 922(n) addressed specifically to pretrial indictees."

Mr. Lyle W. Cayce
Page 2

*Id.* That reasoning supports the government's argument based on historical laws allowing pretrial detention. (Gov't Br. 29–34; Gov't Reply 16–17.)

   *Rowson* declined to uphold § 922(n) under *Salerno*'s framework for liberty restrictions on indicted defendants. 2023 WL 431037, at *13. The government disagrees with that holding. (Gov't Br. 13–16; Gov't Reply 1–3.) *Rowson* did not squarely address the government's argument here that the preexisting right codified by the Second Amendment covers only law-abiding citizens.[1]

                                        Sincerely,

                                        Jaime Esparza
                                        United States Attorney

                         By:    */s/ Charles E. Fowler, Jr.*
                                        Charles E. Fowler, Jr.
                                        Assistant United States Attorney

copy (by ECF):    Timothy Shepherd
                            Attorney for Defendant-Appellant

---

[1] But *Rowson* rejected the argument that indicted defendants are excluded from "the people" referenced in the Second Amendment. 2023 WL 431037, at *19–25. (*See* Gov't Reply 3–5 (explaining that the government's argument here does not rest on "the people").)

2023 WL 431037
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF AMERICA,
v.
ISZAYAH ROWSON, Defendant.

22 Cr. 310 (PAE)
|
Filed 01/26/2023

OPINION & ORDER

Paul A. Engelmayer United States District Judge

**\*1** This decision resolves two motions by defendant Iszayah Rowson. Rowson moves to suppress a firearm seized from him during a traffic stop on the grounds that the livery car in which he was a passenger was stopped, and he was thereafter frisked, in violation of the Fourth Amendment. Rowson also moves to dismiss the one-count Indictment, which charges him with receipt of a firearm in violation of 18 U.S.C. § 922(n), which makes it a crime for a person while under indictment for a crime punishable by imprisonment for a term exceeding one year to ship, transport, or receive a firearm that has travelled in interstate or foreign commerce. Drawing on *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Rowson argues that § 922(n) is facially unconstitutional under the Second Amendment.

For the reasons that follow, the Court denies both motions.

## I. Overview and Procedural History

On June 2, 2022, the Grand Jury returned the Indictment, charging Rowson with a single count of violating §

922(n), on or about March 5, 2022. Dkt. 11. The charges arose from a stop shortly after 9:45 p.m. that evening by two New York City Police Department ("NYPD") officers of an Uber livery car in the Bronx, on the ground that the backseat passenger, Rowson, was not wearing a seatbelt, as required by law. After an exchange with Rowson, and after he was asked to and did exit the vehicle, an officer patted down Rowson and found a firearm in the waistband of his pants. The gun had been stolen on February 8, 2022 in Virginia. Dkt. 8 ("Bail Hearing Tr.") at 6–7. At the time, Rowson was under indictment in New York State for criminal possession of a weapon in the second degree, in violation of New York State Penal Law ("NYSPL") § 265.03(3), and criminal possession of a firearm, in violation of NYSPL § 265.01-(b)(1). Dkt. 11. Both are felony offenses. *See* NYSPL § 70.02.

On November 15, 2022, Rowson moved to suppress the firearm and to dismiss the Indictment. Dkt. 32. In support, he filed a memorandum of law, Dkt. 33 ("Mem."), and exhibits. On December 2, 2022, the Government filed an opposition brief. Dkt. 35 ("Opp."). It opposed an evidentiary suppression hearing. *Id.* at 12. On December 6, 2022, the Court ordered that the hearing would proceed as scheduled. Dkt. 36.

On December 12, 2022, the Court heard testimony from two police officers, received documentary and photographic evidence, and heard argument. At the close of the hearing, the Court invited supplemental briefing on the motion to dismiss. On December 23, 2022, the parties submitted supplemental briefs. Dkts. 41 ("Gov't Ltr. Br."), 42 ("Def. Ltr. Br.").

## II. Rowson's Suppression Motion

### A. Factual Findings

#### 1. Evidence Considered

Based on the evidence at the suppression hearing, the Court finds the following facts. The evidence consisted of the testimony of (1) Lieutenant Rafael Tosado, a 17-year NYPD veteran, *see* Suppression Hearing Transcript ("Tr.") 17; and (2) Officer[i] Eric Bernard, a seven-year NYPD veteran, Tr. 69. Tosado and Bernard (the

"officers") conducted Rowson's traffic stop, frisk, and arrest. Unless otherwise indicated, the Court credits the testimony cited herein. The Court also received photographs of Rowson taken at the police station immediately after his arrest, GX8, GX11, GX12; photographs of signage posted on the Uber, GX9, GX10; photographs of the gun and ammunition recovered from Rowson, GX6, and of the firearm itself, GX7; video footage from the officers' body-worn cameras, GX1 (Tosado), GX2 (Bernard); and a still image from the same footage, GX4. *See generally* Tr. 21 (GX2), 24 (GX11), 28 (GX1), 31 (GX9), 32 (GX10), 38 (GX12), 39 (GX8), 45 (GX6), 46 (GX7), 87 (GX4).

### 2. Facts Established[2]

### a. The Traffic Stop

**\*2** On the night of March 5, 2022, the officers were patrolling the 46th precinct in the Bronx in an unmarked police car. Tr. 17–18, 70. Their purposes were to prevent crimes and to respond to crimes in progress. Tr. 17–18. Such patrols address all offenses, including vehicular offenses. *See* Tr. 69–70. Under New York law, vehicle passengers, including those in the back seat, are required to wear a seatbelt. Tr. 26; *see also* 📙 N.Y. Vehicle & Traffic Law § 1229-c.

Lieutenant Tosado was driving; Officer Bernard sat in the passenger seat. Tr. 18.[3] On numerous occasions, both officers had stopped cars based on the fact that a backseat passenger was not wearing a seatbelt. Tr. 26 (Tosado), 79 (Bernard). Both had received training in identifying concealed firearms and had experience conducting firearm-related arrests. Lieutenant Tosado had been trained in recognizing the shape, sizes, and common methods of concealed carrying, and had participated in numerous gun arrests as part of a team focused on gun crimes. Tr. 46–47. Some of these arrests had arisen from observing bulges in clothing indicative of a firearm. Tr. 47. Officer Bernard had been trained in the concealment of firearms, and in common "characteristics," "body movements," and "demeanors" of a person carrying a concealed weapon. Tr. 90. He had participated in numerous gun arrests, including ones where the concealed firearm produced a bulge in the suspect's clothing. Tr. 90.

At 9:45 p.m., the officers were driving north along Webster Avenue, in the vicinity of East Tremont Avenue and East 178th Street. Tr. 18. Webster Avenue has four traffic lanes—two northbound and two southbound; one of which in each direction is a bus lane. Tr. 18–19, 71. The officers were driving northbound in the bus lane, Tr. 19, 22, at under 10 miles per hour, Tr. 74 (Bernard), and perhaps under five miles per hour, Tr. 23 (Tosado).

Both officers wore body cameras[4]; neither had previously interacted with Rowson. Tr. 25 (Tosado), 75 (Bernard). As they approached a red light, the officers noticed a four-door Toyota Camry, Tr. 19, 52, which they identified as a livery cab from its license plate. Tr. 72. The driver-side window of the officers' car was halfway down, giving them an unobstructed view. Tr. 23 (window was opened to "lower than my eye level"), 77. This portion of Webster Avenue was well lit by streetlights and ambient light from commercial and residential buildings. Tr. 18–19, 28–29 (Tosado); 71–72 (Bernard). Lieutenant Tosado looked to his left, through his window, and into the Camry. Tr. 27, 75; GX2 00:05–:12. Its windows were untinted. Tr. 23, 75.

Lieutenant Tosado noticed that the Camry's rear passenger, later identified as Rowson, was not wearing a seatbelt. Tr. 23. Rowson was sitting on the right-hand side of the Camry, the side closest to the officers, and wearing a white shirt and light-washed denim jacket. Tr. 24 (Tosado), 78, (Bernard); *see also* GX11 (Rowson in clothes from March 5, 2022). Lieutenant Tosado testified that Rowson's light-colored clothing made it easier to spot the absence of a dark-colored seatbelt chest strap. Tr. 24. He also testified that the Camry was clearly visible for a couple of seconds while both cars were stopped at the red light. Tr. 51.

**\*3** Officer Bernard testified that he also saw that Rowson was not wearing his seatbelt. Tr. 72, 75–76. He could see into the Camry, despite being in the police car's passenger seat, because Lieutenant Tosado's window was lowered, and the Camry's windows were not tinted. Tr. 75; *see generally* Tr. 75–77. Officer Bernard testified that he also inferred that Rowson was not wearing a seatbelt from the absence of a dark-colored chest-strap against Rowson's light-colored clothing. Tr. 76–78.

The officers "wav[ed] the vehicle" past them to confirm their "initial sight that the defendant was not wearing a seatbelt." Tr. 79; *see also* Tr. 26; GX2 00:29. Both testified that, before waving the Camry past, they had "already discussed that [they] were going to pull over" the Camry based on having observed Rowson not wearing a seatbelt. Tr. 79 (Bernard); *see also* Tr. 80 ("Q: So at that point, you had already discussed with Lieutenant Tosado that you were going to stop the vehicle? A: That's correct.

Q: And that's why he waved it forward? A: Yes."), Tr. 26–27 ("Q: Why did you signal for the Camry to go past you? A: Because we were going to pull over the Camry. Q: Why were you going to pull over the Camry? A: Because the rear passenger was not wearing his seatbelt."). As the Camry passed the police car, Officer Bernard saw, for a second time, that Rowson was not wearing a seatbelt. Tr. 80. Consistent with this, the body camera footage reflects that, after waving a car past, Lieutenant Tosado looked carefully out his window at a passing black sedan (the Camry). *See* GX2 00:29–:33.

The officers pulled over the Camry. GX1 1:00–:03; Tr. 30, 81. Lieutenant Tosado approached the Camry's driver and asked for his license, consistent with departmental policy for traffic stops. Tr. 33; GX1 1:03–:22. The driver told Lieutenant Tosado that he had asked Rowson to wear a seatbelt, but that Rowson had refused, Tr. 33. The Camry had two signs instructing passengers to wear their seatbelts. Tr. 30–32; GX9–10. Meanwhile, Officer Bernard approached Rowson on the Camry's rear, passenger side. Tr. 33, GX2 1:03–:15. Both officers testified that, as they approached the Camry, they again saw, through its untinted windows, that Rowson was not wearing a seatbelt. Tr, 30, 55 (Tosado); Tr. 82 (Bernard).

### b. The Frisk

The area in which the officers stopped the Camry is a high-crime area, with "a lot of shootings, robberies, gun possession, a lot of violence, a lot of assaults, a lot of fights," Tr. 40 (Tosado), 93 (Bernard). The area of the stop was well lit. Tr. 30, 81. While Lieutenant Tosado spoke to the driver, Officer Bernard knocked on Rowson's window. Tr. 82; GX2 1:10, When Rowson rolled down his window, Officer Bernard said: "You got your I.D. on you? You're not wearing any seatbelt." GX2 1:12–:20; *see also* Tr. 39–40. *But see* Mem. at 2.[5] Rowson said, "I'm sorry," Tr. 82, and began scrolling through his phone to find a photo of his identification. GX2 at 1:23–:25; Tr. 84, 127. For approximately 20 seconds, while Rowson scrolled through his phone, Officer Bernard looked into the car at Rowson with his flashlight. GX2 1:25–:43. During this period, Officer Bernard asked Rowson for his name, which Rowson gave. GX2 1:25–:43.

**\*4** Officer Bernard perceived Rowson as nervous, based on his heavy breathing and rising and falling chest. Tr. 84; *see also* Tr. 36–37 (Tosado: Rowson appeared nervous). Officer Bernard mouthed to Lieutenant Tosado over the roof of the car, "He's nervous." Tr. 35; GX1 1:30–:36.

Officer Bernard testified that, at this point, he started to believe Rowson might be aimed. Tr. 84. Officer Bernard's warning "caused [Lieutenant Tosado] to look into the rear passenger area where [Rowson] was seated," and shine his flashlight toward the rear of the car to better see Rowson, Tr. 35–36 (Tosado).

Turning back to Rowson, Officer Bernard said: "You alright? You're breathing very heavy." GX2 1:40–:43. Rowson responded: "I got nothing on me, look. I just want to see why I was getting pulled over." GX2 1:40–:49; Tr. 85. Officer Bernard responded: "For wearing no seatbelt." GX2 1:48–:50. As he said, "I got nothing on me," Rowson opened the top of his denim jacket a few inches, seemingly to convey that nothing suspicious was on his person. Tr. 35, 56, 85.

Rowson was wearing tight skinny jeans, with a somewhat striated wash pattern, Tr. 108—09; his pants were well illuminated by ambient light and the officers' flashlights, Tr. 37; *see also* GX8, GX11, GX12 (Rowson's clothing night of the arrest). Officer Bernard testified that around this point, he observed "an object going down the left side of [Rowson's] leg, which is consistent with the barrel of a firearm," and "another object going just under the belt loops of his pants ... that could be the handle of a firearm." Tr. 85. Officer Bernard noticed the object "pushing up on [Rowson's] pants," and causing his belt loops to project perpendicularly from his waist, rather than lying parallel to his frame, as they naturally would. Tr. 85–86. Lieutenant Tosado testified that, during this period, he did not notice a bulge in Rowson's pants from his vantage point, alongside the driver's window, Tr. 36–37, 57.

