# FEDERAL PUBLIC DEFENDER
## WESTERN DISTRICT OF TEXAS

**MAUREEN SCOTT FRANCO**
FEDERAL PUBLIC DEFENDER

JUDY F. MADEWELL
FIRST ASSISTANT
─────────────
CHRISTOPHER J. CARLIN | *ALPINE*
HORATIO R. ALDREDGE | *AUSTIN*
JOSEPH A. CORDOVA | *DEL RIO*
BIANCA ROCHA DEL RIO | *DEL RIO*
REGINALDO TREJO, JR. | *EL PASO*
EDGAR HOLGUIN | *EL PASO*
ANTHONY J. COLTON | *MIDLAND*
KRISTIN M. KIMMELMAN | *SAN ANTONIO*
LEWIS B. GAINOR | *WACO*
SUPERVISORY ASSISTANTS

FEDERAL BUILDING • HEMISFAIR PARK
727 E. CÉSAR E. CHÁVEZ BOULEVARD, SUITE B-207
SAN ANTONIO, TEXAS 78206-1278

TELEPHONE
(210) 472-6700

TOLL FREE
(855) 867-3570

FACSIMILE
(210) 472-4454
─────────────
ALPINE
AUSTIN
DEL RIO
EL PASO
MIDLAND
PECOS
WACO

February 6, 2023

Mr. Lyle W. Cayce
Clerk, United States Court of Appeals
 for the Fifth Circuit
600 S. Maestri Place
New Orleans, Louisiana 70130

Re:   *United States v. Jose Gomez Quiroz*, Appeal No. 22-50834
      Response Brief regarding *United States v. Rahimi*

Dear Mr. Cayce:

I write in response to the Court's request for a response to *United States v. Rahimi*, __ F.4th __, No. 21-11001, 2023 WL 1459240 (5th Cir. Feb. 2, 2023).

In *Rahimi*, this Court held that 18 U.S.C. § 922(g)(8) facially violates the Second Amendment under the framework established in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Rahimi* is the Court's first opinion applying the *Bruen* framework,[1] and it rejected nearly every argument raised by the Government in this case. *Rahimi* clarified that: (1) *Bruen* applies to Second Amendment challenges to § 922, (2) facial challenges to § 922 are appropriate and follow *Bruen*'s analysis, (3) all Americans are protected by the Second Amendment, and (4) the Government's historical evidence—which is the same evidence offered in

---

[1] Under the rule of orderliness, one panel of this Court cannot overturn another panel's decision, absent an intervening change in law. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). This rule applies both to express holdings and implicit reasoning. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 (5th Cir. 2022) ("The rule of orderliness applies as equally to a panel's implicit reasoning as it does to its express holdings."). This Court should follow *Rahimi*'s example on how to address Second Amendment challenges.

Quiroz's case—fails to establish a tradition to support § 922(g)(8). Consistent with *Rahimi*, § 922(n) violates the Second Amendment, and the Court should affirm.

### 1. *Bruen* applies.

*Rahimi* held that *Bruen* applies to Second Amendment challenges, including those addressing criminal laws in § 922. 2023 WL 1459240, at *3, 4–5. This is consistent with the plain language of *Bruen*, which abrogated several circuit opinions addressing § 922 cases. *See* 142 S. Ct. at 2127 n.4.

*Rahimi*'s holding and reasoning disposes of the Government's argument that this Court should ignore the Second Amendment framework from *Bruen* and instead extend the due process means-end scrutiny framework from *Salerno*.[2] *See* Gov't Reply 1–3. *Salerno* does not, as the Government argues, "directly control" a Second Amendment challenge to § 922(n), *Bruen* does. *Compare Rahimi*, 2023 WL 1459240, at *3 (holding *Bruen* "clearly 'fundamentally changed' our analysis of laws that implicate the Second Amendment" and rendered even direct precedent on § 922(g)(8) obsolete) *with* Gov't Reply 1–3; *see also* Quiroz Br. 13 n.2. *Rahimi* also repeatedly noted that *Bruen* repudiated the use of means-end scrutiny in Second Amendment challenges. 2023 WL 1459240, at *3, 4.

The *Bruen* framework, applied in *Rahimi* says that when "'the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects the conduct.'" *Id.* at *3 (quoting *Bruen*, 142 S. Ct. at 2129–30) (cleaned up). "In that context, the Government bears the burden of 'justifying its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* As the *Rahimi* Court explained, the question is not whether disarming those under a protective order is a "laudable policy goal," it is whether the statute violates the Second Amendment. *Id.* at *1.

