No. 22-50834

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

*v.*

JOSE GOMEZ QUIROZ,

*Defendant–Appellee.*

Appeal from the United States District Court
for the Western District of Texas
No. 4:22-CR-104-DC

## SUPPLEMENTAL BRIEF FOR THE UNITED STATES

JAIME ESPARZA
United States Attorney

CHARLES E. FOWLER, JR.
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
Phone: (512) 370-1265
Fax: (512) 916-5854

# TABLE OF CONTENTS

ARGUMENT ................................................................ 1

    I.    *Bruen* requires courts to conduct a legal inquiry into the text and history of the Second Amendment..........................3

    II.   Section 922(n) satisfies *Bruen*'s historical inquiry ...................6

CONCLUSION ............................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Agnello v. United States*,
  269 U.S. 20 (1925)............................................................13

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) ..................................................... 5

*Branzburg v. Hayes*,
  408 U.S. 665 (1972)........................................................16

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) .................................................... 7

*Burnham v. Superior Court*,
  495 U.S. 604 (1990)........................................................ 4

*Chandris, Inc. v. Latsis*,
  515 U.S. 347 (1995)........................................................ 4

*Chimel v. California*,
  395 U.S. 752 (1969)........................................................13

*Costello v. United States*,
  350 U.S. 359 (1956)........................................................16

*Crawford v. Washington*,
  541 U.S. 36 (2004)......................................................... 4

*Harmelin v. Michigan*,
  501 U.S. 957 (1991)........................................................ 8

*Hight v. United States*,
    Morris 407 (Iowa 1845) ................................................................. 10

*Houston Community College System v. Wilson*,
    142 S. Ct. 1253 (2022) .................................................................... 4

*Kaley v. United States*,
    571 U.S. 320 (2014) ........................................................................ 9

*Kamen v. Kemper Financial Services, Inc.*,
    500 U.S. 90 (1991) ...................................................................... 5, 6

*Leo Sheep Co. v. United States*,
    440 U.S. 668 (1979) ........................................................................ 4

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ........................................................................ 4

*Medina v. Whitaker*,
    913 F.3d 152 (D.C. Cir. 2019) .................................................. 8, 15

*Milburn, Ex parte*,
    9 Pet. 704 (1835) ............................................................................ 6

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................................... passim

*People v. McLeod*,
    3 Hill 635 (N.Y. 1842) .................................................................. 10

*People v. Tinder*,
    19 Cal. 539 (1862) ........................................................................ 10

*State v. Buzzard*,
    4 Ark. 18 (1842) ...................................................................... 13, 14

*State v. Hill*,
    1 Tread. 242 (S.C. 1812) ............................................................... 10

*State v. Merrick*,
    10 La. Ann. 424 (1855) ................................................................. 10

*State v. Mills*,
    2 Dev. 420 (N.C. 1830) ................................................................. 10

*Taylor v. Taintor*,
    83 U.S. 366 (1873) ................................................................... 12, 13

*Tennessee v. Garner*,
  471 U.S. 1 (1985) ................................................................... 7

*The Territory v. Benoit*,
  1 Mart.(o.s.) 142 (Orleans Super. Ct. 1810) ....................... 9

*The Territory v. McFarlane*,
  1 Mart.(o.s.) 216 (Orleans Super. Ct. 1811) ....................... 9

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .......................................................... 4

*United States v. Guest*,
  383 U.S. 745 (1966) ............................................................17

*United States v. Rahimi*,
  61 F.4th 443 (5th Cir. 2023) ...............................................11

*United States v. Salerno*,
  481 U.S. 739 (1987) .............................................................14

*United States v. Simmons*,
  47 F. 575 (C.C.S.D.N.Y. 1891) ..........................................11

*Weeks v. United States*,
  232 U.S. 383 (1914) .............................................................13

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ............................................................. 5

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ................................................................. 4

## Constitution, Statutes, and Rules

U.S. Const. Art. II .................................................................... 4

U.S. Const. Art. III ................................................................... 4

U.S. Const. Amend. I................................................... 4, 16, 17

