# No. 22-50834

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOSE GOMEZ QUIROZ,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Supplemental Brief of Defendant-Appellee**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

TIMOTHY M. SHEPHERD
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

# Table of Contents

Table of Authorities............................................................................ ii

Arguments and Authorities ............................................................. 1

I.  *Bruen*'s historical analysis involves a question of law, and
    the burden is on the Government. ............................................. 2

II. The Government still fails to show that § 922(n) is
    consistent with the Nation's historical tradition of firearm
    regulation. ..................................................................................... 3

    A.  There is no evidence that criminal defendants were
        historically disarmed while on pretrial release. .................. 5

    B.  None of the Government's cited historical practices are
        relevantly similar analogues for § 922(n)............................ 9

        1.  Pretrial detention is not a historical analogue for
                § 922(n). ............................................................................ 9

        2.  Pretrial surety practices are not historical
                analogues for § 922(n). ................................................. 20

        3.  The practice of disarming a person while under
                arrest is not a historical analogue for § 922(n)............. 29

    C.  Restrictions on other constitutional rights are not
        properly considered under *Bruen* and are not historical
        analogues for § 922(n)....................................................... 32

Conclusion........................................................................................ 37

# Table of Authorities

## Cases

*Agnello v. United States,*
   269 U.S. 20 (1925) ................................................................. 29

*Bell v. Wolfish,*
   441 U.S. 520 (1979) ............................................................... 32

*Chimel v. California,*
   395 U.S. 752 (1969) ......................................................... 29, 30

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
   489 U.S. 189 (1989) ............................................................... 18

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................6, 30, 31, 36

*Ex parte Milburn,*
   34 U.S. (9 Pet.) 704 (1835) .................................................... 26

*Firearms Pol'y Coal., Inc. v. McCraw,*
   __F. Supp. 3d __, No. 4:21-cv-1245,
   2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ............................. 8

*Furman v. Georgia,*
   408 U.S. 238 (1972) ............................................................... 11

*Harmelin v. Michigan,*
   501 U.S. 957 (1991) ............................................................... 11

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) ..........................................10, 11, 36

*N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022)..........................................................*passim*

*Stack v. Boyle,*
   342 U.S. 1 (1951) ................................................................... 28

*State v. Buzzard,*
    4 Ark. 18 (1842) ..................................................... 30, 31

*Taylor v. Taintor,*
    83 U.S. 366 (1873) ................................................. 22, 23

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ........................................................ 12

*United States v. Laurent,*
    861 F. Supp. 2d 71 (E.D.N.Y. 2011) ........................... 26

*United States v. Miller,*
    307 U.S. 174 (1939) ...................................................... 7

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ............................... 3, 4, 36

*United States v. Rowson,*
    __ F. Supp. 3d __, No. 22-cr-310-PAE,
    2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ................. 35

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................... 34, 35

*United States v. Scott,*
    450 F.3d 863 (9th Cir. 2006) ...................................... 18

*Weeks v. United States,*
    232 U.S. 383 (1914) ..................................................... 29

*Young v. Hawaii,*
    896 F.3d 1044 (9th Cir. 2018), *on reh'g en banc,*
    992 F.3d 765 (9th Cir. 2021), *cert. granted, judgment vacated,*
    142 S. Ct. 2895 (2022) ............................................... 30

## Constitutional Provisions

U.S. Const. amend. I ............................................... 33, 36

U.S. Const. amend. II .......................................... *passim*

U.S. Const. amend. IV ............................................................ 29, 36

U.S. Const. amend. VIII ............................................................. 34

N.H. Const., Pt. I, Art. XVIII (1784)............................................ 11

**Statutes**

18 U.S.C. § 922(n) ................................................... *passim*

Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792) ......... 7

Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917)................. 7

Act of Feb. 15, 1791, ch. 74, 5 N.H. Laws 687–88
    (H.H. Metcalf 1916) .................................................... 21

Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73
    (J. Mitchell & H. Flanders comm'rs 1904).................................. 7

Bail Reform Act, Pub. L. No. 98-473, 98 Stat. 1976
    (1984) ........................................................ 24, 28, 33

Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790) .............................. 10

District of Columbia Court Reform and Criminal Procedures
    Act of 1970, Pub.L. No. 91-358, 84 Stat. 531 (1970)................. 28

Judiciary Act, 1 Stat. 73 (1789) .................................................... 12

Second Militia Act, 1 Stat. 271 (May 8, 1792)................................ 6

Stephen P. Halbrook, THE RIGHT TO BEAR ARMS (2021) .................. 8

**Rule**

Fed. R. Crim. P. 5(a)(1)(A) ............................................................ 31

**Other Authorities**

Adam Winkler, GUNFIGHT (2013) .................................................... 8

Alexa Van Brunt & Locke E. Bowman, *Toward a Just Model of Pretrial Release: A History of Bail Reform and a Prescription for What's Next*,
108 J. Crim. L. & Criminology 701, (2018) ...............21, 22, 24, 28

Anthony Highmore, A DIGEST OF THE DOCTRINE OF BAIL IN CIVIL AND CRIMINAL CASES (1733) ............................................. 27

Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act*,
97 Yale L.J. 320 (1987) ................................................. 24

Caleb Foote, *The Coming Constitutional Crisis in Bail: I*,
113 U. Pa. L. Rev. 959 (1965) ............................... 14, 15

Charles Petersdorff, A PRACTICAL TREATISE ON THE LAW OF BAIL IN CIVIL AND CRIMINAL PROCEEDINGS (1824) ............................ 23

Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*,
82 Colum. L. Rev. 328 (1982).........................................11, 13, 14

Dr. Robert Schehr, *Standard of Proof, Presumption of Innocence, and Plea Bargaining: How Wrongful Conviction Data Exposes Inadequate Pre-Trial Criminal Procedure*,
54 Cal. W. L. Rev. 51 (2017).......................................... 15

Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA (1802).................................. 7, 21

