# No. 22-50834

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOSE GOMEZ QUIROZ,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Supplemental Brief of Defendant-Appellee
Addressing *United States v. Rahimi*, 144 S. Ct. 1889 (2024)**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN M. KIMMELMAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

# Table of Contents

Table of Authorities..........................................................................iii

Introduction ................................................................................. 1

Arguments and Authorities ............................................................ 3

I.  *Rahimi* embraced *Bruen*'s focus on text, history, and tradition to draw a narrow principle from historical firearm regulations..................................................... 3

II. Under *Rahimi*, § 922(n) is unconstitutional facially and as applied to Quiroz. .......................................................... 6

    A.  *Rahimi* confirms that Quiroz's conduct is covered by the plain text of the Second Amendment.................................... 6

    B.  Under *Rahimi*'s application of *Bruen*, the government has not shown a historical tradition of firearm regulation that supports § 922(n)....................................... 9

        1.  *Rahimi* reiterates that the relevant historical tradition must come from restrictions on firearms. ......11

        2.  The government's historical evidence does not demonstrate a tradition relevantly similar to § 922(n). ......................................................... 13

            a.  The surety and going armed laws relied on by *Rahimi* provide no support for § 922(n). ............. 14

            b.  The government's reliance on other historical laws fares no better. .................................................. 17

            c.  The government's proposed level of generality is far too high......................................................... 22

    C.  Quiroz satisfies the standards for both a facial and as-applied challenge. .............................................. 25

i

1. Because § 922(n) is unconstitutional in all its applications, this Court should affirm the district court's facial ruling. ..................................................... 26

2. Section 922(n) is, at the very least, unconstitutional as applied to Quiroz. ..................................................... 27

Conclusion ...................................................................................... 30

Certificate of Compliance with Type-Volume Limit ...................... 31

Addendum

# Table of Authorities

## Cases

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015) ............................................................ 26, 27

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................... 5, 7, 8, 26

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ................................................. 19, 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ...............................................................*passim*

*Range v. Att'y Gen. United States of Am.,*
    69 F.4th 96 (3d Cir. 2023) (en banc),
    *cert. granted, judgment vacated sub nom. Garland v. Range,*
    No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024) .................... 29

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...................................................... 30

*United States v. Duarte,*
    101 F.4th 657 (9th Cir. 2024),
    *reh'g en banc granted, opinion vacated,* No. 22-50048,
    2024 WL 3443151 (9th Cir. July 17, 2024) ................................ 29

*United States v. Kapp,*
    302 U.S. 214 (1937) ................................................................... 28

*United States v. Laurent,*
    861 F. Supp. 2d 71 (E.D.N.Y. 2011) ..................................... 15, 19

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ........................................................*passim*

*United States v. Salerno,*
    481 U.S. 739 (1987) .............................................................. 6, 26

*Worth v. Jacobson*,
  __ F.4th __, 2024 WL 3419668, (8th Cir. July 16, 2024) 23, 24, 26

**Constitutional Provisions**

U.S. Const. amend. II ..............................................*passim*

**Statutes**

1786 Va. Acts 35 ...................................................... 16

18 U.S.C. § 922(a)(6) ................................................. 28

18 U.S.C. § 922(g)(1) ................................................. 29

18 U.S.C. § 922(g)(8) ...............................................*passim*

18 U.S.C. § 922(g)(8)(C)(i) ..........................................3, 11

18 U.S.C. § 922(n) .................................................*passim*

Judiciary Act of 1789, 1 Stat. 73, Sec. 33 ..................................... 18

Mass. Rev. Stat., ch. 134, § 1 ........................................... 15

Mass. Rev. Stat., ch. 134, § 16 ........................................ 15, 16

Mass. Rev. Stat., ch. 134, § 3–4 ......................................... 16

Tex. Code Crim. Proc. Ann. art. 20.02(a) .................................... 11

Tex. Code Crim. Proc. Ann. art. 20.04 ..................................... 11

Tex. Const. art. I, § 11 ................................................. 29

**Other Authorities**

Government Brief,
  *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).... 5, 21

Joseph G.S. Greenlee, *Disarming the Dangerous: The American
  Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1 (2024) . 24

Oral Argument Transcript,
  *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023)........ 8, 21

William Blackstone, Commentaries on the Laws of England
  (1769) ......................................................................................... 16

## Introduction

Following *Bruen*,[1] courts considering Second Amendment challenges have been grappling with how narrowly or broadly to draw historical analogies supporting modern-day firearm restrictions. In *Rahimi*, the Supreme Court resisted arguments to either require an exact "historical twin" or to accept a broad principle of disarming "irresponsible" people. Instead, it identified a specific historically supported principle: an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024).

Here, the question is whether the government has shown a similarly drawn historical principle supporting the constitutionality of 18 U.S.C. § 922(n). It has not. Instead, the government argues for an overly broad principle of impairing the rights of people under indictment in the interest of public safety. The historical evidence does not support a tradition comparable to why and how § 922(n) burdens a person's Second Amendment right.

