# No. 22-50834

# In the United States Court of Appeals for the Fifth Circuit

---

**United States of America,**

Plaintiff-Appellant,

v.

**Jose Gomez Quiroz,**

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Western District of Texas

No. 4:22-CR-104-DC

---

## Reply Brief for the United States
## Addressing *United States v. Rahimi*, No. 22-915

---

Jaime Esparza
United States Attorney

Stephanie F. Cagniart
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
(512) 370-1265

# Table of Contents

Table of Authorities ................................................................. ii

Introduction............................................................................1

Argument ...............................................................................2

    I.   Section 922(n) is consistent with the Second
         Amendment, even without the historical twin Quiroz
         continues to erroneously demand..........................................2

    II.  Relevant historical tradition, defined at the correct level
         of generality, supports Section 922(n)....................................3

    III.  Section 922(n) is consistent with historical tradition. ..........5

        A. Why Section 922(n) limits an indicted defendant's
        acquisition of new firearms comports with this Nation's
        historical tradition....................................................................6

        B. How Section 922(n) limits an indicted defendant's
        acquisition of new firearms comports with this Nation's
        historical tradition................................................................12

        C. Every historical analogue identified by the
        government restricted firearms and is part of the
        Nation's history and tradition .............................................18

    IV.  Section 922(n) is constitutional facially and as applied
         to Quiroz ........................................................................... 20

Conclusion ......................................................................... 22

Certificate of Service ......................................................... 23

Certificate of Compliance ................................................. 23

i

# Table of Authorities

## Cases

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................................9, 10

*Harmelin v. Michigan*,
  501 U.S. 957 (1991) ........................................................................ 21

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ........................................................ 21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ....................................................................2, 11, 14

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023) (en banc), *cert. granted,
  judgment vacated sub nom. Garland v. Range*,
  No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024) ......................... 21

*United States v. Alston*,
  No. 5:23-CR-000021, 2023 WL 4758734
  (E.D.N.C. July 18, 2023) ................................................................ 14

*United States v. Baker*,
  No. CR-23-130-G, 2024 WL 24088
  (W.D. Okla. Jan. 2, 2024) ............................................................... 13

*United States v. Bartucci*,
  658 F. Supp. 3d 794 (E.D. Cal. 2023) ....................................11, 14, 22

*United States v. Duarte*,
  101 F.4th 657 (9th Cir. 2024), *reh'g en banc granted,
  opinion vacated*, No. 22-50048, 2024 WL 3443151
  (9th Cir. July 17, 2024) .................................................................. 21

*United States v. Jackson*,
  661 F. Supp. 3d 392 (D. Md. 2023) ................................................. 13

*United States v. Kays*,
  624 F. Supp. 3d 1262 (W.D. Okla. 2022) ......................................... 16

*United States v. Kelly,*
No. 3:22-CR-00037, 2022 WL 17336578
(M.D. Tenn. Nov. 16, 2022) .........................................................3, 18

*United States v. Now,*
No. 22-CR-150, 2023 WL 2717517
(E.D. Wis. Mar. 15, 2023) ..................................................................7

*United States v. Ogilvie,*
No. 2:23-CR-00063-TC, 2024 WL 2804504
(D. Utah May 31, 2024) ............................................................. 15, 21

*United States v. Perez-Garcia,*
96 F.4th 1166 (9th Cir. 2024) ........................................ 4, 7, 8, 17, 22

*United States v. Posada,*
670 F. Supp. 3d 402 (W.D. Tex. 2023).....................................8, 9, 18

*United States v. Rahimi,*
144 S. Ct. 1889 (2024) ............................................................. passim

*United States v. Rowson,*
652 F. Supp. 3d 436  (S.D.N.Y. 2023) ...................................13, 16, 17

*United States v. Salerno,*
481 U.S. 739 (1987) ......................................................................... 11

*United States v. Simien,*
655 F. Supp. 3d 540 (W.D. Tex. 2023).............................................13

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ....................................................................7, 18

## **Statutes**

18 U.S.C. § 922(g)(8) ................................................................. 4, 14, 19

18 U.S.C. § 922(n) ....................................................................... passim

18 U.S.C. § 3142(c)(1)(B)(viii) ............................................................ 6

## <u>Other Authorities</u>

Cong'l Res. Serv.,
*Federal Capital Offenses: An Overview of Substantive and
Procedural Law* (updated July 5, 2023) ..........................................18

