# No. 22-50834

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOSE GOMEZ QUIROZ,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Defendant-Appellee's Petition for Panel Rehearing**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN M. KIMMELMAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

# Table of Contents

Table of Authorities.............................................................................iii

Introduction ..................................................................................... 1

Arguments and Authorities ............................................................ 3

I.  The Court should clarify that its holding addresses only
    the facial constitutionality of § 922(n) and that the case is
    remanded for consideration of the as-applied challenge........... 3

II. The Court should remove the discussion about whether
    burglary indictees were bailable at the founding, as it
    rests on a misapprehension of founding-era law and is
    inconsistent with *Diaz*.............................................................. 5

Conclusion...................................................................................... 16

Certificate of Compliance with Type-Volume Limit...................... 17

Addendum

# Table of Authorities

## Cases

*Fischer v. Ball*,
 212 Md. 517 (1957) ..................................................................... 11

*Lange v. California*,
 594 U.S. 295 (2021) ...................................................................... 8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1 (2022) ................................................................*passim*

*Taylor v. United States*,
 495 U.S. 575 (1990) ................................................................. 8, 12

*United States v. Daniels*,
 124 F.4th 967 (5th Cir. 2025)........................................................ 5

*United States v. Diaz*,
 116 F.4th 458 (5th Cir. 2024).............................................*passim*

*United States v. Perez-Gallan*,
 125 F.4th 204 (5th Cir. 2024).............................................*passim*

*United States v. Quiroz*,
 125 F.4th 713 (5th Cir. 2025).............................................*passim*

*United States v. Rahimi*,
 602 U.S. 680 (2024) ................................................................. 5, 15

*United States v. Salerno*,
 481 U.S. 739 (1987) ..................................................................... 4

## Constitutional Provisions

MD. CONST.,
 Declaration of Rights, Art. III (1776),....................................... 12

N.C. CONST. Art. 39 ........................................................................ 11

N.J. CONST. Art. XXII (1776) .......................................................... 11

U.S. CONST. amend. II....................................................*passim*

**Statutes**

18 U.S.C. § 922(g)(1) .................................................................... 6

18 U.S.C. § 922(g)(3) .................................................................... 5

18 U.S.C. § 922(g)(8)(C)(ii) ..................................................... 4, 5

18 U.S.C. § 922(n) ...............................................................*passim*

Acts of 1715, Chap. 5 (N.C.)....................................................... 12

Acts of 1778, Chap. 133 (N.C.).................................................... 12

Acts of 22 November, 1794, Sec. VIII (N.J.) ................................. 11

Acts of March 18, 1796, Sec. XXX (N.J.) ..................................... 11

An Act against larceny to the value of Five Shillings
    and upwards, Chap. XC (Del.) .................................................. 13

An Act for bailing prisoners, Chap. LVIII (Del.) .......................... 12

An Act for the more effectual preventing and punishing the
    evil and wicked practices of horse-stealing and other
    felonies, Chap. XC, Sec. 3 (Del.)............................................... 13

An Act for the taking away the Benefit of the Clergy from
    certain Offenders, No. 331 (Dec. 12, 1712) (S.C.) ..................... 10

An Act touching Bailment of Persons,
    No. 331 (S.C. Dec. 12, 1712), ................................................... 10

Tex. Penal Code § 30.02 ......................................................... 10, 12

Tex. Penal Code § 30.02(c) ............................................................ 9

## Other Authorities

Charles E. Moylan, Jr.,
*The Historical Intertwining of Maryland's Burglary and
Larceny Laws or the Singular Adventure of the
Misunderstood Indictment Clerk,*
4 U. BALT. L. REV. 28 (1974)........................................................ 12

DeathPenaltyUSA.org,
The database of executions in the United States of America.... 14

Helen A. Anderson,
*From the Thief in the Night to the Guest Who Stayed Too Long:
The Evolution of Burglary in the Shadow of the Common Law,*
45 Ind. L. Rev. 629 (2012)............................................................ 8

Jeff Forrett,
*A Chronological Guide to Records of the Delaware State
Legislature at the Delaware Public Archives*
(updated Jan. 30, 2023).............................................................. 12

John N. Mitchell,
*Bail Reform and the Constitutionality of Pretrial Detention,*
55 Va. L. Rev. 1223 (1969) ......................................................... 10

Kellen R. Funk & Sandra G. Mayson,
*Bail at the Founding,*
137 Harv. L. Rev. 1816 (2024)................................................... 11

THE FEDERALIST No. 42.................................................................. 7

W. LaFave & A. Scott,
Substantive Criminal Law § 8.13 (1986) ................................... 8

William Blackstone,
COMMENTARIES ON THE LAWS OF ENGLAND, Vol. 4 (1765) ............ 8

## Introduction

On the same day the Supreme Court decided *Bruen* and reset the analysis for Second Amendment challenges,[1] a jury found Quiroz guilty of receiving a firearm while under felony indictment and of lying on the firearm purchase form about being under indictment. ROA.192; *see* ROA.13–14. Quiroz moved for reconsideration of the motion to dismiss the district court had denied before trial. ROA.210–25. Quiroz argued that 18 U.S.C. § 922(n)—which prohibits receipt of a firearm while under felony indictment—violates the Second Amendment facially and as applied to him and, because § 922(n) is unconstitutional, his other conviction falls as well. The district court granted the renewed motion to dismiss, holding that § 922(n) is facially unconstitutional. ROA.309. The court did not address Quiroz's as-applied challenge or his post-verdict motion for judgment of acquittal. ROA.309.

The government appealed, and this Court reversed. *United States v. Quiroz*, 125 F.4th 713, 715 (5th Cir. 2025). The Court de-

---

[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

termined that the historical tradition of pretrial detention for capital offenses supports § 922(n). *Quiroz*, 125 F.4th at 719–24. But the Court also recognized that "not everyone facing criminal charges was subject to pretrial detention at the founding." *Id.* at 719. After noting that Quiroz's first indictment was for burglary and briefly discussing whether defendants facing burglary indictments were detained pretrial in the founding era, the Court concluded that "§ 922(n) does not violate the Second Amendment" and reversed the district court's judgment and remanded the case. *Id.* at 724–25.

Quiroz asks the Cout to rehear the case on two points:

1. The Court should clarify that its holding addresses only the *facial* challenge to § 922(n) and that the case is remanded for the district court to consider the as-applied challenge, consistent with *United States v. Perez-Gallan*, 125 F.4th 204, 207 (5th Cir. 2024).

2. The Court should remove the discussion, *Quiroz*, 125 F.4th at 724–25, that suggests the Court engaged in an as-applied analysis, as that analysis misapprehends founding-era law and is inconsistent with *United States v. Diaz*, 116 F.4th 458, 469 (5th Cir. 2024).