The Court credits Officer Bernard's important testimony. Although the body camera footage did not make such a bulge evident to the Court, given the officers' distance from the pants and the limitations of the body-camera medium, the footage was not inconsistent with Officer Bernard's observation. And both officers credibly testified that body camera footage sometimes does not pick up nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers. *See* Tr. 36 (Tosado: "I'm 6′2″. But I usually kept my body-worn camera [on] my lower chest/upper stomach area just so that I can have a better view of things."). Body cameras can also sometimes make objects appear farther away, Tr. 36–37, and pick up reflective glare that would not impede the perceptions of an in-person observer, *see* Tr. 88–89 (Bernard, same).

Officer Bernard asked Rowson to exit the Camry, GX2 1:55–:58; Tr. 58. Officer Bernard was standing close to the Camry with his arms, for tactical reasons, in front of him. Tr. 117–18. At this point, the Camry door was wide open. Tr. 58 (no door separating Rowson and Officer Bernard); *see also* GX2 1:58. Officer Bernard testified that, as Rowson stood from his seated position inside the vehicle, Rowson's left side bumped Officer Bernard's right arm. Tr. 92, 117; *see* GX 1:55–2:05. Officer Bernard felt an object he believed was a firearm. Tr. 92, 118.

Officer Bernard instructed Rowson to turn and put his hands on the vehicle; Rowson did not immediately comply, Tr. 40–41, 92; *see* GX1 2:14–:18. Lieutenant Tosado testified that, at this point, Rowson "appeared really nervous[,]" his "eyes were darting[, and i]t look[ed] like he was possibly thinking of running or fighting." Tr. 40. Officer Bernard testified that he believed Rowson was "looking for his opportunity to flee." Tr. 92–93. Officer Bernard repeatedly told Rowson to "relax." GX2 2:05–:30; *see also* GX1 2:00–:06. The body camera footage reflects that Rowson was still scrolling using his phone with his right hand, while Officer Bernard's arm was wrapped around Rowson's left side, as he repeatedly instructed Rowson to put his hands on the car. Rowson said: "Hold on, let me call my mom." GX1 2:13–:16. Both officers testified that, at this point, Rowson appeared to reach toward his waistband with his left hand, *see, e.g.*, Tr. 41, 44 (Tosado); Tr. 161 (Bernard), and would not raise that arm from his side, *see, e.g.*, GX1 2:04–:20. Lieutenant Tosado concluded that "based on [his] experience, [Rowson] was reaching for a weapon," Tr. 41; Tr. 43–44. The body camera footage reflects that Lieutenant Tosado then grabbed Rowson's left arm, and said, "Don't do that." Tr. 41 (Tosado), 98 (Bernard, discussing Tosado grabbing Rowson's arm); GX1 2:12–:20.

**\*5** While Lieutenant Tosado held Rowson's left arm away from his body, *see* GX1 2:20–:25; Tr. 96, Officer Bernard frisked the outside of the front, left area of Rowson's pants and felt an object resembling a firearm in shape and size. Tr. 94–95. Officer Bernard said: "92." GX1 2:22–:25; GX2 2:20–:22; Tr. 42. "92" refers to NYPD's radio code for executing an arrest; Lieutenant Tosado understood Officer Bernard to be asking him to handcuff Rowson. Tr. 42 (Tosado). Lieutenant Tosado placed Rowson's left wrist in a handcuff. Tr. 42; GX1 2:25–:30.

While the traffic stop was unfolding, an NYPD public safety car passed the Camry. Tr. 42. This timing was coincidental. Tr. 42 ("Q: So how did they end up there while you were handcuffing Rowson? A: Just timing, perfect timing."), 96 (Bernard) (same). The officers from

the passing public safety vehicle "exited [their] vehicle to help [Lieutenant Tosado and Officer Bernard]." Tr. 32. Lieutenant Tosado said "92" to these officers. Tr. 33; GX1 2:25–:38. Officer Bernard said: "He has a gun." Tr. 43; GX1 2:38–:40.

Once Rowson's hands were handcuffed, Officer Bernard reached into his waistband with his right hand and removed the gun. Tr. 95. It was a loaded Taurus TX22 caliber pistol, taken from the front waistband of Rowson's pants.[6] Tr. 10, 44, 125. Officer Bernard stated: "I got the gun." GX2 2:38–:42; Tr. 44 ("I got it."). At the time it was recovered, the gun's barrel was pointing down Rowson's left leg, with the grip extended inward toward his groin. Tr. 10. The gun was approximately seven inches along the barrel, five inches along the grip, and one-to-two inches thick. Tr. 9–10. It had 13 rounds in the magazine, Tr. 100.

The entire encounter—from the officers exiting their vehicle, through Rowson's handcuffing and the recovery of the gun—lasted less than two minutes. *See* GX2 1:03–2:53.

### B. Discussion

Rowson's suppression presents, in sequence, two issues. The first is whether the officers had reasonable suspicion to justify the initial traffic stop, which, here, turns on whether the officers, in fact, observed Rowson riding in the Camry without a seatbelt. The second is whether the officers were justified in frisking Rowson. That turns on whether, based on specific facts perceived at the time, the officers had objectively reasonable suspicion to believe that Rowson was armed and dangerous.

### 1. Applicable Legal Principles

Under *Terry v. Ohio*, 392 U.S. 1 (1968), and ensuing authority, "an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). To satisfy the Fourth Amendment, two requirements must be met. *Id.*

First, the investigatory stop must be lawful. "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police

to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id.* at 327. The Second Circuit has "h[e]ld[ ] unambiguously" that it is lawful to make a traffic stop when officers have "reasonable suspicion of a traffic violation." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009); *see also United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred."). In such circumstances, whether "reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis," *United States v. Gomez*, 199 F. Supp. 3d 728, 741 (S.D.N.Y. 2016) (citation omitted), *aff'd*, 751 F. App'x 63 (2d Cir. 2018); *see also Foreste*, 780 F.3d at 523 (same). During a stop, an officer may order the occupants of a vehicle to exit, or question them about matters unrelated to the stop, as long as the inquiries do not measurably extend the stop's duration. *Johnson*, 555 U.S. at 331, 333.

**\*6** Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Id.* at 326–27. In such instances, "after a vehicle is stopped, concerns regarding officer safety can justify frisking the vehicle's occupants for weapons." *United States v. Williams*, No. 11 Cr. 228 (RWS), 2011 WL 5843475, at \*2 (S.D.N.Y. Nov. 21, 2011). Here, too, "[d]etermining whether reasonable suspicion exists is an objective inquiry," and is measured from "the objective perspective of a trained and experienced law enforcement officer." *Id.* at \*2–3. "A reasonable basis requires more than a 'hunch.' " *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Terry*, 392 U.S. at 27). It demands "specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S. at 21, provide detaining officers with a "particularized and objective basis for suspecting wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).[7]

"The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." *United States v. Stewart*, 604 F. Supp. 2d 676, 680 (S.D.N.Y. 2009) (internal quotations omitted). "If the Government fails to satisfy this burden, any evidence obtained as a result of an improper seizure—that is, a stop or frisk that is not supported by reasonable suspicion—must be excluded from trial."

*United States v. Bristol*, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011).

## 2. The Traffic Stop

The parties agree that the stop of the Camry was lawful if the officers, as they testified, observed Rowson riding in the Camry without a seatbelt before initiating the stop. *See* Mem. at 4; Opp. at 14–17; *see also Johnson*, 555 U.S. at 327. Rowson argues that the officers were not credible in so testifying. He disputes that, under the circumstances and conditions on the night in question, the officers could have observed Rowson not wearing a seatbelt. *See* Tr. 140–41 (Rowson's counsel: "It's a question of credibility [as] to whether or not the officers could have observed, under the circumstances and conditions on March 5 ... Mr. Rowson without a seatbelt in the rear passenger seat of the Uber."). As noted above and as explained more fully below, the Court finds the officers' testimony credible and reliable, and accordingly denies Rowson's challenge to the lawfulness of the stop.

The officers' pertinent testimony was consistent. Both credibly testified that they first noticed Rowson's lack of seatbelt as they approached a red light on Webster Avenue, *see* Tr. 28–29 (Tosado), 74–75 (Bernard); discussed pulling over the Camry for the seatbelt violation, Tr. 26 (Tosado: "We were going to pull over the Camry."), 79–80 (Bernard); waved the Camry by them, *see* Tr. 29 (Tosado), 79–80 (Bernard); and then observed Rowson's lack of a seatbelt a second time, *see* Tr. 27 (Tosado, turned to look into Camry), 80 (Bernard, saw no seatbelt again). The officers' statements were consistent as to the nature of the violation and when they detected it. And Officer Bernard's voice is contemporaneously captured on tape citing Rowson's seatbelt violation as the basis for stopping the Camry, GX2 1:12–:20 (Bernard, to Rowson), 1:48–:50 (same); *see also* Tr. 33–34 (Tosado, to driver); *cf. Stewart*, 604 F. Supp. 2d at 682 (no reasonable suspicion where officers' testimony as to supposed violation and when they detected it was contradictory, and where they did not ask driver about violation after stopping vehicle). That Rowson was, in fact, not wearing a seatbelt—as both the driver's statement to Lieutenant Tosado, Tr. 33, and the body camera footage confirm, *see, e.g.*, GX2 1:38; GX4 (still from body camera footage)—supports the officers' claim to have observed just that.

**\*7** Under these circumstances, the officers had every reason to conclude that Rowson was violating the seatbelt

law. Far from merely inferring a violation of law, they had directly seen Rowson in violation of that law. Of course, "that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to suspect that the violation occurred"; "a court must still assess the reasonableness of the officer's reliance on his observation, in light of any objective circumstances that might have led a reasonable officer to doubt the accuracy of what he believed he saw," *Stewart*, 604 F. Supp. 2d at 682–83. That is because, "[j]ust as it is unreasonable to suspect criminal activity on the basis of faulty deductions and inarticulable facts, it is also unreasonable to suspect a traffic violation on the basis of an unreliable underlying observation." *Id.* at 683–84 (no reasonable suspicion where officers, who were distracted by cab's passenger, claimed to have observed that the cab was over the white line of a sidewalk by a "matter of inches" as they drove by the cab); *United States v. Jenkins*, 324 F. Supp. 2d 504, 510 (S.D.N.Y. 2004) (no reasonable suspicion where angle of windshield created a glare that made it appear tinted, but in a way that could apply to "virtually any vehicle, particularly at night"), *aff'd on other grounds*, 452 F.3d 207 (2d Cir. 2006).

Here, however, there was no reasonable basis for the officers to wonder if their eyes were playing tricks on them. Unlike the examples above, there is no basis on which it can be credibly argued that the officers' observations were "frustrated by fleetingness, distractions, obstructions, or deceptive angles, glares, or shadows," *Stewart*, 604 F. Supp. 2d at 683. The assembled circumstances instead enabled an accurate observation. The officers were driving slowly at approximately five to 10 miles per hour, Tr. 23, 74, they had an unobstructed view into the Camry, Tr. 23 (Tosado's window open; Camry's windows untinted), 75 (Camry's windows untinted),[8] that lasted for several seconds, Tr. 51 (Rowson clearly visible while stopped at red light), and the area was well lit, Tr. 18–19, 28–29, 71–72. Rowson was sitting on the side of the Camry closest to the officers, and his light-colored clothing would have starkly contrasted with a dark seatbelt chest strap, had he been wearing one. Tr. 24, 78; GX11. The officers also saw Rowson twice, and from a variety of angles as the Camry passed. Tr. 79–80. For experienced officers focused on Rowson, a few seconds while driving at a low speed provided ample opportunity to note the absence of a black chest strap on a well-illuminated and—while at the red light, stationary—person. *See United States v. Hagood*, No. 20 Cr. 656 (PAE), 2021 WL 2982026, at *5, *14–15 (S.D.N.Y. July 15, 2021) (reasonable suspicion where experienced officers observed well-illuminated person with weighted bag

across chest for a few seconds while passing at a low speed).

In sum, because they saw Rowson not wearing a seatbelt, the officers had reasonable suspicion to stop the Camry, and the traffic stop was lawful. Rowson's motion, to the extent directed to the traffic stop, is therefore denied. *See, e.g.*, *Foreste*, 780 F.3d at 523–27 (affirming denial of motion to suppress where officers observed vehicular infractions that were basis of underlying traffic stops); *United States v. Derverger*, No. 07 Cr. 147 (NAM), 2008 WL 819040, at *4 (N.D.N.Y. Mar. 24, 2008) (denying suppression motion) ("A traffic stop is valid under the Fourth Amendment if, as here, it is based on an observed traffic violation."), *aff'd*, 337 F. App'x 34 (2d Cir. 2009); *Gomez*, 199 F. Supp. 3d at 741–42 (denying suppression motion where officers observed traffic violation); *see also United States v. Restrepo*, 890 F. Supp. 180, 192 (E.D.N.Y. 1995) (traffic stop permissible if valid basis, even if pretextual).