### 2. The facial challenge is appropriate.

*Rahimi* rejected the argument—the same one the Government makes here—that the *Salerno* standard forecloses finding § 922(g)(8) *facially* unconstitutional. *Compare Rahimi*, 2023 WL 1459240, at *4–5, *with* Gov't Br. 47–49. As *Rahimi* explained, *Bruen* was itself a facial challenge and made clear that "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 2023 WL 1459240, at *4. Facial challenges consider only whether the text of the challenged statute is inconsistent with the Second

---

[2] The Government's position in its Reply Brief that *Bruen* should not be applied to Quiroz's Second Amendment challenge is also inconsistent with its own position in its Opening Brief. *See* Gov't Br. i ("This case calls on the Court to apply the Second Amendment framework set out in *New York States Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)").

Amendment's text and historical understanding. *Id.* at \*4; *see also Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)).[3]

Here, Quiroz argues that § 922(n) is facially unconstitutional because its text is inconsistent with the Second Amendment's text and historical understanding. Quiroz Br. 52–55. Under *Bruen* and *Rahimi*, Quiroz's facial challenge is appropriate.

### 3. All Americans are protected by the Second Amendment.

The *Rahimi* Court also rejected the Government's *Bruen* first step argument—the same one the Government makes here—that the Second Amendment applies only to "law-abiding, responsible citizens[.]" 2023 WL 1459240, at \*3; *cf.* Gov't Br. 16–27. It explained that the argument fails because it is "(1) inconsistent with *Heller*, *Bruen*, and the text of the Second Amendment, (2) it inexplicably treats Second Amendment rights differently than other individually held rights, and (3) it has no limiting principles." *Rahimi*, 2023 WL 1459240, at \*3

The Court held that "the people" in the Second Amendment unambiguously refers to "all members of the political community, not an unspecified subset." *Id.* (citing *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)). And it explained that *Heller* and *Bruen*'s uses of the term "law-abiding" in context "does not add an implied gloss that constricts the Second Amendment's reach." *Id.* at \*4. Rather, it is a shorthand for *Heller*'s recognition that certain groups—felons and the mentally ill—have nevertheless historically been stripped of Second Amendment rights. *Id.* Even felons and the mentally ill, though, are not excluded from the Second Amendment or other constitutional protections automatically but can be subjected to constitutional deprivations by state action. *Id. Rahimi* further recognized that the Government's reading of "law-abiding" lacked a limiting principle. *Id. Rahimi* explained that, insofar as certain categories of people like felons have historically been disarmed, they are not excluded wholesale from "the people" protected by the Second Amendment. *Id.* at \*3–4. Therefore, the sole step one question in *Rahimi* was whether "possession" of a firearm was covered by the Second Amendment; *Rahimi* said it "easily falls within the purview" of the right, and so the Second Amendment presumptively protects Rahimi's right. *Id.* at \*5.

---

[3] The Government goes even further in this case, arguing under *Salerno* that factual circumstances even beyond plain applications of § 922(n) foreclose a facial challenge. Gov't Br. 47–49. This reasoning has been expressly rejected by *Bruen*, *Rahimi*, and *City of Los Angeles, California v. Patel*, 576 U.S. 409 (2015). *See* Quiroz Br. 52–55.

The Government's argument in this case, that Quiroz is excluded from the scope of the Second Amendment because he is not "law-abiding," is irreconcilable with *Rahimi*'s reasoning and holding. *Cf.* Gov't Br. 16–27.

### 4. The Government's historical evidence failed to establish a tradition to support § 922(g)(8) in *Rahimi*, signaling that the same evidence fails to establish a tradition to support § 922(n) in Quiroz's case.

After finding that Rahimi's conduct was covered by the Second Amendment, the Court held that the Government had not met its burden at *Bruen*'s second step to show § 922(g)(8) is consistent with the Nation's historical traditions of firearms regulation. *Rahimi*, 2023 WL 1459240, at *4–10. Much of the *Rahimi* analysis similarly applies to Quiroz's case.

**Government's burden.** *Rahimi* clarified the Government's burden at *Bruen*'s second step. It explained that the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at *5 (quoting *Bruen*, 142 S. Ct. at 2131–32). The Government can do so through a "well-established and representative historical analogue," which is compared to the challenged law based on *how* and *why* they burden the right to armed self-defense. *Id.* (citing *Bruen*, 142 S. Ct. at 2133). "The core question is whether the challenged law and proffered analogue are relevantly similar." *Id.* The Court also noted that when a challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (quoting *Bruen*, 142 S. Ct. at 2131).