U.S. Const. Amend. II .......................................................passim

U.S. Const. Amend. IV ............................................................16

U.S. Const. Amend. V ..............................................................16

U.S. Const. Amend. VI .......................................................4, 16

U.S. Const. Amend. XIV ....................................................... 4

Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91........................ 8

18 U.S.C. 922 ............................................................. passim

18 U.S.C. 3142................................................................17

Fed. R. Evid. 201...........................................................4, 6

**Miscellaneous**

William Blackstone, *Commentaries on the Laws of England* (1765)..... 11, 12

Edward Coke, *A Little Treatise of Baile and Maineprize* (2d ed. 1737).......12

Thomas F. Davidson, *The Power of Courts to Let to Bail*,
    24 Am. L. Reg. 1 (1876).................................................... 9

John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies
    and the Bail Crisis*, 88 U. Chi. L. Rev. 1285 (2021) .............................11

Matthew Hale, *The History of the Pleas of the Crown* (1736)....................12

William Hawkins, *A Treatise of the Pleas of the Crown* (6th ed. 1787) ......13

Anthony Highmore, *A Digest of the Doctrine of Bail
    in Civil and Criminal Cases* (1783) ........................................ 6

Don B. Kates, *Handgun Prohibition and the Original Meaning
    of the Second Amendment*, 82 Mich. L. Rev. 204 (1983).......................11

Charles Petersdorff, *A Practical Treatise on the Law of Bail
    in Civil and Criminal Proceedings* (1824) ........................................ 12, 15

David Robertson, *Reports of the Trials of Colonel Aaron Burr* (1808).........9

Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail:
    Historical Perspectives*, 82 Colum. L. Rev. 328 (1982)...........................8

The United States respectfully submits this brief in response to this Court's request for supplemental briefing.  *See* ECF No. 69.  The Solicitor General has reviewed and approved this brief.

## ARGUMENT

In 18 U.S.C. 922(n), Congress made it unlawful for a person to receive a firearm while under indictment for a felony.  A conviction on such a charge would disqualify the defendant from possessing firearms.  *See* 18 U.S.C. 922(g)(1).  While felony charges are pending, Section 922(n) stops indicted defendants from acquiring new firearms, but does not prevent them from retaining old ones.  That modest restriction serves two important purposes.  First, it protects the integrity of the criminal-justice system by reducing the risk that indicted criminal defendants will acquire firearms to facilitate their flight.  Second, it protects the community at large by reducing the risk that indicted criminal defendants will acquire and use firearms to commit other crimes while awaiting trial.

The government's prior briefs explained that Section 922(n) is constitutional because indicted defendants enjoy diminished constitutional rights (Opening Br. 13-16); because the Second Amendment's plain text does not cover receiving guns while under felony indictment (*id.* at 16-27); because Section 922(n) fits within the Nation's historical tradition of gun regulation (*id.* at 27-47); and because, at minimum, Section 922(n) is constitutional as applied to the defendant (*id.* at 47-49).  We adhere to each of those arguments, but will not repeat them here.  Instead, because the

1

questions posed in the Court's supplemental briefing invitation focused on the historical analysis contemplated by the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), this brief addresses the nature of that analysis and further elaborates on its application to Section 922(n).

As explained below, *Bruen* instructs courts considering Second Amendment challenges to examine the Amendment's text and the Nation's historical tradition of firearms regulation. Although it has an important historical dimension, that is ultimately a legal inquiry into the meaning of the Second Amendment, not a factual one. The Supreme Court has emphasized that, in conducting that inquiry, courts should uphold a modern regulation as consistent with the historical tradition of firearms regulation so long as it has "a well-established and representative historical *analogue*"—the government need not identify "a historical *twin*." *Bruen*, 142 S. Ct. at 2133. And the Court explained that a historical analogue serves to validate a modern regulation if it imposed "comparable burden[s]" and was "comparably justified." *Ibid.*

Section 922(n) easily satisfies that standard. Since the Founding, governments have subjected criminal defendants to a variety of restrictions—including restrictions that limit their ability to keep and bear arms—in order to ensure that the defendants show up for their trials and refrain from committing other crimes in the meantime. Section 922(n) serves similar

2

goals, but in a less burdensome way.  The district court thus erred in holding Section 922(n) unconstitutional.