John D. Bessler, CRUEL & UNUSUAL (2012)................................... 11

John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285 (2021).................. 21

John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*,
76 J. Crim. L. & Criminology 1 (1985).......................24, 25, 27, 28

Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994)..................................... 6

Laura I. Appleman, *Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment*, 69 Wash. & Lee L. Rev. 1297 (2012)........................................... 23

Laurence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Va. L. Rev. 371 (1970) ............................................................ 18

Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837 (2016)............. 19, 26, 28

Lawrence M. Friedman, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1993) ........................................................... 11

Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909 (2013)..... 13, 21, 23

Michael Harwin, *Detaining for Danger Under the Bail Reform Act of 1984: Paradoxes of Procedure and Proof*, 35 Ariz. L. Rev. 1091 (1993)......................................................... 28

Michael Waldman, THE SECOND AMENDMENT: A BIOGRAPHY (2014) ................................................................ 31

Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2022) ........................................................... 6, 7

North Carolina Higher Court Minutes 1709–1723, *reprinted in* 5 The Colonial Records of North Carolina (Price ed. 1974) ........................................................... 14

Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475 (1976–77) .....................*passim*

Records of the Court of Assistants, Colony of the Massachusetts Bay 1630–1640 ........................................................... 14

Records of the Courts of Quarter Sessions and Common Pleas of Bucks County 1684–1700 (1943 ed.)...................................... 14

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245 (2021) .............................. 7

Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1 (1876) ................................................. 15, 16, 19

Thomas Herty, DIGEST OF THE LAWS OF MARYLAND (1799) ............. 7

Timothy R. Schnacke, *A Brief History of Bail*, Judges' J. (Summer 2018) ......................................................... 13

Timothy R. Schnacke, Michael R. Jones, & Claire M.B. Brooker, *The History of Bail and Pretrial Release*, Pretrial Justice Institute (Sept. 23, 2010) ......................................................... 24

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1765) ...................................................................... 27

William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977) ...........................................13, 14, 15, 22

William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511 (2016) ......................................................... 16

## Arguments and Authorities

In its supplemental brief, the Government still fails to marshal historical evidence showing that 18 U.S.C. § 922(n) comports with the Second Amendment under the framework outlined in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Court requested additional briefing regarding evidence that people's firearm rights were historically impaired pretrial and, additionally, whether *Bruen*'s historical inquiry is a question of law or fact. On the latter point, the parties agree that it is a question of law. And, after consulting with the Solicitor General's Office, the Government concedes that historical laws did not forbid criminal defendants from possessing or receiving firearms while awaiting trial. But the Government purports to supplement its historical evidence of analogous restrictions by: (1) rehashing unpersuasive arguments about pretrial detention; (2) citing to a different—though no more compelling—type of surety practice; (3) for the first time, noting the unremarkable fact that criminal suspects are divested of their guns upon arrest; and (4) comparing § 922(n) to unrelated deprivations of other constitutional rights. Each argument is a species of a single flawed theory: because criminal defendants could histor-

1

ically be subjected to other deprivations during the criminal process, firearms restrictions must be permissible for all people under indictment.

The Government's reasoning is irreconcilable with the Second Amendment framework articulated in *Bruen*. The Government relies on practices that are unrelated to the Nation's historical tradition of *firearm* regulation, misunderstands its proffered practices, and ignores that the practices were historically motivated by different purposes than § 922(n). The cited practices are not "relevantly similar" to § 922(n) because they do not impose a comparable burden on Second Amendment rights and are not comparably justified. The Government's evidence simply confirms that criminal defendants could historically be detained or released on bail or suretyship—not that they were prohibited from receiving firearms.

This Court should affirm the district court's dismissal of the indictment.

## I. *Bruen*'s historical analysis involves a question of law, and the burden is on the Government.

The Court asked whether analysis of historical precedents, as required by *Bruen*, is a question of law or a question of fact. Quiroz agrees with the Government that the Supreme Court was clear that

*Bruen*'s text-and-history test involves a question of law. *See* Gov't Supp. Br. 3–6. The Supreme Court was equally clear that the Government bears the burden of showing historical support for § 922(n), and this Court is under no obligation to conduct its own historical inquiry to aid the Government. *See Bruen*, 142 S. Ct. at 2136 n.6, 2150. The Court should rely on the historical evidence identified by the parties in this case, which reflects the available evidence and is even more robust than that developed in other cases resolved by the Court. *Cf. United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).

## II. The Government still fails to show that § 922(n) is consistent with the Nation's historical tradition of firearm regulation.

The Court's remaining questions directed the Government to identify any historical examples of laws or practices restricting those released before trial from obtaining firearms or analogues for such practices. The Government did not identify any such evidence and has failed to meet its burden under *Bruen*. *See* 142 S. Ct. at 2126.

Under *Bruen*, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces

a comparable tradition of regulation." *Id.* at 2131–32. The historical evidence should show a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic," with greatest weight given to founding-era laws. *Id.* at 2136–37.

The Government can do so through a "well-established and representative historical analogue," which is compared to the challenged law based on *how* and *why* they burden the right to armed self-defense. *Id.* at 2133. Whether "modern and historical regulations impose a comparable burden on the right *of armed self-defense* and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (emphasis added). "The core question is whether the challenged law and proffered analogue are relevantly similar." *Rahimi*, 61 F.4th at 454. Courts "should not uphold every modern law that remotely resembles a historical analogue," though analogical reasoning also does not require a "historical twin." *Bruen*, 142 S. Ct. at 2133. But when a challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence

that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131.

The Government has failed to meet its burden of showing that § 922(n) is "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126. *First*, the Government concedes that there is no historical tradition of disarming criminal defendants who have been released pretrial. *Second*, none of the three categories of historical practices the Government cites—pretrial detention for capital crimes, pretrial release sureties, or temporarily disarming those under arrest—serve as relevantly similar analogues for § 922(n). *Third*, other permissible constitutional deprivations for those in the criminal justice system provide no support for infringing the Second Amendment like § 922(n).