---

[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Section 922(n) requires no judicial finding or even allegation that the charged offense involved the misuse of a firearm or that the person threatens the safety of another. It applies regardless of the type of underlying felony and even if the indictee has no other firearm. Its restriction is indefinite; it lasts however long an indictment is pending, with no exception for self-defense.

Unlike 18 U.S.C. § 922(g)(8), the statute at issue in *Rahimi*, § 922(n) burdens people who have not been determined to be a danger to others—people, like Quiroz, who have been released pending trial. Quiroz purchased a firearm more than a year after being indicted for entering another's home without permission to take a weed trimmer. ROA.55, 285–86. He had been released pursuant to a bond after the alleged burglary offense and was released again after a later alleged failure-to-appear charge. ROA.433–35. Both Texas indictments were dismissed years later. Add. 1–4.

Under *Rahimi*, § 922(n) is unconstitutional both facially and as applied to Quiroz.

## Arguments and Authorities

**I.**  ***Rahimi* embraced *Bruen*'s focus on text, history, and tradition to draw a narrow principle from historical firearm regulations.**

In *Rahimi*, the Supreme Court applied the *Bruen* framework to a criminal law for the first time, analyzing whether 18 U.S.C. § 922(g)(8)(C)(i) violates the Second Amendment. The Court's holding was narrow: the temporary disarmament of "an individual found by a court to pose a credible threat to the physical safety of another" is consistent with the Second Amendment. 144 S. Ct. at 1903.

The statute *Rahimi* considered is markedly different from the one Quiroz challenges. Section 922(g)(8)(C)(i) prohibits an individual who is subject to a domestic violence restraining order from possessing a firearm if that order—obtained after a hearing for which the person had notice and an opportunity to participate—includes a finding that the "person represents a credible threat to the physical safety" of others. For Rahimi, that restriction was limited to two years after his release from prison. 144 S. Ct. at 1902.

As *Bruen* requires, *Rahimi* focused on the historical tradition of firearm regulations, with particular emphasis on the regulations in

place at the time of the founding and ratification. *Id.* at 1899–1901. The Court reiterated that the government need not provide a historical twin to the modern-day regulation, but it also emphasized that the historical tradition must be relevantly similar in why and how they burden the right to bear arms for self-defense. *Id.* at 1898 (citing *Bruen*, 597 U.S. at 29).

Relying on the traditions of surety and going armed laws together, the Court held there was a historical tradition of temporarily restricting a person's possession of firearms when an "individual poses a clear threat of physical violence to another." *Id.* at 1901. The Court drew a narrow purpose from the surety and going armed laws. Like § 922(g)(8), they "restrict[ ] gun use to mitigate demonstrated threats of physical violence." *Id.* How they burdened the right was also comparable because they were temporary restrictions and required "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. Thus, § 922(g)(8) is "'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right." *Id.* at 1901. The Court's historical analysis "settle[d] on just the right level of generality." *Id.* at 1926 (Barrett, J., concurring).

The government urged the Court to adopt a broader principle at a much higher level of generality. The government argued that history and tradition support the principle that "Congress may disarm persons who are not law-abiding, responsible citizens." Gov't Br. 12, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). In doing so, the government cited several references to the "law-abiding, responsible citizens" language in *Heller*[2] and *Bruen*, claiming that the Supreme Court's "precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens." *Id.*

The Court flatly rejected that argument. *Rahimi*, 144 S. Ct. at 1903. First, the Court pointed out that "responsible" is a "vague term" and that it is "unclear what such a rule would entail." *Id.* Second, the Court explained that the government's proposed test did not "derive from [its] case law." *Id.* It noted that *Heller* and *Bruen* used the term "responsible" to "describe the class of ordinary citizens who undoubtedly enjoy the right," but neither decision adopted such a formulation to define the contours of that right. *Id.*; *see also id.* at 1944 (Thomas, J., dissenting) ("The Government's

---

[2] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

claim that the Court already held the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best.").

In reversing this Court's holding that § 922(g)(8) is facially unconstitutional, *Rahimi* noted that a statute cannot be facially unconstitutional when it *is* constitutional as applied to the person challenging it. *Id.* at 1898. Mounting a successful facial challenge "requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "[T]o prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications." *Id.* The government made that showing with the "facts of Rahimi's own case." *Id.*

## II. Under *Rahimi*, § 922(n) is unconstitutional facially and as applied to Quiroz.

### A. *Rahimi* confirms that Quiroz's conduct is covered by the plain text of the Second Amendment.

The *Bruen* framework first asks whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. As in its original briefing, the government insists that the Second Amendment "cover[s] only law-abiding, responsible citizens," which the government claims "excludes indicted defendants." Gov't Op. Br.

16, 18; *see also id.* at 19–25 (repeatedly quoting "law-abiding, responsible citizens" dicta from *Heller* and *Bruen*); Gov't Supp. *Rahimi* Br. 11 n.3.[3] That was wrong after *Bruen* and remains wrong after *Rahimi*.

*Rahimi* squarely rejected the government's argument that the Second Amendment protects only "responsible" citizens. *Rahimi*, 144 S. Ct. at 1903; *see id.* at 1944 (Thomas, J., dissenting) ("The Government … argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory."). The "law-abiding" prong fares no better.