Jordan M. Steiker,
*The American Death Penalty: Constitutional Regulation as the
Distinctive Feature of American Exceptionalism*, 67 U. Miami L.
Rev. 329 (2013) ..................................................................................18

Nancy J. King,
*The Origins of Felony Jury Sentencing in the United States*, 78
Chi.-Kent L. Rev. 937 (2003) ............................................................18

## Introduction

Why and how 18 U.S.C. § 922(n) temporarily limits an indicted defendant's ability to acquire new firearms fits comfortably within our nation's historical tradition. That tradition includes the principle that a person's access to firearms can be restrained if they pose a threat of violence to others. It also includes the principle that criminal defendants may be subjected to temporary restrictions on their liberty, including restrictions affecting their right to keep and bear arms, to protect public safety and ensure their attendance at trial.

Quiroz contends that these principles operate at too high a level of generality, but they are no more general than the principle the Supreme Court relied on in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). Quiroz also purports to refute the government's position by individually examining each historical analogue and identifying minute differences between it and Section 922(n). This insistence that the government identify a historical twin is the exact methodological error the Supreme Court corrected in *Rahimi*. Some of Quiroz's criticisms also overlook contrary historical evidence.

Quiroz has not shown his facial or as-applied challenges to Section 922(n) are meritorious. The judgment below should be reversed.

1

## Argument

**I.  Section 922(n) is consistent with the Second Amendment, even without the historical twin Quiroz continues to erroneously demand.**

Quiroz asks this Court to accord substantial weight to the government's alleged failure to identify a "distinctly similar" historical analogue for Section 922(n), because Section 922(n) addresses a "general societal problem that has persisted since the 18th century." Quiroz Supp. *Rahimi* Br. 9–10 (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26 (2022)). And although Quiroz acknowledges elsewhere in his brief that *Rahimi* requires only "relevantly similar" analogues, *id.* at 9, his criticisms of those analogues focus on the minute ways in which each differs from the specifics of Section 922(n), *see id.* at 11–25.

The Supreme Court rejected the methodological approach endorsed by Quiroz and used by the district court, *see Rahimi*, 144 S. Ct. at 1897–98—and for good reason. As Justice Barrett explained, "[t]o be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart." *Id.* at 1925 (Barrett, J., concurring) (original emphasis). A contrary view would result in a "'law trapped in amber'" by "forc[ing] 21st-century regulations to follow late-

18th-century policy choices." *Id*. And it would wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id*.

The absence of a "distinctly similar" historical analogue for Section 922(n) or any other modern regulation thus does little to illuminate the Second Amendment's original understanding. "Because 18 U.S.C. § 922(n) is of a piece with the type of laws that were treated as consistent with the historical right to bear arms," it is constitutional even though "it diverges from those laws in some specifics." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *5 & n.7 (M.D. Tenn. Nov. 16, 2022) (disagreeing with the district court's judgment in this case).

## II. Relevant historical tradition, defined at the correct level of generality, supports Section 922(n).

The principle that justifies Section 922(n) is the same principle that the Supreme Court identified and relied on in *Rahimi*—and thus cannot be "overly broad," as Quiroz claims. *See* Quiroz Supp. *Rahimi* Br. 1. The Supreme Court, relying on surety and going-armed laws, explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 144 S. Ct. at 1896. It held

that 18 U.S.C. § 922(g)(8) is consistent with that tradition, because it prohibits firearm possession by an "individual found by a court to pose a credible threat to the physical safety of another." *Id.* at 1903.

Quiroz acknowledges the historical tradition of "temporarily 'preventing individuals who threaten physical harm to others from misusing firearms.'" Quiroz Supp. *Rahimi* Br. 14 (quoting *Rahimi*, 144 S. Ct. at 1896). Section 922(n), like Section 922(g)(8), is an application of that principle, and rests upon a permissible legislative judgment that felony indictees who acquire new weapons during the pendency of the charges pose a serious threat of harm. *See infra* pp. 9–12.

Additionally, historical pretrial detention practices that permitted the imprisonment of persons accused of serious crimes pending trial (and, consequently, their complete disarmament) support the principle that the government can temporarily restrict an individual's access to firearms while he is under felony indictment. *See* Gov't Op. Br. 29–34; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1182 (9th Cir. 2024) ("[O]ur society has traditionally subjected criminal defendants to temporary restrictions on their liberty—including restrictions that affect their ability to keep and bear arms—to protect public safety and to ensure defendants' attendance at trial."). This

principle is no more "general" than the one that the Supreme Court relied on in *Rahimi*.