## Arguments and Authorities

Quiroz seeks panel rehearing on two related points. First, the Court should clarify that its holding—that 18 U.S.C. "§ 922(n) does not violate the Second Amendment"—addresses only the *facial* challenge to § 922(n) and that the district court is to consider the as-applied challenge on remand. *United States v. Quiroz*, 125 F.4th 713, 725 (5th Cir. 2025). Second, Quiroz requests that the Court remove the discussion, *id.* at 724–25, suggesting that there is a historic tradition of subjecting burglary indictees like Quiroz to mandatory pretrial detention. There is no such tradition. That discussion is dicta, unnecessary for the Court's facial ruling, and incorrectly applies *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024).

## I. The Court should clarify that its holding addresses only the facial constitutionality of § 922(n) and that the case is remanded for consideration of the as-applied challenge.

The Court concludes that § 922(n) does not violate the Second Amendment because defendants indicted for capital offenses at the founding were generally detained pretrial. *Quiroz*, 125 F.4th at 720–25. Under this Court's current interpretation of the standard for facial attacks, this resolves Quiroz's facial challenge to § 922(n) because a set of circumstances exist—people indicted for offenses

punishable by death at the founding—under which the statute would be valid. *See United States v. Perez-Gallan*, 125 F.4th 204, 216 (5th Cir. 2024) ("Because a statute needs just one permissible application to survive a facial challenge, the district court's ruling deeming [18 U.S.C. § 922(g)(8)(C)(ii)] facially unconstitutional is legal error."); *Diaz*, 116 F.4th at 472 ("To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists under which the statute would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

But the Court does not specifically limit its holding to the facial challenge, even though only the facial challenge is before it. *See Quiroz,* 125 F.4th at 715, 723–25. The district court dismissed Quiroz's indictment after holding that § 922(n) is facially unconstitutional and expressly stating that "[t]he Court need not answer whether § 922(n) is unconstitutional as applied." ROA.309.

A different panel of this Court recently addressed a similar situation in *Perez-Gallan*. There, the district court had dismissed the indictment after holding that the charging statute, § 922(g)(8)(C)(ii), is facially unconstitutional. 125 F.4th at 206. *Perez-Gallan* reversed, holding that the statute does not facially vio-

4

late the Second Amendment because "there are at least some circumstances in which the government could constitutionally apply (C)(ii) to a defendant's conduct." *Id.* at 207. *Perez-Gallan* then remanded "for the district court, in the first instance, to address Perez-Gallan's as-applied challenge to (C)(ii)." *Id.*; *cf. United States v. Daniels*, 124 F.4th 967, 978 (5th Cir. 2025) (reversing 18 U.S.C. § 922(g)(3) conviction for faulty jury instructions, noting that "determining the contours of acceptable prosecutions through the resolution of continual as-applied challenges, is what *Bruen* and *Rahimi* require").

The same result should occur here: the Court should clarify that its holding is that § 922(n) does not facially violate the Second Amendment and remand for the district court, in the first instance, to address Quiroz's as-applied challenge to § 922(n).

## II. The Court should remove the discussion about whether burglary indictees were bailable at the founding, as it rests on a misapprehension of founding-era law and is inconsistent with *Diaz*.

The Court's discussion about whether burglary indictees were bailable at the founding, given that one of Quiroz's indictments was for burglary, suggests that the Court also was deciding the as-ap-

plied challenge he raised below but the district court did not address. *See Quiroz*, 125 F.4th at 724–25. That discussion is not necessary for holding that § 922(n) is facially constitutional. *Supra* Section I. Nor is it necessary to resolve the government's appeal from the district court's order dismissing the indictment because § 922(n) is facially unconstitutional, ROA.309. *See supra* Section I; *Perez-Gallan*, 125 F.4th at 206–07.

The discussion is also a faulty application of *Diaz*.

*Diaz* looked to the traditions of capital punishment and permanent estate forfeiture as establishing "a historical tradition of permanently punishing certain offenders who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding." 116 F.4th at 469. Diaz had been convicted of "car theft," and the *Diaz* panel considered "horse theft" as "likely the closest colonial-era analogue to vehicle theft." *Id.* at 467–68. *Diaz* then reasoned that "if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible," and therefore the statute was constitutional as applied to Diaz. *Id.* at 469.

Here, the Court engages in similar reasoning—that if mandatory pretrial detention was permissible to respond to burglary, then the lesser restriction of prohibiting receipt of a firearm while under indictment is also permissible. *Quiroz*, 125 F.4th at 724–25. The missing piece, however, is historical evidence that disarming an indicted burglar like Quiroz fits within the "historical tradition of permanently punishing certain offenders *who … would have been … exposed to [mandatory pretrial detention] at the time of the Founding*." *Diaz*, 116 F.4th at 469 (emphasis added). Simply pointing to the crime's label—"burglary"—is not enough. *See id.* at 468 ("The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century.").

*Diaz* recognized that "felony" was a "'term of loose signification'" at the founding and was "'a good deal narrower' then."[2] 116 F.4th at 468 (quoting THE FEDERALIST No. 42, at 228 (James Madison);

---

[2] *Quiroz*'s statement that "many modern-day felonies were historically capital offenses, meaning many modern-day indictees would historically have been detained prior to trial," 125 F.4th at 719, is in tension with *Diaz* and greatly overstates the thin overlap between modern-day felonies and capital offenses at the founding. *See* Quiroz Supp. Br. 9–11 (May 1, 2023).

*Lange v. California*, 594 U.S. 295, 311 (2021)). *Diaz* cautioned that "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Id.* at 469. Likewise, neither does classifying a crime as "burglary."

"[T]he contemporary understanding of 'burglary' has diverged a long way from its common law roots." *Taylor v. United States*, 495 U.S. 575, 593 (1990). At common law, burglary was "the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." *Id.* at 580 n.3 (quoting W. LaFave & A. Scott, Substantive Criminal Law § 8.13, p. 464 (1986)).[3] "The colonists brought the common law with them from England," but they also started defining crime through legislation. Helen A. Anderson, *From the Thief in the Night to the Guest Who Stayed Too Long: The Evolution of Burglary in the Shadow of the Common Law*, 45 Ind. L. Rev. 629, 634 (2012). For Quiroz, "[t]he modern crime" of burglary "is a far cry from our idea of the common law offense—a forcible night time intrusion into the home." *Id.* at 630.

---

[3] *See* 4 William Blackstone 223–28, COMMENTARIES ON THE LAWS OF ENGLAND (1765), https://archive.org/details/commentaries_laws_england_book4/page/n261/mode/2up.