### 3. The Frisk

**\*8** As an alternative basis for suppression, Rowson argues that Officer Bernard lacked reasonable suspicion to frisk him. *See* Mem. at 5–6.

The Government argues that, taken together, the following articulated facts permitted an officer to reasonably suspect that Rowson was armed and dangerous, supporting a frisk of his front left pocket: (1) the traffic stop occurred in a high-crime area; (2) Rowson appeared visibly nervous in his dealings with Officer Bernard; (3) Rowson reflexively denied having anything on his person, notwithstanding that a question to this effect had not been put to him; (4) Officer Bernard observed a distortion in the belt loops of Rowson's pants consistent with the presence of a firearm around his waist and pocket area; (5) when Rowson bumped into him, Officer Bernard felt a hard object consistent with a firearm; and (6) Rowson thereafter was slow to comply with Officer Bernard's command to turn and place his hands on the vehicle. *See* Opp. at 17–20. The Court agrees. Viewing the circumstances in totality and from the perspective of a reasonable officer, there was an ample, and clearly reasonable, basis to conclude that Rowson was aimed and dangerous, and indeed specifically that his pants housed a firearm. *See United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018).

The Court first considers the stop's high-crime location and Rowson's nervousness. *See* Opp. at 18–19. That

context was permissibly considered by the officers. *Cf. Hagood*, 2021 WL 2982026, at *14 (considering fact that stop occurred in a high-crime area and defendant's nervousness as contextual circumstances in a *Terry* analysis); *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) ("An 'individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[, b]ut officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.' " (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))). But under the circumstances of the stop here, these factors, without more, would fall well short of establishing reasonable suspicion. *See Hagood*, 2021 WL 2982026, at *14.

As to the location of the stop, the Camry was merely passing *through* a high-crime area. The officers had not been given any indication of an intent to stop within the area. *Cf. Hussain*, 835 F.3d at 315 n.7 (fact that "*driving through* a high crime area does not alter [its] analysis," particularly where, as here, the officers referenced, but did not rely, on the area's dangerousness as justifying the frisk (emphasis in original)); *Holeman*, 425 F.3d at 190 ("[I]n the dead of night in a high crime neighborhood, it would be more suspicious to be on foot than in car."); *see, e.g.*, Tr. 40 (Tosado, describing crime levels generally); Tr. 93 (Bernard, describing neighborhood as a "busy area" with "multiple gangs" and firearm-related violence, but not specifically linking crime levels to frisk).

And as to Rowson's nervous demeanor, it contributes only modestly to the conclusion that he was dangerous. "Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Wardlow*, 528 U.S. at 124. But as described by the officers here, Rowson's demonstrated nervousness, at least while situated in the Camry, largely consisted of heavier than normal breathing. That observation was not so unusual, and did not so materially exceed the nervousness inherent in a nighttime stop by the police, to alone reasonably suggest dangerousness. *See United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) ("*Unusual*, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis," (emphasis added)). And, undermining the suggestion of danger, Rowson, while seated in the car, made eye contact with Officer Bernard and spoke steadily. *Compare Santillan*, 902 F.3d at 53, 57

(avoidance of eye contact and shaky voices contributed to reasonable suspicion), *with* GX2 1: 16, 1:37–:40 (making eye contact with Officer Bernard). Rowson did not take any step to try to leave or flee. *See, e.g.*, *Wardlow*, 528 U.S. at 124 (citing suspect's "unprovoked flight" upon noticing the police); *cf. Dancy v. McGinley*, 843 F.3d 93, 110 (2d Cir. 2016) (no reasonable suspicion based on nervousness where defendant did not abruptly "change[ ] direction, r[u]n away, quicken[ ] [his] pace, or make furtive gestures"). The body camera footage reflects Rowson searching his phone responsively. The Court does credit Officer Bernard's testimony that Rowson was "visibly nervous," Tr. 83, a point the officer conveyed in real time to Lieutenant Tosado, as the body camera footage reflects. *See* GX1 1:30–:36 (depicting Officer Bernard stating, across car's roof, that "he's nervous"). And Lieutenant Tosado, who by then had his eyes on Rowson, similarly testified that Rowson was "nervous[l]y trembl[ing]" and "shaking," Tr. 36. He reasonably explained that body camera footage may not capture such behavior, *see* Tr. 35; *see also* Tr. 88–89 (Officer Bernard), as is the case here, *see* GX2 1:16–:36. Both officers also described Rowson's level of nervousness as increasing immediately before the frisk with Rowson's eyes "darting ... like he was possibly thinking of running or fighting," Tr. 40 (Tosado), 154 (Bernard). In sum, Rowson's nervousness is supportive of a finding of reasonable suspicion of dangerousness, but does not establish it or close. The same nervousness could have been explained by other factors, including illegal conduct not indicative of present dangerousness (for example, possession of illegal narcotics).

**\*9** But there was more. Officer Bernard credibly testified to observations that led him—and would lead a reasonable officer—to suspect that Rowson was armed and dangerous. In reaching such a conclusion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Here, in response to Officer Bernard's question, "You alright? You're breathing very heavy," GX2 1:40–:43, Rowson said, "I got nothing on me, look," and opened his jacket, GX2 1:40–:49; Tr. 85. This strange response to a question about whether Rowson was "alright" was reasonably read by Officer Bernard as protesting too much—as suspicious, and a signal to scrutinize Rowson more carefully for a prohibited object. Officer Bernard had already explained that the stop was solely on account of Rowson's lack of seatbelt, and Rowson had

apologized. GX2 1:12–:20; Tr. 82. Officer Bernard was within his rights, drawing on his training and experience, to decode Rowson's irregular response as suggesting something more serious than yet known to the officers was afoot. *See Weaver*, 9 F.4th at 148 (reasonable suspicion where defendant reflexively denied having anything, despite hitching up his pants repeatedly); Tr. 84 (Bernard: "I'm starting to ... believe that this person might be armed with a weapon.").

Most significant by far are Officer Bernard's credible testimony about his observations as to the shape and size of the bulge in Rowson's pants, and that he felt an object consistent with a firearm in Rowson's waistband when they bumped into each other. An observation of a generic "bulge" under a suspect's clothing is usually insufficient to supply reasonable suspicion that the item underneath is a form of contraband. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search."). But where more is seen, the calculus changes, and an observation of "an outline [of a firearm] can significantly contribute to a finding of reasonable suspicion." *United States v. Dixon*, No. 20 Cr. 368 (NSR), 2021 WL 1662492, at *15 (S.D.N.Y. Apr. 28, 2021) (collecting cases); *see also United States v. Black*, 525 F.3d 359, 361–62, 365 (4th Cir. 2008) (the shape of a "slide of a semi-automatic handgun" in defendant's pocket contributed to reasonable suspicion); *United States v. Price*, No. 13 Cr. 216 (RRM), 2014 WL 558674, at *9 (E.D.N.Y. Feb. 11, 2014); *Hagood*, 2021 WL 2982026, at *13 (outline of "an elongated, rigid, solid object" with a "line" that was "hard at the top" consistent with a gun, in light of officer's experience). Here, Officer Bernard observed more. He testified to the apparent shape and size of the object in Rowson's pants with sufficient specificity to make reasonable the inference that the pants held a gun. He testified that he had noticed a hard object "pushing up on [Rowson's] pants" and causing Rowson's belt loops to project perpendicularly from his waist, rather than lying parallel to his frame as they naturally would. Tr. 85–86; *see also* Tr. 107; GX4 (showing some distortion of belt loops).[9] And Officer Bernard had ample time to observe Rowson's pants—which were form-fitting, so as to cast an object in greater relief. He also did so with the benefit of his flashlight's illumination. GX2 1:25–:43.

*10 The Court recognizes that the observation made by Officer Bernard about the appearance of Rowson's pants does not rule out an innocent explanation. But given the officer's relevant experience and training, including with

respect to concealed firearms, and his credible demeanor and the care with which he testified, the Court credits Officer Bernard's in-the-arena account that, in real time, he perceived the bulge to bespeak a gun's presence, *See* Tr. 90; *see, e.g., Hagood*, 2021 WL 2982026, at *14 (denying motion to suppress where officer drew on numerous instances seizing firearms found in fanny packs during *Terry* stops and searches incident to arrest); *see also United States v. Padilla*, 548 F.3d 179, 183 (2d Cir. 2007) (affirming denial of suppression motion where, in officer's experience based on eight to 10 arrests of suspects with guns in waistbands, suspect's movements were "consistent with the adjustment of a gun lodged in one's waistband" but not with an innocent explanation); *United States v. Wiggan*, 530 F. App'x 51, 55–56 (2d Cir. 2013) (summary order) (reasonable suspicion supported by defendant carrying gun in pocket, where officer testified that, in his experience, individuals in legal possession of firearms used a holster under a garment, while those illegally in possession carried them in pockets, waistbands, or inside coats); *United States v. Lucas*, 68 F. App'x 265, 267 (2d Cir. 2003) (summary order) (officers "entitled to draw on their experience that far more individuals who carry concealed handguns do not have licenses than do").

Critically, too, Officer Bernard testified that Rowson bumped into him upon exiting the Camry, with his waist making contact with the officer's hand, which revealed to the officer a hard object consistent with a firearm. This occurrence strongly reinforced Officer Bernard in believing, as soon proved the case upon recovery of the semiautomatic weapon, that Rowson had a gun inside the top of his pants, Tr. 92, 117–18; *see* GX 1:55–2:05. *See, e.g., United States v. Davis*, 111 F. Supp. 3d 323, 329–30, 338–339 (E.D.N.Y. 2015) (reasonable suspicion where officers witnessed bulge and, during unintentional physical contact when attempting to stop a fleeing defendant, felt a hard bulge consistent with a firearm). The Court has carefully considered, and fully credits, that account. Apart from the overall credibility of Officer Bernard's testimony, his testimony on this point is corroborated by the body camera footage, It reveals Officer Bernard standing with his arms in front of him, with no door or object between him and Rowson, and a small space for Rowson to stand upon exiting the car, so as to make the officer's testimony about physical contact between Rowson's waist and the officer's hand quite credible. GX2 1:55–2:10; *see* Tr. 117–18 (Bernard); *cf.* Tr. 161–62 (discussing mechanics of encounter). To the extent reasonable suspicion might be argued to have been lacking prior to that moment, Officer Bernard's having come into tactile contact with the part of the pants housing the gun compellingly supported that Rowson's

pants housed a firearm.

Under these circumstances, the accumulated information known to the officers, viewed in light of their experience and training, gave them reasonable suspicion—prior to the moment that Officer Bernard put his arm around Rowson and frisked him[10]—that Rowson possessed an illegal firearm. It further reasonably supports that Rowson presented a danger to the safety of the police and public at that moment, justifying a frisk. *See, e.g.,* *United States v. Williams*, 526 F. App'x 29, 32 (2d Cir. 2013) (summary order) (after officers approached defendant in street, defendant's 'hostile response' and officer's 'observation of a 'bulge' on the right side of [defendant's] thigh justified the subsequent frisk conducted to protect the officers' safety'); *Hagood*, 2021 WL 2982026, at *16 (officers had reasonable suspicion to search defendant where clear outline of gun was visible in tight-fitting fanny pack); *United States v. Watson*, No. 20 Cr. 346 (JSR), 2021 WL 535807, at *7 (S.D.N.Y. Feb. 11, 2021) (officers had reasonable suspicion to frisk pedestrian with a 'heavy-looking L-shaped object' in his fanny pack); *United States v. Monroe*, No. 08 Cr. 609 (ENV), 2009 WL 3614521, at *4–6 (E.D.N.Y. Nov. 2, 2009) (officer justified in conducting protective patdown where 'defendant turned his body in a way that revealed an L-shaped bulge in his back pocket'); *United States v. Rios*, No. 09 Cr. 369 (CPS), 2009 WL 2602202, at *6 (E.D.N.Y. Aug. 24, 2009) (patdown was justified where officer saw an L-shaped item in defendant's pocket as defendant dismounted his bicycle).

**\*11** The Court accordingly denies Rowson's motion to suppress, to the extent based on the claim of an unlawful frisk.

### III. Rowson's Motion to Dismiss

Rowson separately moves for dismissal of the Indictment on the ground that 18 U.S.C. § 922(n), evaluated under the framework for Second Amendment analysis used by the Supreme Court in *Bruen*, is unconstitutional.

#### A. The Second Amendment Framework Under *Bruen*

In 2008, in *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.' 554 U.S. 570, 628–29 (2008). It held that the District of Columbia's total ban on firearm possession in the home was unconstitutional. '[O]n the basis of both text and history,' the Court held, this ban—which, '[f]ew laws in the history of our Nation have come close to ... [in] sever[ity]'—could not survive '[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.' *Id.* But the Court emphasized that 'the right secured by the Second Amendment is not unlimited.' *Id.* at 626. Its decision, it stated, should not 'be taken to cast doubt on longstanding prohibitions on possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' *Id.* at 626–27.