Quiroz articulated this standard somewhat differently in his briefing. He argued that this "distinctly similar" or "straightforward" approach should be applied separately from the "relevantly similar" or "nuanced" approach in cases that, like *Heller* and *Bruen*, involve a "general societal problem." Quiroz Br. 25–31. *Rahimi* instead implies that *Bruen*'s "straightforward" and "nuanced" approaches are not mutually exclusive. 2023 WL 1459240, at *3. Nevertheless, *Rahimi* explained that the absence of distinctly similar laws—for a societal problem that existed at the time of ratification—is relevant evidence of the law's unconstitutionality. *Id.* at *5. The Government has not met its burden under Quiroz's or *Rahimi*'s framing because the Government's historical examples are not relevantly similar to § 922(n), and the lack of a distinctly similar analogue for § 922(n) is further evidence of its unconstitutionality. *See* Quiroz Br. 31–51.[4]

---

[4] The Government's argument that the "parties' dispute turns on how rigidly the Court should demand founding-era precursors exactly like § 922(n)," ignores Quiroz's extensive argument

In *Rahimi*, the Government relied on three categories of historical analogues: (1) English and American laws providing for disarmament of "dangerous" people, (2) English and American "going armed" laws, and (3) colonial and early state surety laws. 2023 WL 1459240, at *7. The Court held that these examples were not "relevantly similar" enough to § 922(g)(8) to establish its consistency with historical traditions. *Id.* at *6–10. Quiroz addresses each in turn, as the Government relied on much of the same historical evidence in this case. *See* Gov't Br. 27–47.

**Laws disarming "dangerous" people.** First, the *Rahimi* Court rejected the laws disarming "dangerous" people as historical support for § 922(g)(8). 2023 WL 1459240, at *7–8. It explained that the Government's reliance on the English Militia Act of 1662 and related laws in the colonies was particularly misplaced, because its "provenance demonstrates that it is not a forerunner of our Nation's historical tradition of firearm regulation." *Id.* at *7; *cf.* Gov't Br. 35 (relying on the Militia Act). It explained that the English Bill of Rights, a precursor to the Second Amendment, explicitly restricted the Militia Act's reach to prevent the politically motivated disarmaments that had been pursued by English kings during the Stuart Restoration. *Id. Rahimi* also rejected reliance on laws disarming slaves, Native Americans, and those unwilling to take an oath. *Id.* at *7–8; *cf.* Gov't Br. 37–38 (relying on these laws). It determined the laws were not relevantly similar to § 922(g)(8), because they disarmed classes or groups to preserve the general political and social order, not individuals identified to pose a specific threat to another person. 2023 WL 1459240, at *8. Finally, the Court rejected the Government's reliance on proposals to limit the Second Amendment during ratification debates. *Id.*; *cf.* Gov't Br. 38–39 (relying on the same ratification debate proposals). *Rahimi* explained these proposals did not become part of the Second Amendment and so could not counter the Second Amendment's plain text or serve as an analogue for § 922(g)(8). 2023 WL 1459240, at *8.[5]

*Rahimi*'s findings on these laws should inform the Court's analysis in this case. *Rahimi* did not simply say that laws the Government cites in this case about "dangerous" people were dissimilar from § 922(g)(8); it explained that many of those laws or other examples were historically "dubious" or directly contrary to the Second Amendment. *Id.* at *7–10. Therefore, English laws like the Militia Act of 1662 and its

---

that the Government's historical evidence is neither distinctly *nor relevantly* similar to § 922(n). *See* Gov't Reply 12; *see also* Quiroz Br. 31–51.

[5] *Rahimi*'s rejection of the ratification debate proposals also implicitly repudiated the Government's argument that courts should be guided not only by actual historical laws and regulations as dictated by *Bruen*, but by other indicia of the Founders' intent. *Compare Rahimi*, 2023 WL 1459240, at *8 (explaining that proposals might illuminate the scope of firearm rights where they comport with the plain text but cannot serve as an analogue because they were not enacted) *with* Gov't Reply 15–16.

descendants in the colonies should not be relied on in Quiroz's case. So too with respect to rejected state proposals during the Second Amendment's ratification debates. The reasoning on certain laws, like those disarming slaves or Native Americans, was in part specific to § 922(g)(8). *Rahimi* distinguished these laws as addressing classes of people threatening armed rebellions, as opposed to individuals posing credible threats like in § 922(g)(8). *Id.* at *7–8. But § 922(n) is likewise not focused on preventing political unrest, particularly because it applies to even non-violent indictees. In addition to not being relevantly similar to § 922(n), these laws would be unconstitutional and are historically dubious because of their focus on disarming political opponents or individuals who at the time were not deemed "people" under the Constitution. *See* Quiroz Br. 39–43.