### I.   *Bruen* requires courts to conduct a legal inquiry into the text and history of the Second Amendment.

1.  In *Bruen*, the Supreme Court explained that judicial review of gun laws should focus on "the Second Amendment's text" and on "the historical tradition that delimits the outer limits of the right to keep and bear arms."  142 S. Ct. at 2127.  A law complies with the Second Amendment if it regulates conduct that falls outside the Amendment's "plain text" or if the regulation comports with "this Nation's historical tradition of firearm regulation."  *Id.* at 2126.

A modern law can satisfy *Bruen*'s historical standard even if it is not "a dead ringer for historical precursors."  *Bruen*, 142 S. Ct. at 2133.  To establish the modern law's constitutionality, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*."  *Ibid.*  In assessing proposed historical analogues, courts should focus on "two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  A court should uphold a modern law if its historical counterparts imposed "comparable burden[s]" and were "comparably justified."  *Ibid.*

2.  Applying *Bruen*'s "text-and-history test," 142 S. Ct. at 2130 n.6, involves answering a question of law—not a question of fact or a mixed question of law and fact.  *Bruen* itself makes that clear.  The *Bruen* Court

3

stated that the "job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." *Ibid.* The Court also expressly described its test as a "legal inquiry." *Ibid.* (citation omitted).

That makes sense. It is well established that the "interpretation" of a constitutional or statutory provision "is a question of law." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). That is so even when interpretation involves historical work or otherwise depends in part on "legislative facts"—that is, facts that bear on "the formulation of a legal principle or ruling by a judge or a court" as distinct from "the facts of the particular case." Fed. R. Evid. 201 advisory committee's note. The Supreme Court, for example, has relied on history and tradition in interpreting a range of constitutional provisions, including Article II, *see Zivotofsky v. Kerry*, 576 U.S. 1, 23-28 (2015); Article III, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); the Establishment Clause, *see Marsh v. Chambers*, 463 U.S. 783, 786-792 (1983); the Free Speech Clause, *see Houston Community College System v. Wilson*, 142 S. Ct. 1253, 1259-1260 (2022); the Due Process Clause, *see Burnham v. Superior Court*, 495 U.S. 604, 610-616 (1990) (plurality opinion); and the Confrontation Clause, *see Crawford v. Washington*, 541 U.S. 36, 42-50 (2004). And "courts, in construing a statute, may with propriety recur to the history of the times when it was passed." *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979) (citation omitted). Yet in all those contexts, courts treat the inquiry into history as a legal

question, not a factual question. Courts should follow the same approach under the Second Amendment.

In addition, as the Supreme Court explained in discussing the common-law rule that treated questions of foreign law as questions of fact, treating *Bruen*'s historical inquiry as a question of fact would produce "a number of undesirable practical consequences." *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (citation omitted). The relevant historical material would have to be established in each case "in accordance with the rules of evidence," and appellate review would be "deferential and limited to the record made in the trial court." *Id.* (citation omitted). As a result, the meaning of the Second Amendment could vary from case to case depending on the particular record the parties compiled in the district court.

Because applying *Bruen* involves answering a question of law, a court of appeals may rely on legal arguments that are raised for the first time on appeal or that are raised in amicus briefs. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). And "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). Although a court is "not *obliged* to sift the historical materials" itself, *Bruen*, 142 S. Ct. at 2150 (emphasis added), it "retains

the independent *power* to identify and apply the proper construction of governing law," *Kamen*, 500 U.S. at 99 (emphasis added); see Fed. R. Evid. 201 advisory committee's note ("In determining the content or applicability of a rule of domestic law, the judge . . . may make an independent search for persuasive data or rest content with what he has or what the parties present." (citation omitted)).   In *Bruen* itself, the Supreme Court evaluated a broad range of potential historical analogies proffered by the State of New York and its amici, without pausing to consider whether New York had invoked the same analogies in the lower courts.   *See* 142 S. Ct. at 2134-2156.