## A. There is no evidence that criminal defendants were historically disarmed while on pretrial release.

The Government concedes that there is no specific historical tradition of restricting firearm receipt or possession by criminal defendants who have been released pretrial. Gov't Supp Br. 6. Even though criminal defendants have been routinely released pretrial with bail since before the founding, firearm restrictions on such people did not arise until the 20th century. *See infra* Section II.B.1,

B.2. The absence of such laws or practices from the founding is relevant evidence that § 922(n) is unconstitutional. *See Bruen*, 142 S. Ct. at 2131.

The lack of historical firearm restrictions on indictees is not surprising. At the founding, the *right* to bear arms was also deeply connected to the historical *duty* to bear arms. *See* Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 1–10, 138–40 (1994); Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 219–22 (3d ed. 2022) [Johnson]. Indeed, the Second Amendment codified an individual right, but the prefatory clause clarifies that the purpose of that right was to "prevent elimination of the militia." *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). This duty to bear arms was reflected in federal and state laws *requiring* most citizens to keep firearms, as part of militia service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792).[1] These laws "exempted" certain

---

[1] Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the

classes of people, but not indictees. *Id.* § 2, 1 Stat. 272; *cf.* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) (finding no evidence that those with criminal convictions were excluded from militia duties of firearm ownership). The colonies generally required even indentured servants—often convicted criminals—to be armed for militia service. *See* Johnson 185, 191–92. Countless colonial laws similarly required citizens to keep and carry firearms to and from church, as part of patrol duties, to aid against attacks by Native Americans, or otherwise to defend themselves and their community. *See id.* at

---

age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Second Militia Act, § 1. The Act further required that "every citizen so enrolled … shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and other related items like ammunition. *Id.* Similar contemporaneous state militia statutes also did not to exempt felons or those under indictment. *See, e.g.*, Thomas Herty, DIGEST OF THE LAWS OF MARYLAND 367–73 (1799); Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917); Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792); Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73 (J. Mitchell & H. Flanders comm'rs 1904); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 350 (1802); *cf. United States v. Miller*, 307 U.S. 174, 178–82 (1939) (discussing militia laws); Johnson 177–89 (in depth discussion about arms requirements for militia service in each colony).

189–91; Stephen P. Halbrook, THE RIGHT TO BEAR ARMS 131–35, 191–98 (2021).

It follows that, while "the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, __F. Supp. 3d __, No. 4:21-cv-1245-MTP, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022). Disarming indictees would have made little sense to the founders, because it would have effectively relieved them of a civic duty. Despite passing myriad other gun restrictions—early versions of gun registrations, safe storage laws, restrictions on types of firearms, and disarmament of Natives Americans, enslaved persons, and religious minorities—the founders never proposed barring indictees from receiving guns or disarming them. *See* Adam Winkler, GUNFIGHT 113–18, 286–87 (2013) (detailing Revolutionary era gun laws and noting absence of restrictions like those from the 20th century). Not only were indictees not disarmed at the founding; they were likely required to own firearms.

## B. None of the Government's cited historical practices are relevantly similar analogues for § 922(n).

Recognizing the absence of founding-era laws prohibiting indictees from possessing or receiving guns, the Government offers three categories of historical practices as possible analogues for § 922(n): (1) pretrial detention for capital crimes, (2) pretrial release sureties, and (3) firearm seizure incident to arrest. Each argument fails to satisfy the *Bruen* standard.

### 1. Pretrial detention is not a historical analogue for § 922(n).

The Government misplaces reliance on pretrial detention as an analogue for § 922(n). Gov't Supp. Br. 7–11. Pretrial detention is not a historical *firearm* regulation, so it is not even relevant to the *Bruen* analysis. In any event, the Government's argument is based on the flawed premises that most crimes were capital offenses at the founding and that criminal defendants were rarely released. Both are incorrect. Furthermore, pretrial detention does not burden Second Amendment rights in the same way as § 922(n).

### *a. Most crimes were not capital offenses at the founding.*

The Government's position that most indictees were detained at the founding rests entirely on its significant overstatement of the

9

availability of capital punishment and, consequently, the prevalence of detention without bail at the time. While the Government vaguely references the ubiquity of capital crimes at common law, it offers few actual statutes to support the position. The First Congress, for example, only recognized a select few felonies as capital. *See* Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790). These were limited to treason, murder, certain piracy and felony on the high seas offenses, prison break for capital offenders, and counterfeiting. *Id.* Conversely, the Crimes Act enumerated far more crimes that were not capital, including: manslaughter, misprision of treason, accessory, interference with diplomatic immunity, passport obstruction, mayhem, perjury, obstruction, judicial bribery, and property crimes such as larceny. *Id.* Virtually all these crimes were, like those subject to § 922(n), punishable by more than a year in prison, illustrating that they were considered "serious" but were nevertheless not capital. *Id.*

The Government's theory is more consistent with pre-colonial English law, but "during the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting). "Capital punishment was not as common a penalty in

the American colonies" as in England, and the colonies recognized "far fewer" capital crimes. *See Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring). The death penalty was used sparingly in the colonies and, by the time the Constitution was ratified, the term felony was no longer "strongly connected with capital punishment[.]" *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (citing Lawrence M. Friedman, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993); John D. Bessler, CRUEL & UNUSUAL 52–53 (2012)).

At the founding, states did not treat most crimes as capital. New Hampshire, for example, explained in its constitution that "no wise legislature … will afix the same punishment to the crime of theft, forgery and the like, which they do to those of murder and treason[.]" *Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (citing N.H. Const., Pt. I, Art. XVIII (1784)). Massachusetts excluded crimes like arson, burglary, and robbery from its list of capital offenses, even as early as the 17th century. *See* Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 349 (1982) [Verrilli]. Indeed, the very offense for which Quiroz was indicted in this case, burglary, was not generally capital at the time of the founding. *See Kanter*,

919 F.3d at 459 (Barrett, J., dissenting) ("property crimes including variations on theft, burglary, and robbery were, on the whole, not capital") (cleaned up).