Like the word "responsible," the term "law-abiding" is vague—as the government's own contradictory arguments demonstrate. Here, the government argues that someone who has only been *indicted* for a crime is not "law-abiding." Gov't Op. Br. 18. But in *Rahimi*, the government advanced a different definition of "law-abiding" that seemed to acknowledge that a *conviction* is required before someone

---

[3] Quiroz refers to the government's supplemental brief filed on July 10, 2024, as "Gov't Supp. *Rahimi* Br." and otherwise follows the government's "Glossary" for brief citations. *See* Gov't Supp. *Rahimi* Br. vi.

can be considered non-law-abiding. There, the government defined law-abiding as having not "committed serious crimes defined by the felony-level punishment that can attach to those crimes." Oral Arg. Tr. 5, 8, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023). But even though Rahimi himself was alleged to have committed felony-level conduct, the government conceded that he was still "law-abiding." *See id.* at 8–9 (noting Rahimi did not "have the kind of … criminal record that would justify disarmament on that basis"); *Rahimi*, 144 S. Ct. at 1895 (describing aggravated assault conduct and indictment). Instead, the government argued that Rahimi's conduct made him "irresponsible" in a way that stripped him of his Second Amendment rights.

Regardless of the government's shifting "law-abiding" definitions, its argument fails because the Supreme Court has repeatedly said that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581; *see Bruen*, 597 U.S. at 70. At the very least, those like Quiroz who have not been convicted of a crime remain part of "the people" protected by the Constitution. As a member of the political community, Quiroz is covered by the Second Amendment's guarantee. Quiroz Br. 13–24.

**B. Under *Rahimi*'s application of *Bruen*, the government has not shown a historical tradition of firearm regulation that supports § 922(n).**

At step two of the *Bruen* framework, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. "A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 144 S. Ct. at 1898 (cleaned up).

Recognizing that "[e]verything is similar in infinite ways to everything else," the Court provided two metrics for analyzing whether a modern law is relevantly similar to the historical tradition: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *see Rahimi*, 144 S. Ct. at 1898. A court must therefore determine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" (the *how*) and "whether that regulatory burden is comparably justified" (the *why*). *Bruen*, 597 U.S. at 30.

*Rahimi* casts no doubt on the principle that "when a challenged regulation addresses a general societal problem that has persisted

since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (emphasis added). The government concedes that it cannot point to a historical tradition of disarming individuals under indictment. Gov't Supp. Br. 6 ("We are unaware of historical English or American laws that specifically forbade criminal defendants from possessing or buying firearms while awaiting trial."). While this does not end the historical inquiry, it is evidence that § 922(n) is unconstitutional. And the government has not presented evidence of any historical tradition relevantly similar to the restriction in § 922(n). *See Rahimi*, 144 S. Ct. at 1898 ("when a challenged regulation does not precisely match its historical precursors, it still *may* be analogous enough to pass constitutional muster" (emphasis added)); Quiroz Resp. 33–50 (addressing relevantly similar analysis); Quiroz Supp. Br. 9–32 (same).

Unlike the statute in *Rahimi*, § 922(n) does not require a judicial finding that a person poses a credible threat to the physical safety of another. Under § 922(n), a person cannot receive a firearm while under felony indictment even if he does not pose a credible threat

to the safety of another and regardless of whether the indicted felony was for a violent offense or involved a firearm. No court found Quiroz to be a credible threat, and that he was twice released on bond suggests strongly that he was not. *See* ROA.433–35.

Nor does § 922(n) require the due process protections underpinning § 922(g)(8)(C)(i): notice and an opportunity to be heard in the proceedings that trigger the statute's prohibitions on possession and receipt of firearms. Rahimi had such notice and appeared. 144 S. Ct. at 1896. Quiroz, by contrast, had no notice or opportunity to appear at the grand jury proceedings leading to the underlying indictments. *See* Tex. Code Crim. Proc. Ann. arts. 20.02(a), 20.04 (effective Sept 1, 2011, to Dec. 31, 2020). And those indictments did not involve firearms or violence. ROA.55, 57.

Quiroz's arguments are consistent with *Rahimi*'s application of the *Bruen* inquiry. Any marginal differences between *Rahimi*'s approach and the one Quiroz advanced in earlier briefing do not change the result that § 922(n) is unconstitutional.

### 1. *Rahimi* reiterates that the relevant historical tradition must come from restrictions on firearms.

The government argues that *Rahimi* supports its position that courts "are not confined to firearm regulations" when assessing the

Second Amendment's original meaning. Gov't Supp. *Rahimi* Br. 12. That misreads *Rahimi*. The Court relied solely on historical traditions that targeted the misuse of firearms. *Rahimi*, 144 S. Ct. at 1900–01.