Finally, Quiroz contends that the Supreme Court in *Rahimi* rejected any argument that a person can be disarmed because they are "dangerous." Quiroz Supp. *Rahimi* Br. 21–22. But what *Rahimi* rejected was the argument that a person's possession of firearms could be restricted based on whether they are "responsible," because "'[r]esponsible' is a vague term." 144 S. Ct. at 1903. The historical tradition the Court did rely on—like those the government identifies here—recognized that person who poses a credible safety threat may be temporarily disarmed. *See id.*

## III. Section 922(n) is consistent with historical tradition.

"Why and how the [challenged] regulation burdens the right are central to [the] inquiry" into whether the regulation comports with the Second Amendment. *Rahimi*, 144 S. Ct. at 1898. Quiroz purports to find differences between each historical analogue proffered by the government and Section 922(n). None of these criticisms shows that Section 922(n) goes beyond what would historically have been constitutionally permissible.

### A. Why Section 922(n) limits an indicted defendant's acquisition of new firearms comports with this Nation's historical tradition.

Why Section 922(n) limits an indicted defendant's acquisition of new firearms comports with this Nation's historical traditions, because it temporarily and partially restricts a criminal defendant's ability to acquire new firearms, thereby preserving public safety and securing attendance at trial.

1. Quiroz wrongly asserts that defendants who have been indicted but released pending trial should be able to amass firearms because the fact of their release proves they do not "pose a significant threat to public safety." Quiroz Supp. *Rahimi* Br. 15. This argument proves too much. Defendants under felony indictment are released pursuant to Section 922(n)'s prohibitions on acquiring new firearms. While the statute does not presume that every indicted person poses a safety threat such that they must be completely disarmed, *compare* 18 U.S.C. § 3142(c)(1)(B)(viii) (authorizing complete dispossession as a condition of pretrial release), it *is* concerned with defendants who insist on acquiring firearms only after they have been indicted and face a potential prison sentence. Section 922(n) thus "maintains the status quo" for defendants while they are on release during this "volatile

period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others." *United States v. Now*, No. 22-CR-150, 2023 WL 2717517, at *9 (E.D. Wis. Mar. 15, 2023) (citations omitted) (cleaned up), *report and recommendation adopted*, No. 22-CR-150, 2023 WL 2710340 (E.D. Wis. Mar. 30, 2023). Congress made the reasonable determination that the act of acquiring a new weapon during this sensitive period *does* "demonstrate[] threats of physical violence." *See* Quiroz Supp. *Rahimi* Br. 15 (quoting *Rahimi*, 144 S. Ct. at 1901) (added emphasis omitted); *see also* Gov't Supp. *Rahimi* Br. 18–19 & n.6 (gathering cases).

Quiroz's argument also errs by "assum[ing] that because [he was] granted pretrial release today, [he] would have been released pending [his] trial[] in the founding era." *Perez-Garcia*, 96 F.4th at 1184. But "defendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses." *Id.* Burglary was such a felony. *See Woodson v. North Carolina*, 428 U.S. 280, 289 (1976) ("[T]he colonies at the time of the Revolution imposed death sentences on all persons convicted of any of a considerable number of crimes, typically including at a minimum … burglary … ."). Temporarily

7

restricting Quiroz's access to firearms pending trial was therefore consistent with historical tradition.

2. Quiroz also dismisses historical pretrial detention laws because he claims that the purpose of detention—the "why"—was only "to prevent flight" and not "to protect public safety." Quiroz Supp. *Rahimi* Br. 19. The historical record does not support this conclusion. Instead, "the historical justifications for pretrial detention and disarmament have long included protecting the public from future criminal acts of the accused defendant." *Perez-Garcia*, 96 F.4th at 1184 (citing A. Highmore, *A Digest of the Doctrine of Bail: In Civil and Criminal Cases*, vii (1783)); *see also United States v. Posada*, 670 F. Supp. 3d 402, 408 (W.D. Tex. 2023) (concluding that in the founding era, "defendants were detained pretrial when they posed a risk of flight or a danger to the community") (citing Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 348 & n.13 (1982) (collecting sources); John N. Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223, 1230 (1969)). Section 922(n) and the historical pretrial detention laws thus "burden Second Amendment rights for similar

reasons—both aim to keep guns away from allegedly dangerous people." *Posada*, 670 F. Supp. 3d at 408 (citing Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789)).