Quiroz was indicted for Texas burglary of a habitation under Texas Penal Code § 30.02(c). ROA.55. He was accused of "intentionally and knowingly enter[ing] a habitation, without the effective consent of … the owner …, and attempt[ing] to commit or commit[ing] theft of property, namely a weed trimmer." ROA.55. As *Bruen* reiterated, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, 597 U.S. at 34 (quoting *District of Columbia v. Heller*, 553 U.S. 570, 634–35 (2008) (emphasis in *Bruen*)). And *Diaz* made clear that the relevant felony definition is the founding era definition, not the modern definition. 116 F.4th at 469. The question for Quiroz's as-applied challenge, then, is whether someone indicted for entering a habitation without consent and stealing property would have been subject to mandatory pretrial detention at the founding. The government has not shown any such historic tradition.

The Court cites five states—Delaware, Maryland, New Jersey, North Carolina, and South Carolina—that denied bail to burglary defendants at the founding. *Quiroz*, 125 F.4th at 724. The sole support for this assertion is a law review article that includes two summary tables and no corresponding citations to the underlying data. *Id.* at 724 nn.78–82 (citing John N. Mitchell, *Bail Reform and the*

9

*Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223, 1226–29 & nn.17–22 (1969)). One table describes in general terms whether bail was possible in various jurisdictions, and the other lists, without citations or elements, whether certain offenses were capital in those jurisdictions. Mitchell, *Bail Reform* 1226 n.17, 1227–29 n.22. A closer look at those bail and burglary laws demonstrates that there was not a historic tradition of detaining someone indicted for an offense like Quiroz's.

Of the five cited states, one (South Carolina) allowed bail for felonies, including burglary, if granted by two justices.[4] South Carolina also defined burglary as robbing a person when people are in the dwelling and placing them "in fear or dread by the same."[5] Quiroz's indicted offense contains no such aggravating "fear or dread" factor. *See* ROA.55; Tex. Penal Code § 30.02. Three of the cited

---

[4] An Act touching Bailment of Persons, No. 331 (Dec. 12, 1712), *reprinted in* The Public Laws of the State of South Carolina, 58–59, https://archive.org/details/publiclawsofstat1790john/page/58/mode/2up.

[5] An Act for the taking away the Benefit of the Clergy from certain Offenders, No. 331 (Dec. 12, 1712), *reprinted in* The Public Laws of the State of South Carolina, 57–58, https://archive.org/details/publiclawsofstat1790john/page/56/mode/2up.

states (New Jersey, North Carolina, and Maryland) did not allow
bail for capital offenses including burglary,[6] but they incorporated
the common law elements of burglary.[7] These states thus defined

---

[6] New Jersey prohibited bail for burglary offenders. Acts of 22 November, 1794, Sec. VIII, *reprinted in* Laws of the State of New Jersey, 131, https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-new_new-jersey_1800/page/130/mode/2up. Maryland followed the common law rule that bail is not available in capital cases "if the proof is evident and the presumption of guilt great." *Fischer v. Ball*, 212 Md. 517, 522, 129 A.2d 822, 825 (1957) (cleaned up). North Carolina's Constitution of 1776 similarly provided "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident or the presumption great." N.C. CONST. Art. 39 (1776); *see* Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1842 & n.156 (2024) (citing *Fischer* and stating Maryland and North Carolina both "followed the common law model through most or all of the nineteenth century").

[7] The New Jersey Constitution of 1776 adopted the common law, and New Jersey later defined the burglary by statute as requiring a breaking at night. N.J. CONST. Art. XXII (1776), https://www.nj.gov/state/archives/docconst76.html; Acts of March 18, 1796, Sec. XXX, *reprinted in* Laws of the State of New Jersey 213, https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-new_new-jersey_1800/page/212/mode/2up.

burglary as breaking into a dwelling at night.[8] Texas does not have breaking or nighttime requirements. Tex. Penal Code § 30.02.

That leaves Delaware. Delaware prohibited bail for capital offenses such as burglary,[9] and burglary broadly required only the

---

Burglary was a common law felony brought into Maryland intact by the Maryland Declaration of Rights. Charles E. Moylan, Jr., *The Historical Intertwining of Maryland's Burglary and Larceny Laws or the Singular Adventure of the Misunderstood Indictment Clerk,* 4 U. BALT. L. REV. 28, 30 (1974); *see* MD. CONST., Declaration of Rights, Art. III (1776), https://avalon.law.yale.edu/17th_century/ma02.asp.

North Carolina passed several statutes explicitly incorporating and enforcing common law. Acts of 1715, Chap. 5, *reprinted in* I Laws of the State of North Carolina, 102, https://archive.org/details/lawsofstateofnor01nort/page/102/mode/2up; Acts of 1778, Chap. 133, *reprinted in* I Laws of the State of North Carolina, 356–57, https://archive.org/details/lawsofstateofnor01nort/page/356/mode/2up.

[8] *See Taylor*, 495 U.S. at 580 n.3 (providing common law burglary definition).

[9] An Act for bailing prisoners, Chap. LVIII, *reprinted in* I LAWS OF THE STATE OF DELAWARE 134–35 (1817), https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-del_1797_1/page/133/mode/2up; *see* Jeff Forrett, *A Chronological Guide to Records of the Delaware State Legislature at the Delaware Public Archives* (updated Jan. 30, 2023), https://archivesfiles.delaware.gov/public-

entry into a dwelling with an intent to commit a felony.[10] But theft was a felony in Delaware only if the stolen item was valued at five shillings or more.[11] The government has not provided evidence that the founding era equivalent of a weed trimmer was valued at five shillings. But even if it was, that an indictee like Quiroz might have been subject to pretrial detention in *one* state at the time of the founding is hardly enough to establish a historic tradition of firearm regulation that supports prohibiting his receipt of a firearm

services/DE_State_Legislature_Records.pdf (explaining that Volume I of the Laws of the State of Delaware "contains the bills passed by the Delaware General Assembly between 1700 and 1775 inclusive" and are arranged in chronological order).

[10] An Act for the more effectual preventing and punishing the evil and wicked practices of horse-stealing and other felonies, Chap. XC, Sec. 3, *reprinted in* I LAWS OF THE STATE OF DELAWARE 236–37, https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-del_1797_1/page/235/mode/2up;.

[11] An Act against larceny to the value of Five Shillings and upwards, Chap. XC, *reprinted in* I Laws of the State of Delaware, 296–97, https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-del_1797_1/page/295/mode/2up.

now.[12] *See Bruen*, 597 U.S. at 46 ("doubt[ing] that three colonial regulations could suffice to show a tradition of public-carry regulation").