Two years later, in *McDonald v. City of Chicago*, the Court held that the Second Amendment applies to the states, via incorporation through the Due Process Clause of the Fourteenth Amendment. 561 U.S. 742, 786 (2010). The Court accordingly struck down a Chicago law that, similar to the ordinance in *Heller*, effectively banned handgun possession by almost all private citizens, including in their homes. *Id.* at 750. The Court reaffirmed that 'individual self-defense is 'the *central component*' of the Second Amendment right' and 'deeply rooted in this Nation's history and tradition,' and that ' 'the need for defense of self, family, and property is most acute' in the home.' *See* *id.* at 767–68 (quoting, *inter alia*, *Heller*, 554 U.S. at 599, 628) (emphasis in original). The Court in *McDonald* reiterated *Heller*'s teaching that the right to keep and bear arms 'is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,' ' and that its decision should not cast doubt on 'longstanding regulatory measures' of the sorts identified in *Heller*. *Id.* at 786 (quoting *Heller*, 554 U.S. at 626).

As the Second Circuit soon thereafter recognized, *Heller* and *McDonald*, confined as they were to ordinances banning firearm possession in the home, 'raise[d] more questions than [they] answer[ed],' including as to the extent to which the Second Amendment protects the right to bear arms outside the home, and the methodology by which the constitutionality of firearms laws would be evaluated. *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 88–89 (2d Cir. 2012) ('This vast '*terra incognita*' has troubled courts since *Heller* was decided.'); *see also* *Young v. Hawaii*, 992 F.3d 765,

783 (9th Cir. 2021).

**\*12** Following *Heller*, appellate courts—including the Second Circuit—coalesced around a two-step framework that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125; *see* *Kachalsky*, 701 F.3d at 91–101; *see, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1252–53 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA)*, 700 F.3d 185, 194–95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 874–75 (4th Cir. 2013); *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) ("In the decade since *Heller* was decided, courts have adopted a two-step approach for analyzing claims that a statute, ordinance, or regulation infringes the Second Amendment right."); *Young*, 992 F.3d at 783. The first step inquired whether the challenged law regulated conduct within the Second Amendment's scope, based on an historical inquiry into "the scope the [Second Amendment was] understood to have when the people adopted [it]" in 1791. *See* *Heller*, 554 U.S. at 634–45; *see, e.g.*, *Marzzarella*, 614 F.3d at 89 (quoting *Heller*). If so, courts proceeded to the second, means-ends step and determined the appropriate level of scrutiny. *See* *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.*, 883 F.3d 45, 55–56 (2d Cir. 2018), *vacated and remanded sub nom. N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y., N.Y.*, 140 S. Ct. 1525 (2020). This inquiry considered two "interact[ing]" factors: (1) whether the law implicated a "core" Second Amendment right and (2) the severity of the law's burden on that right. *Id.* at 56. "Laws that place[d] substantial burdens on core rights [were] examined using strict scrutiny," whereas those that placed "either insubstantial burdens on conduct at the core of the Second Amendment or substantial burdens only on conduct outside the core" were examined under intermediate scrutiny. *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) (internal quotation marks and alterations omitted).[11]

The Supreme Court in *Bruen* put in place a different test to govern Second Amendment challenges. The *Bruen* test turns on textual and historical analysis alone. It eliminates the courts of appeals' means-ends inquiry into the proper level of scrutiny as informed by whether a "core" Second Amendment right is substantially burdened. *See* *Bruen*, 142 S. Ct. at 2127 ("Despite the popularity of this two-step approach, it is one step too many.").

Under *Bruen*, a court considering a Second Amendment challenge must first determine whether the Amendment's "plain text covers an individual's conduct" *Id.* at 2129–30. If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*; *id.* at 2126 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest."). *Bruen* offered the following guidance for this historical inquiry: "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Likewise, if "earlier generations addressed th[at same] societal problem, but did so through materially different means," such also weighs against a modern regulation's constitutionality. *Id.* However, the Court stated, the inquiry into historical analogues required by *Bruen*'s second step is not a "regulatory straightjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original).

### B. Discussion

**\*13** In arguing that § 922(n) is unconstitutional under *Bruen*, Rowson argues that (1) "the people" whom the Second Amendment protects include the class subject to § 922(n)—persons who, while facing pending felony charges punishable by imprisonment for more than one year, ship, transport, or receive a firearm; and (2) § 922(n) is inconsistent with the nation's tradition of firearm regulation, which Rowson contends does not include similar prohibitions. *See* Mem. at 6–8; Def. Ltr. Br. 3–8. The Government takes the opposite position on each point. *See* Opp. at 28–40; Gov't Ltr. Br. at 3–5.

Before addressing those issues, the Court takes up two threshold questions.

The first is whether Rowson's challenge to § 922(n) is

facial only or also as-applied. At argument, Rowson stated that his was solely a facial challenge. *See* Tr. 174; *see also* Gov't Ltr. Br. at 1. In his post-argument letter, however, he stated, in passing, that the statute could not be constitutionally applied to his conduct. *See* Def. Ltr. Br. at 2, 8–9. Rowson did not develop this argument or cite supporting case law. And the district court decision from the Western District of Texas, on which Rowson largely bases his claim that § 922(n) is unconstitutional, found facial invalidity only. *See United States v. Quiroz*, No. 22 Cr. 0104 (DC), 2022 WL 4352482, at *13 n.119 (W.D. Tex. Sept. 19, 2022) (declining to reach as-applied challenge). Accordingly, the Court considers Rowson's present challenge as facial only, without prejudice to Rowson's right to later pursue an as-applied challenge.[12]

Second, the Government contends that the Court's analysis of § 922(n)'s constitutionality should forego *Bruen*'s history-focused framework in favor of the due process framework used in *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Supreme Court there upheld the 1984 Bail Reform Act's provision for pretrial detention of arrestees found to pose dangers to the safety of the community over a Fifth Amendment due process challenge. *Id.* at 746–52. The Government's interest in protecting the community, the *Salerno* Court held, outweighed the arrestees' liberty interests. *See id.* at 748.[13] The Government here argues that insofar as § 922(n) similarly applies to pretrial arrestees, so as to deny them the right to ship, transport, or receive firearms while subject to a felony indictment, *Salerno*'s recognition that criminal defendants "may face substantial liberty restrictions as a result of the operation of our criminal justice system," *id.* at 749, should carry the day on Rowson's challenge. *See* Opp. at 23. The needs of the criminal justice system, the Government notes, have been held to justify numerous restrictions on a criminal defendant's Fourth, Fifth, and Sixth Amendment rights, *see id.* at 23–24 (citations omitted), and these needs, it contends, "likewise justify the restriction of putative Second Amendment rights at issue here," *id.* at 24. That argument is unconvincing. Rowson here has not brought a due process challenge. And the Court in *Bruen* pointedly rejected, for Second Amendment challenges, the means-end balancing framework, characteristic of due process analysis, that the Government espouses here. The Nation's history of restricting the liberties of a criminal defendant is germane under *Bruen*. But that is so because such may bear on whether the limitation of firearms rights of such persons at issue accords with the nation's historical tradition of firearm regulation, not because the

statutory restriction at issue survives means-ends balancing.

**\*14** The Court here accordingly applies *Bruen* on its terms. In considering both whether the persons covered by § 922(n) are protected by the Second Amendment, and, if so, whether there are historical analogues of firearm regulations, the Court has considered the several post-*Bruen* decisions to date resolving Second Amendment challenges to § 922(n). Three have upheld the provision: the Fifth Circuit, applying plain error review because the defendant had not brought a Second Amendment challenge below, *see United States v. Avila*, No. 22-50088, 2022 WL 17832287, at *1–2 (5th Cir. Dec. 21, 2022); and district courts in Oklahoma, *United States v. Kays*, No. 22 Cr. 40, 2022 WL 3718519 (TDD), at *4–5 (W.D. Okla. Aug. 29, 2022); and Tennessee, *United States v. Kelly*, No. 22 Cr. 37 (AAT), 2022 WL 17336578 (M.D. Term. Nov. 16, 2022). Four district courts (in Texas, Oklahoma, and Indiana) have held § 922(n) invalid. *See Quiroz*, 2022 WL 4352482 (finding § 922(n) unconstitutional); *United States v. Stambaugh*, No. 22 Cr. 218 (PRW), 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) (same); *United States v. Holden*, No. 22 Cr. 30 (RLM) (MGG), 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022) (relying on *Quiroz*), *appeal docketed*, No. 22-3160 (Dec. 1, 2022); *United States v. Hicks*, No. 21 Cr. 060 (ADA), 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (same; not citing *Avila*, 2022 WL17832287), *appeal docketed*, No. 23-50030 (Jan. 12, 2023). The Court has also considered, as instructive, decisions resolving post-*Bruen* challenges to other federal firearms statutes and to New York state firearms laws.[14]

### 1. Are Felony Indictees Within the Scope of "The People" Protected by the Second Amendment?

**\*15** The initial *Bruen* inquiry is whether the Second Amendment's "plain text covers an individual's conduct." 142 S. Ct. at 2126. The Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Rowson argues that, as a pretrial indictee who is an American citizen, he falls within the scope of "the people" covered by the Amendment. The Government seizes on an adjective in *Bruen* to argue the contrary. There, the Court, recapping its decisions in *Heller* and

*McDonald*, stated that the Amendment "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and an "individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. Drawing on the reference to "law-abiding citizen[s]," the Government argues that a felony indictee falls outside "the people" whom the Amendment protects, because, by definition, a showing of probable cause has been made that such a person violated a felony statute. Hence, it argues, such persons should not be viewed as "ordinary, law-abiding citizens" with rights under the Second Amendment. *See* Opp. at 28–32; *id.* at 28 (header: "Rowson Falls Within a Class of Individuals Who the Supreme Court Has Determined Retain No Second Amendment Rights").

The Government's argument on this aspect of the *Bruen* framework is unpersuasive. None of the post-*Bruen* decisions addressing § 922(n)—including the four finding § 922(n) unconstitutional—have so held. Several have explicitly held that a person indicted for a felony remains among "the people" whom the Second Amendment covers. Those include decisions upholding § 922(n), *see, e.g.,* *Kays*, 2022 WL 3718519, at *2, and decisions invalidating it, *see, e.g.,* *Stambaugh*, 2022 WL 16936043, at *2–3.[15]

Nor, apart from the adjective "law-abiding," does any other aspect of the analysis in *Bruen* support the Government's argument at this step. On the contrary, the Court's focus on the "conduct" of the person challenging the law supports Rowson's argument. No doubt because the class of gun persons implicated by the mandatory New York gun licensing statute included all who sought to carry firearms outside the home, the Court's focus in *Bruen* was not on potentially disqualifying status characteristics of the challengers to the statute. It was instead on whether the Amendment's text covered the "*conduct*" the statute proscribed. *See* *Bruen*, 142 S. Ct. at 2126, 2134–35; *see also* *Kays*, 2022 WL 3718519, at *2 (*Bruen*'s focus was "on an individual's conduct, rather than status, to decide if Second Amendment protection exists"); *Quiroz*, 2022 WL 4352482, at *3 (same); *Holden*, 2022 WL 17103509, at *3 (same); *Stambaugh*, 2022 WL 16936043, at *3 (same); *Kelly*, 2022 WL 17336578, at *2–3 (same); *Hicks*, 2023 WL 164170, at *2 (same). The Court recognized in *Bruen* that the conduct at issue there, possessing a firearm, was presumptively protected by the Amendment, so as to require that the challenged law be justified based on "the Nation's historical tradition of firearm regulation."

142 S. Ct. at 2130. The same is so of the conduct to which § 922(n) is addressed—shipping, receiving, or transporting a firearm—as the courts to consider that question have uniformly held. *See, e.g.,* *Holden*, 2022 WL 17103509, at *3 ("Receiving a firearm is ... presumptively protected by the Second Amendment."); *Stambaugh*, 2022 WL 16936043, at *3 (felony indictees are part of "the people" in the Second Amendment *and* Second Amendment covers receipt of handgun); *Kelly*, 2022 WL 17336578, at *2–3 (same); *Hicks*, 2023 WL 164170, at *2 (same); *Quiroz*, 2022 WL 4352482, at *4 ("[D]oes the Second Amendment's plain text cover the conduct [of receiving a firearm]? Without a doubt the answer here is yes.").