**"Going armed" laws.** Second, *Rahimi* rejected "going armed" laws as historical analogues for § 922(g)(8). 2023 WL 1459240, at *8–9. The Government relied on colonial laws from Massachusetts, Virginia, New Hampshire, and North Carolina, which addressed "going armed offensively," and in some cases permitted seizure of firearms. *Id.* at *8; *see* Gov't Br. 35–37 (relying on same laws). The Court noted it was "dubious these 'going armed' laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms." *Rahimi*, 2023 WL 1459240, at *8. It explained that forfeiture was not included in one law and was dropped as a penalty in two others by the time of the founding. *Id.* *8–9. Even if the remaining law did include forfeiture of firearms by the founding, "one outlier is not enough to show a tradition …" *Id.* at *9 (quoting *Bruen*, 142 S. Ct. at 2142). Moreover, the laws were not relevantly similar to § 922(g)(8). The laws only disarmed offenders after criminal proceedings and conviction and were addressed at "curbing terroristic or riotous behavior" unlike § 922(g)(8). *Id.* at *9.

For the same reasons stated in *Rahimi*, the evidence fails in Quiroz's case. These laws are of "dubious" historical value as compared to *any* challenged regulation, whether § 922(g)(8) or § 922(n). *See id.* at *8–9. And they are not relevantly similar to § 922(n) because, as explained in *Rahimi*, they only applied after "criminal proceedings and conviction" and were addressed to terroristic behavior. *See id.* Section 922(n), conversely, criminalizes a broad category of people, not specific violent activity, and applies upon indictment, not conviction.

**Surety laws.** Third, the Court determined "surety laws" were not sufficiently similar to § 922(g)(8). *Id.* at *9–10. These laws generally said that if a person feared another would injure him or destroy his property, that person could be asked to post surety to carry his weapon in public. *Id.* at *9. *Rahimi* recognized these laws as closer analogues, finding them to be part of our tradition of firearm regulation, and motivated by the same purpose as § 922(g)(8)—protecting an identified person from a specific harm. *Id.* at *9. But it reasoned *how* these laws worked was insufficiently similar. *Id.* at *10. Surety laws did not prohibit even public carry, let alone possession

of firearms, so long as the offender posted surety. *Id.* They were only partial deprivations of the right, unlike § 922(g)(8). *Id.*

These surety laws are even less analogous to § 922(n) than to § 922(g)(8), so, under *Rahimi*'s reasoning, are insufficient evidence in Quiroz's case as well. They are based on an individualized threat of actual danger and involved a process, much like the typical hearing underlying § 922(g)(8), to address that concern. *Id.* at *9–10. Section 922(n), conversely, subjects any person indicted for any felony, regardless of whether it involved violence, to criminal prosecution for receiving a firearm. And *how* surety laws burden the Second Amendment right is fundamentally different from § 922(n), like § 922(g)(8), because one could make a surety payment to continue carrying firearms. Also, *Rahimi* did not address that many of the Government's cited surety laws say nothing at all about firearms, and that those from the 19th century were rejected in *Bruen* because of a lack of evidence they were enforced except pretextually. Quiroz Br. 44–51. Like many other laws addressed in *Rahimi*, the historical pedigree of the surety laws is "dubious."

**Unaddressed historical evidence.** The only historical evidence offered by the Government here that was not explicitly addressed in *Rahimi* is pretrial detention. *See* Quiroz Br. 33–36 (addressing this evidence). But Judge Ho's concurrence speaks to this issue. *Rahimi*, 2023 WL 1459240, at *10–11. Judge Ho clarified that the Founders believed in protecting citizens against violence, and that the criminal process addressed those protections. *Id.* Insofar as the Founders were concerned with disarming violent criminals, that concern was addressed by arrest, detention, and incarceration. *Id.* Those who are detained or incarcerated have been determined to be dangerous or a flight risk and are necessarily disarmed. They can be subjected to various restrictions on their liberty and have a reduced need to bear arms for self-defense while detained. *See* NAAGA Amicus Br. 17–18. Those who are released pretrial, like Quiroz, are fundamentally different. They have not been historically disarmed, even though pretrial release was available for most felons, including burglars, at the time of the founding. *See* Judiciary Act of 1789, 1 Stat. 73, § 33 (describing that bail was generally available, including for those accused of capital crimes if ordered by a federal judge); *see also Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting) (explaining that, by the founding, property crimes like burglary "were, on the whole, not capital") (citations omitted).

* * *

Finding the Government failed to meet its burden, *Rahimi* held that § 922(g)(8) is facially unconstitutional. 2023 WL 1459240, at *10. It reiterated that policy goals are the province of means-end scrutiny and are therefore foreclosed by *Bruen*. *Id.* Second Amendment challenges consider only text and history *Id.* Under that inquiry, § 922(g)(8) is unconstitutional. *Id.* The Court should reach the same conclusion here, find § 922(n) is unconstitutional, and affirm.

Respectfully Submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

/S/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
Assistant Federal Public Defender

cc: AUSAs Charles E. Fowler, Jr. and Joseph H. Gay, Jr.,
U.S. Attorney's Office
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216