## II.   Section 922(n) satisfies *Bruen*'s historical inquiry.

Applying those principles should lead this Court to uphold Section 922(n).   We acknowledge that Section 922(n) lacks a "historical *twin*." *Bruen*, 142 S. Ct. at 2133.   We are unaware of historical English or American laws that specifically forbade criminal defendants from possessing or buying firearms while awaiting trial.   Section 922(n) does, however, have venerable "historical precursors."   *Ibid.*   Our society has traditionally recognized that the government is entitled to "secure the due attendance of the party accused" at a criminal trial.   *Ex parte Milburn*, 9 Pet. 704, 710 (1835) (Story, J.).   It has also traditionally recognized that the government is entitled to preserve "the safety of the people" from offenders who are still awaiting trial.   Anthony Highmore, *A Digest of the Doctrine of Bail in Civil and Criminal Cases* vii (1783).   The government has accordingly long

subjected criminal defendants to temporary restrictions on their liberty—including restrictions that affect their ability to keep and bear arms—in order to ensure their attendance at trial and to avert crime in the meantime.

Three of those traditional restrictions are pertinent here. First, in the Founding era, criminal defendants who were indicted on serious charges were ordinarily subject to detention without bail. Second, even defendants who were released on bail were subject to significant restrictions on their liberty—restrictions far more onerous than those imposed by Section 922(n). Third, criminal suspects have long been divested of their arms upon arrest. Each of those practices provides a historical analogue to Section 922(n); all of them, taken together, make it plain that Section 922(n) is fully consistent with this Nation's history and tradition.

1. In the United States at the time of the Founding, persons indicted for serious crimes were usually subject to detention without bail. That effect resulted from the combination of two separate practices: (1) the imposition of the death penalty for serious crimes and (2) the denial of bail to defendants indicted on capital charges.

"[D]eath was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted); *see Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). At the federal level, the First Congress imposed capital punishment for crimes such as "forgery of United States securities" and "'running away with a

ship or vessel, or any goods or merchandise to the value of fifty dollars.'" *Harmelin v. Michigan*, 501 U.S. 957, 980-981 (1991) (opinion of Scalia, J.) (brackets and citation omitted).  And the States imposed capital punishment even for "nonviolent crimes such as forgery and horse theft." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

A founding-era capital defendant's entitlement to bail historically turned on the strength of the prosecution's evidence against him.  At the federal level, the First Congress granted criminal defendants an absolute right to bail in non-capital cases, but made bail discretionary "where the punishment may be death."  Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91.  Congress directed courts to "exercise their discretion" in light of the "evidence" against the defendant. *Ibid.*  Similarly, "every state that entered the Union after 1789, except West Virginia and Hawaii, guaranteed a right to bail in its original state constitution."  Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 351 (1982).  The provision was "with little variation expressed in the following language: 'All prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident or presumption great.'" *Id.* at 351.

In determining whether the evidence was sufficiently strong to justify denying bail, courts accorded great weight to the grand jury's indictment.  Chief Justice Marshall's decisions during Aaron Burr's trial for treason (a capital crime) illustrate that practice.  Chief Justice Marshall "admitted

[Burr] to bail" "before indictment," but "refused bail" "after indictment." Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876). At the bail hearing, Chief Justice Marshall "doubted extremely" whether he had the power to grant bail "after an indictment." 1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* 311 (1808). He rejected Burr's invitation to "go into testimony extrinsic to the indictment," stating that he "had never known a case . . . where such an examination had taken place." *Id.* at 312 (emphasis omitted); *cf. Kaley v. United States*, 571 U.S. 320, 328 (2014) ("We have found no 'authority for looking into and revising the judgment of the grand jury upon the evidence.'") (citation omitted).

Other courts followed Chief Justice Marshall's lead. For example:

- "Bail is never allowed in offences punishable by death, when the proof is evident or the presumption great . . . . [T]he finding of the Grand Jury [is] too great a presumption of the defendant's guilt to bail him. We recollect no case in which it was done. C.J. Marshall who, on the examination of Aaron Burr, had admitted him to bail, [agreed] that he was no longer entitled to that indulgence after the Grand Jury found the bill against him." *The Territory v. Benoit*, 1 Mart.(o.s.) 142 (Orleans Super. Ct. 1810).