The Government is simply wrong that the body of capital offenses from the founding serve as a comparable proxy for all felonies today. Many laws that were misdemeanors or non-existent at common law are now felonies, and the distinction between misdemeanors and felonies while once "broad and deep," is today "minor and often arbitrary." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). Assuredly, more crimes were capital at the founding than today. But most were not. And most modern crimes that implicate § 922(n) were not capital at the founding.

### b. *Criminal defendants were frequently released pretrial at the founding.*

Because the Government misunderstands the prevalence of capital punishment at the founding, it misconstrues how frequently criminal defendants were detained without bail. Federal offenses that were not capital required bail. *See, e.g.*, Judiciary Act, 1 Stat. 73, Sec. 33 (1789). Indeed, the Government acknowledges that bail was available to those accused of felonies and that almost every state entering the union adopted an explicit right to bail, a right

that would be unnecessary if, as the Government posits, virtually every offense was capital and every offender detained. *See* Gov't Supp. Br. 8 (citing Verrilli 351–52), 15.

Many of those indicted for felonies today, and thus subject to § 922(n), would not have been detained without bail at the founding. Individuals charged with felonies in the 18th century were routinely released from custody pending trial. *See* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 78–86 (1977) [Duker]; Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 925–30 (2013) [Hegreness]; *cf.* Timothy R. Schnacke, *A Brief History of Bail*, Judges' J., 6 (Summer 2018) (explaining the American tradition of liberally releasing offenders pretrial). In Pennsylvania, for example, even as punishment grew harsher in the 18th century, bail "continued to be granted routinely" for most crimes including felony assault, trespass, robbery, burglary, sodomy, and even capital offenses and, "[i]ndeed, there is not an offense charged before the [quarter sessions] court during this period for which someone was not granted bail." Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475, 497 (1976–77) [Lermack]. The American colonies distinguished themselves from the less liberal

English bail tradition by disfavoring discretionary bail in favor of compulsory bail for non-capital crimes. *See* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 975–79 (1965) [Foote].

Even those accused of capital crimes were often released on bail. Scholars have identified "frequent instances of capital defendants, even those arrested for murder or treason, being released on bail before trial." Verrilli at 349 (citing 2 Records of the Court of Assistants, Colony of the Massachusetts Bay 1630–1640, 11, 60; Records of the Courts of Quarter Sessions and Common Pleas of Bucks County 1684–1700, 20 (1943 ed.); North Carolina Higher Court Minutes 1709–1723, *reprinted in* 5 The Colonial Records of North Carolina 28 (Price ed. 1974)); Duker at 102 (identifying instances shortly after the founding of bail granted for those charged with treason and piracy); *cf.* Lermack at 495–96 (explaining bail was sometimes granted in even the most serious cases in 18th century Pennsylvania, though not routinely granted as a matter of right). In 17th century Massachusetts, "it was routine to release pending trial defendants charged with such serious and sometimes capital offenses as: burglary, theft, aggravated assault and battery, at-

tempted rape, bigamy, fornication and bastardy …, arson, infanticide, manslaughter, and blasphemy." Foote at 981. Similar release practices were recorded in 17th century New York for those charged with sedition, riot, treason, theft, and murder. *Id*. at 981–82.

The Government asserts, however, that, once *indicted*, capital defendants were generally unbailable by the 19th century. *See* Gov't Supp. Br. 8–11. Though evidence suggests this was a common practice, it was not uniform, as acknowledged in the Government's cited authorities. *See* Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876) [Davidson] (noting many courts followed this English practice, but describing practice to hold a bail hearing after indictment in the 19th century in states like Indiana, Mississippi, and Ohio). Indeed, the authorities cited above identify several founding-era capital defendants who were released after being charged with or indicted for a crime. *See, e.g.*, Duker at 102.

Moreover, the Government ignores that founding-era indictments generally required far more proof and certainty of guilt than modern indictments. *See* Dr. Robert Schehr, *Standard of Proof, Presumption of Innocence, and Plea Bargaining: How Wrongful Conviction Data Exposes Inadequate Pre-Trial Criminal Procedure*, 54 Cal. W. L. Rev. 51, 72–75 (2017) (noting American grand juries at

the founding and up to the early 20th century generally applied a stricter historical standard of proof closer to the trial burden, rather than the modern probable cause standard); William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511, 519–21, 530–33 (2016) (explaining the judicial view that an indictment required more than probable cause "dominated" around the founding). Thus, historically, courts could more readily rely on an indictment as significant evidence of a person's guilt, so as to support detention. *See* Davidson at 1–3. Regardless of whether an indictment for a capital offense generally foreclosed pretrial release, such indictments are not meaningful proxies for modern indictments and, as discussed above, most modern crimes were not capital at the founding.

Even if it were appropriate to consider laws other than firearm restrictions under *Bruen*, the Government fails to show any actual historical evidence, let alone a widespread tradition, to support its implicit theory that the broad category of defendants subject to § 922(n) would have been automatically detained at the founding, and thereby disarmed. Rather it uses ill-defined terms like "serious crime" or "felony" interchangeably with "capital" and rests on vague inferences and assumptions about the historical prevalence of capital punishment and detention. The reasoning is irreconcilable with

the framework described, and applied, in *Bruen*. *See* 142 S. Ct. at 2131–35.

> c. *Historical pretrial detention practices are not relevantly similar to § 922(n).*

The Government's pretrial detention argument is not only ahistorical, it also fails to satisfy *Bruen*'s "relevantly similar" standard.