*Rahimi* focused on "two distinct legal regimes … that *specifically addressed firearms violence*." *Id.* at 1899 (emphasis added). First, the Court addressed surety laws, which sought to prevent violence before it occurred by requiring "individuals suspected of future misbehavior to post a bond." *Id.* at 1900. Although the surety tradition was not limited to firearms, the Court stressed that, "*[i]mportantly for this case*, the surety laws also targeted the misuse of firearms." *Id.* at 1900 (emphasis added). Laws that did *not* target the misuse of firearms, by contrast, are *not* proper analogues.

The second legal regime *Rahimi* relied on—going armed laws— also targeted the misuse of firearms. *Id.* at 1901. Those laws punished, by imprisonment and forfeiture of arms, defendants who had gone armed in a terrorizing manner. *Id.* The purpose of the laws was to promote public safety by restricting the firearms possession of people who had misused them. *Id.*

These two sets of laws were tools to directly regulate and prevent the misuse of firearms. The effect on firearm possession or use

was not an incidental by-product of some other concern. Here the government relies on laws—pretrial detention and pretrial surety bonds—that did not target firearms use. Gov't Op. Br. 29–47; Gov't Supp. Br. 7–14. These are not firearm regulations relevant to the Second Amendment analysis. In any event, Quiroz has distinguished how and why they burden the right to bear arms, as well as the government's sweeping claims about these practices, elsewhere and below. *See* Quiroz Resp. 33–3; Quiroz Supp. Br. 9–28; *infra* 18–20.

### 2. The government's historical evidence does not demonstrate a tradition relevantly similar to § 922(n).

*Rahimi*'s application of *Bruen*'s historical inquiry clarifies that a historical tradition can be established from multiple regulatory traditions that share a common, narrow principle. 144 S. Ct. at 1901. This does not help the government carry its burden here.

### a. The surety and going armed laws relied on by *Rahimi* provide no support for § 922(n).

The government relies on the same tradition of surety and going armed laws that *Rahimi* addressed.[4] Gov't Op. Br. 35–47. From those laws, the Supreme Court found a historical tradition of temporarily "preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 144 S. Ct. at 1896. This is consistent with the traditions noted in *Bruen*, which the Court summarized as "limit[ing] the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." 597 U.S. at 70.

Section 922(n) does not fit within that historical tradition.

The "why" of surety and going armed laws was to restrict gun use when an individual "poses a clear threat of physical violence to another." *Rahimi*, 144 S. Ct. at 1901. Section 922(n), to the contrary

---

[4] Quiroz critiqued the government's reliance on surety laws because, as *Bruen* noted, authorities enforced them inconsistently and the cited examples were not all from the relevant historical period. Quiroz Resp. 44–46 (citing *Bruen*, 597 U.S. at 35–37, 57–58 & n.25). In *Rahimi*, the Court nonetheless relied on surety laws coupled with affray laws to support a narrow principle. *Rahimi*, 144 S. Ct. at 1899–1901.

affects the inverse population: people who have been *released* pre-trial and thus have *not* been determined to pose a significant threat to public safety. Section 922(n) merely promotes public safety in general based on Congress's stated belief that individuals under indictment have a "somewhat greater likelihood than other citizens to misuse firearms." *United States v. Laurent*, 861 F. Supp. 2d 71, 87 (E.D.N.Y. 2011) (cleaned up; discussing legislative history and collecting cases); *see* ROA.292–93 (discussing statutory evolution of § 922(n)). This is a far cry from regulating "gun use to check *demonstrated* threats of physical violence." *Rahimi*, 144 S. Ct. at 1901 (emphasis added). Quiroz and other indictees pose, at most, a "potential" threat to public safety. Gov't Supp. *Rahimi* Br. 8.

"How" surety and going armed laws burdened the right to bear arms also differs drastically from § 922(n). These historic laws imposed a temporary restriction accompanied by significant procedural protections. For example, before requiring a surety bond, a person having "'reasonable cause to fear' that the accused would do him harm or breach the peace" would have to make a complaint. *Rahimi*, 144 S. Ct. at 1900 (citing Mass. Rev. Stat., ch. 134, §§ 1, 16). If the magistrate determined that cause existed for the charge,

the accused would be summoned and have an opportunity to respond to the allegations. Mass. Rev. Stat., ch. 134, §§ 3–4. Once issued, surety bonds were limited to "six months at a time, and an individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason." *Rahimi*, 144 S. Ct. at 1900 (citing Mass. Rev. Stat., ch. 134, § 16).

Similarly, going armed laws required a conviction before imprisonment or forfeiture, and that conviction necessarily rested on finding that the individual had carried firearms in a terrorizing manner. *Id.* at 1901. The imprisonment or forfeiture resulting from a going-armed conviction was limited to either the time imprisoned or the forfeiture of the arms possessed at the time of the offense. *Id.* at 1901 (collecting laws and citing 4 William Blackstone, Commentaries on the Laws of England 148–49 (1769)); *see, e.g.*, 1786 Va. Acts 35 (providing maximum imprisonment of one month).