3.  Finally, Quiroz mistakenly contends that Section 922(n) is constitutionally infirm because restraining felon indictees' access to firearms based on their perceived dangerousness is unsupported by historical tradition. This argument, too, is unavailing both because it demands a historical twin and ignores historical evidence.

Congress can enact modern firearm prohibitions, including categorical prohibitions, so long as they fit within our nation's historical tradition. *Rahimi* instructs that the Second Amendment does not "prohibit[] the enactment of laws banning the possession of guns by *categories* of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901 (emphasis added) (citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The Court did not suggest that in making this determination, the legislature is confined to categories of persons believed at the founding to present a special danger of firearm misuse. *See id*. That approach would be both over- and under-inclusive. And it would create a "'law trapped in amber'" that "forces 21st-century regulations to follow late-18th-century policy

choices." *Id.* at 1925 (Barrett, J., concurring) (citation omitted). As one Justice put it, "the legislatures of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary." *Id.* at 1905 (Sotomayor, J., concurring, joined by Kagan, J.).

A limited and temporary restriction on a felon indictee's access to firearms fits within the broader historical tradition of firearm regulation, as the government has shown. *See* Gov't Op. Br. 27–47; Gov't Reply 12–19; Gov't Supp. Br. 6–17. Indicted felons were subject to pretrial detention at the time of the founding, which could result in a complete though temporary loss of any right to bear arms. *See* Gov't Supp. Br. 7–11. And in illustrating "categories of persons thought by a legislature to present a special danger of misuse" in *Rahimi*, the Supreme Court cited its previous statement in *Heller* that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller* 554 U.S. at 626; *see also id.* at 626–27 & n.26 (describing such prohibitions as "presumptively lawful"). There likewise was "a long tradition, before and at the time of the Nation's founding, of disarming groups of people perceived as

dangerous." *United States v. Bartucci*, 658 F. Supp. 3d 794, 803 (E.D. Cal. 2023). While some historical classifications were appalling and would not be constitutional today, "[n]evertheless, following the *Bruen* requirement for locating a historical analogy, these regulations when viewed in combination, are telling about what was understood as the scope of the Second Amendment during the period leading up to 1791." *Id.* at 804 (citing *Bruen*, 142 S. Ct. at 2137).

Quiroz argues that an indicted felon category is over-inclusive because it could include people accused of crimes such as reading another person's email, or charges that are ultimately dismissed. *See* Quiroz Supp. *Rahimi* Br. 24–25. As the Supreme Court reiterated in *Rahimi*, the relevant question is not whether there exist "hypothetical scenarios where [the statute] might raise constitutional concerns," 144 S. Ct. at 1903, but instead whether any "set of circumstances exists under which the Act would be valid," *id.* at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To prevail on his challenges, Quiroz therefore must show that *all* applications of the law would be unconstitutional, or that the law is unconstitutional as applied to him. Quiroz's list—which includes neither burglary nor failure to appear—shows neither. And the criminal process itself provides safeguards

11

against insubstantial charges, from grand jury and motion proceedings through the right to trial by jury. The dismissal of the indictment ends any limitations under Section 922(n).

### B.  How Section 922(n) limits an indicted defendant's acquisition of new firearms comports with this Nation's historical tradition.

How Section 922(n) limits an indicted defendant's acquisition of new firearms also comports with this Nation's historical traditions, because Section 922(n) only temporarily and partially restricts a defendant's access to firearms after an indictment has issued. Quiroz identifies several ways in which Section 922(n) is not identical to its historical analogues, but none of these are constitutionally significant because they do not place Section 922(n) outside the bounds of historical tradition.