Focusing on a crime's classification or name rather than its substance in order to justify the application of § 922(n) is contrary to *Bruen*'s instruction that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket *nor a regulatory blank check*." 597 U.S. at 30 (emphasis added). By relying simply on what a crime was called, the Court risks sanctioning a firearm restriction that the founders would not have deemed permissible. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would have never accepted." *Id.* (cleaned up).

---

[12] Quiroz has not located historical sources that illuminate how frequently mandatory pretrial detention was used for burglars at the founding, but available records show that execution for burglary was infrequent. For instance, Delaware executed three burglars (two in 1757 and one in 1770). DeathPenaltyUSA.org, The database of executions in the United States of America, https://deathpenaltyusa.org/usa1/index-state1.htm (selecting records for Delaware 1607–1976).

Because "not all [burglars] today would have been considered [burglars] at the founding" and thus subject to mandatory pretrial detention in certain jurisdictions, "[s]imply classifying a crime as a [burglary] does not meet the level of historical rigor required by *Bruen* and its progeny." *Diaz*, 116 F.4th at 469. Reading historical burglary statutes at such a "high level of generality … waters down the [Second Amendment] right" by eliminating material distinctions between crimes that were nonbailable in certain jurisdictions and those that were. *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring).

Because of these misapprehensions regarding founding-era law and whether an indictee like Quiroz would have been subject to mandatory detention at the founding, the Court should remove the discussion that suggests it addressed Quiroz's as-applied challenge and clarify that the district court should consider it in the first instance on remand. *See Perez-Gallan*, 125 F.4th at 217.

## Conclusion

For these reasons, the Court should grant panel rehearing and (1) clarify that the Court's holding is that 18 U.S.C. § 922(n) does not *facially* violate the Second Amendment and that the case is remanded for the district court to consider the as-applied challenge; and (2) remove the discussion suggesting that there is a historic tradition of subjecting burglary indictees like Quiroz to mandatory pretrial detention.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*

16

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed R. App. P. 40(d)(3) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,990 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, and using 13-point Century Schoolbook for footnotes.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellee*

Dated: February 10, 2025

17

ADDENDUM

125 F.4th 713
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff—Appellant,

v.

Jose Gomez QUIROZ, Defendant—Appellee.

No. 22-50834
|
FILED January 13, 2025

**Synopsis**

**Background:** After his motion to dismiss indictment was denied, defendant was convicted of making a false statement while buying a firearm and for receiving a firearm while under indictment for a felony. Defendant subsequently moved for judgment of acquittal or reconsideration of his motion to dismiss indictment in light of the Supreme Court's decision in *Bruen*, which required that regulation of conduct covered by Second Amendment be consistent with historical tradition of firearm regulation. The United States District Court for the Western District of Texas, David Counts, J., 629 F.Supp.3d 511, granted reconsideration and dismissed indictment. Government appealed.

The Court of Appeals, Richman, Circuit Judge, held that federal statute prohibiting receipt of a firearm while under indictment for a felony was facially constitutional under the Second Amendment.

Reversed and remanded.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion; Post-Trial Hearing Motion.

 **\*715**  Appeal from the United States District Court for the Western District of Texas, USDC No. 4:22-CR-104-1, Walter David Counts, III, U.S. District Judge

**Attorneys and Law Firms**

Joseph H. Gay, Jr., Assistant U.S. Attorney, U.S. Attorney's Office, Western District of Texas, San Antonio, TX, Stephanie Frederique Cagniart, Attorney, U.S. Attorney's Office, Western District of Texas, Austin, TX, Scott Greenbaum, U.S. Attorney's Office, Southern District of Texas, McAllen, TX, Charles E. Fowler, Jr. (argued), for Plaintiff—Appellant.

Kristin Michelle Kimmelman, Assistant Federal Public Defender, Maureen Scott Franco, Federal Public Defender, Federal Public Defender's Office, Western District of Texas, San Antonio, TX, Timothy Shepherd (argued), for Defendant—Appellee.

David H. Thompson, Cooper & Kirk, P.L.L.C., Washington, DC, for Amicus Curiae National African American Gun Association, Incorporated.

Before King, Richman, and Higginson, Circuit Judges.

**Opinion**

Priscilla Richman, Circuit Judge:

Jose Gomez Quiroz was charged under 18 U.S.C. § 922(a)(6) with making a false statement while buying a firearm because he allegedly denied that he was then under indictment for a felony. He was also charged under 18 U.S.C. § 922(n) for receiving

a firearm while under indictment for a felony. A jury found him guilty on both counts. However, on the same day the jury rendered its verdict, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen.* [1]

Quiroz subsequently moved to dismiss the indictment. In light of *Bruen*, the district court granted the motion and released Quiroz. The court held that § 922(n) is facially unconstitutional under the Second Amendment. The court also held that because § 922(n) is unconstitutional, Quiroz's false statement about his indictment, which was the basis for the § 922(a)(6) count, was not material to whether the sale of the firearm was lawful, and therefore, there was not a violation of § 922(a)(6). Because we conclude that § 922(n) is consistent with the nation's historical tradition of firearms regulation, we reverse the district court's judgment and remand.

## I

Quiroz was indicted in Texas state court for burglary of a habitation and bail jumping. [2] While under indictment, he purchased a handgun (an M1911, semi-auto .22 caliber pistol). To do so, he completed Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Form 4473 and checked "No" in response to the question that asked  **\*716**  whether he was under "indictment ... for a felony, or any other crime for which the judge could imprison [him] for more than one year." The National Instant Criminal Background Check System (NICS) returned a delayed response, which meant that Quiroz could not receive the firearm until a "proceed" response was given or seven days passed. Seven days elapsed, and Quiroz retrieved the gun. Five days later, NICS informed the store that Quiroz was ineligible to make the purchase, and, the following day, NICS informed ATF of the illegal purchase attempt.

Quiroz was charged under 18 U.S.C. § 922(n) with receiving a firearm while under indictment and under 18 U.S.C. § 922(a)(6) with making a false statement while buying a firearm. Section 922(n) makes it

> unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. [3]

Section 922(a)(6) makes it

> unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition. [4]

Before trial, Quiroz moved to dismiss the indictment, asserting that § 922(n) violates the Second Amendment and that because Congress could not constitutionally prohibit those under indictment from receiving guns, he could not be convicted under §

922(a)(6) of falsely denying that he was under indictment. The government opposed the motion, and the district court denied the motion. At trial, a jury convicted Quiroz on both counts.