**\*16** To be sure, *Bruen* did not have occasion to address whether, as the Government posits, the threshold textual inquiry into the scope of the Second Amendment's coverage may also consider whether certain persons, by category, fall outside "the people" whom the Amendment covers. It is reasonable to assume that *Bruen* leaves room for that inquiry in an appropriate case. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."). But even if so, the Government does not offer a convincing basis to treat the broad and eclectic category of persons under any type of pending felony indictment as, *ex officio*, lacking all Second Amendment rights. Pre-*Bruen* decisions, in fact, had so inquired as to the Second Amendment rights of various persons by category. With limited exceptions, most declined to hold that the groups at issue were categorically without Second Amendment rights. These included convicted felons, *see, e.g.,* *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (rejecting as-applied challenge to 18 U.S.C. § 922(g)(1)); *Kanter v. Barr*, 919 F.3d 437, 445–47 (7th Cir. 2019) (assuming *arguendo* that felons are within "the people" under the Amendment), *abrogated by* *Bruen*, 142 S. Ct. 2111.; *see also* *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) ("Neither felons nor the mentally ill are categorically excluded from our national community.")[16]; illegal aliens, *see, e.g.,* *United States v. Meza-Rodriguez*, 798 F.3d 664, 669–72 (7th Cir. 2015) (illegal aliens are within "the people"); *see also* *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (assuming, without deciding, that illegal immigrants are within "the people"); *United States v. Torres*, 911 F.3d 1253, 1257, 1261 (9th Cir. 2019) (same); *United States v. Perez*, 6 F.4th 488, 453 (2d Cir.

2021) (same)[17]; persons dishonorably discharged from the United States Armed Forces, *see, e.g.*, *United States v. Jiminez*, 895 F.3d 228, 233–34 (2d Cir. 2018) (assuming *arguendo* that defendant could claim Second Amendment protections despite dishonorable discharge); persons subject to certain court orders, *see, e.g.*, *United States v. Witcher*, No. 20 Cr. 116 (KMW), 2021 WL 5868172, at *4 (S.D.N.Y. Dec. 10, 2021) (considering § 922(g)(8)); and persons convicted of domestic violence misdemeanors, *see, e.g.*, *United States v. Chester*, 628 F.3d 673, 680–82 (4th Cir. 2010) (noting that Government had not argued and historical evidence did not support excluding persons convicted of domestic violence crimes from "the people"). Insofar as the scope of "the people" the Amendment covered presented an unresolved question before *Bruen*, the decision there did not address, let alone settle, that question.

Salient here, the two pre-*Bruen* decisions to consider the Second Amendment rights of indicted persons charged under § 922(n) each rejected the argument that such persons lacked all Second Amendment rights. In the first, Judge Weinstein, although upholding § 922(n) facially and as applied, held that felony indictees "remain[ ] eligible for Second Amendment protections." *See United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011). He noted that, although *Heller* had described as "presumptively lawful" statutory prohibitions on gun possession by convicted felons, "it is assumed until conviction that the defendant is not guilty of the initial indictment triggering criminal liability." *Id.* "Thus, for purposes of construing the statute, a defendant under indictment but as-yet not convicted remains a 'law-abiding citizen.' " *Id.*; *see Bruen*, 142 S. Ct. at 2122 (describing "the people" as "law-abiding citizens"); *Heller*, 554 U.S. at 625 (same). The following year, a district court in Nevada reached the same conclusion, drawing upon the analysis in *Laurent*. *See United States v. Call*, 874 F. Supp. 2d 969, 977 (D. Nev. 2012). The Government has not pointed to contrary authority.

**\*17** The case law as to convicted felons is also instructive on this point. The post-*Bruen* decisions addressing the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), although uniformly upholding that statute, have divided on the analytic basis for doing so. Although some courts have treated convicted felons as lacking Second Amendment rights,[18] others have held otherwise, and have instead sustained § 922(g)(1) at the second step of *Bruen* analysis, based on the statute's historical antecedents. *See, e.g.*, *United States v. Price*, No. 22 Cr. 097 (JRG), 2022 WL 6968457, at *7, *8 & n.4 (S.D.

W.Va. Oct. 12, 2022) ("The plain text of the Second Amendment does not include 'a qualification that Second Amendment rights belong only to individuals who have not violated any laws.' " (quoting *United States v. Jackson*, No. 22 Cr. 59 (TDD), 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022))); *Carrero*, 2022 WL 9348792, at *2 (convicted felons within "the people," but § 922(g)(1) is consistent with historical tradition); *United States v. Coombes*, No. 22 Cr. 00189 (GKF), 2022 WL 4367056, at *3–4 (N.D. Okla. Sept 21, 2022) (same); *United States v. Gray*, No. 22 Cr. 0247 (CNS), 2022 WL 16855696, at *2–4 (D. Colo. Nov. 10, 2022) (same); *Campiti v. Garland*, No. 22 Civ. 177 (AWT), 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) (same); *see also United States v. Bernard*, No. 22 Cr. 03 (CJW) (MAR), 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022) (same, as to § 922(g)(9)). To the extent that convicted felons have been held to be within the scope of "the people" whom the Second Amendment covers, it follows *a priori* that felony indictees are, too.

Most fundamentally, the Government's argument disqualifying felony indictees from any Second Amendment rights is in conflict with the Supreme Court's explanation in *Heller* of the meaning of the term "the people"—reasoning foundational to its landmark holding that the Second Amendment protects individual rights. In his decision for the *Heller* majority, Justice Scalia equated that term as used in the Second Amendment to its use in other Amendments, including the First Amendment's assembly-and-petition clause and the Fourth Amendment's search-and-seizure clause:

> [I]n all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, (1990):
>
> > '[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and

within a certain age range. Reading the Second Amendment as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people."

**\*18** We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.

🚩554 U.S. at 580–81.

It is black letter law that even convicted felons retain rights under, *inter alia*, the First and Fourth Amendments. *See, e.g.,* 🚩*Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[W]e have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.") (citing protections under the First and Fourth Amendments, among others); 🚩*Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That the rights of such persons may be burdened based on their criminal records does not expunge these rights *in toto*. And unlike convicted felons, felony indictees do not stand to lose their political rights (for example, the right to vote) on account of a pending but as-yet-unadjudicated felony charge. *Cf. Coombes*, 2022 WL 4367056, at \*4 & n.2 (noting same). The holding urged by the Government, under which felony indictees would be excluded altogether from "the people" as used in the Second Amendment, would therefore be inconsistent with both the breadth of the term, and its symmetrical use across amendments, noted in *Heller*.[19] *Cf. Coombes*, 2022 WL 4367056, at \*4 ("[I]t is clear that convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments."); *Carrero*, 2022 WL 9348792, at \*2 (applying "presumption of consistent usage" to interpret convicted felons as within "the people"); *Campiti*, 2023 WL 143173, at \*3 (as to 🚩§ 922(g)(1)) ("[F]or purposes of the Second Amendment, the phrase 'the people' is interpreted consistently with the First, Fourth, Ninth, and Tenth Amendments ....").

**\*19** The Court, joining all others to consider the question squarely post-*Bruen*, accordingly holds that felony indictees are within the scope of "the people" who have Second Amendment rights, and that the conduct regulated by 🚩§ 922(n) of shipping, receiving,\*5 or transporting firearms is also covered by the plain text of the Second Amendment. *See* 🚩*Kays*, 2022 WL 3718519, at \*2 ("This Court declines to read into *Bruen* a qualification

that Second Amendment rights belong only to individuals who have not been accused of violating any laws."); *Stambaugh*, 2022 WL 16936043, at \*2 ("neither [*Bruen* nor *Heller*] explicitly nor implicitly removes those merely *accused* of felony by a grand jury from 'the people' entitled to the protection of the Second Amendment" (emphasis in original)). Under *Bruen*, the burden is therefore on the Government to show that 🚩§ 922(n) is consistent with the Nation's historical tradition of firearm regulation. *See* 🚩142 S. Ct. at 2126.

## 2. Is 🚩§ 922(n) Consistent with the Historical Tradition of Firearms Regulation?

Had *Bruen*'s inquiry into historical antecedents required locating an 18th-century replica of 🚩§ 922(n), the statute would fail the Second Amendment. The Government has not identified any federal law, before 1938, that specifically targeted felony indictees. That year, § 2(e) of the Federal Firearms Act of 1938, Pub. L. No. 75-850, 52 Stat. 1250, 1251, put in place 🚩§ 922(n)'s predecessor statute. *See* 🚩*Laurent*, 861 F. Supp. 2d at 82–84 (tracing statute's history).[20] Nor has the Government or the Court located a colonial era state-law replica of 🚩§ 922(n).[21]

The Supreme Court in *Bruen*, however, disclaimed the need to find an exact historical match. The proper inquiry, the Court stated, is whether the regulation "is consistent with the Nation's historical tradition of firearm regulation." 🚩*Bruen*, 142 S. Ct. at 2126. Where the challenged law "addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence" but it is not dispositive, 🚩*id.* at 2131. And the search for analogues is not intended to impose a "regulatory straightjacket." 🚩*Id.* at 2133. Rather, the historical inquiry "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). In conducting this inquiry, the Court inquires whether the antecedent laws and the law at issue "are 'relevantly similar' "—that is, "how and why the regulations burden" a citizen. 🚩*Id.* at 2132–33. The Court is also to focus on laws that reflect "the scope [that constitutional rights] were understood to have *when the people adopted them*"—that is, laws temporally proximate to 1791, when the Second Amendment was adopted, and, as potentially confirmative evidence, to

1868, when the Fourteenth Amendment was adopted. *See id.* at 2136 (emphasis in original); *see also id.* at 2138 (noting scholarly debate as to whether 1791 or 1868 is the more apt date for analysis). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous to pass constitutional muster." *Id.* at 2133.

**\*20** Employing this historical inquiry, post-*Bruen* decisions have uniformly upheld, on the basis of historical antecedents, two federal laws with significant resemblances to § 922(n). The first set of decisions concerns 18 U.S.C. § 922(g)(1), which makes it a crime for a felon to possess a firearm that has traveled in interstate commerce. *See supra* note 14 (collecting decisions upholding this provision). As the sources collected in the Third Circuit's *Range* decision reflect,[22] firearm legislation in colonial America prohibited various categories of persons viewed at the time as dangerous, having violent propensities, and/or unfaithful to the sovereign and its laws from owning firearms. These included Native Americans, Black persons, and indentured servants. *See infra* (collecting secondary and primary sources); *see also* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 L. & HIST. REV. 567, 575–76 (1998). Revolutionary War statutes also disarmed even non-violent persons whose actions were transgressive so as to reflect a refusal to comply with developing social and legal norms. *See Range*, 53 F.4th at 277–80 (collecting statutes, including Pennsylvania law disarming Quakers and Virginia law disarming persons who refused to swear "allegiance and fidelity" to the state). And some colonies (and, later, states) punished convicted felons with forfeiture of their estates, and/or authorized the seizure of firearms even from convicted misdemeanants. *Id.* at 280–81 (collecting statutes).

The second set of decisions concerns 18 U.S.C. § 3142, the statute at issue in *Salerno*, governing pretrial detention and conditions of pretrial release. Post-*Bruen* courts have upheld that statute's disarmament condition of release for persons charged with federal offenses, 18 U.S.C. § 3142(c)(1)(B)(viii). *See supra* note 14 (collecting decisions upholding this provision); *see also* Hermine Herta Meyer, *Constitutionality of Pretrial Detention*, 60 GEO. L.J. 1139 (May 1972) (history of bail practices). In considering historical analogues, these cases have emphasized that pretrial detention and other significant pretrial restrictions on defendants' constitutional rights—such as rights to speech and association—"have existed since the early days of the

Republic" and that "the Constitution has never guaranteed a criminal defendant's right to pretrial release." *See Slye*, 2022 WL 9728732, at \*2. As a matter of reasonable analogy, these decisions have held, it would be illogical to view these antecedents authorizing "the temporary abridgement of numerous core constitutional rights" as not countenancing the modern statute authorizing a defendant's "release on bond with a firearms restriction." *Id.*

To be sure, the class of felony indictees covered by § 922(n) only imperfectly maps the classes of persons subject to these two laws. Although § 922(n) and § 922(g)(1) both apply to persons charged with felonies, the former applies during the finite period between the return of the indictment and the disposition of the charge, whereas the latter applies from the point of conviction through (barring pardon or expungement) the balance of the convicted felon's life. And although § 922(n) and § 3142(c) both apply to criminal defendants before the charges against them are resolved, § 922(n) in one respect sweeps more broadly than § 3142(c), in that it applies to all felony indictees, whereas § 3142(c)'s firearm prohibition does not apply to those released on recognizance (that is, those as to whom a determination of dangerousness, requiring the imposition of conditions of release, has not been made). *See id.* § 3142(c)(1). But § 922(n) in various respects is narrower than § 3142(c), in that it does not cover persons charged by means other than an indictment (for example, a complaint); it does not cover persons charged with misdemeanors; and, most significant, it precludes only the shipping, receipt, or transport of a firearm during the indictment period, leaving the felony indictee free to possess firearms. Nonetheless, notwithstanding these imperfect congruities, the considerable overlaps between these undisputedly constitutional provisions and § 922(n) inform this Court's analysis of § 922(n)'s constitutionality.

**\*21** Here, utilizing the *Bruen* methodology, the Court finds two lines of historical regulation of firearms to supply analogues sufficiently apposite to sustain § 922(n). The first entails the Nation's long line of laws of disarming persons perceived as dangerous. *See Kelly*, 2022 WL 17336578, at \*5–6 (upholding § 922(n) based on "common law tradition of gun regulation permitting the disarming of certain classes of individuals based on questions regarding whether those individuals had been 'peaceable' and/or 'law-abiding' "). The second consists of historical surety laws. *See Kays*, 2022 WL

3718519, at *4–5 (upholding § 922(n) based on analogy to surety laws). The Court develops these lines below.