- "When the grand jury find a bill for a capital offence, the party charged lies, from the finding alone, under such a violent suspicion of guilt, [that] the court will instantly commit him . . . [and will] not lend its ear to a motion for bail." *The Territory v. McFarlane*, 1 Mart.(o.s.) 216, 217 (Orleans Super. Ct. 1811).

- "The general rule is, not to admit to bail after bill found, in capital cases." *State v. Hill*, 1 Tread. 242, 246 (S.C. 1812) (opinion of Smith, J.).

- "[A]fter bill found, a Defendant is presumed to be guilty to most, if not all purposes, except that of a fair and impartial trial before a *petit* jury. This presumption is so strong, that in the case of a capital felony, the party cannot be let to bail." *State v. Mills*, 2 Dev. 420, 421-422 (N.C. 1830).

- "Chief Justice Marshall bailed Colonel Burr on a charge of high treason *before* he was indicted; but *after indictment* he refused to take bail . . . . [N]either he, nor the distinguished counsel of Colonel Burr, could find any reliable authority warranting the exercise of the power of bail under such circumstances." *People v. McLeod*, 3 Hill 635, 645 (N.Y. 1842).

- "[The law] declares that 'all persons shall be bailable, unless for capital offenses where the proof shall be evident or the presumption great.' It is contended that an indictment furnishes no such proof or presumption . . . . If the construction contended for by counsel be correct it is a little remarkable that no case can be found where a similar application has been successfully made." *Hight v. United States*, Morris 407, 412 (Iowa 1845).

- "[A]lthough the propriety of admitting to bail . . . [has been] entrusted to the sound discretion of Judges, . . . the fact that the Grand Jury have found a true bill of indictment for a capital offence, has generally been considered as affording a sufficiently strong presumption of the prisoner's guilt to preclude any further inquiry into the merits of the case." *State v. Merrick*, 10 La. Ann. 424, 428 (1855).

- "[A]n indictment for a capital offense does of itself furnish a presumption of guilt of the defendant too great to entitle him to bail . . . . [That rule] prevails in the Courts of nearly every State. It is also the rule of the Federal Courts." *People v. Tinder*, 19 Cal. 539, 543, 546 (1862) (Field, C.J.).

Some of the foregoing authorities leave open the possibility of granting bail in an exceptional case—say, where "the trial of the prisoner has been unreasonably delayed," *Tinder*, 19 Cal. at 540, or where "his continued confinement would endanger his life," *Merrick*, 10 La. Ann. at 428.

But they show that, in early America, a defendant indicted for a serious (and hence capital) crime would *ordinarily* be held without bail.

It should go without saying that pretrial detention without bail operates as a restriction on the right to keep and bear arms. "[I]ncarceration naturally entails the loss of a wide range of liberties—including the loss of access to weapons." *United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. 2023) (Ho, J., concurring), petition for cert. pending, No. 22-915 (filed Mar. 17, 2023); *see, e.g.*, Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("We may presume that persons confined in gaols awaiting trial on criminal charges were . . . debarred from the possession of arms.").

2.  Even a defendant who was released on bail remained subject to significant restrictions while awaiting trial.  A defendant seeking release on bail had to find "sureties"—that is, friends, neighbors, or other third parties who were willing to guarantee his attendance at trial and his good behavior in the meantime.  *See* 3 William Blackstone, *Commentaries on the Laws of England* 290 (1765).  Sureties were responsible for "monitoring" and "keeping track" of the defendant after release.  John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285, 1313 (2021).  Courts "look[ed] to their vigilance to secure the attendance and prevent the absconding of the [defendant]."  *United States v. Simmons*, 47 F. 575, 577 (C.C.S.D.N.Y. 1891).  Sureties were also often required to ensure that the defendant "ke[pt] the peace" until trial.  4

Blackstone 250.  If the sureties failed to fulfil their duties, they would forfeit a sum of money, over and above the sum forfeited by the defendant. *See* 3 *id.* at 280; 4 *id.* at 250.