The Government ignores *Bruen*'s directive to compare challenged statutes to the historical tradition of *firearm* regulation. *Id*. at 2130. The *Bruen* Court considered only firearms restrictions in its historical analysis, *id*. at 2138–53, and none of the proposed historical analogues were as tenuously related to the challenged statute as those offered here by the Government.[2]

Pretrial detention and § 922(n) do not comparably *burden* the right of armed self-defense. *See id*. at 2133. Section 922(n) affects those who have been *released*, not those who have been *detained* pretrial. The need for armed self-defense is not the same while in

---

[2] *Bruen* rejected as historical analogues for the challenged may-issue licensing regime: English and colonial "going armed" and "going armed offensively" laws, English proclamations decrying the proliferation of handguns, laws restricting concealed carry, surety statutes, and even a law forbidding public carry without reasonable grounds to fear an attack. *See* 142 S. Ct. at 2138–53.

custody, where the State bears a duty to protect detainees. *See* NAAGA Amicus Br. 18 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). And, historically, only the narrow category of capital offenders was likely to be detained, while indictees for any state or federal felony, specifically those adjudicated not to pose a flight risk or danger, are subject to § 922(n). Even if detained populations were not historically distinguishable from released populations, it does not follow that the power to detain implies the power to impair all constitutional rights. *See United States v. Scott*, 450 F.3d 863, 866 n.5 (9th Cir. 2006) ("The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions").

Section 922(n) and pretrial detention are also not comparably *justified. See Bruen*, 142 S. Ct. at 2133. Even assuming pretrial detention and § 922(n) serve the same safety purposes,[3] the safety

---

[3] The Government presumes that pretrial detention has always been tied to concerns about community safety, but the historical evidence is not so clear. Many scholars recognize that, until the 20th century, pretrial detention primarily served to ensure a defendant's appearance in

justification for § 922(n) is dubious and overly broad as compared to justifications for detaining defendants. Section 922(n) imposes criminal sanctions on even those accused of relatively minor and non-violent crimes, without a hearing or judicial determination of dangerousness. To the contrary, the statute impacts those who have been *released* pretrial, which means they have *not* been found to be dangerous at a bond hearing.  Section 922(n) is entirely inconsistent with the historical practice of detaining those accused of capital crimes.

---

court. *See* Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837, 845–50 (2016) [Gouldin]; Laurence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Va. L. Rev. 371 (1970); Davidson at 2–3 (noting bail was rarely granted in capital cases where the evidence was strong "because no pecuniary consideration would induce a party, charged with a capital crime, who felt that there was a strong probability of conviction, to appear for trial").

2. <u>Pretrial surety practices are not historical analogues for § 922(n).</u>

The Government next argues that historical practices of pretrial release, by bail or surety, provide support for § 922(n).[4] Gov't Supp. Br. 11–14. Those practices did not restrict the possession or receipt of firearms. They are not *firearm* regulations, and they differ in purpose from § 922(n), focusing primarily on the appearance of the defendant rather than any potential danger to the community. The mere use of bail or surety as part of pretrial release is in no way "relevantly similar" to § 922(n) under *Bruen*.

---

[4] This pretrial surety practice is unrelated to the Government's previously cited "surety of the peace" laws, which address credible concerns about *future* misconduct. *Compare* Gov't Br. 42–47 *with* Gov't Supp. Br. 11–14. Bail or surety in the criminal process provided pretrial release for conduct already alleged to have been committed and secured the person's attendance in court. *See, e.g.*, Lermack at 493–99. Surety of the peace or peace bonds only addressed credible fears that a person might engage in misconduct of some kind in the future. *Id.* at 502–04; *cf.* Quiroz Br. 44–51 (addressing the Government's previous "surety of the peace" argument). Both practices used bail or a surety, but the purposes motivating them was very different. Neither is relevantly similar to § 922(n).

### a. Criminal defendants were historically released pretrial by bail or surety, not with nonfinancial conditions.

Those accused of a crime could historically be released pretrial upon payment of bail or securing a surety. *See* John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285, 1299–1303 (2021); Hegreness at 916–31. In the 17th and 18th centuries, the American colonies favored sureties, with payment only upon default, rather than prepayment of bail. *See* Alexa Van Brunt & Locke E. Bowman, *Toward a Just Model of Pretrial Release: A History of Bail Reform and a Prescription for What's Next*, 108 J. Crim. L. & Criminology 701, 713–714 (2018) [Van Brunt]. The bail and surety practices were not limited to criminal defendants, and witnesses or parties to civil cases in early America were also often required to post bail or obtain a surety. *See, e.g.*, Lermack at 489–93, 499–502; Act of Feb. 15, 1791, ch. 74, 5 N.H. Laws 687–88 (H.H. Metcalf 1916); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA at 296 (1802) (describing Act of Feb. 16, 1799, § 13). But the purpose of bail or surety through English and early American law was largely the same: to ensure a person's appearance in court. *See, e.g.*, Hegreness at 939–40.

The Government appears to infer from the custodial authority granted to sureties, that they must have been permitted to impose conditions of release or other restrictions on defendants. *See* Gov't Supp. Br. 12. The Government asserts that "even defendants who were released on bail were subject to significant restrictions on their liberty—restrictions far more onerous than those imposed by Section 922(n)." Gov't Supp. Br. 7; *see also* Gov't Supp. Br. 11. But the position is unsupported. The Government fails to cite to any specific statutes or laws and relies instead on generalized descriptions of surety practices across hundreds of years. The Government never identifies *any* purported restriction, much less a *firearm restriction*. Moreover, all but one of the Government's cites for this proposition involve English law. *See* Gov't Supp. Br. 12. *Bruen* requires the Government to identify specific laws, with those from the American founding providing the best evidence. 142 S. Ct. at 2132–34. The Government has not done so.