By contrast, § 922(n) lacks any similar procedural protections or limit. Its prohibition on receiving a firearm begins with the return of a felony indictment. There is no requirement that the accused be given notice and an opportunity to respond to the allegations before the indictment is issued. The restriction lasts however long the in-

dictment remains pending. For example, Quiroz had been under indictment for well over a year before he attempted to obtain a firearm, ROA.55, 61–63, and his burglary indictment was dismissed three-and-a-half years after it was issued, Add. 3. Section 922(n) also imposes a greater burden than surety and going armed laws because it completely prohibits the possession of firearms if the indictee, like Quiroz, happens not to already have one. *See* ROA.291. And it does so without allowing an exception for obtaining a firearm for self-defense or for another legitimate reason.

These are not minute differences between the surety and going armed laws on one hand and § 922(n) on the other. "Why" and "how" § 922(n) burdens the right to bear arms is materially different in every relevant respect from the surety and going armed laws.

### b. The government's reliance on other historical laws fares no better.

The government also relies on general historical practices related to criminal justice—pretrial detention for those charged with serious crimes, pretrial release subject to bonds, disarmament upon arrest—and other laws restricting the possession of firearms by supposedly "dangerous" and "untrustworthy" persons. Gov't Op. Br. 29–42; Gov't Supp. Br. 6–15; Gov't Supp. *Rahimi* Br. 13–16. Quiroz

17

previously addressed deficiencies in the government's reliance on these practices in detail. Quiroz Resp. 33–43; Quiroz Supp. Br. 9–32. The government's proposed analogues, even taken together, fare no better after *Rahimi*.

**Pretrial detention for those charged with serious crimes.** The government's reliance pretrial detention is misplaced in three regards. First, pretrial detention is not a targeted restriction on firearms or their misuse. *See supra* 11–12; *see also* Quiroz Resp. 33–34; Quiroz Supp. Br. 9. Any effect on a person's Second Amendment rights was incidental to the purpose of punishment. It is not a comparable *firearm* restriction.

Second, the government continues to overstate the prevalence of pretrial detention. *See* Gov't Supp. *Rahimi* Br. 13–14. Pretrial detention in the founding era was mandatory only for capital offenses. *See, e.g.*, Judiciary Act of 1789, 1 Stat. 73, Sec. 33. The number of serious crimes punished by death was drastically smaller than the number of felonies today. Quiroz Supp. Br. 9–12 (discussing historical sources). While more offenses were subject to capital punishment at the time of the founding than are now, it was still used sparingly in the American colonies and generally did not apply to property crimes, including burglary. *Kanter v. Barr*, 919 F.3d 437,

458–61 (7th Cir. 2019) (Barrett, J., dissenting). Thus, release was routinely granted for most felonies, including burglary. Quiroz Supp. Br. 9–15.

Third, the greater deprivation of detention does not support the lesser deprivation of indefinite disarmament as the justifications for those restrictions are not comparable. *See* Quiroz Supp. Br. 17–19. *Rahimi* reasoned that the imprisonment "permissible to respond to the use of guns to threaten the physical safety of others" supported "the lesser restriction of temporary disarmament" imposed by § 922(g)(8). 144 S. Ct. at 1902. But the Court's finding that these burdens were comparable was inextricably linked to the similar purpose: responding to the use of guns to threaten the physical safety of others. Section 922(n) has no such comparable purpose.

"Why and how" pretrial detention and § 922(n) burden the right to armed self-defense are starkly different. The government offers no historical evidence that the purpose of pretrial detention in the founding era was to protect public safety as opposed to prevent flight. *See* Quiroz Supp. Br. 18–19 & n.3 (discussing contrary evidence). Nor has it shown that the purpose of § 922(n) was to prevent flight as opposed to, at the broadest level, promote public safety. *See Laurent*, 861 F. Supp. 2d at 87. The "why" does not match.

19

Nor does the "how." *See* Quiroz Supp. Br. 17–18. Someone who is detained would rely on the government for his protection. In contrast, someone released pending indictment does not have that governmental protection. Yet § 922(n) prevents him from obtaining a firearm.

**Bail sureties.** The government also claims that those released on bail at the founding were subject to restrictions more onerous than § 922(n), but it provides no proof of those supposed conditions. Gov't Supp. Br. 12; Gov't Supp. *Rahimi* Br. 14. The government appears to rely on the sureties' ability to restrict the person's movement and possibly subject that person to detention. Again, this legal regime is not a firearm restriction, the prevalence of any such conditions is overstated, and it does not have comparable justifications. *See* Quiroz Supp. Br. 20–28.

**Disarming a person under arrest.** The government claims an officers' authority to seize a suspect's weapons upon arrest supports the "principle that the government can restrict Second Amendment rights during the sensitive period of arrest and custody." Gov't Supp. *Rahimi* Br. 11–12 n.4. Just as the government's "sensitive place" definition was too broad in *Bruen*, 597 U.S. at 31, there is no historical basis to define the time between indictment

and trial as a "sensitive period" when an indictee loses the right to bear arms. The "why and how" of the seizure of weapons upon arrest are not comparable to § 922(n). *See* Quiroz Supp. Br. 29–32.