1.  Quiroz points out that surety and going-armed laws required specific legal procedures. Quiroz Supp. *Rahimi* Br. 15–16.[1] An indictment, too, is the result of a legal process, and issues when probable

---

[1]    To the extent that Quiroz is making a due-process challenge, that challenge was not asserted below, nor would it be appropriate to resolve it under the Second Amendment. *See Rahimi*, 144 S. Ct. at 1903 n.2 ("[W]e need not address any due process concern here because this challenge was not litigated as a due process challenge and there is no such claim before us.").

cause that the defendant has committed a serious crime has been found by a grand jury. *United States v. Rowson*, 652 F. Supp. 3d 436, 469 (S.D.N.Y. 2023); *see also* ROA.55 (indictment by grand jury on burglary charge); ROA.57 (indictment by grand jury on bail jumping/failure to appear charge). Section 922(n) thus "impose[s] comparable procedural hurdles [than surety laws] that must be met before the accusation is accepted and action may be taken." *United States v. Baker*, No. CR-23-130-G, 2024 WL 24088, at *5 (W.D. Okla. Jan. 2, 2024); *see also United States v. Simien*, 655 F. Supp. 3d 540, 552 (W.D. Tex. 2023) ("[Section] 922(n) has more procedural safeguards than the surety laws," under which "a person could be required to post a bond based on another's oath alone." (citing 4 Blackstone, Commentaries on the Laws of England 252 (1769))); *United States v. Jackson*, 661 F. Supp. 3d 392, 414 (D. Md. 2023) ("[B]ecause § 922(n) restricts access to firearms as to persons accused by a grand jury, and is consistent with laws such as surety laws, this Court finds no constitutionally fatal infirmity in the fact that it deviates from those laws in some specifics.").

Section 922(n)'s procedural protections are also comparable to the ones that accompanied historical pretrial detention and surety bonds. "[B]oth the historical practice of pretrial detention and § 922(n)

find their justification from the same source: a grand jury's formal accusation that there is probable cause to believe the defendant committed a serious crime." *United States v. Alston*, No. 5:23-CR-000021, 2023 WL 4758734, at *10 (E.D.N.C. July 18, 2023). Surety laws "only required reasonable suspicion from officers of the peace, not a conviction, to justify confiscation of firearms; only the 'view of such justice' was required." *Bartucci*, 658 F. Supp. 3d at 805. Section 922(n) fits well within the regulatory tradition demonstrated by these founding-era laws. While it may not be "identical to these founding era regimes, . . . it does not need to be." *Rahimi*, 144 S. Ct. 1901 (citing *Bruen*, 597 U.S. at 30).

Quiroz also refers several times to the procedures in 18 U.S.C. § 922(g)(8), which completely disarms certain defendants while they are subject to a domestic violence restraining order. *See* Quiroz Supp. *Rahimi* Br. 10–11. These include notice and an opportunity to be heard, and a "finding that the defendant 'represents a credible threat to the physical safety'" of another. *Rahimi*, 144 S. Ct. at 1896 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). The Supreme Court in *Rahimi* did not hold that every firearm regulation must include these specific procedures to satisfy the Second Amendment. The process accompanying issuance of

14

the indictment suffices to justify the temporary restriction on an indicted defendant's ability to acquire new weapons.

2. Quiroz also fails to identify a constitutionally significant difference between Section 922(n)'s restrictions and those permitted at the founding. *See* Quiroz Supp. *Rahimi* Br. 16. If anything, Section 922(n)'s firearms restrictions are substantially more limited than those imposed by surety laws, going-armed laws, pretrial detention, and surety bond laws, because Section 922(n) prohibits only the acquisition of *new* weapons. Those historical analogues, in contrast, could deprive a person of arms entirely. *See* Gov't Op. Br. 32–37, 43–45; Gov't Supp. Br. 11–13, 15.

Quiroz states that surety laws allowed a person to keep firearms needed for self-defense or other legitimate purposes.[2] But a firearm restriction does not need to contain such exceptions to comport with the Second Amendment. Section 922(g)(8) disarms persons subject to it and contains no exception for self-defense, and the Supreme Court

---

[2]    Quiroz does not claim that he purchased the semiautomatic gun for self-defense. "While a person under indictment—who does not already own a gun and who is not in pretrial detention—might conceivably face a need for self-defense that arises while the indictment remains pending, such situations would be comparatively rare." *United States v. Ogilvie*, No. 2:23-CR-00063-TC, 2024 WL 2804504, at *4 (D. Utah May 31, 2024).

upheld that regulation—even while taking note of historical surety laws' self-defense exception. *See Rahimi*, 144 S. Ct. at 1900.[3]

In any event, even without an express self-defense exception, Section 922(n) is "less restrictive than the surety laws" Quiroz identifies. *See United States v. Kays*, 624 F. Supp. 3d 1262, 1268 (W.D. Okla. 2022). It allows defendants to keep and carry the guns they already possess, *without* needing to post a bond or prove their need for self-defense, as could be required by the surety laws. *See id*.