The day the jury rendered its verdict against Quiroz, the Supreme Court decided *Bruen.* Based on *Bruen*, Quiroz moved for judgment of acquittal or reconsideration of his motion to dismiss, which the government opposed. The district court granted reconsideration and dismissed the indictment. It ruled that § 922(n) facially violates the Second Amendment because (1) the plain text of the Second Amendment covers the conduct regulated under § 922(n) and (2) § 922(n) is not consistent with historical tradition. Further, it concluded that the misstatement that formed the basis of the § 922(a)(6) charge was immaterial because it did not pertain to whether the sale of the firearm was lawful. The government timely appealed. This court has jurisdiction under 18 U.S.C. § 3731.

## II

In *Bruen*, the Supreme Court explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." [5] To justify its regulation of that protected conduct, "the government must demonstrate that the regulation is consistent with [the] Nation's **\*717** historical tradition of firearm regulation." [6] As with regulations of other constitutional rights, the government bears the burden of establishing this justification. [7]

The district court concluded that the plain text of the Second Amendment covers the conduct in question and that § 922(n) is inconsistent with the historical tradition of firearms regulation in this country. Our court "review[s] preserved challenges to the constitutionality of a criminal statute de novo." [8] We will assume arguendo that the plain text of the Second Amendment covers Quiroz and Quiroz's conduct and turn our attention to the historical analysis. [9]

## A

While *Bruen* serves as an important guidepost, the Supreme Court's recent decision in *United States v. Rahimi* [10] further informs our analysis. The Court explained in *Rahimi* that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." [11] We "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " [12] The Court further explained that the challenged regulation does not need to "precisely match its historical precursors." [13] "[I]t need not be a 'dead ringer' or a 'historical twin.' " [14] Rather, we must ensure that its historical analogues are "sufficiently similar to place that provision in our historical tradition." [15]

The *Rahimi* Court also reiterated that the law is not "trapped in amber." [16] The regulatory challenges posed by firearms today "implicat[e] unprecedented societal concerns [and] dramatic technological changes." [17] Accordingly, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." [18] After all, "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.' " [19]

Neither *Bruen* nor *Rahimi* "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but they do point toward two metrics: *why* and *how* **\*718** the regulation burdens a citizen's right to armed self-defense are central to the inquiry. [20] By focusing on the *why* and *how*, we must ascertain whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" to that imposed by a historically recognized

regulation.[21] Although the government here does not identify a historical law that specifically prevented acquisition of firearms by those under indictment, this lack of a historical twin is not dispositive to our inquiry into the constitutionality of § 922(n).

### B

Our nation has a long history of disarming criminal defendants facing serious charges pending trial. Since the founding, the government has subjected criminal defendants to temporary restrictions on their liberty, including restrictions that affected their ability to keep and bear arms. During the founding era, the government was empowered to detain criminal defendants charged with serious crimes while they awaited trial.[22] Pretrial detention resulted in the complete deprivation of the criminal defendant's liberty and *ipso facto* restricted their access to weapons.[23] These historical regulations are the starting point for our analysis.

We first examine *why* § 922(n) burdens the right to armed self-defense and assess whether this purpose is relevantly similar to the purpose of pretrial detention at the founding. Congress enacted § 922(n) to protect the public from the danger of illegal firearm use by indictees.[24] Similarly, at the founding, American legislatures provided for pretrial detention of indicted defendants out of a concern for public safety.[25] One reason for denying bail in the early republic was to preserve "the safety of the people" from offenders awaiting trial.[26] As recently noted by the Ninth Circuit, **\*719** "the historical justifications for pretrial detention and disarmament have long included protecting the public from future criminal acts of the accused defendant."[27] We therefore conclude that the modern purpose of § 922(n) is relevantly similar to the historical purpose of pretrial detention.

We next examine *how* § 922(n) burdens the right to armed self-defense and assess whether it "impose[s] a comparable burden"[28] to the founding-era system of pretrial detention. Section 922(n) is a temporary restriction on an individual's Second Amendment rights when awaiting trial. The statute prohibits individuals under felony indictment from shipping, transporting, or receiving any firearm or ammunition through interstate or foreign commerce.[29] Section 922(n)'s restrictions are temporally limited; they apply only to the period between indictment and trial. The statute's restrictions are also limited in scope; they do not bar the *possession* of weapons—only their shipment, transport, or receipt.

At the founding, pretrial detention was also a temporary restriction on the constitutional rights of those who posed a threat to society but had not been proven guilty. Just as § 922(n) restricts the ability of those under indictment to receive new weapons, pretrial detention "naturally entail[ed] the loss of a wide range of liberties—including the loss of access to weapons."[30] In fact, because § 922(n) restricts only shipping, transporting, and receiving firearms, whereas pretrial detention denied the mere possession of firearms, it could be said that § 922(n) places a lesser burden on Second Amendment rights.[31]

To be sure, not everyone facing criminal charges was subject to pretrial detention at the founding. Bail was a common mechanism used to release individuals not charged with a capital offense prior to trial.[32] However, many modern-day felonies were historically capital offenses, meaning many modern-day indictees would historically have been detained prior to trial. "[D]eath was 'the standard penalty for all serious crimes' at the time of the founding."[33] For instance, the First Congress "punished forgery of United States securities, 'run[ning] away with [a] ship or vessel, or any goods or merchandise to the value of fifty dollars,' treason, and murder on the high seas with the same penalty: death by hanging."[34]

State laws similarly imposed the death penalty for a number of crimes. Between **\*720** 1790 and 1805, Georgia sentenced individuals to death for crimes such as murder, forgery, and horse-stealing.[35] In Massachusetts, a 1784 statute made burglary in the nighttime punishable by death.[36] Likewise, in Virginia, a 1748 statute imposed the death penalty for a third offense of stealing a hog.[37]

At the time of the Second Amendment's ratification in 1791, capital punishment remained the punishment for many crimes, though reform would soon follow. In 1777, Virginia's legislature considered limiting capital crimes to only treason and murder while "[m]ost other crimes that had long been capital, including manslaughter, arson, robbery, and burglary, w[ould] be punished by public labor." [38]  However, the bill was defeated in the legislature in 1785. [39]  Pennsylvania revised its penal code in 1786, the first state to do so. [40]  The change "abolished capital punishment for robbery, burglary, sodomy, and buggery," [41]  but capital punishment remained a punishment in Pennsylvania for "treason, manslaughter, rape, arson, and counterfeiting" until 1794. [42]  Other states followed suit in the years after the ratification of the Second Amendment. [43]  Nevertheless, our inquiry examines the understanding of the Second Amendment when it was ratified. [44]  Although death did not "inevitably follow[ ] a felony conviction," "[b]y the time the Constitution was ratified" in 1791, "many crimes remained eligible for the death penalty." [45]  Pennsylvania's reforms may have foreshadowed the changes that were to come, but many states continued to treat modern-day felonies as capital offenses. This pre-ratification history "elucidates how contemporaries understood the text" of the Second Amendment and the scope of its protections. [46]