### a. Laws Disarming Categories of Persons Perceived as Dangerous

A long line of statutes predating—and/or present at—the founding disarmed persons deemed inherently dangerous. These included many statutes that disarmed persons on bases other than a felony (or other) conviction. *See Range*, 53 F.4th at 274–81 (canvassing authority); *Kelly*, 2022 WL 17336578, at *5 (noting "the common law tradition of gun regulation [which] permitted the disarming of certain classes of individuals based on questions regarding whether those individuals had been 'peaceable' and/or 'law-abiding'"); *see also* Opp. at 30, 32–39.

For example, in 1662, the British Parliament authorized Lieutenants to "seize all arms in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Opp. at 30 (citing Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)); *see also* Militia Act of 1662 ("[A]rms so seized may be restored to the owners again if the said Lieutenants or ... their deputies or any two or more of them shall so think fit."). During the ratification period, a "highly influential," *Heller*, 554 U.S. at 604, proposal that circulated among delegates recognized that "people have a right to bear arms ... *unless for crimes committed, or real danger of public injury*," *id.* at 658 (Stevens, J., dissenting) (emphasis added) (discussing "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents").

There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as *per se* dangerous, on the basis of their religious, racial, and political identities. *See, e.g.*, Adam Winkler, Gunfight: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 115–16 & accompanying notes (2013) (citing laws barring gun sales to Native Americans, due to fears of violence; free and enslaved Black or mixed-race persons, even where completely law-abiding, out of fear of revolution against white masters; and Catholics or Loyalists); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMPORARY PROBS. 55, 72 & nn.103–04 (2017) (citing examples of colonial and revolutionary era laws disarming those who

expressed dangerous opinions or refused to swear loyalty to the new American government); *see also* Samuel Cornell, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–07 (2004) (citing examples of laws disarming those who refused to swear loyalty oaths) ("The security of the community outweighed any right a person might have to possess a firearm."); *see also Waters v. State*, 1 Gill 302, 309 (Md. 1843) (stating that, because free Black persons were treated as a "dangerous population," "laws have been passed to ... make it unlawful for them to bear arms"). Both parties have collected examples of and/or authorities collecting such laws. *See* Mem., Ex. C at 40–42 (state laws as to Native Americans), 83–87 (state laws as to slaves); Opp. at 33–34 (collecting examples and secondary authorities).

**\*22** It goes without saying that, in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (discussing such laws). But the Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a "public understanding of the [Second Amendment] right" in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness. *Bruen* and *Heller* recognized one such longstanding classification—on gun possession by felons. *See Bruen*, 142 S. Ct. at 2137; *Heller*, 553 U.S. at 627; *see also Medina*, 913 F.3d at 159 (collecting cases evidencing that the scope of the Second Amendment was understood to permit the exclusion of dangerous categories of persons). And courts have recognized, based on historical evidence, the common law tradition of disarming classes of individuals based on judgments about whether they were "peaceable" or "law-abiding."[23]

In this historical context, a law such as § 922(n) fits within the tradition of firearms regulation at the time of the nation's founding. Section 922(n) imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison. And the burden § 922(n) imposes is limited in scope (barring the indictee from shipping, transporting, or receiving firearms, but not from possessing them) and time (expiring upon the disposition of the indictment). This aspect of historical firearms

regulations is sufficient to sustain 🚩 § 922(n) against Rowson's challenge.

### b. Surety Statutes

Surety laws supply another relevant set of analogues. These laws required persons deemed likely to breach the peace or otherwise transgressive to post a bond before publicly carrying a firearm. The majority of courts to have considered 🚩 § 922(n) following *Bruen* have treated such statutes as the most germane historical comparators for 🚩 § 922(n), *See, e.g.,* 🔖*Kays,* 2022 WL 3718519, at *4–5 (surety statutes sufficient to satisfy Government's burden to justify 🚩 § 922(n)); 🚩*Quiroz,* 2022 WL 4352482, at *8 (surety statutes insufficient analogue); *Stambaugh,* 2022 WL 16936043, at *3–5 (same); 🔖*Holden,* 2022 WL 17103509, at *4 (same); 🔖*Hicks,* 2023 WL 164170, at *7 (same).

Colonial and American surety laws derived from a longstanding English tradition of authorizing government agents to seize arms from persons who had acted unlawfully or in a manner that threatened the public. *See, e.g.,* Robert Gardiner, THE COMPLEAT CONSTABLE 18 (3d ed. 1708) (directing justices of the peace to "arrest such persons as ride or go offensively Arm'ed" and "seize and take away their Armour and Weapons, and have them apprized as forfeited to her majesty"); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review,* 60 CLEVELAND STATE L. REV. 2, 24 n.114 (2012) (quoting Robert Gardiner, *The Complete Constable* 13 (6th ed. 1724) (stating that the constable may "stop all such Persons as go or ride unlawfully arm'd and take their Arms from them" for "preventing the Breach of the Peace")); *see also* Mem., Ex. C., at 18 (citing other English colonial-era authorities).[24] Consistent with this tradition, various colonial regulations confiscated weapons from people who were deemed dangerous or apt to disturb the peace. For example, in 1692, Massachusetts authorized "every justice of the peace" to arrest "all affrayers, rioters, disturbers or breakers of the peace" who, "upon [the] view of such justice," "ride, or go armed offensively" or cause "fear or affray of their majesties' liege people," and to "seize and take away his armour and weapons, and ... cause them to be apprized and answered to the king as forfeited." Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province of the Massachusetts-Bay, 2d Sess., 52–53 (1692).[25] In 1759, New Hampshire enacted a substantially

identical statute empowering justices of the peace to arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear" and, "upon view of such justice," "cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." Acts and Laws of His Majesty's Province of New-Hampshire in New-England 1–2 (1759).[26] These statutes authorized imprisonment "until [the perpetrator] find[s] sureties for the peace and good behavior;" they did not address the return of the confiscated weapons upon the payment of such surety. Most salient, although each statute provided that a confession or "legal proof of any such offense" could justify such confiscation, neither required a conviction as a predicate. Rather, as noted, the "view of such justice" was sufficient.

**\*23** As *Bruen* recounted, other laws enacted in the years immediately before and after the Second Amendment's adoption also aimed to neutralize people who were armed in ways that could cause alarm. A 1786 Virginia statute, for example, provided that "no man ... [shall] go nor ride armed by night nor by day, ... in terror of the Country," Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)[27]; a 1795 Massachusetts statute required justices of the peace, "upon [the] view of such Justice," to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth," 1795 Mass. Acts and Laws. Ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts[28]; and an 1801 Tennessee statute required a "judge or justice, on his own view," to require a surety from anyone who "shall publicly ride or go armed to the terror of the people" or "privately carry any ... pistol ... to the fear or terror of any person," or, if "they fail to find securities, commit him or them to jail," *see* 🔖*Bruen,* 142 S. Ct. at 2144–45 (quoting 1801 Tenn. Laws 710, § 6). *See id.* (citing the same). Similarly, in 1821, a Maine statute provided that disturbers of the peace or "such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State" would be arrested and, "upon view of such Justice, confession of the delinquent or other legal conviction of any such offence," be required to "fund sureties to appear and answer for his offence." 1821 Me. Laws 285, ch. 76. Taken together, as *Bruen* synopsized, these statutes reflected the "by-now-familiar thread" of laws prohibiting "bearing firearms in a way that spreads 'fear' or 'terror' among the people." 🔖*Bruen,* 142 S. Ct. at 2145. Like their predecessors, these laws empowered justices of the peace to apprehend those who were publicly armed and presented offensively.

The Supreme Court considered these surety laws *in Bruen* but found them inapposite to the New York "proper cause" statute at issue, which conditioned the right to a license to carry a handgun in public on a showing of a "special need" for self-protection different from that of the general community. As the Court explained:

> Contrary to respondents' position, these [and other surety laws] in no way represented the "direct precursors" to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry [unless they did so in a way that inspired fear or terror.] ... Thus, unlike New York's regime, a showing of special need was required only *after* an individual [had or] was reasonably accused of intending to injure another or breach the peace.

🚩 *Bruen*, 142 S. Ct. at 2148-49 (internal citation omitted) (emphasis in original).

In the different context presented here, however, the surety laws, considered collectively, are "relevantly similar" to 🚩 § 922(n). 🚩 *Id.* at 2132. That inquiry turns on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 🚩 *Id.* at 2133 (emphasis in original) (quoting 🚩 *McDonald*, 561 U.S. at 767). As to the first question, the surety laws—like 🚩 § 922(n), but unlike the New York "proper cause" law at issue in *Bruen*—presume that individuals have the right to bear arms. 🚩 *Id.* at 2148 (rejecting surety laws as analogues, in part, because, unlike the surety laws, "New York presumes that individuals have no public carry right without a showing of heightened need"). These laws imprisoned or otherwise restricted only those persons who had disturbed the peace or whose public possession of a firearm, as determined by a justice of the peace or other legal process, was otherwise likely to spread fear among the public. 🚩 Section 922(n) similarly applies only to a subset of persons—felony

indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime. And they impose a burden with respect to the firearms that is comparable or, arguably, less. Unlike the surety laws, which deprived citizens of the right to possess firearms, 🚩 § 922(n) does not disturb the indictee's right to continued possession of a firearm; instead, it limits the ability of the indictee to ship, receive, or transfer firearms during the pendency of the indictment. As to the second question, there is comparable justification: the period in which an indictment pends is "a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or to others," thereby reasonably giving rise to fear of threats or violence among the community. 🚩 *Kays*, 2022 WL 3718519, at *4 (quoting *United States v. Khatib*, No. 12 Cr. 190 (AEG) (WCG), 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012), *report and recommendation adopted*, 2012 WL 6707199 (E.D. Wis. Dec. 26, 2012)); *see Khatib*, 2012 WL 6086862, at *4 ("It is not unreasonable to infer malevolent intent when an indictee finds it necessary to obtain a firearm during the narrow period during which an indictment is pending...."); *see also* 🚩 *Laurent*, 861 F. Supp. 2d at 102 ("[I]f the individual only received a gun *after* indictment, this conduct raises the suspicion that his purpose is not self-defense in the home, but further crime." (emphasis added)).

**\*24** The analogy to surety statutes has particular utility because the public safety threat posed by pretrial indictees was not, in the main, "a general societal problem" at the founding, 🚩 *Bruen*, 142 S. Ct. at 2131. Such invites, as the Government rightly argues, a broader search for historical analogies. *See* Gov't Ltr. Br. at 4–5. That is because, at the time the Second Amendment was ratified, bail was not available for many crimes that were then treated as capital offenses but which today would be treated as felonies within 🚩 § 922(n)'s scope. Under English law through the time of ratification, bail generally was either unavailable for persons "clearly guilty or indicted" of certain violent crimes such as murder, or was discretionary for "thieves openly defamed and known; persons charged with other felonies ... [or] accessories to felony under the same want of reputation." *See* Meyer, *Constitutionality of Pretrial Detention*, at 1157 (citing 4 Blackstone 298–99). A few colonies, such as Massachusetts, Pennsylvania, and New York, departed from English bail practices during the 17th century and required bail for non-capital offenses—although colonial New York's law specified that "person[s] taken in Execucon [sic] for debts" were not eligible for bail. *Id.* at

1162–63 & accompanying notes. Similarly, when the Continental Congress enacted the Northwest Territory Ordinance in 1787, it specified that "all persons shall be bailable *unless* for capital offences, where the proof shall be evident, or the presumption great." *See* An Ordinance for the Government of the Territory of the United States, North-West of the River Ohio, art. 2, 1787 (emphasis added), But even in such jurisdictions, the scope of capital offenses was far broader than today. For example, in colonial Massachusetts, persons who practiced witchcraft, a "son over 16 rebelling against his parents," or a "child over 16 years old cursing or smiting his parent" all had committed capital crimes. *See* Meyer, *Constitutionality of Pretrial Detention*, at 1162 n.133 (citing The Lawes and Libertyes Concerning the Inhabitants of the Massachusetts 5 (M. Farrand ed. 1648)). The circumstances—the relative scarcity of non-detained felony indictees—likely explain the absence of a colonial-era statute like 🚩 § 922(n) addressed specifically to pretrial indictees. They reinforce this Court's conclusion that the surety statutes—as colonial and early American examples of statutes disarming (and imprisoning) persons charged with serious offenses, whereby their conduct threatened the public safety—are worthy comparators.