To enable sureties to fulfill their functions, the common law granted them legal custody of the bailed defendant.  Lord Chief Justice Coke explained that the "word Baile" is "derived from the French word Bailer, which signifieth to deliver, because he that is Bailed, is as it were delivered into the hands and custody of those that are his Pledges and Sureties." Edward Coke, *A Little Treatise of Baile and Maineprize* 1 (2d ed. 1637).  Lord Chief Justice Hale agreed that "he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers." 2 Matthew Hale, *The History of the Pleas of the Crown* 124 (1736).  Blackstone defined bail as "a delivery, or bailment, of a person to his sureties, . . . he being supposed to continue in their friendly custody, instead of going to gaol."  3 Blackstone 290.  And the Supreme Court observed in the 19th century that a bailed defendant "is regarded as delivered to the custody of his sureties," whose "dominion is a continuance of the original imprisonment."  *Taylor v. Taintor*, 83 U.S. 366, 371 (1873).

As the defendant's legal custodians, the sureties enjoyed "unrestricted authority over [his] person."  Charles Petersdorff, *A Practical Treatise on the Law of Bail in Civil and Criminal Proceedings* 514 (1824).  "Whenever they ch[ose] to do so," they could terminate the defendant's release, "seize him," and "deliver him up" to the court.  *Taylor*, 83 U.S. at 371.  To that

end, they could "pursue him," "break and enter his house," "arrest him," and even "imprison him" until he could be surrendered. *Id.* at 371. They could also restrict his movement, say by forbidding him to "go beyond the limits of the State within which he is to answer." *Id.* at 372. A defendant's sureties were thus "gaolers of his own choosing." 2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 15, § 84, at 178 (6th ed. 1787). They had the defendant "on a string," and they could "pull the string whenever they please[d]." *Taylor*, 83 U.S. at 372 (citation omitted).

3. The final relevant historical precursor to Section 922(n) is the common law of arrest. The common law has long allowed the arresting officer to seize, among other things, a suspect's "weapons," lest the suspect use them to "effect an escape from custody." *Agnello v. United States*, 269 U.S. 20, 30 (1925). That power was "always recognized under English and American law" and was "uniformly maintained in many cases." *Weeks v. United States*, 232 U.S. 383, 392 (1914). In keeping with the common law, the Supreme Court's Fourth Amendment cases establish that, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762-763 (1969).

One 19th-century court cited that doctrine to illustrate the point that the right to keep and bear arms is not absolute. *See State v. Buzzard*, 4 Ark. 18, 21 (1842). The court observed that "[p]ersons accused of a crime,

upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned." *Ibid.* But it asked rhetorically, "[i]f the right to keep and bear arms be subject to no legal control or regulation whatever, . . . [b]y what legal right can a person accused of a crime be disarmed?" *Ibid.*

4. The historical practices discussed above—pretrial detention of capital defendants without bail, custodianship of the sureties after release on bail, and seizure of arms at the time of arrest—all strongly support the constitutionality of Section 922(n). Although Section 922(n) obviously differs from those earlier practices in some ways, it resembles them on the metrics that *Bruen* treated as pertinent in evaluating historical analogies.

To begin with, Section 922(n) and its historical precursors are all "comparably justified." *Bruen*, 142 S. Ct. at 2133. Pretrial detention, the powers of the sureties, and the seizure of arrestees' weapons all serve the government's interests in interests in "bringing the accused to trial" and in "preventing crime by arrestees." *United States v. Salerno*, 481 U.S. 739, 745, 750 (1987). Section 922(n) serves similar purposes. It reduces the risk that criminal defendants will use firearms to facilitate their flight, and it helps ensure that indicted criminal defendants do not use firearms to commit other crimes while awaiting trial.