The Government's conclusion is also inconsistent with historical evidence. The surety's authority related solely to detaining a person and returning him or her to jail. *See, e.g.*, *Taylor v. Taintor*, 83 U.S. 366, 371 (1873); Lermack at 506; Duker at 70–77; Van Brunt at 714; *see also* Charles Petersdorff, A PRACTICAL TREATISE ON THE LAW OF

BAIL IN CIVIL AND CRIMINAL PROCEEDINGS 514–18 (1824) (discussing English tradition). Indeed, the case the Government cites confirms that the "rights of the bail in civil and criminal cases are the same," and thus conditions were specifically related to appearance in court. *Taylor*, 83 U.S. at 372. Pretrial release varied only in the amount of bail or the number of sureties required, not the existence of additional conditions of release.[5] *See* Lermack at 504. The surety role was analogous to that of a bail bondsman, not a modern pretrial officer or court. *Cf.* Hegreness at 939; Laura I. Appleman, *Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment*, 69 Wash. & Lee L. Rev. 1297, 1329 (2012) ("the personal surety system eventually morphed into the commercial bondsman system"); Betsy Kushlan Wanger, *Limiting Preventive*

---

[5] The only example of a "condition" the Government offers is its general assertion citing to a 19th century case that sureties could "restrict [a person's] movement, say by forbidding him to 'go beyond the limits of the State within which he is to answer.'" Gov't Supp. Br. 13 (quoting *Taylor*, 83 U.S. at 372). Even assuming this was a typical practice at the founding, that power relates to ensuring the defendant's appearance and preventing flight—not barring him or her from possessing or receiving firearms.

*Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act*, 97 Yale L.J. 320, 324 (1987) (same).

Non-monetary conditions of pretrial release are a late 20th century innovation that accompanied a shifting focus towards community safety rather than court appearance. *See* John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1, 12 (1985) [Goldkamp] (describing conditional release provisions as products of the bail reform movement of the 1960s and 70s); Van Brunt at 759 n.313 (discussing pretrial services model of non-monetary conditions as a component of third-wave bail reform efforts); *cf.* Timothy R. Schnacke, Michael R. Jones, & Claire M.B. Brooker, *The History of Bail and Pretrial Release*, Pretrial Justice Institute, at 17 (Sept. 23, 2010) (explaining that the Bail Reform Act of 1984 arose in part from frustrations with the prior inability of a judge to impose release conditions related to the risk to the community).

> *b. Pretrial sureties are not relevantly similar to § 922(n).*

Historical practices of pretrial release by bail or surety are not "relevantly similar" to § 922(n). Much like detention, sureties are not firearm restrictions, so they are not a proper analogue under *Bruen. See supra* Section II.B.1. And, unlike detention, there is no

24

evidence that pretrial release in any way impaired firearm rights historically.

The Government does not assert that surety practices imposed any *burden on the right to bear arms*, as required to show a "relevantly similar" historical analogue for Second Amendment purposes.[6] *See Bruen*, 142 S. Ct. at 2132–33. Thus, "how" surety practices impacted those rights bears no resemblance to § 922(n). *See* Goldkamp at 63. The only historically available restrictions for pretrial defendants were bail, surety, and detention. Specific pretrial firearms restrictions did not arise until the late 20th century. *See id.* (survey of release conditions available by state found in 1985 only six states and the federal government expressly provided for firearms prohibitions as a condition of pretrial release). Pretrial release historically had no meaningful impact on a person's Second Amendment rights. Historical bail and surety practices share virtually no features with § 922(n).

---

[6] The Government addresses the "relevantly similar" analyses for each of its historical "precursors" together. Gov't Supp. Br. 14–16. In this section, it consistently compares § 922(n) to the burdens of these "precursors" on general liberties, with little reference to the specific burden on Second Amendment rights as required by *Bruen*.

As for whether the practice is comparably *justified*, the Government also mistakes the purposes of bail and surety practices and how they compare to the purposes behind § 922(n). It asserts that "powers of the sureties" and § 922(n) both serve the purposes of ensuring a person's appearance at trial and preventing crime by them while awaiting trial. Gov't Supp. Br. 14. The Government cites to nothing for its theory that § 922(n)'s passage was motivated by concerns about flight risk, as opposed to purely community safety purposes. *See United States v. Laurent*, 861 F. Supp. 2d 71, 82–84 (E.D.N.Y. 2011) (discussing safety goals motivating passage of § 922(n)).

And, conversely, there is little evidence to suggest that pretrial bail or surety practices around the founding were motivated by community safety interests. Rather, the purpose of bail and sureties around the founding was to ensure a person's appearance in court. *See, e.g.*, *Ex parte Milburn*, 34 U.S. (9 Pet.) 704, 710 (1835); Lermack at 486–93, 499–502; Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837, 845–47 (2016)

[Gouldin]; Goldkamp at 15.[7] This is particularly clear because sureties and bail were used for witnesses and parties in civil cases as well. *See* Lermack at 489–93, 499–502. Even into the early 20th

---

[7] The Government's primary argument that pretrial surety practices were motivated by public safety stems from its conflation of the two distinct concepts of pretrial surety and surety of the peace or peace bonds. *See* Gov't Supp. Br. 11–12. The two practices are largely unrelated. *See supra* n.4. But the Government asserts: "[s]ureties were also often required to ensure that the defendant 'kept the peace' until trial." Gov't Supp. Br. 11–12 (citing 4 William Blackstone 250, COMMENTARIES ON THE LAWS OF ENGLAND (1765)). The phrase "until trial," does not appear in the cited Blackstone section. Rather, Blackstone discusses this surety practice in a section on the "Means of Preventing Offenses," explaining that a surety of the peace is intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime is intended or likely to happen …" 4 Blackstone ch. 18. Blackstone discusses pretrial sureties separately, in a chapter on "Commitment and Bail," which says nothing about "keeping the peace," but clarifies that the purpose of bail in the criminal context is to ensure appearance of the defendant. 4 Blackstone ch. 22.

The Government elsewhere cites to another 18th century English treatise for a similar position. *See* Gov't Supp. Br. 6 (citing Anthony Highmore, A DIGEST OF THE DOCTRINE OF BAIL IN CIVIL AND CRIMINAL CASES vii (1733) [Highmore]). The Government misstates the relevant language from the treatise, which makes clear that bail was used in both civil and criminal contexts, but the need to ensure one's *appearance* in the criminal context was more important because of generalized concerns about public safety in the criminal context. Highmore at vi–vii. Indeed, there is no other reference in the treatise to public safety bearing any relationship to either civil or criminal bail practices.

century, the sole recognized function of bail was securing the appearance of the accused. *See Stack v. Boyle*, 342 U.S. 1, 4–5 (1951); Van Brunt at 731–32. Indeed, the use of detention to address danger to the community was a novel feature of laws like the District of Columbia Court Reform and Criminal Procedures Act of 1970 and the Bail Reform Act of 1984, which departed from the traditional limitation of bail to prevent flight risk. *See generally* Michael Harwin, *Detaining for Danger Under the Bail Reform Act of 1984: Paradoxes of Procedure and Proof*, 35 Ariz. L. Rev. 1091 (1993); *see also* Goldkamp at 4–6, 15–16; Van Brunt at 732–33. Historical financial conditions like bail or a surety generally related to concerns of flight risk, while non-financial conditions, like those on firearms, address the purely modern concerns of community risk. *See* Gouldin at 895–97 (comparing conditions that manage flight risk to those that mitigate danger).

The Government fails to show that pretrial surety practices are "relevantly similar" to § 922(n) on either "how" or "why" they burden Second Amendment rights. *See Bruen*, 142 S. Ct. at 2133.

28

3. <u>The practice of disarming a person while under arrest is not a historical analogue for § 922(n).</u>

The Government next argues that the "common law of arrest" is a "historical precursor to Section 922(n) [.]" Gov't Supp. Br. 13–14. But the practice of temporarily disarming individuals who are actively under arrest is not "relevantly similar" to § 922(n).

The Fourth Amendment cases cited by the Government rest on an obvious premise: when a person is arrested and has a firearm on him or her, police do not permit that person to keep that firearm while in custody, processing, and jail. *See Agnello v. United States*, 269 U.S. 20, 30 (1925); *Chimel v. California*, 395 U.S. 752, 762–63 (1969).[8] The cases clarify that searching for weapons incident to arrest prevents the use of the weapon to resist arrest or escape from custody. *See Chimel*, 395 U.S. at 762–63. The cases do not address the Second Amendment. Nor are they the type of specific historical evidence required by *Bruen*. None of the cases suggest that arrestees have historically been more broadly deprived of firearms in

_____

[8] The Government also cites *Weeks v. United States*, 232 U.S. 383, 392 (1914). Gov't Supp. Br. 13. But *Weeks* says nothing about weapons and only notes the power to search a person legally under arrest for evidence of a crime. 232 U.S. at 392.

their homes, that their disarmament historically persisted past their release from custody, or that they were not permitted to obtain additional firearms once released. *Cf. id.* at 763–64 (limiting the search-incident-to-arrest principle to the immediate vicinity of the arrestee at the time of the arrest).

The Government cites one Second Amendment case, an Arkansas plurality opinion upholding a concealed weapons prohibition. *See State v. Buzzard*, 4 Ark. 18 (1842). The opinion notes in dicta that Second Amendment rights are not limitless and that arrestees have historically been divested of their arms. *Id.* at 21. It does not provide further historical evidence for the practice and, likewise, does not assert that such disarmament extended beyond the period of time the person was in police custody. *Buzzard* also reflects a limited view of the Second Amendment right, which is inconsistent with, if not expressly overruled by, modern cases like *Heller* and *Bruen. See Young v. Hawaii*, 896 F.3d 1044, 1056–58 (9th Cir. 2018), *on reh'g en banc*, 992 F.3d 765 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) ("Yet, with *Heller* on the books, cases in *Buzzard*'s flock furnish us with little instructive value"); *cf.* Michael Waldman, THE SECOND AMENDMENT: A BIOGRAPHY 68

(2014) (describing the collective rights view of the Second Amendment, ultimately rejected in *Heller*, as the "Arkansas doctrine," exemplified by *Buzzard*).

The arrest practice is not "relevantly similar" to § 922(n). It does not pose a comparable *burden* on the Second Amendment right. *See Bruen*, 142 S. Ct. at 2133. Section 922(n) imposes criminal sanctions for a person receiving a firearm while under indictment for any state or federal felony. A person can be subject to the restriction for years. An arrestee, on the other hand, is simply not permitted to carry a firearm on his or her person during the time they are under arrest, a period which would typically last hours or days unless they are ordered detained further. *See, e.g.*, Fed. R. Crim. P. 5(a)(1)(A) (requiring an arrestee appear before a judge "without unnecessary delay"). After that point, a person would either be released pretrial or further detained, as addressed above. *See supra* Section II.B.1.

Nor is § 922(n) comparably *justified* to the practice of disarming those under arrest. *See Bruen*, 142 S. Ct. at 2133. A person in police custody, like any person on more prolonged pretrial detention, has a reduced need for self-defense. *See supra* Section II.B.1. And the prospect of arrestees or detainees carrying firearms while in a jail

or in the back of a police car presents unique dangers and safety concerns, entirely dissimilar to a person obtaining a firearm while released to the general public. *Cf. Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979) (discussing unique need to maintain institutional security in carceral setting). Like the Government's other historical examples, arrest practices simply confirm that people do not keep their firearms on their person while they are detained or in jail.

The requirement that arrestees cannot bring their firearms into a jail is in no way comparable under *Bruen* to an often years-long § 922(n) impairment of a person's Second Amendment rights, which is enforceable by imprisonment.

### C. Restrictions on other constitutional rights are not properly considered under *Bruen* and are not historical analogues for § 922(n).

The Government lastly argues that "[a]nalogies to other constitutional rights confirm Section 922(n)'s constitutionality." Gov't Supp. Br. 16–17. The Government reasons that indictees can be subjected to limitations including on speech and travel, so they can necessarily be disarmed. *Id.* This argument is inconsistent with *Bruen*.

*Bruen* does not permit analogy to other constitutional deprivations to satisfy the Government's historical burden. Every historical

analogue addressed in *Bruen* was a firearm restriction, and the Court never suggested that historical practices related to other constitutional rights should guide how courts interpret the historical tradition of firearm regulation.[9] *See* 142 S. Ct. at 2138–56. The Government misleadingly suggests that *Bruen* endorses such "analogies." Gov't Supp. Br. 16 (citing *Bruen*, 142 S. Ct. at 2130, 2156). But the cited passages merely demonstrate that *Bruen* found support for its underlying textual and historical framework in the jurisprudence for other constitutional rights, like the First Amendment. *See Bruen*, 142 S. Ct. at 2130, 2132, 2156. Indeed, there is no reference to restrictions on other constitutional rights anywhere in the *Bruen* historical analysis itself. *See id.* at 2138–56. When applying the *Bruen* framework to a Second Amendment challenge, a court must analyze the "Nation's historical tradition of *firearm regulation*," not historical laws implicating other constitutional rights. *Id.* at 2130 (emphasis added).

---

[9] The Government's cited evidence for this proposition, part of the Bail Reform Act of 1984, is also of questionable historical value. *See* Gov't Supp. Br. 17. *Bruen* held that the most important historical evidence comes from the founding and dismissed reliance on 20th century historical evidence. 142 S. Ct. at 2136–37, 2154 n.28.

The Government's argument is consistent with other attempts to evade *Bruen*'s framework. Despite acknowledging now that a *Bruen* analysis is required, *see* Gov't Supp. Br. 3, the Government elsewhere maintains its position that the Court should uphold § 922(n) against this Second Amendment challenge without consideration of the Second Amendment or *Bruen*, by comparison to caselaw addressing due process or other rights. *See* Gov't Supp. Br. 1; Gov't Br. 13–16; Gov't Reply 1–3 (citing *United States v. Salerno*, 481 U.S. 739 (1987)). The position is wholly without merit.

The Government reasons that if infringements on indictees' rights, like detention after a hearing, do not violate due process or the Eighth Amendment, then firearms restrictions on released indictees must not violate the Second Amendment. Gov't Br. 13–16; Gov't Reply 1–3. The Government relies on an unusual binary view of the Constitution, whereby laws are either "constitutional" or "unconstitutional," without reference to any specific constitutional right. *See, e.g.*, Gov't Supp. Br. 1. That § 922(n) might not violate due process or other rights, however, is entirely non-responsive to Quiroz's Second Amendment challenge. *See* Quiroz Br. 13 n.2. Other courts have already rejected the Government's attempt to transform a Second Amendment challenge into a due process challenge

34

by comparison to *Salerno*. *See, e.g.*, *United States v. Rowson*, __ F. Supp. 3d __, No. 22-cr-310-PAE, 2023 WL 431037, at *13–14 (S.D.N.Y. Jan. 26, 2023). As noted in *Rowson*, the Government's argument ignores that *Salerno* and other cited cases upheld restrictions through means-end scrutiny, the precise framework prohibited in the Second Amendment context by *Bruen*. *See id*. at *13.

Under *Bruen*, the Court cannot assess § 922(n)'s constitutionality under the Second Amendment by simply extending caselaw addressing other rights, particularly those that applied means-end scrutiny. Rather, the Government must show § 922(n) is consistent with the Nation's historical tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2130. It has failed to do so.

\*   \*   \*

Under the *Bruen* framework, § 922(n) is unconstitutional. The Second Amendment's plain text covers the conduct criminalized by § 922(n), and indictees are not excluded from "the people" protected

by the Second Amendment.[10] *See Bruen*, 142 S. Ct. at 2126; *Heller*, 554 U.S. at 580; Quiroz Br. 13–24.

None of the Government's historical evidence shows the law is consistent with the Nation's historical tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2130. The Court has already found far more compelling and analogous historical evidence insufficient to uphold 18 U.S.C. § 922(g)(8). *See Rahimi*, 61 F.4th at 456–61; *see*

---

[10] At oral argument, the parties agreed that *Rahimi* foreclosed argument that indictees were excluded from the Second Amendment. Oral Arg. 1:55–2:11; *see United States v. Rahimi*, 59 F.4th 163 (5th Cir.), *withdrawn and superseded by* 61 F.4th 443 (5th Cir. 2023). The *Rahimi* panel later withdrew its opinion and issued a new one, but the result under the new opinion is the same. While *Rahimi* declined to address whether indictees are excluded from the Second Amendment, *see* 61 F.4th at 452 n.6, it recognized that "the people" in the Second Amendment has been interpreted to "'unambiguously refer[ ] to all members of the political community,'" which creates a "strong presumption" that the Second Amendment right "'belongs to all Americans[.]'" *Id.* at 451 (quoting *Heller*, 554 U.S. at 580–81).

Even if that "strong presumption" may be overcome in other cases, no court has ever held that indictees subject to § 922(n) are excepted from "the people" protected by the Constitution. Quiroz Br. 20–24. Categorically excluding *any* group of Americans from the Constitution's protections turns traditional constitutional notions on their head. *See Rahimi*, 61 F.4th at 453 (citing *Kanter*, 919 F.3d at 452–53 (Barrett, J., dissenting)); *see also* NAAGA Amicus Brief 7–14. And excluding those who have merely been indicted goes further, disregarding the presumption of innocence and endangering First and Fourth Amendment protections for all people simply accused of a crime. *See* Quiroz Br. 16, 21–22.

*also* Quiroz *Rahimi* Resp. Br. 4–7. And the Court has afforded the Government ample opportunity to meet its burden in this case. Finding a law unconstitutional is a serious matter and this Court has taken great care to ensure the integrity and sufficiency of the historical record. The lack of historical evidence on the record to support § 922(n) reflects not a shortcoming of the Government, but the absence of a historical tradition of firearm restrictions on indictees.

### Conclusion

For these reasons and those stated in prior briefing, this Court should affirm the district court's dismissal of the indictment.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*