**"Dangerous" persons prohibitions.** Lastly, the government relies on the same type of laws restricting firearm possession by so-called "dangerous" persons that *Rahimi* ignored. Gov't Op. Br. 36–39; Gov't Supp. *Rahimi* Br. 13. The government claims that Congress can disarm "dangerous persons." Gov't Supp. *Rahimi* Br. 13. But this sweeping theory just repackages the "responsible citizen" theory unanimously rejected by the Supreme Court in *Rahimi*. 144 S. Ct. at 1903.

The government marshalled similar historical sources to support "Congress's power to disarm those who are not 'responsible.'" Gov't Br. 27–28, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). *Rahimi* rejected that argument. 144 S. Ct. at 1903. And "irresponsible," according to the government, just means "dangerous." *Rahimi* Oral Arg. Tr. 10–12. The government cannot revive this theory simply by casting it in terms of danger instead of responsibility. *See Rahimi*, 144 S. Ct. at 1945 (Thomas, J., dissenting) (rejecting argument "[n]o matter how many adjectives the Government swaps out").

*Rahimi* forecloses the government's overly broad "dangerousness" argument.

### c. The government's proposed level of generality is far too high.

The government claims that these historical examples serve the broad purpose of "public safety" and assuring "attendance at trial," similar to § 922(n).[5] Gov't Supp. *Rahimi* Br. 13–14. This offered principle operates at too high a level of generality to be a useful comparator. Analogical reasoning under the Second Amendment is not a "regulatory blank check." *Bruen*, 597 U.S. at 30.

Indeed, the New York regulation struck down in *Bruen* also sought to burden the right to bear arms, first in the name of public safety, and then by deeming Manhattan a "sensitive place." *Bruen*, 597 U.S. at 30–31; *see id.* at 77 (Alito, J., concurring). *Bruen* rejected the government's "sensitive place" definition as "far too broa[d]." *Id.* at 31 (finding no historical basis to expand that category to include "places of public congregation that are not isolated from law enforcement"). The historical tradition of restricting "the intent for

---

[5] The government offers no support that the purpose of § 922(n) is to prevent flight. *See supra* 15, 19.

which one could carry arms, the manner of carry, [and] the exceptional circumstances under which one could not carry arms" did not justify the New York proper-cause requirement. *Bruen*, 597 U.S. at 38–39.

Of course, *Rahimi* does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901. But any category used by the legislature, and the imposed burden, must be rooted in the historical tradition of firearm restrictions to be constitutional. *Id.*; *see Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

As the Eighth Circuit recently explained, a "legislature's ability to deem a category of people dangerous based only on belief would subjugate the right to bear arms 'in public for self-defense' to 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Worth v. Jacobson*, __ F.4th __, 2024 WL 3419668, at *14 (8th Cir. July 16, 2024) (quoting *Bruen*,

597 U.S. at 70). In *Worth*, the court held, post-*Rahimi*, that Minnesota had not established a historic tradition restricting arms carrying to those who are more than 20 years old.[6] *Id.* at *9–14.

Thus, the test is not whether a firearm restriction applies to a limited subset of the public, *contra* Gov't Supp. *Rahimi* Br. 15, but whether that restricted category is justified by a relevant historical tradition. The category "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year," § 922(n), is not. *See supra* 13–21. The indicted felon category includes people accused of reading another person's email, operating a recording device in a movie theater, and releasing heart-shaped balloons in a romantic gesture. Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 82 n.472 (2024). And it includes people charged,

---

[6] The Eighth Circuit relied on the founding-era militia duty that the government rejects. *Compare* Gov't Supp. *Rahimi* Br. 16–17 *with Worth*, 2024 WL 3419668, at *11. In the late 1700's, federal and state laws required most citizens, including those 18 to 20 years old to keep firearms, as part of militia service. *See* Quiroz Supp. Br. 6–8 (discussing laws). Those laws provided no exception for individuals under indictment. *Id.* at 6–7. "A mandate to acquire a firearm is hardly 'evidence' that one was previously prohibited from owning one." *Worth*, 2024 WL 3419668, at *11.

like Quiroz, based on prosecutorial mistake and insufficient evidence. Add. 1–4.

In sum, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). The government's argument that any regulation can be justified in the name of "public safety" operates at too high a level of generality. These historical restrictions, taken together, do not justify § 922(n).

### C. Quiroz satisfies the standards for both a facial and as-applied challenge.

*Rahimi* reasoned that, because § 922(g)(8) was constitutional as applied to Rahimi, his facial challenge to the statute necessarily failed. 144 S. Ct. at 1898, 1903. Here, § 922(n) is unconstitutional as applied to Quiroz—and in all its applications.[7] The district court's facial ruling, thus, should be affirmed. At minimum, this Court should hold the statute is unconstitutional as applied to Quiroz.

--------

[7] Quiroz challenges only the constitutionality of § 922(n) with regard to receipt. The statute also bars an indictee from shipping or transporting firearms. § 922(n). Quiroz was not charged with or convicted for shipping or transporting firearms. ROA.14, 189, 192.

### 1. Because § 922(n) is unconstitutional in all its applications, this Court should affirm the district court's facial ruling.

The government seizes on *Rahimi*'s statement that a facial challenge "is the 'most difficult challenge to mount successfully.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see* Gov't Supp. *Rahimi* Br. 5. This challenge, however, is not unsurmountable. Indeed, the Supreme Court struck down firearm restrictions facially in *Bruen* and *Heller*. *Bruen*, 597 U.S. at 71; *Heller*, 554 U.S. at 635. And the Eighth Circuit, post-*Rahimi*, held Minnesota's ban on public carry for people 18 to 20 years old was unconstitutional on its face. *Worth*, 2024 WL 3419668, at *14.

*Rahimi* explained that the government prevails against a facial challenge by demonstrating that the regulation "is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898. To try to make this showing, the government relies on hypotheticals that have nothing to do with § 922(n). *See* Gov't Op. Br. 48–49; Gov't Supp. *Rahimi* Br. 7. But reliance on hypotheticals where § 922(n) does not "actually authorize[ ] or prohibit[ ] conduct" is misplaced. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015). Section 922(n) does not prohibit, for example, the receipt of dangerous weapons or

the receipt of a firearm by someone who previously misused firearms, committed violence, or intends to do so. *See* Gov't Op. Br. 48–49; Gov't Supp. *Rahimi* Br. 7; Quiroz Resp. 52–54. Those are not applications of the statute. *See Patel*, 576 U.S. at 418.

Because there is no historical tradition indefinitely burdening the receipt of a firearm based on mere charges of a felony offense, § 922(n) is facially unconstitutional.

## 2. Section 922(n) is, at the very least, unconstitutional as applied to Quiroz.

Nor is there a historical tradition that supports § 922(n) as applied to Quiroz.

Quiroz's underlying Texas felony indictments were for burglary of a habitation and failure to appear.[8] ROA.55, 57. The 2020 burglary indictment alleged that Quiroz entered another's home without permission to take a weed trimmer. ROA.55. The 2021 failure-

---

[8] The Texas indictments have since been dismissed. Add. 1–4. In September 2023, the State admitted that the failure-to-appear indictment was based on incorrect information and that Quiroz had, in fact, appeared. Add. 1. In January 2024—more than three years after the indictment was issued—the State declined to prosecute the burglary, citing insufficient evidence. Add. 4.

to-appear indictment alleged that he did not appear at a court hearing in the burglary case. ROA.57. Despite these charges, Quiroz remained free, and no court had found him to pose a credible threat of danger to anyone's safety or to have misused firearms. *See* ROA.433–35. About a year-and-a-half after the first indictment, and six months after the second, he purchased a semiautomatic .22 caliber and indicated on a form that he was not under felony indictment.[9] ROA.59, 61. There is no evidence that he had a firearm before then. ROA.291.

These circumstances do not show Quiroz presented a flight risk or a potential danger to the physical safety of others, contrary to the government's suggestion otherwise. *See* Gov't Supp. *Rahimi* Br.

---

[9] Quiroz was charged with making a false statement on a firearm form for indicating that he was not under felony indictment. ROA.13–14. The district court dismissed that count, ROA.309, and the government acknowledges that *Rahimi* does not impact that decision, Gov't Supp. *Rahimi* Br. 20. For the reasons Quiroz has already expressed, this Court should affirm the dismissal of that 18 U.S.C. § 922(a)(6) count. *See* Quiroz Br. 58–64; *Quiroz* Oral Arg. 36:00–38:30; Quiroz Resp. 28(j) 1–2 (June 27, 2023). Without § 922(n), there is no other inherent materiality of that statement as there was in the falsehood addressed in *United States v. Kapp*, 302 U.S. 214, 217–18 (1937).

8. Rather, the Texas Constitution and legislature deemed his offenses as presumptively qualifying for release pending bail. *See* Tex. Const. art. I, § 11 ("All prisoners shall be bailable by sufficient sureties, unless for capital offences.").

Jurists who have considered challenges to § 922(g)(1) recognize that there is not a longstanding tradition restricting firearm possession by persons with non-violent convictions. *See, e.g.*, *United States v. Duarte*, 101 F.4th 657, 691 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024); *see also Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). It follows that no restriction tradition exists for people merely *indicted* for non-violent offenses.

\* \* \*

The remaining task for the Court is to ascertain whether § 922(n) is "relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 144 S. Ct. at 1898 (cleaned up). "Discerning and developing the law in this way

29

is a commonplace task for any lawyer or judge." *Id.* (cleaned up). Remanding to the district court for consideration of this purely legal question—one subject to de novo review, Gov't Op. Br. 15—is unnecessary and unwarranted. *See Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) ("this court may affirm the district court's judgment on any grounds supported by the record").

## Conclusion

For these reasons and those stated in prior briefing, this Court should affirm the district court's dismissal of the indictment.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,953 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, and using 13-point Century Schoolbook for footnotes.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

Dated: July 25, 2024

ADDENDUM

Filed: 9/19/2023 9:48 AM
Darla Cude,
District Clerk
Pecos County, Texas

Arelee Flores

9/19/2023 1:55:03 pm

### CAUSE NO. P-4248-112-CR

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **IN THE 112TH DISTRICT COURT** |
| | § | |
| **VS** | § | **OF** |
| | § | |
| **JOSE GOMEZ QUIROZ** | § | **PECOS COUNTY, TEXAS** |
| **SID: TX #05806477** | | |

## MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the State of Texas by and through her Attorney, and respectfully requests the Court to dismiss the above entitled and numbered criminal action in which the defendant is charged with the offense of BAIL JUMPING / FAILURE TO APPEAR (TRN # 9131332196) for the reason:

☐     The evidence is insufficient;
☐     The defendant was convicted in another case;
☐     The complaining witness has requested dismissal;
☐     The case has been refiled;
☐     The defendant is unapprehended;
☐     The defendant is deceased;
☐     The defendant has been granted immunity in light of his testimony;
☒     Other: **IN THE INTEREST OF JUSTICE (SEE BELOW)**
and for cause would show the Court the following:

This office recently discovered a memo posted in the District Clerk's file in the Odyssey program, dated February 7, 2022, which states the following: "NO CAPIAS WAS ISSUED ON 4.20.21 FTA AS DEFENDANT DID APPEAR." The District Attorney's Office was not aware of this Memo when the State relied on the signed, file-stamped courtroom documentation (Motion for Capias, Certificate of Failure to Appear, and Order for Capias), to present the failure to appear case to the Grand Jury, on June 17, 2021.

WHEREFORE, it is prayed that the above entitled and numbered cause be dismissed.

Respectfully submitted,

*/s/ Laurie K. English*
Laurie K. English / Gene Stump / Camilla Cutbirth
District Attorney/Assistant District Attorney
24025349 / 24048824 / 24092311

## ORDER

The foregoing motion having been presented to me on this the _____ 19th _____ day of _____ September _____, 20 _23_, and the same having been considered, it is, therefore, ORDERED, ADJUDGED and DECREED that said above entitled and numbered cause be and the same is HEREBY DISMISSED and all outstanding warrants issued in this case are HEREBY RECALLED.

Pedro Gomez, Jr. 112th District Court Judge

1

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Karen  Suarez  on behalf of Laurie English
Bar No. 24025349
karen.suarez112thda@gmail.com
Envelope ID: 79689970
Filing Code Description: Proposed Order
Filing Description: Motion and Order to Dismiss
Status as of 9/19/2023 1:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Adrian Valadez | 24096496 | Adrian@ValadezLaw.net | 9/19/2023 9:48:05 AM | SENT |
| Gene Stump | | genestump112da@gmail.com | 9/19/2023 9:48:05 AM | SENT |
| Karen Suarez | | karen.suarez112thda@gmail.com | 9/19/2023 9:48:05 AM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Gene Stump | | genestump112da@gmail.com | 9/19/2023 9:48:05 AM | SENT |

1/11/2024 2:50:16 pm

Filed: 1/10/2024 6:18 PM
Darla Cude,
District Clerk
Pecos County, Texas

Arelee Flores

**CAUSE NO. P-4081-112-CR**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 112TH DISTRICT COURT |
| | § | |
| VS. | § | OF |
| | § | |
| JOSE GOMEZ QUIROZ | § | PECOS COUNTY, TEXAS |
| SID: TX #05806477 | | |

## MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the State of Texas by and through her Attorney, and respectfully requests the Court to dismiss the above entitled and numbered criminal action in which the defendant is charged with the offense of BURGLARY OF HABITATION (TRN #9131320716) for the reason:

☒ The evidence is insufficient;
☐ The defendant was convicted in another case;
☐ The complaining witness has requested dismissal;
☐ The case has been refiled;
☐ The defendant is unapprehended;
☐ The defendant is deceased;
☐ The defendant has been granted immunity in light of his testimony;
☐ Other:

and for cause would show the Court the following:

The State dismisses Cause No. P-4081-112-CR due to insufficient evidence.

WHEREFORE, it is prayed that the above entitled and numbered cause be dismissed.

Respectfully submitted,

/s/ *Laurie K. English*
Laurie K. English
112th District Attorney
24025349

## ORDER

1/11/2024

The foregoing motion having been presented to me on this the_____ day of _____, 20___, and the same having been considered, it is, therefore, ORDERED, ADJUDGED and DECREED that said above entitled and numbered cause be and the same is HEREBY DISMISSED and all outstanding warrants issued in this case are HEREBY RECALLED.

_____
Pedro Gomez, Jr.
Judge of the 112th Judicial District Court
Pecos County, Texas

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Karen  Suarez  on behalf of Laurie English
Bar No. 24025349
karen.suarez112thda@gmail.com
Envelope ID: 83299776
Filing Code Description: Proposed Order
Filing Description: Motion and Order to Dismiss
Status as of 1/11/2024 2:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Laurie KEnglish | | lke112da@gmail.com | 1/10/2024 6:18:29 PM | SENT |
| Adrian Valadez | 24096496 | Adrian@ValadezLaw.net | 1/10/2024 6:18:29 PM | SENT |
| Karen Suarez | | karen.suarez112thda@gmail.com | 1/10/2024 6:18:29 PM | SENT |