Quiroz also complains about the amount of time his indictments remained pending. Quiroz Supp. *Rahimi* Br. 17. Again, however, he fails to show that this places Section 922(n) beyond the boundaries of what has traditionally been permitted. Quiroz does not argue that indictments always, or even often, last longer than pretrial detention or the imprisonment and forfeiture penalties imposed under surety and going-armed laws.[4] Indeed, it appears that Quiroz's indictments—and

---

[3]    The surety laws' self-defense exception may also have "developed materially after the founding." *Rowson*, 652 F. Supp. 3d at 471 (explaining that the first such exception "appears to have been enacted in Massachusetts in 1836") (citing Mass. Rev. Stat., ch. 134, § 16; *see also Bruen*, 142 S. Ct. at 2148)).

[4]    Surety bond laws, for example, "authorized imprisonment 'until the perpetrator finds sureties for the peace and good behavior'; they did not address the return of the confiscated weapons upon the

the attendant Section 922(n) restrictions—were in place for a shorter amount of time than the firearm restrictions that that the Supreme Court deemed temporary and constitutional in *Rahimi*. *See* 144 S. Ct. at 1895, 1902 (explaining the restriction "was temporary" and would expire "one to two years after [the defendant's] release from prison"— a prison term that could be up to ten years).

3.   Finally, Quiroz repeats his claims that the government overstates the prevalence of pretrial detention and bail sureties, and argues that burglary was generally not a capital offense at the time of the Founding. Quiroz Supp. *Rahimi* Br. 18–19. The parties have submitted their historical evidence on the prevalence of detention and bail. *See* Gov't Supp. Br. 7–11; *see also Perez-Garcia*, 96 F.4th at 1183 ("[P]retrial release was far rarer in the founding era than it is today because the founding generation generally did not allow defendants facing capital charges to be released pending trial, and most serious criminal acts and felonies constituted capital releases," a practice that "continued after the Second Amendment was ratified." (gathering authorities)). At

---

payment of such surety." *Rowson*, 652 F. Supp. 3d at 468 (citation omitted) (cleaned up).

the time of the founding, burglary was a capital offense. *See Woodson*, 428 U.S. at 289.[5]

By focusing on the prevalence of pretrial detention, Quiroz also mistakenly presumes that founding-era legislatures exercised their maximum authority to classify crimes as capital. The relevant inquiry, however, is not merely what legislatures did but what they could have done. *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). "Such an approach is necessary in order for *Bruen* to make sense, because a list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been . . . permissible." *Posada*, 670 F. Supp. 3d at 410 (quoting *Kelly*, 2022 WL 17336578, at *2).

## C. Every historical analogue identified by the government restricted firearms and is part of the Nation's history and tradition.

Quiroz urges the Court to ignore two historical analogues altogether—pretrial detention and surety bonds—because they did not

---

[5] *See also* Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent L. Rev. 937, 991 (2003) (similar); Jordan M. Steiker, *The American Death Penalty: Constitutional Regulation as the Distinctive Feature of American Exceptionalism*, 67 U. Miami L. Rev. 329, 331 (2013) (similar); Cong'l Res. Serv., *Federal Capital Offenses: An Overview of Substantive and Procedural Law* at 1 (updated July 5, 2023) (gathering founding-era statutes).

directly target "firearms or their misuse." Quiroz Supp. *Rahimi* Br. 18; *see also id.* at 11–13, 20. These are not the only analogues the government relies on, however. Section 922(n) is also supported by the surety and going-armed laws the Supreme Court relied on in *Rahimi*, and that Quiroz agrees "specifically addressed firearms violence." *Id.* at 12. Section 922(n) would therefore pass constitutional muster even if Quiroz's narrow interpretation of what constitutes an appropriate historical analogue were correct.

That narrow interpretation is not correct, however. The Supreme Court did not express any such limitation in *Rahimi*. Instead, it determined that going-armed laws were an appropriate analogue even though they could result in imprisonment rather than arms forfeiture. "[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others," the Supreme Court explained, "then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 144 S. Ct. at 1902. Pretrial detention and surety bonds likewise addressed threats of violence through imprisonment and other restraints that affected individuals' access to firearms. Under *Rahimi* and *Bruen*, they are part of the

Nation's tradition of regulations that were considered compatible with the Second Amendment and are appropriate analogues.

## IV. Section 922(n) is constitutional facially and as applied to Quiroz.

1.  Quiroz identifies no new arguments or authority in support of his facial challenge. As previously explained, Section 922(n) is constitutional in all of its applications. *See* Gov't Supp. *Rahimi* Br. 6–8.

2.  Quiroz likewise fails to support his claim that Section 922(n) is unconstitutional as applied to him. Quiroz asserts that the circumstances of his case do not show that he presented a flight risk or danger to the safety of others. Quiroz Supp. *Rahimi* Br. 28. But his admissions are to the contrary. *See id.* at 27–28. Quiroz's first felony indictment was for burglary, ROA.55, for which he could historically have been detained and completely deprived of arms, *see supra* pp. 7–8, 17–18. His second felony indictment was for bail jumping/failure to appear, ROA.57—a clear indicator of flight risk. He then acquired a firearm by lying about these indictments. Quiroz Supp. *Rahimi* Br. 28. Even now, Quiroz does not claim a need for self-defense. His acquisition of a gun only after being indicted is "conduct [that] raises the suspicion that his purpose [was] not self-defense in the home, but further crime." *See*

*United States v. Oglivie*, No. 2:23-CR-00063-C, 2024 WL 2804504, at
*4 (D. Utah May 31, 2024) (citation omitted).

Quiroz also contends that there is no tradition of restricting fire-
arms based on non-violent felony convictions. Quiroz Supp. *Rahimi*
Br. 29. This broad claim is supported only with vacated out-of-Circuit
opinions analyzing Section 922(g)(1)'s felon-in-possession ban. *See
id.*[6] It also is not relevant. Section 922(n) is justified by the historical
tradition restraining access to firearms by persons who pose a public
safety or flight risk. Its historical analogues include surety laws and
pretrial detention, neither of which required a prior violent felony con-
viction. A surety "was intended merely for prevention" and could be
issued on "probable suspicion, that some crime was intended or likely

---

[6]    *See United States v. Duarte*, 101 F.4th 657, 691 (9th Cir. 2024),
*reh'g en banc granted, opinion vacated*, No. 22-50048, 2024 WL
3443151 (9th Cir. July 17, 2024); *Range v. Att'y Gen. United States of
Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *cert. granted, judg-
ment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL
3259661 (U.S. July 2, 2024); *but see Medina v. Whitaker*, 913 F.3d 152,
158 (D.C. Cir. 2019) (holding Section 922(g)(1) was constitutional as
applied and explaining that "at the time of the Second Amendment's
ratification, nonviolent crimes such as forgery and horse theft were
capital offenses"); *Harmelin v. Michigan*, 501 U.S. 957, 980–81 (1991)
(explaining the First Congress punished "forgery of United States se-
curities, running away with a ship or vessel, or any goods or merchan-
dise to the value of fifty dollars, treason, and murder on the high seas
with the same penalty: death by hanging" (cleaned up)).

to happen." *Bartucci*, 658 F. Supp. 3d at 805 (internal quotation omitted) (citing 4 William Blackstone, Commentaries on the Laws of England 252 (1769) at 249). "Pretrial detention in the founding era involved total disarmament" and applied to "criminal defendants facing serious or felony charges pending trial," including for "nonviolent crimes." *Perez-Garcia*, 96 F.4th at 1183–84.

Section 922(n)'s limited restriction on firearms, including as applied to Quiroz, comports with the Second Amendment.

## Conclusion

For these reasons and those stated in prior briefing, the government respectfully requests that the Court reverse the judgment below, or vacate the judgment and remand for further proceedings.

Respectfully submitted,

Jaime Esparza
United States Attorney

*/s/ Stephanie F. Cagniart*
By:  Stephanie F. Cagniart
Assistant United States Attorney

## Certificate of Service

I certify that on August 1, 2024, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Stephanie F. Cagniart*
Stephanie F. Cagniart
Assistant United States Attorney

## Certificate of Compliance

I certify that:

(1) this brief contains 4,560 words; and

(2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Georgia font.

Dated:  August 1, 2024

*/s/ Stephanie F. Cagniart*
Stephanie F. Cagniart
Assistant United States Attorney