The historical record makes clear that founding-era defendants were rarely released pretrial after indictment for a capital crime. The Judiciary Act of 1789 states that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." [47]  However, the Act made bail discretionary "where the punishment may be death" and directed courts to "exercise their discretion"  **721**  in light of the "nature and circumstances of the offense" and the "evidence" against the defendant. [48]  The historical record demonstrates that courts typically denied bail after grand jury indictment. For example, during Aaron Burr's trial for treason, CHIEF JUSTICE MARSHALL "admitted [Burr] to bail" "before indictment" but "refused bail" "after indictment." [49]  CHIEF JUSTICE MARSHALL "doubted extremely" whether he had the power to grant bail "after an indictment for treason." [50]

Multiple other historical cases also show that, at the time of the founding, bail was uncommon for those indicted for a capital crime. One case stated:

> Bail is never allowed in offences punishable by death, when the proof is evident or the presumption great.... [T]he finding of the Grand Jury [is] too great a presumption of the defendant's guilt to bail him. We recollect no case in which it was done. C.J. Marshall who, on the examination of Aaron Burr, had admitted him to bail, [agreed] that he was no longer entitled to that indulgence after the Grand Jury found the bill against him. [51]

Another case stated, "[w]hen the grand jury find a bill for a capital offence, the party charged lies, from the finding alone, under such a violent suspicion of guilt, [that] the court will instantly commit him ... [and] it is the practice of the court not to lend its ear to a motion for bail." [52]

Quiroz acknowledges that it "was a common practice" that "once *indicted*, capital defendants were generally unbailable by the 19th century." He cites to a source that describes an instance in which an  **722**  individual was granted bail despite being charged with high treason, a capital crime. [53]  But Quiroz neither claims nor proves that the individual had already been indicted. [54]  In addition, the source describes an individual released on bail due to poor health, [55]  but this exception does not alter the evidence that capital indictees were *generally* unbailable.

Moreover, even when criminal defendants were charged with bailable offenses, founding-era magistrates could require those defendants suspected of future misbehavior to post a surety bond before their release. [56] The surety laws were a form of "preventive justice," wherein the defendant pledged "good behavior" and to "keep the peace" as a condition of their pretrial release. [57] When invoked, the surety laws required the defendant to find sureties—typically a family member, friend, or employer—who would forfeit a specified amount of money if the defendant failed to adhere to the court's conditions. [58] In doing so, "the surety laws provided a mechanism for preventing violence before it occurred," [59] confirming that pretrial restrictions were not aberrations.

Quiroz also cites to a source which indicates that three states permitted hearings regarding whether bail should have been granted and in which defendants could present evidence indicating they were not guilty of the charge. [60] However, the earliest case cited is from 1850, [61] and Quiroz agrees that evidence arising "in the mid-19th century [has] less significance for establishing historical tradition than laws passed around the founding." [62] That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" [63]  **\*723**  Even if some states permitted such a practice in the mid-nineteenth century, CHIEF JUSTICE MARSHALL stated in 1808 that he had never known a case in which an examination into testimony extrinsic to the indictment had occurred. [64] Quiroz's evidence shows only that nearly sixty years after the Second Amendment was ratified, three states marginally lessened the restrictions they placed on the rights of indictees. This evidence does little to narrow the understanding of permissible Second Amendment restrictions in 1791. [65] Although providing evidence that there is a relevantly similar historical analogue is the government's burden, [66] Quiroz has failed to adequately refute the evidence the government has provided.

Quiroz further argues that, because there are some instances in which an individual would have been granted bail post-indictment at the founding but would not be permitted to receive firearms under § 922(n), § 922(n) is facially unconstitutional. However, as explained above, neither *Bruen* nor *Rahimi* require a historical twin. Additionally, "a facial challenge must fail where the statute has a 'plainly legitimate sweep.' " [67] It is sufficient that the government has shown that many modern-day felonies were capital offenses at the founding and that those indicted for capital offenses were typically denied bail.

At the founding, there was limited need for pretrial release conditions because, as described above, there was limited pretrial release for serious offenses. Over time, pretrial detention became less common [68] and pretrial release conditions protected the public in instances in which, historically, the public would have been protected by the detention of the indictee. The Supreme Court acknowledged in *Bruen* that the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." [69] The *Rahimi* Court confirmed that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." [70] Accordingly, we hold that the government has met its burden of showing that § 922(n) is relevantly similar to pretrial detention at the founding. This modern regulation "fits neatly" [71] within our nation's historical tradition of protecting the  **\*724**  public from criminal defendants indicted for serious offenses.

Our recent opinion in *United States v. Diaz* [72] reinforces our conclusions. In *Diaz*, we rejected an as-applied challenge to 18 U.S.C. § 922(g)(1), which makes it unlawful for felons to possess firearms. [73] Diaz had prior convictions for vehicle theft, evading arrest, and possessing a firearm as a felon. [74] To determine whether "the Nation has a longstanding tradition of disarming someone with [an analogous] criminal history," we considered the crime of horse theft—describing it as "likely the closest colonial-era analogue to vehicle theft"—and we noted that founding-era horse theft defendants were subject to the death penalty. [75] Because "capital punishment was permissible to respond to theft," we concluded that "the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." [76]

Quiroz's first indictment was for burglary. Following our analysis in *Diaz*, we note that § 922(n) and founding-era burglary laws "impose a comparable burden on the right of armed self-defense." [77] At the time of the founding, burglary defendants were denied bail (and thus disarmed pretrial) in at least five states: Delaware, [78] Maryland, [79] New Jersey (until 1796), [80] North Carolina, [81] and South Carolina. [82] Moreover, burglary was a capital offense in seven states at the founding: Connecticut (until 1796), Massachusetts (at night), Delaware, New Hampshire, New York (until 1796), South Carolina, and Rhode Island. [83] Following *Diaz*, if "capital punishment was permissible to respond to" burglary at the founding, then so too is the temporary disarmament that § 922(n) may lead to—surely a lesser penalty than the "permanent disarmament" required by § 922(g)(1) and *Diaz*. [84]

Just like *Diaz*, "the 'why' of these examples aligns with the 'why' of" § 922(n). [85] As we mentioned earlier, pretrial detention and § 922(n) both serve to prevent dangerous activities by indictees. *Diaz* also explains that founding-era capital punishment had a "relevantly similar" public **\*725** safety justification to § 922: "deterrence, retribution, and penitence." [86]

Quiroz points out that burglary was not a capital offense in founding-era Virginia and Pennsylvania. He is correct. [87] Burglary was also bailable in both jurisdictions at the founding, as it was in Connecticut, Massachusetts, Georgia, and New York. [88] However, our historical analysis does not require unanimity in every instance. As the Court explained in *Rahimi*, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit," [89] such as the founding-era penal codes we surveyed above. In a § 922(g)(1) case, the Fourth Circuit reached a similar conclusion, rejecting an argument that "the evidence that the founding generation disarmed felons is mixed at best." [90]

### III

The district court concluded that because § 922(n) is unconstitutional, the § 922(a)(6) charge should be dismissed because Quiroz's false statement about not being under indictment was immaterial. Because we hold that § 922(n) does not violate the Second Amendment, we reverse the district court's dismissal of the § 922(a)(6) charge.

\* \* \*

The judgment of the district court is REVERSED, and the case is REMANDED.

### All Citations

125 F.4th 713

---

### Footnotes

1    597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

2    Under Texas law, burglary of a habitation is a second-degree felony. TEX. PENAL CODE ANN. § 30.02(c)(2) (West 2024). Bail jumping is a third-degree felony if the offense for which the defendant's appearance was required is classified as a felony. *Id.* § 38.10(f).

3   18 U.S.C. § 922(n).

4   *Id.* § 922(a)(6).

5   *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111.

6   *Id.*

7   *See id.* at 24, 142 S.Ct. 2111.

8   *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014) (citing *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009)).

9   *See United States v. Gore*, 118 F.4th 808, 812 (6th Cir. 2024) (declining to resolve *Bruen*'s first step because § 922(j) "is consistent with our nation's regulatory traditions and thus satisfies step two").

10  602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024).

11  *Id.* at 692, 144 S.Ct. 1889.

12  *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7, 142 S.Ct. 2111).

13  *Id.*

14  *Id.* (quoting *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111).

15  *Id.* at 700, 144 S.Ct. 1889.

16  *Id.* at 691, 144 S.Ct. 1889.

17  *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111.

18  *Rahimi*, 602 U.S. at 691-92, 144 S.Ct. 1889.

19  *Bruen*, 597 U.S. at 27-28, 142 S.Ct. 2111 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819)).

20  *See id.* at 29, 142 S.Ct. 2111; *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889.

21  *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111.

22  *See, e.g.*, Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 502 (2018) (noting that "[c]apital defendants have been excluded from bail"—and thus detained—"since colonial days").

23  *See United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. 2023) (HO, J., concurring) (observing that "incarceration naturally entail[s] the loss of a wide range of liberties—including the loss of access to weapons"), *rev'd*, 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024); *cf. United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) ("Congress may ban bail in entire classes of cases, because the Eighth Amendment 'fails to say all arrests must be bailable.' ... We see nothing in the Supreme Court's relevant precedents to indicate the Adam Walsh Act's much less restrictive mandatory release conditions are facially unconstitutional." (quoting *Carlson v. Landon*, 342 U.S. 524, 546, 72 S.Ct. 525, 96 L.Ed. 547 (1952))).

24  *See* S. REP. NO. 90-1097, at 2197-98 (1968) (stating, in connection with the passing of § 922, that "the ease with which any person can acquire firearms other than a rifle and shotgun ... is a significant factor in the prevalence of lawlessness and violent crime in the United States"); *cf. United States v. Salerno*, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d

697 (1987) ("The government's interest in preventing crime by arrestees is both legitimate and compelling." (citing *De Veau v. Braisted*, 363 U.S. 144, 155, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960))).

25    *See* Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 HARV. L. REV. 1816, 1891, 1895 (2024) (explaining that "preventive detention and restraint clearly played a central role in pretrial proceedings in the Founding period" and that "concern for public safety [in the Founding period] animated bail conditions and detention orders much as it does today").

26    ANTHONY HIGHMORE, A DIGEST OF THE DOCTRINE OF BAIL IN CIVIL AND CRIMINAL CASES vii (1783) (stating that the government is entitled to preserve "the safety of the people ... against the lawless depredations of atrocious offenders").

27    *United States v. Perez-Garcia*, 96 F.4th 1166, 1184 (9th Cir. 2024) (holding conditions of pre-trial release that temporarily barred releasees from possessing firearms to be constitutional).

28    *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

29    18 U.S.C. § 922(n).

30    *See United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. 2023) (Ho, J., concurring), *rev'd*, 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024).

31    *See United States v. Gore*, 118 F.4th 808, 815 (6th Cir. 2024).

32    *See* Funk & Mayson, *supra* note 25, at 1822, 1825-89 (observing that "American law ... aspired to limit pretrial detention to a subset of capital cases").

33    *Bucklew v. Precythe*, 587 U.S. 119, 129, 139 S.Ct. 1112, 203 L.Ed.2d 521 (2019) (citing STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 23 (2002)).

34    *Harmelin v. Michigan*, 501 U.S. 957, 980-81, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (citing 1 Stat. 114 (1790)) (alteration in original).

35    BANNER, *supra* note 33, at 18; *see also Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing BANNER, *supra* note 33, at 18).

36    *Commonwealth v. Hope*, 39 Mass. 1, 9, 22 Pick. 1 (Mass. 1839).

37    LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993).

38    BANNER, *supra* note 33, at 95.

39    *Id.* at 96.

40    *Id.* at 97.

41    *Id.*

42    *Id.* at 97-98.

43    *Id.* at 98-99.

44    *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 34, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022) ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008))); *see also Medina v. Whitaker*, 913 F.3d

152, 158 (D.C. Cir. 2019) (explaining that "[t]he Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time").

45   *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (BARRETT, J., dissenting), *abrogated by Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

46   *United States v. Rahimi*, 602 U.S. 680, 738-39, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (BARRETT, J., concurring).

47   Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 (codified as amended at 28 U.S.C. §§ 1-5001).

48   *Id.*

49   Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 AM. L. REG. 1, 3 (1876).

50   1 DAVID ROBERTSON, REPORTS OF THE TRIALS OF COLONEL AARON BURR 310-311 (1808).

51   *Territory v. Benoit*, 1 Mart.(o.s.) 142, 142-43 (Orleans 1810) (per curiam).

52   *Territory v. McFarlane*, 1 Mart.(o.s.) 216, 217 (Orleans 1811) (per curiam); *see also People v. Tinder*, 19 Cal. 539, 543 (1862) ("[A]n indictment for a capital offense does of itself furnish a presumption of the guilt of the defendant too great to entitle him to bail."); *State v. Merrick*, 10 La. Ann. 424, 428 (1855) (observing that "although the propriety of admitting to bail ... [has been] entrusted to the sound discretion of Judges," courts have generally found "the fact that the Grand Jury have found a true bill of indictment for a capital offence, ... afford[s]a sufficiently strong presumption of the prisoner's guilt to preclude any further inquiry into the merits of the case upon *habeas corpus*"); *Hight v. United States*, Morris 407, 409 (Iowa 1845) (per curiam) (stating that "[t]he ordinance of 1787 ... declares that 'all persons shall be bailable, unless for capital offenses where the proof shall be evident or the presumption great' " and that counsel "contend[s] that an indictment furnishes no such proof or presumption" but remarking that "[i]f the construction contended for by counsel be correct it is a little remarkable that no case can be found where a similar application has been successfully made"); *People v. McLeod*, 3 Hill 635, 645 (N.Y. 1842) (stating that "Chief Justice Marshall bailed Colonel Burr on a charge of high treason *before* he was indicted; but *after indictment* he refused to take bail" because "neither he, nor the distinguished counsel of Colonel Burr, could find any reliable authority warranting the exercise of the power to bail under such circumstances"); *State v. Mills*, 13 N.C. 420, 421-422 (1830) ("For after bill found, a Defendant is presumed to be guilty to most, if not all purposes, except that of a fair and impartial trial before a *petit* jury. This presumption is so strong, that in the case of a capital felony, the party cannot be let to bail."); *State v. Hill*, 6 S.C.L. 242, 246 (1812) (opinion of SMITH, J.) ("The general rule is, not to admit to bail after bill found, in capital cases."); *see also* Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 ARIZ. L. REV. 909, 930 (2013) (stating that in 1785 in Virginia "bail could be denied not only for capital offenses but also for manslaughter and offenses punishable 'by limb' ").

53   *See* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 ALB. L. REV. 33, 102 (1977) (describing a case where the Supreme Court "allowed bail for a defendant charged with high treason" in 1795, five years after high treason was designated a capital offense).

54   *Id.*; *see also United States v. Hamilton*, 3 U.S. (3 Dall.) 17, 18, 1 L.Ed. 490 (1795).

55   *See* Duker, *supra* note 53, at 102; *United States v. Jones*, 26 F. Cas. 658, 659 (C.C.D. Pa. 1813).

56   *See United States v. Rahimi*, 602 U.S. 680, 695-97, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (describing the surety law regime).

57   *See id.* at 695-96, 144 S.Ct. 1889 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *248, *252-53); *see also* Funk & Mayson, *supra* note 25, at 1848 n.184 (observing "a difference between bonds to keep the peace (violated only

if the bailee acted violently towards an identified victim) and bonds for good behavior (violated for incurring any further criminal charge)").

58    *See* Funk & Mayson, *supra* note 25, at 1823 (describing the role of sureties in the early American bail system).

59    *Rahimi*, 602 U.S. at 697, 144 S.Ct. 1889.

60    *See* Davidson, *supra* note 49, at 4 (describing state cases where the court heard evidence before deciding whether to grant bail to a defendant who had already been indicted).

61    *See id.* (discussing *Ex parte Wray*, 30 Miss. 673 (1856), *Lumm v. State*, 3 Ind. 293 (1852), and *State v. Summons*, 19 Ohio 139 (1850)).

62    *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36-37, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022); *see also Range v. Att'y Gen. U.S.*, 53 F.4th 262, 274 (3d Cir. 2022) ("[A]lthough the Court [in *Bruen*] considered history from Reconstruction to the late nineteenth century, it underscored that it did so merely to confirm its conclusions and that evidence from this period is less informative." (citing *Bruen*, 597 U.S. at 36-37, 142 S.Ct. 2111)), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023).

63    *Bruen*, 597 U.S. at 34, 142 S.Ct. 2111 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)).

64    1 ROBERTSON, *supra* note 50, at 312.

65    *See Bruen*, 597 U.S. at 36-37, 142 S.Ct. 2111 ("The belated innovations of the mid-to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]" (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008) (ROBERTS, C.J., dissenting))).

66    *See United States v. Rahimi*, 602 U.S. 680, 691, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024).

67    *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments)).

68    *See United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (stating that "[i]n our society liberty is the norm, and detention prior to trial ... is the carefully limited exception" and locating the Bail Reform Act "within" that exception because it "authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel").

69    *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111.

70    *Rahimi*, 602 U.S. at 691-92, 144 S.Ct. 1889.

71    *Id.* at 698, 144 S.Ct. 1889.

72    116 F.4th 458 (5th Cir. 2024).

73    *Id.* at 462, 471; *see* 18 U.S.C. § 922(g)(1).

74    *Diaz*, 116 F.4th at 462.

75    *Id.* at 467-68.

76   *Id.* at 469.

77   *Id.* at 467 (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)).

78   John N. Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223, 1226-29 & nn.17-22 (1969) (describing burglary as a capital offense and later noting that capital were not bailable in Delaware).

79   *Id.* at 1226 n.17 (no bail in felony cases).

80   *Id.* at 1226-29, 1226 n.17 (describing New Jersey as a common law state which "imposed capital punishment for most felonies" and noting that bail was denied in capital cases); BANNER, *supra* note 33, at 98 (noting 1796 New Jersey reforms that restricted capital punishment to treason and murder).

81   Mitchell, *supra* note 78, at 1226-29, 1226 n.17 (describing North Carolina as a common law state which "imposed capital punishment for most felonies" and noting that there was "[n]o bail for capital offenses in 1801").

82   *Id.* at 1226 n.17 (no bail in felony cases "unless defendant is not indicted within 1 term of the Court").

83   *Id.* at 1227-28 n.22; Banner, *supra* note 33, at 98 (describing 1796 New York reforms).

84   *United States v. Diaz*, 116 F.4th 458, 469 (5th Cir. 2024).

85   *Id.*

86   *Id.*

87   A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 356 (1803) (reprinting Act of Dec. 15, 1796) ("EVERY person convicted of ... burglary ... [shall] be sentenced to undergo similar confinement, for a period not less than three, nor more than ten years ...."); Act of Apr. 5, 1790, 13 Pa. Stat. at Large 511, 511-12 ("[E]very person convicted of ... burglary ... [shall] be sentenced to undergo a servitude of any term or time ... not exceeding ten years ....").

88   Mitchell, *supra* note 78, at 1226-29 & nn.17-22 (describing founding-era state laws regarding burglary and bail).

89   *United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)).

90   *United States v. Hunt*, 123 F.4th 697, 707 (4th Cir. 2024).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.