Courts invalidating 🚩 § 922(n) have discounted the surety laws, reasoning that, because some such laws had exceptions for the payment of a bond or self-defense, these imposed a "qualitatively different burden[ ]" on the accused's Second Amendment right. *Compare Quiroz*, 2022 WL 4352482, at *8 ("Rather than completely restrict the accused's constitutional right, surety laws permitted the accused to prove a special self-defense need. And if they couldn't, the accused needed only to post a money bond for no more than six months to keep their firearms."); *Stambaugh*, 2022 WL 16936043, at *3–5 ("[s]urety laws and 🚩 § 922(n) thus impose qualitatively different burdens on the 'central component' of the Second Amendment right" because surety laws had exceptions for self-defense or if person posted bond); 🏳️ *Holden*, 2022 WL 17103509, at *4 (same); 🏳️ *Hicks*, 2023 WL 164170, at *7 (same) *with* 🏳️ *Kays*, 2022 WL 3718519, at *4–5 (Government's reliance on surety laws sufficient to satisfy its burden to justify 🚩 § 922(n)). In this Court's assessment, however, the surety laws, though an imperfect match, are informative and viable analogues. *See Kelly*, 2022 WL 17336578, at *3–6 & n.7 (upholding 🚩 § 922(n), discussing challenge of applying *Bruen*'s second step given the 18th century's different legal and social structures, and declining to "focus[ ] ... on a minutely precise analogy to historical prohibitions"). That

some surety laws permitted the accused to reclaim their firearm on the posting of a bond or a showing of self-defense does not destroy the analogy to 🚩 § 922(n). On the contrary, 🚩 § 922(n) embeds its own mechanism for relief: resolution of the pending indictment (whether by dismissal, plea, acquittal, or conviction).

Further, to the extent that *Quiroz*, *Stambaugh*, *Holden*, and *Hicks* rely on the "self-defense exception" in some surety statutes, this exception developed materially after the founding. The first appears to have been enacted by Massachusetts in 1836. It provided that:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Mass Rev. Stat., ch. 134, § 16; *see Stambaugh*, 2022 WL 16936043, at *4; *see also* 🏳️ *Bruen*, 142 S. Ct. at 2148 (quoting same, and distinguishing 1795 statute).[29] Between 1836 and 1871, another 10 states adopted similar laws. *See* 🏳️ *Bruen*, 142 S. Ct. at 2148 & n.23. But as *Bruen* teaches, the more apt comparators are those in place at the time of the Second Amendment's ratification. The surety laws then in place did not provide for the retention of weapons upon a showing of self-defense, but instead applied upon the determination by a justice of the peace or other legal proceeding that a person's conduct made their possession of the weapon a heightened danger.[30] Such makes them fair analogues to 🚩 § 922(n).

**\*25** Accordingly, the Government has satisfied its burden to justify 🚩 § 922(n) with reference to historical antecedents. 🚩 Section 922(n), the Court holds, is consistent with the Nation's history of firearms regulation.

## CONCLUSION

For the foregoing reasons, the Court denies Rowson's motions to suppress and to dismiss the Indictment. The Clerk of Court is respectfully directed to terminate the motion pending at docket 32, Trial in this case remains scheduled to commence on February 21, 2023.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 431037

## Footnotes

1    The Court here refers to the officers' roles and experience as of March 5, 2022.

2    On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

3    At the time, Lieutenant Tosado oversaw the precinct's special operations, which included supervising the domestic violence unit, neighborhood coordination and safety officers, and public safety officers. Tr. 17. Officer Bernard was assigned to assist Lieutenant Tosado. Tr. 69.

4    Body cameras do not continuously save all footage they record. Tr. 73–74 ("The body camera has a standby mode ... [where] it's constantly recording and re-erasing the video and recording new video."). Instead, such cameras save both audio and visual footage beginning the moment of activation, and video footage beginning the minute before activation. Tr. 21 (explaining lack of audio in first minute of body camera footage); Tr. 73–74 (same).

5    Rowson characterized Officer Bernard as having made this statement "with seeming surprise." Mem. at 2. The Court, on review of the body camera footage, did not perceive apparent surprise. *See* GX2 1:16–:18. As noted, the Court credits the officers' testimony that by this point, they had observed, multiple times, that Rowson was not wearing a seatbelt.

6    For the purposes only of the suppression motion, Rowson does not contest that he was, in fact, wearing no seatbelt and carrying a gun in his waistband. Tr. 142.

7    To fall within an officer's "narrowly drawn authority" to conduct searches pursuant to *Terry*, the search must also be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *See* ⚑ *United States v. Casado*, 303 F.3d 440, 444 (2d Cir. 2002) (quoting ⚑ *Terry*, 392 U.S. at 27, 29). The Court finds, and Rowson does not contest, that the patdown of the outside of Rowson's front left pocket—during which Officer Bernard felt a hard object consistent in size and shape with a

firearm, Tr. 94—was permissibly confined in scope. *Id.*; *cf.* 📁 *Casado, 303 F.3d at 449* (unreasonable search where officer reached directly into defendant's pocket, rather than conducting patdown).

8       This assessment is particularly so as to Lieutenant Tosado; Officer Bernard's line of sight was more difficult insofar as he was on the opposite side of the police car from the Camry. *But see* Tr. 75–77 (Officer Bernard explaining that he could see the top part of Rowson's chest from his vantage point and noticed the absence of a dark seatbelt chest strap). The officers testified that they discussed Rowson's lack of seatbelt before the arrest, Tr. 26, 80, and the body camera footage captures them doing, *see, e.g.,* GX2 00:24–:40. Even if Lieutenant Tosado's testimony alone were credited, such would justify the stop as reasonable. Under the doctrine of collective knowledge, "[r]easonable suspicion can ... be premised in whole or in part on the knowledge of the officer conveying the information"; Officer Bernard need not have himself seen "the specific facts which led [Lieutenant Tosado] to seek [his] assistance." *See* 📁 *United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016)* (requiring evidence, as exists here, that viewing officer communicated his suspicion or relevant information to colleague).

9       At the hearing, the Government argued that the unnatural distortion of the belt loops on Rowson's jeans was evident in GX4—a still image drawn from Officer Bernard's body camera. *See* Tr. 156; *see also* Tr. 138 (Bernard, explaining how body cameras flatten images visible to the naked eye). Although some buckling of the belt loop is visible in the image, the image alone does not make crystal clear whether that distortion resulted from an object in the waistband or the tightness of Rowson's pants and the angle at which he was sitting. But, as noted, Officer Bernard's immediate view from a couple of feet away gave him a more revealing perspective than the body camera footage. And the Court credits Officer Bernard's account of what he saw. *See* 📁 *Arvizu, 534 U.S. at 273* (reasonable suspicion standard allows "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information to them that 'might well elude an untrained person' "); *Weaver, 9 F.4th at 149* (officer "need not rule out the possibility of innocent conduct" to have reasonable suspicion).

10      For avoidance of doubt, in reaching this determination, the Court has considered only facts known to the officers *before* Officer Bernard placed his arm around Rowson. *See* GX1 2:13–:16; *Weaver, 9 F.4th at 143–45* (officer may order passengers out of car, even without reason to search occupants, and order suspect to move to place hands on the vehicle without commencing a search under the Fourth Amendment). The Court has not considered the immediately ensuing events, including Rowson's delay in complying with the officer's command to place his hands on the car, *see* Opp. at 19 (arguing that delay in complying with command supports reasonable suspicion), or Rowson's arguably suspicious and non-compliant movement of his left hand, Tr. 9 (same, as to Rowson reaching for weapon with left hand). That is because a search requiring a reasonable suspicion of danger under the Fourth Amendment may have been underway when Officer Bernard placed his arm around Rowson. *See* GX1 2:14–:16 (seeming to show Officer Bernard patting down Rowson with his right hand prior to the suspicious movement of Rowson's left hand); GX1 2:17–:20 (Tosado reaching for left hand); *see also Weaver, 9 F.4th at 142–45* (search begins with physical intrusion into a protected area). *But see id. at 144* (no search where defendant "was not forced to reveal anything that was not already exposed to the public"). Were these ensuing events considered, they would further bolster the reasonableness of the officers' perception of danger.

11      For examples of decisions using such analysis, *see* 🚩 *Marzzarella, 614 F.3d at 89*; 🚩 *Reese, 627 F.3d at 800–01*; 📁 *Heller II, 670 F.3d at 1252–53*; 📁 *Ezell, 651 F.3d at 701–04*; 📁 *Nat'l Rifle Ass'n of Am., Inc., 700 F.3d at 194*; 🚩 *Greeno, 679 F.3d at 518*; 🔶 *Woollard, 712 F.3d at 874–75*; 📁 *Gould, 907 F.3d at 668*; and 🚩 *Kolbe v.*

*Hogan*, 849 F.3d 114, 139 (4th Cir. 2017). In applying this methodology, many circuit courts assumed *arguendo* that the challenged law implicated the Second Amendment and proceeded to the means-end analysis. *See, e.g., Woollard*, 712 F.3d at 875; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018); *Worman v. Healey*, 922 F.3d 26, 30–31 (1st Cir. 2019) (same), *cert. denied*, 141 S. Ct. 109 (2020); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022) (same). The decisions in *Marzzarella, Reese, Nat'l Rifle Ass'n of Am., Inc., Ass'n of N.J. Rifle & Pistol Clubs, Inc., Kachalsky, Young, Gould, Greeno, Worman*, and *Kolbe* have been abrogated by *Bruen*.

[12]   Given *Bruen*'s recency, the case law has not yet developed the parameters of an as-applied Second Amendment challenge to a prosecution under § 922(n). Would that inquiry focus solely on the categorical nature of the felony charge pending against the defendant? Would the factual allegations underlying that charge also be germane? Could other facts relating to the threat the defendant posed to public safety be considered? In all events, it is premature here to determine definitively § 922(n)'s constitutionality as applied to Rowson, with the issue not briefed and the factual record—to the extent germane—undeveloped.

That said, on the facts known and proffered to date, it does not appear that, if § 922(n) is facially valid, Rowson would have a strong basis to claim to challenge its application to him, regardless of the parameters of that inquiry. The pending felony charge against Rowson on which the § 922(n) charge was based was for a quintessential crime of violence. *See People v. Nelson*, 169 N.Y.S.3d 771, 772, *leave to appeal denied*, 38 N.Y.3d 1152 (2022) (§ 265.03 is a violent felony). And the facts underlying that charge, as proffered, involve violent conduct implicating public safety. *See* Opp. at 3 ("police officers heard multiple gun shots coming from the courtyard of 2260 Crotona Avenue ... then saw Rowson run out [of the building] and drop a 9mm firearm, which they recovered" and which "was loaded with four rounds of ammunition"). Rowson's detention hearing in this case also adduced evidence of his gang affiliations and repeated firearms offenses, including while on pretrial release, These led the Court to order Rowson's pretrial detention, based on the danger he posed to the safety of the community. *See* Apr. 5, 2022 Tr. at 11–12, 41–42; *see also* Dkt. 16 (July 28, 2022 order, denying reconsideration of detention).

[13]   The Court in *Salerno* also rejected the argument that the statute violated the Eighth Amendment's excessive bail clause, *See* 481 U.S. at 752–55.

[14]   For challenges to 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by convicted felons, see *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (§ 922(g)(1) constitutional as applied to violent felon); *Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022) (§ 922(g)(1) constitutional), *reh'g en banc granted, opinion vacated*, 2023 WL 118469 (3d Cir. Jan. 6, 2023); *Zherka v. Garland*, 593 F. Supp. 3d 73, 80 (S.D.N.Y. 2022) (§ 922(g)(1) constitutional, including as to persons convicted of non-violent financial felonies); *United States v. King*, No. 21 Cr. 255 (NSR), 2022 WL 5240928, at *5 (S.D.N.Y. Oct. 6, 2022) (§ 922(g)(1) constitutional facially and as-applied); *United States v. Carrero*, No. 22 Cr. 0030 (RHC), 2022 WL 9348792, at *2–4 (D. Utah Oct. 14, 2022) (same; *Bruen* did not supersede Tenth Circuit precedent holding § 922(g)(1) constitutional); *United States v. Butts*, No. Cr. 22 Cr. 33 (DWM), 2022 WL 16553037, at *3 (D. Mont. Oct. 31, 2022) (§ 922(g)(1) constitutional); and *United States v. Garrett*, No. 18 CR 880, 2023 WL 157961, at *2–3 (N.D. Ill. Jan. 11, 2023) (same, noting that 58 other decisions had upheld § 922(n) since *Bruen* as of the Government

opposition brief).

For challenges to 18 U.S.C. § 922(g)(3), which prohibits the possession by unlawful "user[s] of or addict[s] to any controlled substance," see *United States v. Daniels*, No. 22 Cr. 58 (LG), 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022) (§ 922(g)(3) constitutional); *United States v. Sanchez*, No. 21 Cr. 0213 (ADA), 2022 WL 17815116, at *3–4 (W.D. Tex. Dec. 19, 2022) (same); and *United States v. Black*, No. 22 Cr. 133-01, 2023 WL 122920, at *4 (W.D. La. Jan. 6, 2023) (same).

For challenges to 18 U.S.C. § 922(g)(8), which prohibits persons subject to certain court-issued restraining orders from possessing a firearm, see *United States v. Haas*, No. 22-5054, 2022 WL 15048667, at *2 & n.1 (10th Cir. Oct. 27, 2022) (refuting argument that § 922(g)(8) was unconstitutional, but not specifically deciding question); and *Kays*, 2022 WL 3718519, at *3–4 (§ 922(g)(8) constitutional after *Bruen*).

For challenges to 18 U.S.C. § 922(g)(9), which prohibits persons convicted of misdemeanor crimes of domestic violence from possessing firearms, see *United States v. Nutter*, No. 21 Cr. 0142 (ICB), 2022 WL 3718518, at *8 (S.D. W.Va. Aug. 29, 2022) (§ 922(g)(9) constitutional); and *United States v. Bernard*, No. 22 Cr. 03 (CJW) (MAR), 2022 WL 17416681, at *8 (N.D. Iowa Dec. 5, 2022) (same).

For challenges to New York state firearm laws, see *Antonyuk v. Bruen*, No. 22 Civ. 0734 (GTS/CFH), 2022 WL 3999791, at *25–35 (N.D.N.Y. Aug. 31, 2022) (preliminarily enjoining New York Concealed Carry Improvement Act as, *inter alia*, likely to succeed on Second Amendment challenge); *Hardaway v. Nigrelli*, No. 22 Civ. 771 (JLS), 2022 WL 16646220, at *15–17 (W.D.N.Y. Nov. 3, 2022) (preliminarily enjoining statute prohibiting firearm possession in "sensitive places," including places of worship and religious observation, as Second Amendment challenge was likely to succeed), *appeal docketed* No. 22-2933 (2d Cir. Nov. 15, 2022); and *Gazzola v. Hochul*, No. 22 Civ. 1134 (BKS) (DJS), 2022 WL 17485810, at *13 (N.D.N.Y. Dec. 7, 2022) (declining to preliminarily enjoin firearms statute requiring, *inter alia*, licenses for semi-automatic weapons and training courses for new firearms licenses; court found Second Amendment challenge to such laws unlikely to succeed).

The Court has also considered challenges to standard pretrial release conditions prohibiting possession of firearms under 18 U.S.C. § 3142(c). *See, e.g.*, *United States v. Perez-Garcia*, No. 22 Cr. 01581 (GPC), 2022 WL 4351967, at *6 (S.D. Cal. Sept. 18, 2022) (upholding pretrial release prohibition on gun possession); *United States v. Slye*, No. 22 Mj. 144 (RAL), 2022 WL 9728732, at *1 (W.D. Pa. Oct. 6, 2022) (same); *United States v. Fencl*, No. 21 Cr. 3101 (JLS), 2022 WL 17486363, at *2–4 (S.D. Cal. Dec. 7, 2022) (same), *appeal docketed*, No. 22-50316 (9th Cir. Dec. 21, 2022); *United States v. Wendt*, No. 22 Cr. 0199 (SHL) (HCA), 2023 WL 166461, at *4 (S.D. Iowa Jan. 11, 2023) (same).

[15]    Two decisions from the Southern District of California, upholding pretrial conditions imposed pursuant to 18 U.S.C. § 3142(c)(1)(B)(viii) that prohibited the possession of firearms, have, however, held the contrary, *See Perez-Garcia*, 2022 WL 4351967, at *6 (stating that "a person who has been charged with a crime based on a finding of probable cause ... would not be considered a 'law-abiding' or responsible citizen, so he is outside the plain text of the Second Amendment"); *Fencl*, 2022 WL 17486363, at *2 (same, citing *Perez-Garcia*).

[16]    *But see United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (felons "categorically different from the individuals who have a fundamental right to bear arms"); *Hamilton v. Pallozzi*, 848 F.3d 614, 625 (4th Cir. 2017) ("[W]e simply hold that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the Second Amendment[.]"); *see also Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir.

2019) ("We need not decide today if it is ever possible for a convicted felon to show that he may still count as a 'law-abiding, responsible citizen' " because defendant failed to show "facts about his conviction that distinguish[ ] him from other convicted felons encompassed by the 🚩 § 922 (g)(1) prohibition").

17    *But see* 🚩 *United States v. Carpio-Leon, 701 F.3d 974, 982 (4th Cir. 2012)* (holding that illegal aliens are excluded from "the people" under the Amendment); 🚩 *United States v. Portillo-Munoz, 643 F.3d 437, 442 (5th Cir. 2011)* (same); 🚩 *United States v. Flores, 663 F.3d 1022 (8th Cir. 2011)* (per curiam) (citing *Portillo-Munoz*).

18    *See, e.g.,* 🚩 *Range, 53 F.4th at 284 & n.32* (convicted felons outside the "people" under the Second Amendment); 🚩 *United States v. Collette,* No. 22 Cr. 0141 (DC), 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022) (same); *United States v. Riley,* No. 22 Cr. 163 (RDA), 2022 WL 7610264, at *10 (E.D. Va. Oct. 13, 2022) (same); *United States v. Hill,* No. 22 Cr. 249 (JAP), 2022 WL 17069855, at *4 (S.D. Tex. Nov. 17, 2022) (same); *United States v. Grinage,* No. 21 Cr. 0399 (JKP), 2022 WL 17420390, at *4–7 (W.D. Tex. Dec. 5, 2022) (same); *United States v. Spencer,* No. 22 Cr. 106 (ALWA), 2022 WL 17585782, at *4 (E.D. Va. Dec. 12, 2022) ("Because *Bruen* cautions it does not displace *Heller*, instead focusing only on those areas of analysis requiring emphasis and clarification, it does not backtrack on *Heller*'s upholding of statutes prohibiting possession of firearms by felons.").

19    Although not bearing on the scope of the Second Amendment, the Government's treatment of felony indictees as categorically without Second Amendment rights is also in tension with the state of federal statutory law, under which such persons retain substantial rights with respect to firearms. For example, as the Government acknowledged at argument, 🚩 § 922(n) does not bar a felony indictee from *possessing* firearms he or she obtained pre-indictment. *See* Tr. 204–05; *see also* *United States v. Adams,* No. 11 Cr. 0046 (CB), 2011 WL 1475978 (S.D. Ala. 2011) (dismissing indictment under 🚩 § 922(n) that charged only possession); 🚩 *Laurent,* 861 F. Supp. 2d at 81 ("[T]he provision does not prohibit individuals under indictment from owning or possessing guns for the purposes of self-defense in the home, it restricts their ability to acquire a weapon until they are free of the indictment."); *Call,* 874 F. Supp. 2d at 972–73 (statute does not reach firearms or ammunition received prior to indictment); *Khatib,* 2012 WL 6086862, at *3 ("[A] person who is indicted for an offense does not run afoul of [🚩 § 922(n)] simply by retaining a firearm he already possesses."); *United States v. Now,* No. 22 Cr. 150 (WED), 2022 WL 4182306, at *1 (E.D. Wis. Sept. 13, 2022) ("An indictment that alleges that a person unlawfully possessed a firearm while under indictment would not state a violation of 🚩 18 U.S.C. § 922(n).").

20    As enacted, the Federal Firearms Act of 1938 applied to persons under indictment for crimes of violence—a term understood "to include only those offenses 'ordinarily committed with the aid of firearms,' " *Laurent,* 861 F. Supp. 2d at 82. Although the statute provided that "the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received ... in violation of this Act," the Supreme Court in 1943 invalidated this presumption as inconsistent with due process. *See* 🚩 *Tot v. United States,* 319 U.S. 463 (1943) (quoting statute). In 1961, Congress expanded the statute's scope to encompass all persons under indictment, *see* Act of Oct. 3, 1961, Pub.L. No. 87–342, 75 Stat. 757 (repealed). In 1968, Congress amended the statute to clarify that the term "indictment" included an information or indictment in "*any* court—state or federal—if the court had the power to prosecute any crime punishable by more than one year in prison." *Laurent,* 861 F. Supp. at 83 (discussing Gun Control Act of 1968. Pub. L. 90–618, 82 Stat. 1213 (codified at

🚩 18 U.S.C. §§ 921 *et seq.*).). 🚩 Section 922(n) took on substantially its present form as part of the 1986 Firearms Owners' Protection Act, Pub. L. 99–308, 100 Stat 449 (1986), which amended 🚩 § 922 to combine, in a single subsection, provisions of 🚩 § 922(g)(1) and 🚩 (h)(1) that had related to indictees. *See* 🚩 *Laurent*, 861 F. Supp. 2d at 84.

21    The closest pre-1938 state-law historical analogue appears to be an 1892 Florida statute that authorized law enforcement "making any arrest" related to carrying concealed weapons or committing a criminal offense or disturbing the peace while armed to "take possession of any arms or weapons found upon the person arrested, and ... retain the same until after the trial of such person, and if he be convicted, said arms or weapons shall be forfeited." Mem., Ex. C. (citing Fla. Act of Feb. 12, 1885, chap. 3620, § 3 as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2424).

22    The Court draws upon the *Range* panel's collection of historical analogues, but because the decision has since been vacated *in favor of en banc* review, does not accord it precedential weight. *See* 🚩 53 F.4th 262, *vacated and rehearing en banc granted by* 2023 WL 118369 (3d Cir. Jan. 6, 2023).

23    *See, e.g.,* 🚩 *Carpio-Leon*, 701 F.3d at 982 (unlawfully present aliens); 🚩 *United States v. Yancey*, 621 F.3d 681, 685–86 (7th Cir. 2010) (unlawful users of drugs); 🚩 *Vongxay*, 594 F.3d at 1118 (felons); *Medina*, 913 F.3d at 159 (same). Although these decisions predated *Bruen*, "they included historical analyses that, while less central to Second Amendment caselaw at the time, addressed the same general inquiry." *Kelly*, 2022 WL 17336578, at *5. The existence of shall-issue licensing regimes cited with approval in *Bruen*, under which authorities must deny licensees on the basis of certain disqualifying characteristics, *see* 🚩 142 S. Ct. at 2123–24 & 2138 n.9, also implicitly reflects the longstanding practice of disqualifying categories of persons based on a shared characteristics indicative of unsuitability to possess firearms (that is, dangerousness).

24    *Heller* and *Bruen* teach that, although colonial laws and practices are apt by far to be most relevant, English laws and practices may be considered as "historical background of the Second Amendment," 🚩 *Heller*, 554 U.S. at 592, particularly where these were temporally proximate to ratification. *See* 🚩 *Bruen*, 142 S. Ct. at 2136 ("Historical evidence that long predates [1791 and 1868] may not illuminate the scope of the [Second Amendment] right."); 🚩 *id.* at 2139–40 (expressing skepticism as to, for example, the relevance of the Statute of Northampton of 1328); 🚩 *Heller*, 554 U.S. at 592–93 (looking to the English Declaration of Rights of 1689, *inter alia*, as bearing on Second Amendment).

25    The full texts of this and other early Massachusetts statues are in the electronic repository of the State Library of Massachusetts, in the section on Acts and Resolves. These can be found at https://archives.lib.state.ma.us/handle/2452/2. The link to the specific section cited above is at https://archives.lib.state.ma.us/bitstream/handle/2452/118706/1692acts0018.pdf?sequence=4&isAllowed=y.

26    The    Laws    of    New    Hampshire    may    be    found    at

https://archive.org/details/actsandlawshism02britgoog/page/n24/mode/2up.

27    This statute "codified the existing common law in this regard." *Bruen*, 142 S. Ct. at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

28    The 1795 statute stated in full:

> And it is further enacted by the authority aforesaid, That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behavior; and in want therof, to commit him to prison until he shall comply with such requisition; and may further punish the breach of the Peace in any person that shall assault or strike another, by fine to the Commonwealth, not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender, to appear and answer for his offence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require.

1795 Mass. Acts and Laws. Ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts.

29    *Quiroz*, *Holden*, and *Hicks* appear to conflate the 1795 Massachusetts statute, which did not discuss self-defense and the 1836 statute, which did. *Compare supra* note 28 (quoting 1795 statute), *with* Mass. Rev. Stat., ch. 134, § 16 (quoting 1836 statute). *See Quiroz*, 2022 WL 4352482, at *7 (referencing 1795 statute, but stating that accused needed to "prove a special need for self-defense"); *Holden*, 2022 WL 17103509, at *4 (not specifying statute, but stating that surety laws could be overcome by showing an individual need for self-defense); *Hicks*, 2023 WL 164170, at *7 (stating that 1795 surety law required a person "reasonably likely to breach the peace and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm"—language drawn from the 1836 statute).

30    Contrary to the assessment of one court to hold § 922(n) invalid, New Hampshire's 1759 statute is a proper historical analogue to § 922(n). That court distinguished that statute on the ground that it was "backward-looking" and punished persons "who had already gone 'armed offensively' and allow[ing] for forfeiture of the weapon *used in that crime*," in contrast to surety laws which disarmed persons on a "forward-looking" basis based on a "reasonable cause to fear an injury, or breach of the peace." *Stambaugh*, 2022 WL 16936043, at *3 n.25 (emphasis in original). In fact, § 922(n) is fairly viewed as both backward- and forward-looking, so as to make each version of the surety laws analogous. It is backward looking insofar as it applies to persons on the basis of an extant indictment for offenses of the requisite seriousness. It is forward-looking insofar as it is targeted to conduct (shipping, receiving, or transporting firearms) during the "volatile" indictment period that presents a heightened risk of violence. *Kays*, 2022 WL 3718519, at *4.

**UNITED STATES OF AMERICA, v. ISZAYAH ROWSON, Defendant., Slip Copy (2023)**

2023 WL 431037

**End of Document**                                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.