The "burden[s]" imposed by Section 922(n) are also "comparable" in important ways to the burdens imposed by its historical precursors. *Bruen*, 142 S. Ct. at 2133. Like those precursors, Section 922(n) applies only to

14

those who have been accused of crimes, not to the public at large. And like those precursors, Section 922(n) imposes only a temporary restriction on the defendant's rights. It remains in force during the criminal proceeding, but ceases to operate once the case ends.

In other respects, Section 922(n) is significantly *less* burdensome than the restraints on criminal defendants' liberty accepted at the founding. Detention without bail involves the total denial of liberty, including the total denial of any ability to keep and bear arms. Release on bail traditionally involved subjection to the legal custody and "unrestricted authority" of the sureties. Petersdorff 514. And a criminal defendant who is arrested may be deprived of weapons that he already possesses. Section 922(n), in contrast, does not subject persons under felony indictment to a total denial of liberty, to the legal custody and unrestricted authority of third parties, or to the deprivation of arms that already belong to them. It just temporarily precludes them from receiving new firearms.

Section 922(n) is also narrower in scope than its historical counterparts. The rules governing sureties and arrest extended to all criminal cases—misdemeanors as well as felonies. Section 922(n), in contrast, extends only to "crime[s] punishable by imprisonment for a term exceeding one year." 18 U.S.C. 922(n). Such crimes are comparable in seriousness to the capital crimes of early America. *See Medina*, 913 F.3d at 158. As discussed above, those were the crimes that the founding generation

thought most clearly justified significant pretrial restrictions on liberty. *See* pp. 8-11, *supra*.

Finally, Section 922(n) incorporates more procedural safeguards than its historical forbears. Even before an indictment, an arresting officer can disarm a suspect, a surety can exercise custodial authority, and a magistrate can choose to deny bail. Section 922(n), in contrast, operates only after the grand jury returns an indictment. The grand jury's "ancient role" includes "protecting citizens against unfounded criminal prosecutions." *Branzburg v. Hayes*, 408 U.S. 665, 686-687 (1972). And the inclusion of the Grand Jury Clause in the Fifth Amendment "shows the high place [the grand jury] held [for the Framers] as an instrument of justice." *Costello v. United States*, 350 U.S. 359, 362 (1956).

Section 922(n) is thus "consistent with this Nation's historical tradition." *Bruen*, 142 S. Ct. at 2126. Put simply, the Framers accepted that the government had the greater power to lock up indicted defendants until they could be tried on serious charges; it follows that the government must also have the lesser power to release them on the condition that they do not obtain firearms.

5. Analogies to other constitutional rights confirm Section 922(n)'s constitutionality. *See Bruen*, 142 S. Ct. at at 2130 (considering analogies to the Establishment, Free Speech, and Confrontation Clauses); *id.* at 2132 (Free Speech Clause and Fourth Amendment); *id.* at 2156 (Free Exercise, Free Speech, and Confrontation Clauses). In a variety of other contexts,

it is accepted that the government may burden a constitutional right of a criminal defendant in order to ensure that the defendant attends trial or to prevent him from committing other crimes while awaiting trial.

For instance, the First Amendment protects the freedom of speech, yet released defendants may be required to "avoid all contact" with victims and potential witnesses.  18 U.S.C. 3142(c)(1)(B)(v).  The First Amendment also guarantees the freedom of association, yet defendants may be required to "abide by specified restrictions on personal associations."  18 U.S.C. 3142(c)(1)(B)(iv).  And the Constitution protects a right to travel, *see United States v. Guest*, 383 U.S. 745, 756-759 (1966), yet a defendant may be required to "abide by specified restrictions on . . . travel," 18 U.S.C. 3142(c)(1)(B)(iv).

Upholding Section 922(n) accordingly would not "treat the Second Amendment as "a second-class right."  *Bruen*, 142 S. Ct. 2156 (citation omitted).  It would instead subject the Second Amendment to the same "body of rules" as "the other Bill of Rights guarantees."  *Ibid.* (citation omitted).

## CONCLUSION

This Court should reverse the district court's order dismissing the defendant's indictment.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2023, I filed this brief through this Court's

electronic case-filing system, which will serve it on all registered counsel.

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney